UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 1:15-cv-20807-MARTINEZ/GOODMAN

AT LAW AND IN ADMIRALTY

SHIRLEY RILEY,

      Plaintiff,

v.

CARNIVAL CORPORATION
d/b/a CARNIVAL CRUISE LINES,

      Defendant.

_____/

## PLAINTIFF'S CONSOLIDATED MOTION *IN LIMINE*

The Plaintiff, by and through her undersigned counsel, and pursuant to this Court's trial Order [DE 19] and the Federal Rules of Civil Procedure, the Local Rules of the Southern District of Florida, and the Federal Rules of Evidence, hereby files this Consolidated Motion *in Limine* to prevent the Defendant, counsel, and any witness from asking questions, providing answers, commenting, or arguing, directly or indirectly, in the presence of the jury at any time, any of the issues addressed herein, and says:

## BACKGROUND

1.   This is a maritime personal injury case set for trial for the two week trial period commencing November 30, 2015 [D.E. 19].

2.   Discovery closed on September 19, 2015. [D.E. 19].

3.   On the day of the incident, April 19, 2014, Carnival allowed a spill of water to remain on the walkway in the Jackpot Casino on the *Carnival Dream* for an extended period of time

without removing the water or warning passengers of the dangerous condition. Specifically, a third party witness, Dalise Gautreaux, testified the water was present on the walkway for a period of 30-45 minutes prior to the Plaintiff slipping in the water and falling.  A copy of the deposition transcript of Gautreaux is attached hereto as Exhibit A.  [Deposition Gautreaux p. 43, lines 4-21]

4. As a result of the cruise lines' negligence, the Plaintiff, passenger Shirley Riley, walked onto the subject floor and slipped and fell. As a result of the slip and fall, Riley has suffered serious, debilitating, and permanent injuries including but not limited to a comminuted fracture of her right elbow requiring surgery for implantation of an artificial elbow joint. [D.E. 1 ¶ 14]

5. Defendant through its witnesses, Sandra Lee Morton and her son, John Ezell, dispute that Ms. Riley slipped and fell on water present on the walkway.  Both witnesses admit that the only saw Ms. Riley "in the process of falling" and did not look at Ms. Riley's feet as she fell.  A copy of the deposition transcript of Morton is attached hereto as Exhibit B and a copy of the deposition transcript of Ezell is attached hereto as Exhibit C. [Deposition Ezell, p. 67 & p. 70]. [Deposition Morton, p. 57-58].

## THE PURPOSE OF MOTIONS *IN LIMINE* AND THE LAW

6. A federal district court's authority to manage trials includes the power to exclude evidence pursuant to Motions *in Limine*.  *See*, *Alexander v. Mt. Sinai Hospital Medical Center of Chicago,* 2005 WL 3710369 (N.D. Ill. January 143, 2005).  The purpose of a Motion *in Limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence.  *See, Luce v. United States*, 469 U.S. 38, 41 F.N.4 (1984) (noting that, although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the District Court's inherent authority to manage the course of trials).

2

<u>NO. 1  MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF SANDRA LEE MORTON</u>

    **A.  <u>Testimony regarding witness' disabled son.</u>**

    7.   On July 7, 2015, Defendant deposed third party witness, Sandra Lee Morton. During her deposition the witness repeatedly testified about her disabled son "Teddy". Additionally, Ms. Morton testified about that "Teddy's" father was killed so she had to take care of her son. Ms. Morton testified as follows:

    Q.  All right.  Are you currently employed?

    A.  No.  I take care of Teddy, the oldest boy, is mentally challenged, and
        he has Cerebral Palsy and he's autistic.  So I have taken care of him –
        his father was killed when he was five, so I've taken care of him by
        myself for a lot of years.
        [Deposition Morton p. 8, lines 10-15]

    Q.  Understood.

    A.  I stayed home all my life, and I finally got respite care for my boy
        that's disabled.
        [Deposition Morton p. 9, lines 3-5]

            *          *          *

    Q.  And what is that for, ma'am?

    A.  That's for - - because I take care of a 70 - - a 70 - - a 46-year-old son,
        47-year-old son that is mentally challenged, and I just felt like I
        needed it.
        [Deposition Morton p. 50, lines 9-12]

            *          *          *

    Q.  And - - and why is that?

    A.  Because he's - - he's autistic.  He's got Cerebral Palsy.

      [Deposition Morton p. 89, lines 10-13]

    8.   Under the Fed. R.Evid.401 evidence is relevant if (a) it has any tendency to make a fact more or less probably than it would be without the evidence and (b) the fact is of

consequence in determining the action. *See* Notes of Advisory Committee on Proposed Rules *citing* James, Relevancy, Probability and the Law, 29 Calif.L.Rev. 689, 696, n. 15 (1941), in Selected Writings on Evidence and Trial 610, 615, n. 15 (Fryer ed. 1957). The rule summarizes this relationship as a "tendency to make the existence" of the fact to be proved "more probable or less probable."

9.   Clearly, information regarding Ms. Morton's late husband's death and her son's disability has no bearing on the Ms. Morton's observations of Ms. Riley's accident in the Jackpot casino on the Carnival Dream on April 19, 2014. Accordingly, Ms. Morton's testimony about her disabled son and the fact that her late husband was killed must be precluded from coming into evidence because it fails the test of relevancy under the Fed. R. Evid. 401.

10.   In the event the testimony is deemed relevant, it should still be barred from coming into evidence under Fed. R. Evid. 403. Any probative value of Ms. Morton's testimony about her own suffering, i.e. that her late husband was killed and that she has been at home with a severely disabled son is substantially outweighed by a danger of unfair prejudice. The testimony is sympathy evoking which in turn may cause jurors to attribute greater weight to her testimony. Additionally, the probative value of Ms. Morton's testimony regarding her personal life story is outweighed by a danger of confusing the jury. Emphasis may be given to Ms. Morton's suffering, when only Ms. Riley's emotional damages are at issue.

11.   In sum, counsel and witnesses should therefore be precluded at trial from making any assertions, testimony or reference to Ms. Morton's son being disabled or that Ms. Morton's husband was killed.

**B.      Testimony regarding Ms. Riley's fault '**

12.  In her deposition Ms. Morton testified about Ms. Riley being at fault. Mr. Morton

testified that:

> Q. ]…[why did you talk to the -- to the steward?
>
> A.  Just because I'm an honest person and I felt like it wasn't -- it was her
>      own fault.
>
> [Deposition Morton p. 79, lines 4-12]
>
> > \*                     \*                     \*
>
> Q. All right.  Is it your testimony, ma'am, that you told the steward that it
>      was her own fault?
>
> A.  Just Yes, probably, because that's -- that's why I went and talked to
>      him.
>
> [Deposition Morton p. 79]

13.  A lay witness can only testify based on personal knowledge. See the Fed. R. Evid.

602. "The rule requiring that a witness who testifies to a fact which can be perceived by the

senses must have had an opportunity to observe, and must have actually observed the fact" is a

"most pervasive manifestation" of the common law insistence upon "the most reliable sources of

information." McCormick §10, p. 19." Hence, Ms. Morton can only testify to what she saw and

what she observed. Whether Ms. Riley was at fault is for the jury as the ultimate trier of facts to

decide, not for Ms. Morton to determine.

14.  In fact, Ms. Morton admitted in deposition that as a fact witness she can only testify

about what she observed and perceived with her own senses. She testified as follows:

> Q. All you can do as a witness is to testify about what you observed with
>      your eyes and what you heard and what you touched and what you –
>      what you perceived with your senses.  Is that correct?
>
> MR. KERNS:  Object—

A: Yes.

[Deposition Morton p. 80, lines 16-21]

15. In sum, Ms. Morton's personal opinions regarding Ms. Riley being at must be excluded from evidence.

## NO. 2 MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF DALISE GAUTREAUX

### A. Alcoholic beverages consumed by witness after she made observations

15. Dalise Gautreaux is a witness to the incident involving Ms. Riley. Ms. Gautreaux was deposed on August 27, 2015. She testified that she observed water on the walkway in the casino on the Carnival Dream 30-45 minutes prior to Ms. Riley walking into the casino and that she observed Ms. Riley slipping and falling. [Deposition Gautreaux p. 42-43].

16. Ms. Gautreaux testified that she had not had anything to drink before or during the time when she made her observations of water being present on the walkway and Ms. Riley slipping and falling in the water. [Deposition Gautreaux p. 100]. The accident involving Ms. Riley occurred around 5:00 p.m. in the afternoon. [Ms. Gautreaux p. 27-28].

17. Yet, counsel for Defendant went into a long cross examination about what she and her husband drank in terms of alcoholic beverages later that evening. [Deposition Gautreaux pp. 100-105]:

Q. And when you say "not yet", later on you had some drinks?

A. Yes; in the comedy club.

Q. All right.  How many did you have?

A. Um, one in the comedy club, during the comedy thing; and then, actually later on that night; um because this was the day before we got off the ship, um, a lady had won a $500, uh, drink thing; and she wasn't gonna' drink it; so she bought rounds at the bar.

Q. Ha, ha, ha! Okay.
A. So, of course, I'm gonna' have free drinks!
[Deposition of Gautreaux p. 101, lines 4-18]
          *        *        *
Q. And what kind of drink did you have at the comedy club?
A. A margarita.
Q. And how big was it?
A. Um, a little bitty glass, about that (indicating) big.
Q. Okay.
A. It's got a - -
Q. I see you have a cup in front of you?
A. Yeah.
Q. What does the cup say?
A. "PJ's Coffee".
Q. From the place right down the street; right?
A. Yes.
Q. Was the margarita you had, was it more, or less, liquid than that, if it's full?

[Deposition Gautreaux p. 102]

          *        *        *

A: If it's full, including the top (indicating), less.
Q. Okay.  How about not including the top?
A. Hmm; about the same amount.
Q. All right.  Was the margarita - - was it a good margarita?
A. No.

          *        *        *

Q. Ha, ha, ha! It wasn't?
A. No.  They don't put too - - that much liquor in it; but, I mean, you're gonna' charge $8 for a margarita, of course.
Q. Yeah.  So are you saying it had too much, or too little, liquor in it?
A. Too little.  Ha, ha!
Q. How about the drinks at the bar, helping the lady celebrate her - -
A. That was good.
Q. That was good.  What did you have there?

[Deposition Gautreaux p. 103]

          *        *        *

A.  Um, I had two margaritas on her; and a couple of shots of Patrol Tequila.

7

Q. All right.  I think you indicated you're not a very heavy drinker; right?
A. No.
Q. So, after the comedy club, did you go right to the bar?
A. Yes.
Q. And how long was the comedy show; was it an hour?
A. Uh, yes.
Q. And so at what point did the lady start buying free drinks?
A. Hmm, about - - about midnight.
Q. And so - -
A. She was - - she was there before I was at the bar; I walked in - - walked up on her yelling "free shots".
Q. Ha, ha, ha, ha!
A. So.
Q. Okay.  That's always - - that always makes for an exciting time. When you got there, and she was yelling: "free shots", you had just had one margarita at the club earlier?
A. Yes.

[Deposition Gautreaux p. 104-105]

18. Under the Fed. R.Evid.401 evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence and (b) the fact is of consequence in determining the action.

19. Here, the witness alcohol consumption took place long after the witness made her observations about the presence of water on the walkway and Ms. Riley slipping and falling in it. Hence, testimony regarding subsequent drinking does not have any "tendency to make a fact more or less probable than it would be without the evidence." As such, Ms. Gautreaux testimony regarding alcohol consumption later in the evening must be excluded because the Defendant cannot show that it is relevant under the Fed. R. Evid. 401.

20. In the event the Court find the testimony to pass the test of relevancy in the Fed. R. Evid. 401, the probative value of the testimony that Ms. Gautreaux consumed several alcoholic

beverages in the evening and night after the incident is outweighed by its prejudice. The evidence must be excluded under the Fed. R. Evid. 403.

**B.   Ms. Gautreaux testimony as to what "somebody" can see**

21. Defendant has two witnesses who testified they were located in the casino at the time of the subject incident, Ms. Morton and her son John Ezell. The two witnesses were deposed on July 7, 2015. The two witnesses testified they were seated near an island of slot machines.  The seats where these two witnesses sat and observed Ms. Riley as she was in the process of falling were identified as chair or seat number "1" and "2" in their deposition. A copy of the exhibit identifying the seats is attached hereto as Exhibit "D".

22. In the deposition of Ms. Morton and Mr. Ezell, counsel for Defendant asked them about the observations they made being seated in seat number "1" and "2" at the time of the incident. [Deposition Morton pp. 11-15] and [Deposition Ezell pp. 23-30].

23. Defendant perhaps not being satisfied with the testimony obtained by Mr. Morton and Mr. Ezell elicited testimony of Ms. Gautreaux that "someone" seated on stool number "1" and "2" would have had a good view of what occurred when Ms. Riley's fell. Specifically the testimony of Ms. Gautreaux was as follows:

> Q. If someone were seated at, you know, stools that you've marked "1", and "2", and observing Ms. Riley fall, assuming that the pillar was not in their view. Okay? So, assuming the pillar was not in their view, would they have a good -- a good look at what had occurred?
>
> A. Assuming –
>
> Ms. Eikeland: Objection; form.
>
> A: Assuming that the pillar was not in our view, yes; they would.
>
> [Deposition Gautreaux p. 84]

9

24. A lay witness can only testify based on personal knowledge. See the Fed. R. Evid. 602:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

Fed.R.Evid.602

25. "The rule requiring that a witness who testifies to a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed the fact" is a "most pervasive manifestation" of the common law insistence upon "the most reliable sources of information." McCormick §10, p. 19."

26. Ms. Gautreaux's testimony regarding what "somebody" saw is pure speculation.  The speculative nature of the testimony is clear from defense counsel's question where he asks the witness to "assuming the pillar was not in their view". Ms. Gautreaux's response "assuming there was not in our view, yes; they would" is similarly speculative.

27. Ms. Gautreaux admitted she does not have personal knowledge as to what you can see if you were seated on the two particular seats. She never sat there. Ms. Gautreaux testified as follows:

> Q. I'm trying to understand. Were you, at any point in time—
>
> A. Sitting there playing? No.
>
> Q. Okay. Were you, at any point in time during April 19th, 2014, or that cruise, were you seated on seat number "1", or seat number "2" here (indicating)?
>
> A. No.
>
> Q. Okay. So, when Mr. Kerns,Carnival's lawyer, asked you what you

> could see when you were seated at seat marked number "1" and "2",
> in Defense Exhibit number 2, you wouldn't know, from experience,
> what, actually, vantage point you have; right?
>
> A. No.
>
> [Deposition of Dalise Gautreaux p. 193-194]

Additionally Ms. Gautreaux testified:

> Q. Based on your own experience do you have any information as to
> what you can see if you're seated in either seat number "1" or seat
> number "2" depicted in Plaintiff's Exhibit 2 (SIC)?
>
> A. No.
>
> [Deposition Gautreaux p. 194-195]

28. In *Boyd v. City of Oakland*, 458 F. Supp. 2d 1015, 2545 (N.D. Cal. 2006) the court held a mother's assertion that her son called her 'within five minutes" of the police leaving the scene after stopping her son's vehicle inadmissible under Fed. R. Evid. 602.    The mother admitted not to be present at the alleged event and therefore had no personal knowledge as to when the event ended.

29. Similarly in this case, Ms. Gautreaux had never been seated on seat number "1" and seat number "2" in the casino and therefore possessed no personal knowledge as to what can observe from those seats. Also in this case should the testimony not based on personal knowledge be deemed inadmissible.

30. The burden of proof is on the offering party to show that the witness has personal knowledge. *Elizarraras v. Bank of El Paso*, 631 F.2d 366, 373 (5th Cir. 1980). Defendant has not carried this burden.  Accordingly, Ms. Gautreaux's testimony that "somebody" would have a good look at what occurred must be barred from coming into evidence.

## NO. 3 MOTION *IN LIMINE* REGARDING COLLATERAL SOURCE BENEFITS

31. Ms. Riley has Medicare and medical insurance (ERISA self-funded plan) through her employment. Pursuant to the collateral source rule as applied under the general maritime law, medical treatment paid for by Medicare and Aetna's self-funded ERISA plan should not be presented to the jury nor deducted from any award compensating Ms. Riley for past and future medical expenses. Moreover, the collateral source rule as it applies under the substantive general maritime law precludes not only payments made by insurance from being off-set from any recovery but also precludes insurance discounts from coming into evidence.

32. The Defendant's Third Affirmative Defense states: "to the extent applicable, any award of damages to the Plaintiff must be reduced by the amount of any collateral source payments" [D.E. 12].

33. Regardless of whether set off for collateral source is viewed as an affirmative defense (arguably not an affirmative defense), reference to collateral sources for payments or discounts of the Plaintiff's medical treatment should be precluded at trial.

34. The collateral source rule is intended to insure that a benefit that is directed to an injured party from a third party is not shifted so as to become a windfall for the tortfeasor since it is the tortfeasor's responsibility to compensate for all harm that he causes. *See, e.g.*, Restatement (Second) of Torts § 920A(2). The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing the quantum of damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the tortfeasor. *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 (5th Cir. 1994). Further, the collateral source rule applies in maritime cases. *See, e.g., Jones v. Carnival, Case No.* 04-20407-CIV-JORDAN *(*S.D. Fla. Jan. 24, 2006*); Trico Marine Assets Inc. v. Diamond B Marine*

12

*Services Inc.,* 332 F.3d 779, 2003 A.M.C. 1355 (5th Cir. 2003); *Chisholm v. UHP Projects, Inc*.,

205 F.3d 731, 741 (4th Cir. 2000); *Lohman v. M/V Korean Pioneer*, 77 F.3d 489 (9th Cir. 1996);

*Thyssen, Inc. v. S/S Eurounity*, 21 F.3d 533, 1994 A.M.C. 1638 (2d Cir. 1994); *1Phillips v.*

*Western Co. of North America,* 953 F.2d 923, 1993 A.M.C. 1815 (5th Cir.1992)*; Bourque v.*

*Diamond M. Drilling Co.*, 623 F.2d 351, 354 n. 2 (5th Cir.1980); *Haughton v. Blackships, Inc*.,

462 F.2d 788, 1972 A.M.C. 1923 (5th Cir.1972); *Stanley v. Bertram-Trojan, Inc*., 868 F. Supp.

541 (S.D.N.Y. 1994).

> The collateral source doctrine generally precludes benefits received from third-parties from being considered in determining the amount of damages. *See Turnbull v. USAir, Inc*., 133 F.3d 184, 186 (2d Cir.1998). It is fully applicable in admiralty cases such as this. *See A/H Battery Associates v. Gulf Craft, Inc.,* No. 93 CIV 1915, 1998 WL 252105, at *1 (S.D.N.Y. May 18, 1998); *Stanley v. Bertram-Trojan, Inc*., 868 F.Supp. 541, 543 (S.D.N.Y.1994). Furthermore, both pension and social security benefits are considered collateral source payments. *See Clausen v. Sea-3, Inc*., 21 F.3d 1181, 1192-93 (1st Cir.1994)(disability benefits and social security); *In re Adventure Bound Sports, Inc*., 858 F.Supp. 1192, 1208-09 (S.D.Ga.1994) (social security); *Olsen v. City of New York*, No. 83 CIV. 0462, 1984 WL 1033, at * 2 (S.D.N.Y. Oct. 18, 1984)(pension).

*Silivanch v. Celebrity Cruises, Inc*., 171 F. Supp. 2d 241, 265-266 (S.D.N.Y. 2001).

35. As indicated in *Silivanch*, a passenger case, disability benefits fall within the collateral source rule in maritime cases. *See, e.g., Clausen v. Sea-3, Inc*., 21 F.3d 1181, 1192-93 (1st Cir.1994)*; Elms v. Crowley Marine Service, Inc*., 1997 A.M.C. 835 (W.D. Wash. 1996). "The collateral source rule is fully applicable in admiralty so that personal injury damages are not reduced by disability, unemployment, social security, or insurance benefits that may be due and owing to the victim." T. Schoenbaum, 1ADMIRALTY & MAR. LAW §5-15 (4th ed.), citing as examples *Thomas v. Humble Oil & Refining Co.*, 420 F.2d 793, 1970 AMC 25 (4th Cir.1970); *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 1963 AMC 175 (9th Cir.1962); *Complaint of Farrell Lines, Inc*., 389 F.Supp. 194, 1976 AMC 1684 (S.D.Ga.1975).

13

36. The 5th Circuit in *Trico Marine* said: "The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing the quantum of damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the tortfeasor." *Trico Marine Assets Inc. v. Diamond B Marine Services Inc.*, 332 F.3d 77.

37. "This substantive rule 'carries with it an evidentiary rule requiring the exclusion of evidence of any collateral benefits.'" *See* Judge Jordan's Order on Motion *In Limine* to Exclude Evidence of Contractual Discount, in *Jones v. Carnival Corporation*, Case No. 04-20407-CIV-JORDAN (S.D. Fla. Jan. 24, 2006). A copy of this Order is attached hereto as Exhibit E.

38. In *Jones* plaintiff's past medical expenses amounted to $96,835.15. The insurer paid $58,780.97 and discounted $37,054.18. Defendant, Carnival, sought to exclude reference to contractual discount of medical bills in the amount of $37,054.18, thereby reducing tortfeasor's liability for past medical expenses. Judge Jordan held the contractual discount is a collateral source payment and that the collateral source rule "expressly prohibits me from excluding evidence of the $37,054.18 discount." See Judge Jordan's Order attached hereto as Exhibit E. Similarly, counsel or witnesses in this case should not be permitted to admit into evidence or reference payment made to the Plaintiff or to be paid to or on behalf of the Plaintiff by any collateral source in an attempt to reduce Plaintiff's recovery.

39. The Southern District of Florida admiralty case of *Jones v. Carnival Corporation*, Case No. 04-20407-CIV-JORDAN (Jan. 24, 2006), attached hereto as Exhibit E,  held that the contractual discount provided by a health insurance company to the Plaintiff's providers is a collateral source and should not come into evidence.  The Court in *Jones*, The Hon. Adelberto Jordan, said that the Florida Supreme Court in *Goble v. Frohman*, 901 So. 2d 830, 832 (Fla.

14

2005) held that a contractual discount is a collateral source. In admiralty law however collateral sources are excluded. The Court in *Jones* excluded the contractual discount on the basis that "The substantive collateral source rule, however, denies to a tortfeasor a reduction in liability by any amounts the Plaintiff receives from a collateral source " citing to the 2d Circuit *Phillips* case referenced above.

40. In *Phillips*, the Defense sought to introduce evidence of "**disability and other payments**". Evidence of those payments was excluded. In the admiralty case of *Stanley v. Bertram-Trojan, Inc.*, 868 F.Supp. 541, 542 (S.D. N.Y. 1994), the Court excluded collateral sources such as **insurance for medical and other expenses**. The First Circuit Court of Appeals in the admiralty case of *Clausen v. Sea-3, Inc.*, 21 F. 3d 1181, 1192-3 (1st Cir. 1994) excluded **disability benefits and social security.** The Southern District of Georgia in interpreting admiralty law in the case of *In re Adventure Bound Sports, Inc*., 858 F. Supp. 1192, 1208-9 (S.D. Ga. 1994) excluded evidence of **social security benefits**.

41. In sum, based on the Collateral Source Rule applicable to this maritime case, Defendant must be barred from introducing evidence and/or testimony, make references to or imply that that medical expenses has been paid or discounted through insurance or other collateral source benefits.


**NO. 4  MOTION *IN LIMINE* REGARDING PRE-EXISTING CONDITION**

42. The Defendant's Eighth Affirmative Defense states: "Plaintiff's injuries and/or damages are the result of the aggravation of (a) prior injury(ies) and/or condition(s), and Plaintiff's damages, if any, are thereby limited to the degree of aggravation of this (these) preexisting condition(s) caused by the alleged incident" [D.E. 12]

43. On July 9, 2015, the deposition of the corporate representative of Carnival took place. A copy of the deposition transcript of Monica Pettisco is attached hereto as Exhibit F.  The corporate representative, Monica Pettisco testified as follows regarding Carnival's affirmative defense of pre-existing condition:

> Q. Do you have, sitting here today, do you have any facts, information or evidence that the injury sustained was an aggravation of a pre-existing injury?
>
> A. Again, not that I know of. I don't know about specific treatment, you know, before the ship or after she debarked the ship, but it's my understanding that she didn't have any pre-existing. I'm not sure though.
>
> Q. Is it your understanding, sitting here today, that there was no aggravation of a pre-existing condition?
>
> A. I don't believe that there is, no.
>
> [Deposition of Carnival p. 44, lines 1-13]

44. Discovery closed on September 16, 2015. [DE 19] At the close of discovery Defendant has not come forward with any evidence that Ms. Riley suffered from a pre-existing medical condition to her right elbow.  Hence, the Defendant should not be allowed during trial from arguing, directly or indirectly, in the presence of the jury that Ms. Riley had a pre-existing condition with regard to her elbow.

## NO.5. MOTION IN LIMINE REGARDING HEARSAY STATEMENTS IN MEDICAL RECORDS.

45. On July 29, 2015 Defendant took the deposition of the Plaintiff, Shirley Riley. During her deposition, she was asked about a document called "Guest Consultation Form" which was marked Defendant's Exhibit 12.  A copy of the document is attached hereto as Exhibit G.

46. The document is a consultation form from "DREAM medical department" and a Carnival documents. See Exhibit G.

47. The document reflects that Ms. Riley "fell/ injured L arm".  Further, the form reflects in response to the question "what do you believe caused the accident?" that there "was something on floor". These statements are hearsay statements and must be precluded from being admitted into evidence.

48.  The statement was not made by the Plaintiff. A copy of the deposition transcript of Shirley Riley is attached hereto as Exhibit H. [Deposition Riley p. 69 and p. 70]. Further, the form on which the statement appears never affirmed or adopted by the Plaintiff because she did not sign it. Ms. Riley testified as follows:

Q: And then on the form it says, "What do you believe caused the accident?"  It's written there "Something on the floor." Do you see that towards the bottom?

A: I didn't fill that out sir.

[Deposition Riley p. 69]

      *    *    *

Q: There's a signature at the bottom of that. Is that nor your signature?

A: That is not my signature.

Q: And it says, slash, CR. You don't know who CR might be?

A: I don't know what the CR is. But I see they filled out, "injured left arm."

Q: Okay.

A: That's wrong. They didn't check my left arm.

 Q: It was the right arm that you hurt.

A: Yes, sir.

[Deposition Riley p. 70]

49. Statements made in a medical record are hearsay and not admissible for the truth of the matter asserted. See Fed. R. Evid. 802. Therefore, unless the Defendant lays the foundation needed to show that a statement in a medical record falls within the medical record exception in 803(4) the statement must be barred from coming into evidence for the truth of the matter asserted.

50. In order for a statement to fall within the exception "the statement must be obtained from the person seeking treatment, or in some instances from someone with a special relationship to the person seeking treatment, such as a parent." *Stull v. Fuqua Indus., Inc.*, 906 F.2d 1271, 1274 (8th Cir. 1990). Here, the statement was not made by the Plaintiff. *See* Deposition Riley pp.69-70. In fact, there is no information as to who made the statements.

51. In *Stull*, the defendant sought to admit into evidence a statement in the medical record that the plaintiff "jumped off the lawn mower". *Stull* at 1273.  The defendant was unable to establish that the statement was made by the plaintiff and could not establish from whom the statement was obtained. *Id*. The court held that " [i]n the absence of any evidence attributing the statement to Stull, the district court acted well within its discretion in excluding the hospital record." *Id*.

52.  In this case, the defendant has similarly not been able to establish that the Plaintiff made the statements contained in the "Guest Consultation Form". Accordingly, the Defendant has not established that the statements fall within the hearsay exception of the Fed. R. Evid. 803(4). The statements must therefore be barred from coming into evidence.

## NO. 6 MOTION *IN LIMINE* REGARDING JURY CONSULTANT

53. The Plaintiff, hereby moves *in limine* to bar the Defendant from any attempt to introduce any direct or indirect evidence or documentation, and refrain from any direct or indirect testimony, reference, and/or inference during the voir dire, opening statements, direct or cross examinations, closing arguments, or any other portion of this trial, regarding any mention of a litigation consultant or a jury consultant or a jury psychologist.

54. The Plaintiff may have present at trial a jury consultant, Jay Burke, to help gauge, evaluate and select a jury in this cause, as well as to consult during the trial of this matter.

55.  Mr. Burke may be present at various stages during the trial, but Mr. Burke will never testify in this case.

56. On April 1, 1984, the nationwide television news program "60 Minutes" presented information about jury selection consultants.  The following week, viewers' comments and mail regarding the segment were all negative. Another movie, "The Runaway Jury" depicts jury consultants in an extremely bad light.

57. Moreover, independent research has shown that jurors may improperly base their decisions, in part, on the presence of a litigation consultant.  See Michele Galen, The Best Jurors Money Can Pick, Business Week, June 15, 1992 at 108; D.P. Stolle, et al., The Perceived Fairness of the Psychologist Trial Consultant: an Empirical Investigation, 20 Law & Psychological Review 139 (Spring, 1996).

58. Defendant should not be permitted to speak to the jury regarding Mr. Burke, his position as a jury consultant and/or what he is doing.  Defendants should be precluded from making any reference to his retention or use in this case to preclude prejudice to the Plaintiffs and to ensure proper decision making by the jurors.

59. Mr. Burke has been a litigation consultant for approximately 30 years. No judge in this jurisdiction has allowed the defense to make any mention of his role in a trial. His office is in Pembroke Pines, Florida; he avoids newspaper and TV interviews. The Plaintiffs will introduce him as "Mr. Jay Burke who is working with us" and inquire if anyone knows him. That way the prospective jurors will know he is working with the Plaintiffs and avoid talking with him if they see him outside of the courtroom.

60. Since the Plaintiff's use of their own intuition, a litigation consultant, a psychologist, a rabbit's foot, or a coin toss for assistance in voir dire is not relative to any material issues in this case, Defendant should not be permitted to mention what Mr. Burke does for a living, or his role in this trial, pursuant to the Fed. R. Evid., 401, 402 and 403.

61. In sum, Defendant should refrain from any attempt to introduce any direct or indirect evidence or documentation, and refrain from any direct or indirect testimony, reference, and/or inference during the *voir dire*, opening statements, direct or cross examinations, closing arguments, or any other portion of this trial, regarding any mention of a litigation consultant or a jury consultant or a jury psychologist.

62. Prior to filing this motion, the undersigned conferred with counsel for the Defendant who objects to all motions in limine except Motion in Limine No.6 regarding Jay Burke.

WHEREFORE, the Plaintiff respectfully requests an Order from the Court granting the Plaintiff's Motions in Limine number 1 through 6, and for any other relief the Court deems just and proper.

Dated this 2nd day of November, 2015.

<div style="margin-left: 50%;">

Respectfully Submitted,

___ s/ Bjorg Eikeland _____
Bjorg Eikeland, Esq. (FBN 37005)
beikeland@hickeylawfirm.com
John H. Hickey, Esq. (FBN 305081)
hickey@hickeylawfirm.com
Hickey Law Firm, P.A.
1401 Brickell Avenue, Suite 510
Miami, FL  33131
Phone: (305) 371-8000
Fax: (305) 371-3542
*Attorneys for the Plaintiff*

</div>

## CERTIFICATE OF SERVICE

We hereby certify that the foregoing was electronically filed with the Clerk of the Court via CM/ECF on this 2nd day of November, 2015.  We also certify that the foregoing was served on all counsel or parties of record on the attached Service List either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Filing.

<div style="margin-left: 50%;">

_s/ Bjørg Eikeland_____
Bjørg Eikeland (FBN 37005)

</div>

**SERVICE LIST**

RILEY v. CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINES
CASE NO.: 1:15-cv-20807-MARTINEZ/GOODMAN

| | |
|---|---|
| John H. Hickey, Esq. (FBN 305081)<br>hickey@hickeylawfirm.com<br>Bjørg Eikeland, Esq. (FBN 37005)<br>beikeland@hickeylawfirm.com<br>Hickey Law Firm, P.A.<br>1401 Brickell Avenue, Suite 510<br>Miami, FL 33131-3504<br>Tel. (305) 371-8000<br>Fax (305) 371-3542<br>*Attorneys for Plaintiff* | Scott P. Mebane, Esq. (FBN 273030)<br>smebane@maselara.com<br>Mason Kerns, Esq. (FBN 91754)<br>mkerns@maselara.com<br>Masa, Lara, P.A.<br>2601 South Bayshore Drive, Suite 800<br>Miami, FL 33133<br>Tel.: (305) 377-3770<br>Fax: (305) 377-0080<br>*Attorneys for Defendant*<br>*Service by Notice of Electronic Filing* |