EXHIBIT A

# In The Matter Of:

*Shirley Riley vs*
*Carnival Corporation, et al*

---

*Dalise L. Gautreaux*
*August 27, 2015*

---

*Associated Reporters, Inc.*

*201 St. Charles Avenue*

*Suite 4315*

*New Orleans, LA 70170*

*(504) 529-3355*

Original File dalisegautreauxAug27.zip.txt

Min-U-Script® with Word Index

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 1

```
 1            UNITED STATES DISTRICT COURT FOR
 2            THE SOUTHERN DISTRICT OF FLORIDA
 3                     MIAMI DISTRICT
 4         CASE NO: 1:15-CV-20807-MARTINEZ/GOODMAN
 5               AT LAW AND IN ADMIRALTY
 6   SHIRLEY RILEY           *
 7              PLAINTIFF, *
 8                          *
 9   VERSUS                 *
10                          *
11   CARNIVAL CORPORATION    *
12   D/B/A CARNIVAL CRUISE   *
13   LINES,                 *
14              DEFENDANT. *
15   *    *    *    *    *    *
16
17            VIDEO DEPOSITION OF DALISE L.
18   GAUTREAUX, 1424 NORTH BENGAL ROAD, METAIRIE,
19   LOUISIANA, 70003, TAKEN IN THE OFFICES OF
20   ASSOCIATED REPORTERS, INC., 201 ST. CHARLES
21   AVENUE, SUITE 4315 PLACE ST. CHARLES, NEW
22   ORLEANS, LOUISIANA, 70170, ON THURSDAY, THE
23   27TH DAY OF AUGUST, 2015, COMMENCING AT 11:03
24   A.M., AND CONCLUDING AT 3:41 P.M.
25
```

Page 2

```
 1   APPEARANCES:
 2
 3            HICKEY LAW FIRM
 4            ATTORNEYS AT LAW
 5            (BY:  BJORG EIKELAND, ESQUIRE)
 6            1401 BRICKELL AVENUE, SUITE 510
 7            MIAMI, FLORIDA          33131
 8            (305) 371-8000
 9            E-MAIL:  BEIKELAND@HICKEYLAWFIRM.COM
10        (ATTORNEYS REPRESENTING SHIRLEY RILEY)
11
12            MASELARA
13            ATTORNEYS AT LAW
14            (BY:  MASON KERNS, ESQUIRE)
15            2601 SOUTH BAYSHORE DRIVE, SUITE 800
16            MIAMI, FLORIDA          33133
17            (305) 377-3770
18            E-MAIL:  MKERNS@MASELARA.COM
19   (ATTORNEYS REPRESENTING CARNIVAL CORPORATION,
20         D/B/A CARNIVAL CRUISE LINES)
21
22   ALSO PRESENT:  MICHAEL BOSSIER - VIDEOGRAPHER
23
24   REPORTED BY:
     KATHY A. MARTINY, CSR
25   CERTIFIED COURT REPORTER
```

Page 3

```
 1               EXAMINATION INDEX
 2   EXAMINATION BY MS. EIKELAND:  PAGE 7, LINE
     15; PAGE 192, LINE 9; PAGE 221, LINE 6
 3
     EXAMINATION BY MR. KERNS:  PAGE 64, LINE 4;
 4   PAGE 216, LINE 8
 5                  EXHIBITS
 6   DALISE GAUTREAUX DEPOSITION PLAINTIFF'S
           EXHIBIT NUMBER 1:   PAGE 8, LINE 15
 7
         (NOTICE OF DEPOSITION WITH
 8             SUBPOENA TO TESTIFY)
 9   DALISE GAUTREAUX DEPOSITION PLAINTIFF'S
           EXHIBIT NUMBER 2:   PAGE 19, LINE 18
10
        (DIAGRAM OF LAYOUT OF CARNIVAL DREAM
11                PROMENADE DECK)
12   DALISE GAUTREAUX DEPOSITION PLAINTIFF'S
           EXHIBIT NUMBER 3:   PAGE 22, LINE 20
13
     (COLOR PHOTO OF CASINO FLOOR DURING DAYTIME
14          HOURS IN AREA OF INCIDENT)
15   DALISE GAUTREAUX DEPOSITION PLAINTIFF'S
           EXHIBIT NUMBER 4:   PAGE 45, LINE 15
16
     (COLOR PHOTO OF CASINO FLOOR DURING EVENING
17          HOURS IN AREA OF INCIDENT)
18   DALISE GAUTREAUX DEPOSITION DEFENSE
           EXHIBIT NUMBER 1:   PAGE 75, LINE 24
19
     (LARGER DIAGRAM OF LAYOUT OF CARNIVAL DREAM
20                PROMENADE DECK)
21   DALISE GAUTREAUX DEPOSITION DEFENSE
           EXHIBIT NUMBER 2:   PAGE 79, LINE 17
22
     (COLOR PHOTO OF CASINO FLOOR DURING EVENING
23          HOURS IN AREA OF INCIDENT)
24   DALISE GAUTREAUX DEPOSITION DEFENSE
           EXHIBIT NUMBER 3:   PAGE 88, LINE 23
25
```

Page 4

```
 1   EXHIBITS (CONTINUED):
 2
 3   DALISE GAUTREAUX DEPOSITION DEFENSE
           EXHIBIT NUMBER 4:   PAGE 135, LINE 18
 4       (VIEW NOTE ATTACHED BY: 412930, DATED
         APRIL 21, 2014; SUBJECT:  COMPLAINT)
 5
 6   DALISE GAUTREAUX DEPOSITION DEFENSE
           EXHIBIT NUMBER 5:   PAGE 141, LINE 5
 7       (VIEW NOTE ATTACHED BY: 406192, DATED
         APRIL 21, 2014; SUBJECT: DALISE WALGAMOTTE)
 8
 9   DALISE GAUTREAUX DEPOSITION DEFENSE
           EXHIBIT NUMBER 6:   PAGE 147, LINE 25
10   (APRIL 16, 2014 LETTER TO DALISE WALGAMOTTE
         FROM CHRISTINA AULE, GUEST SERVICES
11        ASSOCIATE, CARNIVAL CRUISE LINES)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 5

```
 1              S T I P U L A T I O N
 2
 3        IT IS STIPULATED BY AND AGREED BY
 4  AND BETWEEN COUNSEL FOR THE PARTIES HERETO
 5  THAT THE DEPOSITION OF THE AFOREMENTIONED
 6  WITNESS IS HEREBY BEING TAKEN FOR ALL
 7  PURPOSES ALLOWED UNDER ARTICLE 1421, ET SEQ.,
 8  OF THE LOUISIANA CODE OF CIVIL PROCEDURE, IN
 9  ACCORDANCE WITH LAW, PURSUANT TO NOTICE;
10        THAT THE FORMALITIES OF READING
11  AND SIGNING ARE SPECIFICALLY WAIVED;
12        THAT THE FORMALITIES OF FILING,
13  SEALING, AND CERTIFICATION ARE SPECIFICALLY
14  WAIVED;
15        THAT ALL OBJECTIONS, SAVE THOSE
16  AS TO THE FORM OF THE QUESTION AND THE
17  RESPONSIVENESS OF THE ANSWER, ARE HEREBY
18  RESERVED UNTIL SUCH TIME AS THIS DEPOSITION,
19  OR ANY PART THEREOF, MAY BE USED OR SOUGHT TO
20  BE USED IN EVIDENCE.
21
22        KATHY A. MARTINY, CSR, CERTIFIED
23  COURT REPORTER IN AND FOR THE STATE OF
24  LOUISIANA, OFFICIATED IN ADMINISTERING THE
25  OATH TO THE WITNESS.
```

Page 6

```
 1    DALISE M. GAUTREAUX,
 2  AFTER HAVING BEEN FIRST DULY SWORN BY THE
 3  ABOVE-MENTIONED CERTIFIED COURT REPORTER, WAS
 4    EXAMINED AND TESTIFIED AS FOLLOWS:
 5    VIDEOGRAPHER:
 6    THIS IS THE VIDEO TAPE
 7  DEPOSITION OF DALISE GAUTREAUX, BEING HELD AT
 8  THE OFFICES OF ASSOCIATED REPORTERS, 201 ST.
 9  CHARLES AVENUE, SUITE 4315 NEW ORLEANS,
10  LOUISIANA, IN THE MATTER OF SHIRLEY RILEY
11  VERSUS CARNIVAL CORPORATION; THIS CASE IS
12  CURRENTLY PENDING IN THE UNITED STATES
13  DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA,
14  MIAMI DIVISION.
15    THE COURT REPORTER TODAY IS
16  KATHY MARTINY; MY NAME IS MIKE BOSSIER, AND
17  I'M THE VIDEOGRAPHER; THE TIME INDICATED ON
18    THE VIDEO MONITOR IS 10:55 A.M.
19    WOULD COUNSEL PLEASE IDENTIFY
20  YOURSELVES; AND STATE WHO YOU REPRESENT?
21    MR. KERNS:
22    HELLO.  MY NAME IS MASON KERNS,
23  OF THE LAW FIRM MASELARA, IN MIAMI; AND I
24  REPRESENT THE DEFENDANT, THE CARNIVAL
25  CORPORATION.
```

Page 7

```
 1    MS. EIKELAND:
 2    MY NAME IS BJORG EIKELAND; I'M
 3  WITH HICKEY LAW FIRM; AND WE REPRESENT
 4  SHIRLEY RILEY IN THIS CASE.
 5    VIDEOGRAPHER:
 6    WOULD THE COURT REPORTER PLEASE
 7  SWEAR IN THE WITNESS?
 8    MADAME REPORTER:
 9    RAISE YOUR RIGHT HAND, PLEASE.
10  DO YOU SOLEMNLY SWEAR THE TESTIMONY YOU ARE
11  ABOUT TO GIVE IS THE TRUTH, THE WHOLE TRUTH,
12  AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?
13    WITNESS:
14    I DO.
15    EXAMINATION BY MS. EIKELAND:
16  Q.  GOOD MORNING.  COULD YOU PLEASE
17    STATE YOUR FULL NAME, FOR THE RECORD?
18  A.  DALISE LOUISE GAUTREAUX.
19  Q.  AND HOW DO YOU SPELL YOUR LAST
20    NAME?
21  A.  G-A-U-T-R-E-A-U-X.
22  Q.  OKAY.  HAVE YOU GONE BY ANY
23    OTHER NAMES?
24  A.  UH, WALGAMOTTE.
25  Q.  AND HOW DO YOU SPELL THAT?
```

Page 8

```
 1  A.  W-A-L-G-A-M-O-T-T-E.
 2  Q.  AND WHAT IS YOUR DATE OF BIRTH,
 3    MA'AM?
 4  A.  11/20/91.
 5  Q.  SO THAT MAKES YOU HOW OLD?
 6  A.  TWENTY-THREE.
 7  Q.  HA, HA, HA!  THANKS.  ARE YOU
 8    HERE PURSUANT TO A SUBPOENA?
 9  A.  YES.
10  Q.  OKAY.
11    MS. EIKELAND:
12    I'M GONNA' MARK THE SUBPOENA
13  PLAINTIFF'S EXHIBIT 1; I'M JUST MAKING A
14  PRELIMINARY MARK ON IT.
15    (WHEREUPON, THE INSTRUMENT REFERRED
16  TO WAS MARKED DALISE GAUTREAUX DEPOSITION
17  PLAINTIFF'S EXHIBIT NUMBER 1 AND IS ATTACHED
18  TO THE TRANSCRIPT.)
19  Q.  (BY MS. EIKELAND).  ALL RIGHT.
20    HAVE YOU HAD YOUR DEPOSITION TAKEN BEFORE?
21  A.  YES.
22  Q.  OKAY.  AND CAN YOU TELL ME ABOUT
23    THAT; FIRST OF ALL, HOW MANY TIMES,
24    APPROXIMATELY?
25  A.  UM, TWICE AS OF RIGHT NOW; UM,
```

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

---

Page 9

1   BOTH THROUGH WORK, UM, FOR CRIMINAL
2   SITUATIONS.
3   Q.  OKAY.  SO, TWO TIMES.  AND WHAT
4   DO YOU DO FOR A LIVING?
5   A.  A CORRECTIONS OFFICER FOR
6   JEFFERSON PARISH SHERIFF'S OFFICE.
7   Q.  AND HOW LONG HAVE YOU WORKED
8   THERE?
9   A.  A YEAR ON SEPTEMBER 22ND.
10  Q.  AND WHAT DO YOU DO THERE; WHAT'S
11  YOUR JOB?
12  A.  UM, I WORK INTAKE AND BOOKING AS
13  AN OFFICER; BASICALLY, PROCESSING EVERYBODY
14  IN; UM, BEFORE THIS, I WAS, ACTUALLY, ON THE
15  WATCH WHERE I DEALT WITH ALL THE CRIMINALS.
16  Q.  WHAT KIND OF FACILITY IS IT;
17  DOES IT HAVE BOTH MALE, AND FEMALE, INMATES?
18  A.  YES.
19  Q.  OKAY.  NOW, IN TERMS OF
20  EDUCATION, CAN YOU TELL ME A LITTLE BIT ABOUT
21  YOUR -- ANY EDUCATION THAT YOU HAVE AFTER
22  HIGH SCHOOL?
23  A.  UM, AS OF RIGHT NOW, I'M
24  CURRENTLY ENROLLED AT DELGADO COMMUNITY
25  COLLEGE; I -- THIS IS MY FIRST YEAR; AND I'M

---

Page 10

1   GOING FOR CRIMINAL JUSTICE FOR MY ASSOCIATE'S
2   DEGREE AS OF RIGHT NOW.
3   Q.  OKAY.  ARE YOU MARRIED, MA'AM?
4   A.  YES.
5   Q.  I WANTED TO SAY, I APPRECIATE
6   YOU COMING HERE TODAY; I KNOW YOU'RE GOING TO
7   WORK TODAY, ALTHOUGH YOU HAVE BEEN
8   SUBPOENAED; I JUST WANT TO SAY THAT.  IT
9   SOUNDS LIKE YOU'VE NEVER TAKEN -- OR HAD --
10  GIVEN A CIVIL DEPOSITION; IS THAT CORRECT?
11  A.  NO.
12  Q.  IN A CIVIL MATTER?
13  A.  NO.
14  Q.  SO I'M JUST GONNA' GO OVER SOME
15  OF THE RULES; AS YOU CAN SEE, THERE'S A COURT
16  REPORTER WHO'S TAKING DOWN WHAT WE'RE SAYING;
17  SO SHE'S GONNA' CREATE IT INTO A WRITTEN
18  TRANSCRIPT AT THE END OF THE DAY, OR
19  SUBSEQUENTLY.
20      YOU'RE GONNA' BE GIVEN THE RIGHT
21  TO READ THE TRANSCRIPT, AND SEE IF THERE IS
22  ANY MISTAKES, OR ERRORS, THAT WAS MADE TO THE
23  TRANSCRIPT; OR YOU CAN WAIVE THAT RIGHT; AND
24  I'LL GET BACK TO YOU AT THE END OF THE
25  DEPOSITION; IF IN DOUBT, YOU KNOW, YOU DON'T

---

Page 11

1   WANT TO WAIVE YOUR RIGHT, GENERALLY; BUT I'M
2   NOT YOUR LAWYER; SO THAT'S A DECISION YOU
3   HAVE TO MAKE YOURSELF.
4       IF YOU WANT A BREAK FOR ANY
5   REASON, TELL ME; AND WE'LL ACCOMMODATE YOU;
6   AND IT CAN BE ANY BREAK YOU NEED, FOR ANY
7   REASON; ALSO, IF YOU'RE UNCOMFORTABLE, OR YOU
8   NEED SOMETHING TO DRINK, OR THE AC IS MAKING
9   YOU FREEZING, YOU NEED TO LET US KNOW,
10  BECAUSE WE WANT YOU TO BE COMFORTABLE.
11      IN THE DEPOSITION, I'M GONNA'
12  ASK YOU QUESTIONS; SO THIS IS A QUESTION AND
13  ANSWER TYPE OF SITUATION; PLEASE LET ME
14  FINISH MY QUESTION BEFORE YOU GO AHEAD AND
15  ANSWER; OTHERWISE, THE COURT REPORTER IS NOT
16  GONNA' BE ABLE TO TAKE DOWN WHAT WE'RE SAYING
17  IF WE SPEAK OVER EACH OTHER; AND I'LL ALSO
18  TRY AND WAIT FOR YOUR ANSWER TO BE COMPLETED
19  BEFORE I ASK THE NEXT QUESTION.
20      IF THERE IS ANYTHING ABOUT MY
21  QUESTION YOU DO NOT UNDERSTAND, FEEL FREE TO
22  TELL ME; AND I'LL TRY AND REPHRASE, OR ASK IT
23  DIFFERENTLY; ALSO, OPPOSING COUNSEL MAY
24  OBJECT DURING MY DIRECT EXAMINATION OF YOU;
25  HE WILL DO SO IN ORDER TO PRESERVE AN

---

Page 12

1   OBJECTION FOR THE RECORD; IF DOES OBJECT, LET
2   HIM FINISH THE OBJECTION; THEN YOU CAN
3   PROCEED TO ANSWER THE QUESTION AFTER THE
4   OBJECTION IS FINISHED.
5       WHEN I'M DONE WITH DIRECT
6   EXAMINATION, THE CARNIVAL'S LAWYER WILL
7   PROBABLY HAVE SOME QUESTIONS FOR YOU; HE WILL
8   THEN -- STRIKE THAT.  AFTER I'M DONE WITH MY
9   DIRECT EXAMINATION, IT IS HIS TURN TO ASK
10  QUESTIONS; AND, AGAIN, IF I OBJECT DURING HIS
11  QUESTIONS, JUST LET ME FINISH THE OBJECTION
12  BEFORE YOU ANSWER THE QUESTION.
13  A.  (WITNESS NODDING HEAD
14  AFFIRMATIVELY).
15  Q.  ALL RIGHT.  DO YOU HAVE ANY
16  QUESTIONS FOR ME BEFORE WE START?
17  A.  NOPE.
18  Q.  OKAY.  I UNDERSTAND THAT, IN
19  APRIL OF 2014, YOU WERE ON A CRUISE ON THE
20  CARNIVAL DREAM; IS THAT CORRECT?
21  A.  YES.
22  Q.  OKAY.  HOW MANY DAYS WAS THE
23  CRUISE, IF YOU REMEMBER?
24  A.  SIX.
25  Q.  AND WHERE DID YOU -- WHERE DID

---

Associated Reporters, Inc.
(504) 529-3355

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 13

1   THAT CRUISE START?
2   A.  UH, IT STARTED OUT OF NEW
3   ORLEANS, LOUISIANA; WE WENT TO COSTA MAYA --
4   COSTA MAYA; COZUMEL; AND HONDURAS.
5   Q.  DO YOU, BY ANY CHANCE, REMEMBER
6   WHEN THE CRUISE STARTED?
7   A.  ROATAN.
8   Q.  I'M SORRY?
9   A.  ROATAN, HONDURAS.  AND DO YOU,
10  BY ANY CHANCE, REMEMBER THE DAY THE CRUISE
11  STARTED?
12  A.  NO, MA'AM.
13  Q.  DO YOU REMEMBER THE DAY THE
14  CRUISE ENDED?
15  A.  NO, MA'AM.
16  Q.  I'M GONNA' REPRESENT TO YOU THAT
17  THE INCIDENT INVOLVING MS. RILEY HAPPENED ON
18  APRIL 19, 2014.
19  A.  (WITNESS NODDING HEAD
20  AFFIRMATIVELY).
21  Q.  DO YOU REMEMBER IF THE INCIDENT
22  WAS THE DAY NEXT TO THE LAST DAY OF THE
23  CRUISE?
24  A.  YES, MA'AM.
25  Q.  SO IN OTHER WORDS, YOU WOULD

Page 14

1   HAVE DISEMBARKED ON APRIL 20TH; DOES THAT
2   SOUND CORRECT?
3   A.  YES, MA'AM.
4   Q.  OKAY.
5   A.  20TH, OR 21ST.
6   Q.  DO YOU REMEMBER WHAT CABIN YOU
7   WERE IN?
8   A.  FIRST FLOOR; 1111.
9   Q.  AND WHO WERE YOU TRAVELLING
10  WITH?
11  A.  MY HUSBAND; MY MOTHER; MY
12  FATHER; MY SISTER; MY AUNT; FAMILY AND
13  FRIENDS, UM, THE BOURGEOISES; FAMILY FRIENDS,
14  THE DOTIS; AND I'M TRYING -- MY HUSBAND.
15  Q.  ALL RIGHT.  SO IT WAS A BIG
16  GROUP; RIGHT?
17  A.  YES.
18  Q.  HAVE YOU BEEN ON ANY OTHER
19  CRUISES BEFORE THE CRUISE ON THE CARNIVAL
20  DREAM?
21  A.  YES.
22  Q.  OKAY.  ABOUT HOW MANY?
23  A.  ABOUT FOUR BEFORE THE CARNIVAL
24  DREAM.
25  Q.  HOW MANY CRUISES HAVE YOU TAKEN

Page 15

1   TOTAL?
2   A.  SIX.
3   Q.  AND THE CRUISES YOU'VE BEEN ON
4   PRIOR TO THE SUBJECT CRUISE ON THE CARNIVAL
5   DREAM, WHAT SHIPS WERE THOSE CRUISES ON?
6   A.  THE TRIUMPH; THE CONQUEST; AND
7   THE ELATION; AND THEN THE CONQUEST, AGAIN.
8   Q.  OKAY.  HAVE YOU, SUBSEQUENT TO
9   THE SUBJECT INCIDENT, AND THE SUBJECT CRUISE,
10  HAVE YOU BEEN ON THE CARNIVAL DREAM?
11  A.  YES.
12  Q.  OKAY.  HOW MANY TIMES?
13  A.  ONCE.
14  Q.  AND WHEN WAS THAT?
15  A.  APRIL OF 2014.
16  Q.  HAVE YOU BEEN ON THE CARNIVAL
17  DREAM ON ANY OTHER OCCASIONS THAN --
18  A.  NO.
19  Q.  SO YOU ONLY CRUISED ON THE
20  CARNIVAL DREAM ONCE?
21  A.  YES.
22  Q.  OKAY.  DO YOU -- I'M GONNA' ASK
23  YOU SOME QUESTIONS ABOUT THE CARNIVAL DREAM.
24  ARE YOU SOMEWHAT FAMILIAR WITH THE LAYOUT OF
25  THE SHIP, FROM HAVING BEEN ON THAT CRUISE ON

Page 16

1   THE DREAM?
2   A.  YES.
3   Q.  OKAY.  DO YOU REMEMBER WHAT DECK
4   THAT THE CASINO IS ON?
5   A.  FIFTH.
6   Q.  DO YOU KNOW WHAT THE NAME OF THE
7   DECK IS?
8   A.  UM, I DON'T KNOW THE NAME OF IT.
9   Q.  DOES --
10  A.  IT STARTS WITH A P.
11  Q.  PROMENADE?
12  A.  PROMENADE.
13  Q.  OKAY.  DURING THAT CRUISE IN
14  APRIL OF 2014, DID YOU GO TO -- DID YOU GO TO
15  THE CASINO?
16  A.  YES.
17  Q.  OKAY.  DO YOU REMEMBER THE NAME
18  OF THE CASINO?
19  A.  THE JACKPOT CASINO.
20  Q.  OKAY.  AND HAD YOU -- ABOUT HOW
21  MANY TIMES, PRIOR TO THE INCIDENT INVOLVING
22  MS. SHIRLEY, HAD YOU BEEN TO THE CASINO?
23  A.  SEVERAL.
24  Q.  OKAY.  CAN YOU BE MORE SPECIFIC?
25  A.  PROBABLY ABOUT A HUNDRED.

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 17

1 Q.  HA, HA, HA, HA!  AND WHY WAS
2   THAT?
3 A.  BECAUSE IT'S THE ONLY PLACE YOU
4   CAN SMOKE.
5 Q.  ALL RIGHT.
6 A.  BESIDES THE LIDO DECK; AND I'M
7   NOT -- I BURN TOO EASY.
8 Q.  ALL RIGHT.  OKAY.  SO IS THERE A
9   SPECIFIC PLACE IN THE CASINO THAT -- WHERE
10   YOU CAN SMOKE?
11 A.  IT'S ON THE -- IF YOU FACE THE
12   BAR, IT'S ON THE RIGHT-HAND SIDE OF THE BAR.
13 Q.  OKAY.  AND IS THAT THE ONLY
14   PLACE IN THE CASINO WHERE YOU'RE ALLOWED TO
15   SMOKE?
16 A.  UM, THERE; AND A COUPLE OF THE
17   SLOT MACHINES.
18 Q.  IS IT FAIR TO SAY THAT THE
19   CASINO IS ONE OF THE DESIGNATED SMOKING AREAS
20   ON THE SHIP?
21 A.  YES.
22 Q.  OKAY.  AND SO YOU HAD -- DID YOU
23   GO THERE EVERY DAY?
24 A.  YES.
25 Q.  SEVERAL TIMES A DAY?

Page 18

1 A.  YES.
2 Q.  OKAY.  ARE YOU, BY THE WAY, A
3   VIP, OR VFIP MEMBER?
4 A.  NOT ON THAT CRUISE.
5 Q.  OKAY.  SO WHEN YOU WENT TO THE
6   CASINO BAR TO SMOKE, WOULD YOU, ALSO, AT
7   TIMES, HAVE ANY BEVERAGES?
8 A.  YES.
9 Q.  OKAY.  DO YOU DRINK ALCOHOL?
10 A.  YES.
11 Q.  OKAY.  DO YOU ALSO DRINK SODA,
12   AND OTHER BEVERAGES?
13 A.  YES.
14 Q.  DID YOU HAVE ONE OF THOSE
15   PACKAGES WHERE YOU CAN DRINK ALL THE SODA YOU
16   WANT?
17 A.  YES; "ENDLESS BUBBLES".
18 Q.  DID YOU EVER PLAY ON THE SLOT
19   MACHINES DURING THAT PARTICULAR CRUISE?
20 A.  YES.
21 Q.  HOW MANY TIMES WOULD YOU SAY?
22 A.  ONCE; MAYBE TWICE, AT THE
23   BEGINNING.
24 Q.  OKAY.
25 A.  AND IT WASN'T THE SLOT MACHINES;

Page 19

1   IT WAS THAT MONEY GRAB MACHINE; BUT THEY
2   CONSIDER IT A SLOT MACHINE, BECAUSE IT'S IN
3   THE CASINO; BASICALLY, LIKE A CLAW MACHINE;
4   YOU HAVE MONEY AT, LIKE (INDICATING WITH
5   HANDS) BIG THINGS; ROLLS OF MONEY AT THE
6   BOTTOM.
7 Q.  AND YOU PUT A PENNY IN, OR --
8 A.  YOU PUT A DOLLAR IN.
9 Q.  YOU PUT A DOLLAR IN?
10 A.  YOU PUT A DOLLAR IN!
11 Q.  DID YOU WIN?
12 A.  NO.
13 Q.  ALL RIGHT.
14   MS. EIKELAND:
15   SO, I'M GONNA' SHOW YOU A LAYOUT
16   OF THE PROMENADE DECK ON THE CARNIVAL DREAM;
17   I'M GONNA' MARK IT PLAINTIFF'S EXHIBIT 2.
18   (WHEREUPON, THE INSTRUMENT REFERRED
19   TO WAS MARKED DALISE GAUTREAUX DEPOSITION
20   PLAINTIFF'S EXHIBIT NUMBER 2 AND IS ATTACHED
21   TO THE TRANSCRIPT).
22   MS. EIKELAND:
23   WOULD YOU LIKE TO TAKE A LOOK
24   (INDICATING)?
25   MR. KERNS:

Page 20

1   GOOD.  THANKS.
2 Q.  (BY MS. EIKELAND).  SO, IF YOU
3   TAKE A LOOK AT THAT (HANDING), DO YOU SEE
4   WHERE THE JACKPOT CASINO IS LOCATED?
5 A.  YES.
6 Q.  OKAY.  AND WHERE --
7   APPROXIMATELY WHERE ON THE PROMENADE DECK IS
8   THE JACKPOT CASINO LOCATED?
9 A.  TOWARDS THE FRONT OF THE SHIP
10   (INDICATING ON DIAGRAM).
11 Q.  ALL RIGHT.  ARE THERE ELEVATORS
12   ON EACH SIDE OF THE CASINO?
13 A.  YES.
14   MR. KERNS:
15   OBJECTION; FORM.
16 Q.  (BY MR. EIKELAND).  DO YOU --
17   OKAY.  WHERE ARE THE ELEVATORS LOCATED
18   COMPARED TO THE -- IN RELATION TO THE JACKPOT
19   CASINO?
20 A.  UH, ONE'S IN THE FRONT; ONE'S IN
21   THE BACK.
22 Q.  OKAY.
23 A.  ONE'S IN THE FRONT; ONE'S IN THE
24   MIDDLE.
25 Q.  OKAY.  AND CAN YOU DESCRIBE TO

Page 21

1  ME, IF YOU REMEMBER, THE LAYOUT OF THE
2  CASINO; WHAT DOES IT LOOK LIKE; THE CASINO ON
3  THE CARNIVAL DREAM?
4  A.  UM, WHEN YOU FIRST WALK IN, YOU
5  -- ON YOUR RIGHT, YOU HAVE ALL THE CASINOS;
6  AND -- WELL, ALL THE SLOT MACHINES; AND THEN,
7  RIGHT BEHIND THE SLOT MACHINES, YOU HAVE THE
8  TABLES; AND THEN RIGHT BEHIND THE TABLES, YOU
9  HAVE MORE SLOT MACHINES; WALK STRAIGHT TO THE
10  BACK, YOU HAVE THE BAR THERE; YOU HAVE AN
11  AREA THAT'S GOT A STAND FOR THE BAND; AND
12  THEY DO, UM, LIKE, TRIVIA THERE DURING --
13  DURING THE WEEK, WITH THE, UM, ENTERTAINMENT
14  YOU; UM, OVER THERE THEY HAVE, UM, TABLES;
15  AND LITTLE SOFA AREAS ON YOUR LEFT SIDE, WHEN
16  YOU FIRST WALK IN, ALSO.
17  Q.  DO YOU HAVE SLOT MACHINES ON THE
18  LEFT-HAND SIDE?
19  A.  NO.
20  Q.  OKAY.  SO WHEN YOU SAY YOU --
21  WHEN YOU WALK IN, WHICH ENTRANCE, OR WHAT
22  SIDE OF THE SHIP, ARE YOU COMING FROM; ARE
23  YOU COMING FROM THE ATRIUM SIDE, OR THE OTHER
24  SIDE?
25  A.  I'M COMING FROM THE FRONT OF THE

Page 22

1  SHIP.
2  Q.  OKAY.  IS THAT FROM THE ATRIUM?
3  A.  I DON'T KNOW WHAT THE ATRIUM IS.
4  Q.  SO, IF YOU LOOK AT THAT
5  (INDICATING) LAYOUT, DO YOU SEE THE ATRIUM?
6  OKAY.  LET ME ASK YOU DIFFERENTLY.  WHEN YOU
7  CAN -- IS THERE A BAR IN THE CASINO?
8  A.  YES.
9  Q.  OKAY.  SO, WHEN YOU SAY YOU WALK
10  IN, AND ON YOUR RIGHT-HAND SIDE YOU HAVE SLOT
11  MACHINES, ARE YOU WALKING IN WHERE THE BAR
12  IS, OR ON THE OPPOSITE SIDE?
13  A.  ON THE OPPOSITE SIDE.
14  Q.  OH, OKAY.
15     MS. EIKELAND:
16     SO, I'M GONNA' MARK THIS
17  (INDICATING) PHOTO AS PLAINTIFF'S EXHIBIT 3.
18     MR. KERNS:
19     (NODDING HEAD AFFIRMATIVELY).
20     (WHEREUPON, THE INSTRUMENT REFERRED
21  TO WAS MARKED DALISE GAUTREAUX DEPOSITION
22  PLAINTIFF'S EXHIBIT NUMBER 3 AND IS ATTACHED
23  TO THE TRANSCRIPT).
24  Q.  (BY MS. EIKELAND).  SO, DOES
25  THAT LOOK FAMILIAR TO YOU?

Page 23

1  A.  YES.
2  Q.  OKAY.  SO, DO YOU SEE THE BAR IN
3  THAT PHOTO MARKED PLAINTIFF'S EXHIBIT 3?
4  A.  YES.
5  Q.  OKAY.  SO IS THIS (INDICATING)
6  THE VIEW YOU WOULD HAVE AS YOU WALK INTO THE
7  JACKPOT CASINO FROM THE ATRIUM SIDE?
8  A.  YES.
9  Q.  OKAY.  AND IN THE MIDDLE -- OR
10  HOW WOULD YOU DESCRIBE THE SURFACE, OR THE
11  FLOORING, IN THE JACKPOT CASINO?
12  A.  GLASSY LOOKING.
13  Q.  OKAY.  IS THERE A WALKWAY IN THE
14  MIDDLE?
15  A.  YES.
16  Q.  OKAY.  AND DO YOU KNOW WHAT KIND
17  OF MATERIAL IT'S MADE OUT OF?
18  A.  NO.
19  Q.  IS IT -- THE WALKWAY.  IS IT --
20  A.  IT LOOKS LIKE GRANITE.
21  Q.  CARPET?
22  A.  NO.
23  Q.  HOW WOULD YOU DESCRIBE IT?
24  A.  SLEEK; PRETTY; CLEAN.
25  Q.  AND YOU'RE LOOKING, YOU'RE

Page 24

1  DESCRIBING IT; YOU'RE LOOKING AT PLAINTIFF'S
2  EXHIBIT 3.  SO, WHAT COLOR IS IT?
3  A.  UM, MULTICOLOR.
4  Q.  OKAY.  SO, I THINK YOU'VE
5  DESCRIBED IT AS MARBLE; IS THAT WHAT YOU
6  SAID?
7  A.  YEAH.
8  Q.  OKAY.  IS IT -- WHAT KIND OF
9  MARBLE IS IT; IS IT A POLISHED MARBLE; OR IS
10  IT A MATTE MARBLE?
11  A.  A POLISHED MARBLE.
12  Q.  DO YOU SEE ANYTHING ELSE IN THE
13  PHOTO; DO YOU SEE ANY REFLECTION OF THE
14  LIGHTS?
15  A.  YES.
16  Q.  OKAY.
17     MR. KERNS:
18     OBJECTION; FORM.
19  Q.  (BY MR. EIKELAND).  ARE YOU
20  FAMILIAR WITH THAT (INDICATING) WALKWAY?
21  A.  YES.
22  Q.  OKAY.  DID YOU HAVE A CHANCE TO
23  WALK ON THAT WALKWAY DURING THAT CARNIVAL
24  APRIL 2014 CRUISE?
25  A.  YES.

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

---

Page 25

1 Q.   ON SEVERAL OCCASIONS?
2 A.   YES.
3 Q.   AND WOULD YOU BE ABLE TO,
4   ACTUALLY, WALK THROUGH THE CASINO?
5 A.   YES.
6 Q.   OKAY.  AND WHY WOULD YOU WALK
7   THROUGH THE CASINO?
8 A.   UM, TO GET TO THE HOT TUBS ON
9   THE SIDE OF IT; TO GET TO THE BACK DINING
10   ROOM; TO GET TO THE FRONT AREA.
11 Q.   WOULD YOU EVER GO THROUGH THE
12   CASINO TO GET TO YOUR ROOMS?
13 A.   NO.
14 Q.   OKAY.  WHAT ABOUT TO GO TO THE
15   ELEVATORS?
16 A.   YES.
17 Q.   SO, IN THAT PHOTOGRAPH MARKED
18   PLAINTIFF'S EXHIBIT 3, DO YOU SEE LIGHTS IN
19   THAT PHOTO?
20 A.   YES.
21 Q.   OKAY.  WHAT KIND OF LIGHTS DO
22   YOU SEE; AND WHERE DO YOU SEE THEM?
23 A.   UM, UP AT THE TOP; THE JACKPOT
24   MACHINES; UM, AROUND THE BAR, BY THE STOOLS;
25   THEY ALL REFLECT ON THE FLOOR.

---

Page 26

1 Q.   DOES THIS (INDICATING)
2   PHOTOGRAPH MARKED PLAINTIFF'S EXHIBIT 3
3   ACCURATELY DEPICT THE LAYOUT OF THE CASINO ON
4   APRIL 19TH, 2014, WHEN YOU WERE THERE?
5 A.   YES.
6 Q.   IN OTHER WORDS, THE PLACEMENT OF
7   THE SLOT MACHINES; THE LOCATION OF THE BAR
8   WOULD BE THE SAME AS DEPICTED IN THIS
9   (INDICATING) PHOTO?
10 A.   YES.
11 Q.   OKAY.  WHAT ABOUT THE LIGHT IN
12   THE CASINO?  ACTUALLY, I'M GONNA' STRIKE
13   THAT; I'M GONNA' GET BACK TO THAT; IT'S
14   DIFFICULT TO ANSWER THE WAY I PHRASED IT.
15   THAT WALKWAY THAT YOU SEE THERE (INDICATING).
16   IS THAT PART OF THE COMMON AREA ON THE SHIP;
17   PUBLIC AREA?
18 A.   YEAH.
19 Q.   DOES THE WALKWAY RUN THROUGH THE
20   ENTIRE CASINO?
21 A.   YES.
22 Q.   WHAT KIND OF FLOORING IS ON EACH
23   SIDE OF THE WALKWAY?
24 A.   CARPET.
25 Q.   SO, AS YOU WALK IN FROM THE

---

Page 27

1   ATRIUM, AS DEPICTED IN PLAINTIFF'S EXHIBIT 3
2   (INDICATING), YOU'LL HAVE CARPET ON THE RIGHT
3   SIDE; IS THAT ACCURATE?
4 A.   YES.
5 Q.   AND THEN, ON THE OPPOSITE SIDE,
6   ON THE LEFT SIDE AS YOU WALK IN, THERE WOULD
7   BE A CARPETED AREA, TOO; CORRECT?
8 A.   YES.
9 Q.   OKAY.  AND ON THAT CARPET AREA,
10   IS THAT WHERE THE SLOT MACHINES, AND THE
11   GAMING TABLES, ARE LOCATED?
12 A.   YES.
13 Q.   IS THE WALKWAY IN THE JACKPOT
14   CASINO, IS IT A COMMON THOROUGHFARE ON THE
15   CARNIVAL DREAM?
16 A.   EXCUSE ME?
17 Q.   IS IT A COMMON WALKWAY; YOU
18   KNOW, WHERE PEOPLE WALK?
19 A.   YEAH.
20 Q.   IS IT -- I MEAN -- STRIKE THAT.
21   OKAY.  SO, I WANT TO GO TO APRIL 19TH, 2014.
22   DID THERE COME A TIME WHERE YOU WITNESSED AN
23   INCIDENT INVOLVING SHIRLEY RILEY?
24 A.   YES.
25 Q.   OKAY.  CAN YOU TELL ME, FIRST OF

---

Page 28

1   ALL, APPROXIMATELY WHAT TIME OF DAY IT WAS
2   WHEN YOU OBSERVED THE INCIDENT?
3 A.   MID AFTERNOON; ABOUT 5:30-ISH;
4   5:00, 5:30.
5 Q.   AND WHAT DID YOU OBSERVE?
6 A.   UM, MS. SHIRLEY RILEY FALLING,
7   UM, ON HER BACK, AND ARM; AND EVERYBODY
8   SWARMING TO HELP HER; UM, I ALSO WENT TO SEE
9   IF SHE NEEDED ANY HELP; SHE WAS WITH HER
10   HUSBAND/BOYFRIEND/FIANCE'; I DON'T KNOW WHAT
11   HE WAS TO HER AT THAT TIME.
12 Q.   OKAY.  WHERE WERE YOU WHEN YOU
13   MADE THESE OBSERVATIONS?
14 A.   I WAS HEADING TO MY ROOM;
15   WALKING TO THE FRONT PART OF THE SHIP, TO THE
16   ATRIUM, AS -- WALKING OUT OF THE CASINO.
17 Q.   OKAY.  SO YOU HAD -- YOU WERE NO
18   LONGER AT THE BAR?
19 A.   NO.
20 Q.   YOU --
21   MR. KERNS:
22   OBJECTION; FORM.
23 Q.   (BY MR. EIKELAND).  OKAY.  HAD
24   YOU LEFT THE BAR AT THAT POINT?
25 A.   YES.

---

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

---

Page 29

1  Q.  OKAY.
2       MR. KERNS:
3       OBJECTION; FORM.
4  Q.  (BY MR. EIKELAND).  TELL ME,
5  FROM -- WAS THERE A TIME WHERE YOU WERE
6  SEATED AT THE BAR?
7  A.  YES.
8  Q.  OKAY.  SO, AS YOU ARE GOING TO
9  GO TO YOUR ROOM, WHAT DO YOU DO, STARTING
10  WITH YOU BEING AT THE BAR?
11  A.  I GOT UP, 'CAUSE MY FIANCE', AT
12  THE TIME, UM, WALKED TO THE -- TOWARDS THE
13  FRONT OF THE SHIP TO GET ON THE ELEVATORS TO
14  GO DOWN TO THE FIRST FLOOR.
15  Q.  OKAY.  SO DO YOU -- IF YOU LOOK
16  AT PLAINTIFF'S EXHIBIT 3, WHICH WAY WERE YOU
17  WALKING; ARE YOU WALKING TOWARDS THE CAMERA,
18  OR --
19  A.  I'M WALKING TOWARDS THE CAMERA.
20  Q.  OKAY.  WERE YOU -- HOW CLOSE TO
21  SHIRLEY WERE YOU WHEN YOU OBSERVED HER
22  FALLING?
23  A.  RIGHT --
24       MR. KERNS:
25       OBJECTION; FORM.

---

Page 30

1       WITNESS:
2       RIGHT IN FRONT; DIAGONAL AREA.
3  Q.  (BY MR. EIKELAND).  CAN YOU
4  APPROXIMATE, OR CAN YOU MAKE AN ESTIMATE, AS
5  TO HOW FAR AWAY FROM SHIRLEY YOU WERE WHEN
6  SHE -- WHEN YOU SAW HER FALL?
7  A.  MAYBE THREE, FOUR FEET.
8  Q.  AND HOW WERE YOU POSITIONED AT
9  THAT TIME; WERE YOU FACING HER?
10  A.  YES.
11       MR. KERNS:
12       OBJECTION; FORM.
13  Q.  (BY MR. EIKELAND).  SO, LOOKING
14  AT THAT (INDICATING) PHOTOGRAPH -- WELL, BACK
15  UP A LITTLE BIT.  SO, TELL ME.  AS YOU WERE
16  WALKING DOWN THE HALL -- THE WALKWAY, YOU --
17  WHEN IS THE FIRST TIME YOU SEE SHIRLEY?
18  A.  WHEN SHE FIRST WALKS IN.
19  Q.  OKAY.  AND DO YOU MEAN WHEN SHE
20  WALKS INTO THE CASINO?
21  A.  YES.
22  Q.  OKAY.  AND ABOUT HOW FAR DOES
23  SHIRLEY -- HOW -- HOW FAR DOES SHE GET BEFORE
24  YOU OBSERVE HER FALLING?
25  A.  UM, TO THE FIRST CYLINDER.

---

Page 31

1  Q.  OKAY.  ARE YOU LOOKING AT THE
2  PHOTO, PLAINTIFF'S EXHIBIT 3?
3  A.  YES.
4  Q.  OKAY.  AND CAN YOU POINT TO ME
5  WHERE THE CYLINDER IS?
6  A.  (INDICATING ON PHOTO).
7  Q.  OH, OKAY.  SO, YOU'RE POINTING
8  TO, ON THE RIGHT-HAND SIDE, THERE IS A
9  CYLINDER RIGHT THERE (INDICATING); AND THAT'S
10  (INDICATING) THE CYLINDER YOU'RE TALKING
11  ABOUT?
12  A.  YES.
13  Q.  OKAY.  SO, WHEN YOU LOOK AT
14  PLAINTIFF'S EXHIBIT 3, ON THE RIGHT-HAND
15  SIDE, THERE APPEARS TO BE A WALL.  DO YOU SEE
16  THAT (INDICATING)?
17  A.  YES.
18  Q.  AND THEN AFTER THAT (INDICATING)
19  WALL, THERE IS A CYLINDER (INDICATING) --
20  A.  YES.
21  Q.  ON THE RIGHT-HAND SIDE.  AND SO
22  IT'S YOUR TESTIMONY THAT SHE GOT TO ABOUT
23  THAT (INDICATING) AREA; SHE WAS ABOUT AT THAT
24  -- NEXT TO THE CYLINDER WHEN SHE FELL?
25       MR. KERNS:

---

Page 32

1       OBJECTION; FORM.
2       WITNESS:
3       YES.
4       MS. EIKELAND:
5       I'M GONNA' REPHRASE THAT; THAT
6  WAS A BAD QUESTION.
7  Q.  (BY MR. EIKELAND).  OKAY.  SO,
8  TELL ME AGAIN.  WHEN YOU OBSERVED SHIRLEY
9  FALLING, ABOUT WHERE WAS SHE COMPARED TO THAT
10  CYLINDER?
11  A.  LIKE, RIGHT ON THE SIDE OF IT
12  FROM THE WALKWAY.
13  Q.  OKAY.  AND ABOUT HOW FAR AWAY
14  FROM THE CYLINDER WAS SHE?
15  A.  UM, LIKE, RIGHT ON THE SIDE;
16  PROBABLY, THE THIRD ROW OF TILES.
17  Q.  OKAY.  SO, IF YOU WOULDN'T MIND
18  JUST MAKING A LITTLE "X" WHERE YOU BELIEVE
19  YOU OBSERVED SHIRLEY RILEY TO BE WHERE SHE
20  FELL.
21  A.  (WITNESS MARKING ON PHOTO).
22  Q.  OKAY.
23  A.  SORRY; THAT (INDICATING) ONE.
24  Q.  OKAY.  SO, CAN YOU JUST CIRCLE
25  THE ONE THAT YOU BELIEVE TO BE MORE ACCURATE?

---

Shirley Riley vs
Carnival Corporation, et al

Danise L. Gautreaux
August 27, 2015

Page 33

1   A.   (INDICATING ON PHOTO).
2   Q.   OKAY.  AND WHEN YOU OBSERVED THE
3   INCIDENT, WHERE ARE YOU LOCATED, IF YOU CAN
4   MARK THAT WITH A "Y"?
5   A.   (WITNESS INDICATING ON PHOTO).
6   Q.   OKAY.  HOW ARE YOU POSITIONED,
7   COMPARED TO SHIRLEY, AT THAT POINT?
8   A.   THE OPPOSITE.
9   Q.   ARE YOU FACING HER, OR DO YOU
10  HAVE YOUR BACK AGAINST HER?
11  A.   I'M FACING HER.
12  Q.   OKAY.  SO, WHAT DO YOU SEE AS
13  YOU OBSERVE MS. SHIRLEY FALLING?
14  A.   UM, SEVERAL OTHER SAILORS COMING
15  TO --
16      MR. KERNS:
17      I'M SORRY; I NEED TO OBJECT TO
18  THE FORM OF THE QUESTION.  GO AHEAD.
19  Q.   (BY MR. EIKELAND).  CAN YOU --
20  I'M GONNA' BE ASKING YOU MORE DETAILS ABOUT
21  WHAT YOU -- WHAT, EXACTLY, DID YOU OBSERVE AS
22  SHE'S FALLING?
23  A.   UM, HER FALL, AND SCREAM; SHE
24  WAS SCREAMING FOR HELP, SAYING THAT SHE WAS
25  HURT; HURTING.

Page 34

1   Q.   CAN YOU DESCRIBE FOR ME THE
2   MECHANICS OF HER FALL?
3   A.   FEET FIRST; BACK DOWN; ON BUTT.
4   Q.   WHAT ABOUT HER FEET DID YOU SEE;
5   DID YOU OBSERVE ANYTHING; DID YOU SEE HER
6   SLIP AND FALL --
7       MR. KERNS:
8       OBJECTION; FORM.
9   Q.   (BY MR. EIKELAND) -- TRIP AND
10  FALL; LIKE, WHAT DID YOU -- EXACTLY, DID YOU
11  SEE?
12      MR. KERNS:
13      OBJECTION; FORM.
14      WITNESS:
15      I SEEN HER SLIP, AND FALL; AND
16  SHE HAD ON A VERY NICE PAIR OF SANDALS.
17  Q.   (BY MR. EIKELAND).  YOU SAID
18  THAT YOU HEARD HER SAY SOMETHING ABOUT
19  HURTING.  DO YOU RECALL WHAT, EXACTLY, SHE
20  SAID?
21  A.   SHE WAS COMPLAINING OF HER LOWER
22  BACK; AND HER ELBOW; SHOULDER AREA OF HER
23  RIGHT ARM.
24  Q.   DID YOU HAVE A CHANCE TO SEE
25  WHERE HER RIGHT ARM WAS AS SHE WAS FALLING;

Page 35

1   OR AS SHE WAS ON THE GROUND?
2   A.   YES, MA'AM; IT WAS MORE BEHIND
3   HER BACK AREA.
4   Q.   BEHIND HER BACK AS SHE CAME
5   DOWN; OR IN FRONT OF HER AS SHE CAME DOWN
6   (INDICATING)?
7       MR. KERNS:
8       OBJECTION; FORM.
9       WITNESS:
10      BEHIND HER.
11  Q.   (BY MR. EIKELAND).  HOW ABOUT
12  WHEN SHE WAS ON THE GROUND; DID SHE HAVE --
13  WHERE WAS HER ARM -- RIGHT ARM --
14  A.   HER RIGHT ARM WAS ON THE GROUND,
15  UM, MORE TOWARDS THE BACK OF HER.
16  Q.   WAS IT -- WHAT KIND OF POSITION
17  WAS IT IN?
18  A.   SHE WAS LAYING ON HER BACK; AND
19  HAD HER ELBOW COCK -- COCKED (INDICATING);
20  HA, HA, HA; UM.
21  Q.   WAS THE --
22  A.   SHE HAD IT COCKED UP
23  (INDICATING), LIKE SHE WAS -- LIKE HER ELBOW
24  HAD HIT THE FLOOR FIRST.
25  Q.   OKAY.  DID YOU SEE WHAT BODY

Page 36

1   PART SHE HIT THE FLOOR WITH FIRST?
2   A.   I'M NOT QUITE SURE.
3   Q.   WHAT ABOUT, HOW MUCH TIME DID IT
4   TAKE BETWEEN THE TIME YOU SEE HER LOSE
5   FOOTING, AND THE FALL?
6   A.   ABOUT A GOOD, MAYBE -- WAIT.
7   SAY THAT AGAIN?
8   Q.   HOW LONG A TIME DID IT TAKE FOR
9   HER TO FALL?
10  A.   NOT LONG AT ALL; UM, SHE WALKED
11  IN; SHE LOOKED LIKE SHE WAS GOING TOWARDS THE
12  BAR AREA WHEN SHE SLIPPED.
13  Q.   HOW WOULD YOU DESCRIBE HER
14  WALKING AS SHE WALKS INTO THE CASINO THAT
15  DAY, BEFORE SHE FELL?
16  A.   UM, LIKE A REGULAR STROLL.
17  Q.   OKAY.  AND WHAT DID YOU DO WHEN
18  YOU SAW MS. SHIRLEY SLIP, AND FALL?
19  A.   I RAN TO HELP HER.
20  Q.   WHAT DID YOU SAY, IF ANYTHING?
21  A.   EXCUSE ME?
22  Q.   WHAT DID YOU TELL -- SAY TO HER,
23  IF ANYTHING?
24  A.   UM: "ARE YOU OKAY; IS THERE
25  ANYTHING I CAN DO?"

Page 37

1  Q.  DID SHE RESPOND?
2  A.  YES.
3  Q.  WHAT DID SHE SAY?
4  A.  UM, SHE WAS HURT; AND SHE NEEDED
5  SOMEBODY TO CALL HER BROTHER IN THEIR ROOM.
6  Q.  OKAY.  AND WHAT HAPPENED NEXT?
7  A.  UM, I ASKED FOR THE ROOM NUMBER;
8  AND I RAN BACK TOWARDS THE BAR; AND THERE'S A
9  PHONE THAT'S ON THE WALL, RIGHT ON THE SIDE
10  OF THE BAR THAT'S, LIKE, RIGHT BEHIND THE
11  BATHROOM AREA; AND I MADE THE PHONE CALL TO
12  HER BROTHER'S ROOM.
13  Q.  OKAY.  WHAT DID YOU DO NEXT?
14  A.  UM, I -- THE NIECE, OR NEPHEW,
15  ANSWERED; I INFORMED THE JUVENILE OF WHAT,
16  UM, WAS GOING ON; AND SHE SAID SHE WOULD GET
17  HER DAD; HE/SHE SAID THEY WOULD GET THEIR
18  DAD, UM, TO GET DOWN THERE.
19  Q.  OKAY.  AND AFTER THAT HAPPENED,
20  WHAT DID YOU DO; WHERE DID YOU GO?
21  A.  I WENT BACK, UM, TO MS. SHIRLEY
22  RILEY --
23  Q.  OKAY.
24  A.  -- TO SEE IF THERE WAS ANYTHING
25  ELSE I COULD DO.

Page 38

1  Q.  OKAY.  WERE YOU AT THE SCENE --
2  STRIKE THAT?  DID YOU OBSERVE ANYBODY FROM
3  THE MEDICAL DEPARTMENT ON THE SHIP AT THE
4  SCENE?
5  MR. KERNS:
6  OBJECTION; FORM.
7  WITNESS:
8  NOT AT THAT TIME.
9  Q.  (BY MR. EIKELAND).  OKAY.  ABOUT
10  WHAT TIME DID -- STRIKE THAT?  DID ANYBODY
11  CALL MEDICAL, FOR MEDICAL ASSISTANCE?
12  A.  YES.
13  Q.  AND WHO WAS THAT?
14  A.  UM, THE SECURITY GUARD FOR THE
15  CASINO; HE WAS ON THE RIGHT SIDE OF THE, UM
16  -- THE RIGHT SIDE OF THE CASINO, WAITING;
17  MAYBE ON A BREAK.
18  Q.  OKAY.  SO, ABOUT WHAT TIME --
19  HOW LONG DID IT TAKE FOR THE MEDICAL
20  ASSISTANCE TO COME TO SHIRLEY'S ASSISTANCE?
21  A.  UM, ABOUT TEN, MAYBE FIFTEEN,
22  MINUTES.
23  Q.  OKAY.  AND DURING THOSE FIFTEEN
24  MINUTES, DID SHIRLEY REMAIN ON THE TILED
25  WALKWAY?

Page 39

1  A.  YES.
2  Q.  OKAY.  WAS SHE LAYING DOWN FOR
3  TEN TO FIFTEEN -- HOW LONG WAS SHE LAYING
4  DOWN ON THE FLOOR?
5  A.  FOR ABOUT, MAYBE, TEN MINUTES
6  BEFORE, UM, A -- ANOTHER PASSENGER HELPED HER
7  UP.
8  Q.  OKAY.  DO YOU KNOW WHO THAT
9  PASSENGER WAS?
10  A.  NO.
11  Q.  AND --
12  A.  HE SAID HE WAS A DOCTOR.
13  Q.  WHEN YOU SAY THAT HE "HELPED HER
14  UP", CAN YOU EXPLAIN THAT; WHAT HE DID?
15  A.  HE GOT ON HER LEFT SIDE OF HER
16  BODY; AND HE BENT DOWN; AND PUT HIS HAND ON
17  THE UPPER PART (INDICATING) OF HER ARMPIT;
18  AND ON THE (INDICATING) ELBOW AREA; AND
19  HELPED HER GET UP; PICKED HER UP.
20  Q.  OKAY.  DID HE -- WHEN YOU SAY
21  "GOT HER UP", DID HE GET HER UP ON HER FEET,
22  OR IN A SITTING POSITION?
23  A.  IN A SITTING POSITION; AND THEN
24  HE TRIED TO GET HER UP FULLY TO HER FEET.
25  Q.  OKAY.  DID -- OKAY.  SO TELL ME

Page 40

1  ABOUT WHEN THE MEDICAL ASSISTANCE CAME.  HOW
2  MANY PEOPLE CAME?
3  A.  UH, TWO.
4  Q.  OKAY.  DID THEY BRING ANYTHING
5  WITH THEM?
6  A.  UM, A BAG; UM, FIRST AID BAG;
7  DUFFLE BAG.
8  Q.  OKAY.  DID THEY BRING ANY TYPE
9  OF MEANS OF TRANSPORTATION?
10  A.  UM, LATER ON, A WHEELCHAIR HAD
11  ARRIVED.
12  Q.  OKAY.  AND WERE YOU THERE WHEN
13  THE WHEELCHAIR ARRIVED?
14  A.  YES.
15  Q.  OKAY.  AND APPROXIMATELY HOW
16  LONG FROM THE TIME SHIRLEY FELL UNTIL THE
17  WHEELCHAIR CAME?
18  A.  ABOUT, MAYBE, TWO, THREE
19  MINUTES; NOT LONG.
20  Q.  FROM THE TIME OF THE FALL?
21  A.  OH, NO; UM, FROM THE TIME OF THE
22  MEDICAL ARRIVING; UM, THE WHEELCHAIR PROBABLY
23  DIDN'T ARRIVE UNTIL, MAYBE, TWENTY MINUTES
24  LATER, AFTER MS. SHIRLEY RILEY HAD FALLEN.
25  Q.  OKAY.  NOW, WHEN YOU WALKED OVER

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 41

1  TO MS. RILEY AFTER SHE HAD FALLEN, WAS SHE
2  STILL ON THE FLOOR?
3  A.  YES.
4  Q.  OKAY.  AND DID YOU -- IN ORDER
5  TO COMMUNICATE WITH HER, DID YOU CROUCH DOWN;
6  OR DID YOU REMAIN STANDING?
7  A.  I CROUCHED DOWN.
8  Q.  OKAY.  SO, AT THAT POINT, DID
9  YOU HAVE A CHANCE TO OBSERVE WHETHER THERE
10  WAS ANYTHING ON THE FLOOR?
11  A.  YES.
12  Q.  OKAY.  SO, TELL ME ABOUT YOUR
13  OBSERVATIONS.
14  A.  UM, THERE WAS A PILE OF WATER
15  THAT WAS ON THE FLOOR.
16  Q.  APPROXIMATELY HOW BIG WOULD YOU
17  SAY?
18  A.  UM, A NICE SIZE PUDDLE; IT WAS
19  SEEPING INTO THE CARPET.
20  Q.  IF YOU'LL LOOK AT THE TILES, THE
21  SIZE OF THE TILE.  APPROXIMATELY HOW MANY
22  TILES WIDE WAS IT?
23  A.  UM, WIDE; ABOUT, PROBABLY, FOUR.
24  Q.  FOUR TILES WIDE.  HOW ABOUT HOW
25  MANY TILES WIDE -- LONG?

Page 42

1  A.  LONG, PROBABLY TWO; MAYBE THREE.
2  Q.  DID YOU SEE ANYTHING -- DID YOU
3  OBSERVE ANYTHING IN THE WATER?
4  A.  NO.
5  Q.  DID YOU OBSERVE ANY SKIDMARKS;
6  ANY FOOTPRINTS; ANY DIRT?
7  A.  NOPE.
8  Q.  NO?  WAS IT -- HOW WOULD YOU
9  DESCRIBE THE WATER; WAS IT -- HOW MUCH WATER
10  WAS THERE?
11  A.  A LOT.
12  Q.  NOW, WHEN MS. SHIRLEY FELL, HOW
13  LONG HAD YOU BEEN SITTING AT THE BAR?
14  A.  UM, ABOUT FORTY MINUTES; THIRTY,
15  FORTY MINUTES.
16  Q.  OKAY.  AND FROM THE TIME YOU SAW
17  HER FALL, AND BETWEEN -- FROM THE TIME THAT
18  YOU WALKED INTO THE JACKPOT CASINO FROM THE
19  ATRIUM ENTRANCE, UNTIL THE TIME SHE FALLS,
20  ABOUT HOW MUCH TIME PASSED?
21  A.  WAIT.  SAY THAT AGAIN?
22  Q.  HA, HA, HA!  FROM THE TIME WHEN
23  YOU -- FROM THE TIME THAT YOU WALK INTO THE
24  CASINO TO SIT DOWN AT THE BAR, AND UNTIL THE
25  TIME MS. SHIRLEY -- YOU SEE MS. SHIRLEY FALL,

Page 43

1  ABOUT HOW MUCH TIME PASSED?
2  A.  ABOUT THIRTY, FORTY-FIVE
3  MINUTES.
4  Q.  OKAY.  SO, WHEN YOU WALKED IN
5  THIRTY TO FORTY-FIVE MINUTES PRIOR, DID YOU
6  OBSERVE ANYTHING ON -- ANY SUBSTANCE ON THE
7  WALKWAY?
8  A.  YES.
9  Q.  AND CAN YOU TELL ME ABOUT WHAT
10  YOU OBSERVED WHEN YOU WALKED IN THIRTY TO
11  FORTY-FIVE MINUTES PRIOR?
12  A.  UM, THERE WAS A SMALL PUDDLE OF
13  WATER WHEN I WALKED IN; UM.
14  Q.  ABOUT HOW LONG -- BIG WOULD YOU
15  SAY?
16  A.  UM, MAYBE, LIKE, TWO, THREE --
17  PROBABLY ABOUT TWO OF THE TILES.
18  Q.  AND WHERE WAS THAT WATER
19  LOCATED?
20  A.  IN THE AREA OF WHERE MS. SHIRLEY
21  RILEY HAD FALLEN.
22  Q.  OKAY.  AND FROM THE TIME YOU
23  WALKED IN UNTIL MS. RILEY FALLS, AND YOU GO
24  OVER, AND YOU CROUCH DOWN, AND YOU OBSERVE
25  THE WATER, DID IT APPEAR TO BE UNCHANGED?

Page 44

1  A.  YES.
2  MR. KERNS:
3  OBJECTION; FORM.
4  WITNESS:
5  IT HAD APPEARED TO BE CHANGED;
6  IT HAD SEEPED MORE TOWARDS THE CARPET AREA.
7  Q.  (BY MR. EIKELAND).  OKAY.
8  DURING THAT TIME YOU WERE SITTING AT THE BAR,
9  HAD YOU OBSERVED ANYBODY PUTTING UP WARNING
10  CONES?
11  A.  NO.
12  Q.  OKAY.  AT THE TIME THAT YOU WERE
13  SEATED AT THE BAR, DID ANYBODY CLEAN UP THE
14  WATER?
15  A.  NO.
16  Q.  AT THE TIME THAT YOU WERE SEATED
17  AT THE BAR, DID YOU OBSERVE ANY WARNING
18  SIGNS?
19  A.  NO.
20  Q.  AND AT THE TIME THAT YOU GO OVER
21  TO MS. SHIRLEY, AFTER SHE'S FALLEN, AND YOU
22  CROUCH DOWN, DID YOU SEE ANY WARNING CONES
23  THERE?
24  A.  NO.
25  Q.  OKAY.  ANY WARNING SIGNS THERE?

---

**Page 45**

1 A.  NO.
2 Q.  OKAY.  AS YOU WALKED INTO THE
3 CASINO, BEFORE THIS HAPPENED, THIRTY TO
4 FORTY-FIVE MINUTES PRIOR, WAS ANY OF THE
5 HALLWAY -- THE WALKWAY -- ROPED OFF?
6 A.  NO.
7 Q.  OKAY.  NOW, AT THE TIME OF THE
8 INCIDENT -- STRIKE THAT.  I'M GONNA' -- I'M
9 GONNA' SHOW YOU ANOTHER PICTURE OF THE TILE,
10 OR THE WALKWAY; AND IF YOU LOOK AT --
11      MS. EIKELAND:
12      I'M GONNA' MARK IT, JUST SO WE
13 CAN KEEP TRACK OF THEM, PLAINTIFF'S EXHIBIT
14 4.
15      (WHEREUPON, THE INSTRUMENT REFERRED
16 TO WAS MARKED DALISE GAUTREAUX DEPOSITION
17 PLAINTIFF'S EXHIBIT NUMBER 4 AND IS ATTACHED
18 TO THE TRANSCRIPT).
19 Q.  (BY MS. EIKELAND).  IT'S A
20 DIFFERENT PHOTOGRAPH.  DO YOU RECOGNIZE THIS
21 (INDICATING) TO BE THE TILED WALKWAY IN THE
22 CARNIVAL -- ON THE CARNIVAL DREAM, IN THE
23 JACKPOT CASINO?
24 A.  YES.
25 Q.  NOW, IF YOU LOOK AT PHOTOGRAPH

**Page 46**

1 MARKED PLAINTIFF'S EXHIBIT 3, AND PLAINTIFF'S
2 EXHIBIT -- THE PHOTO MARKED PLAINTIFF'S
3 EXHIBIT 4, IS THERE A DIFFERENCE IN COLOR --
4 A.  YES.
5 Q.  -- IN THOSE TWO PHOTOS?  I DON'T
6 KNOW WHY; I'M JUST GONNA' SAY THAT THEY WERE
7 TAKEN AT DIFFERENT TIMES, OBVIOUSLY.  WHEN
8 YOU WERE THERE IN THE CASINO AT THE TIME OF
9 THE INCIDENT, IT WAS -- WHAT DID YOU SAY;
10      ABOUT 5:00 IN THE AFTERNOON?
11 A.  UH-HUH.
12 Q.  AS YOU PERCEIVED IT WAS THE
13 COLOR OF THE TILE MORE LIKE THE COLOR IN
14 PLAINTIFF'S EXHIBIT 4, OR PLAINTIFF'S EXHIBIT
15 3?
16 A.  4.
17 Q.  SO AT 5:00 IN THE AFTERNOON, IT
18 SEEMED MORE LIKE PLAINTIFF'S EXHIBIT 4?
19 A.  UH-HUH.
20      MR. KERNS:
21      OBJECTION; FORM.
22 Q.  (BY MS. EIKELAND).  AND HOW
23 WOULD YOU DESCRIBE THE COLOR OF THE TILE THAT
24 YOU SEE IN PLAINTIFF'S EXHIBIT 4?
25 A.  MORE OF A COPPER COLOR.

**Page 47**

1 Q.  OKAY.  AND THAT'S HOW YOU
2 REMEMBER IT?
3 A.  YES.
4 Q.  BASED ON -- STRIKE THAT.  THIS
5 CRUISE WAS IN APRIL OF 2014.  WAS THAT DURING
6 SPRING BREAK?
7 A.  YES.
8 Q.  OKAY.  AND HOW WOULD YOU
9 DESCRIBE THAT PARTICULAR CRUISE?
10 A.  HORRIBLE.
11 Q.  AND CAN YOU EXPLAIN WHAT YOU
12 MEAN BY THAT?
13 A.  UM --
14 Q.  OR LET ME REPHRASE IT.  WHAT WAS
15 DIFFERENT ABOUT THIS CRUISE, COMPARED TO THE
16 OTHER CRUISES THAT YOU'D BEEN ON?
17 A.  ALL KINDS OF THINGS; IT WAS
18 SHORT STAFFED; UM; THEY HAD KIDS RUNNING WILD
19 EVERYWHERE; UM.
20 Q.  THE OTHER CRUISES THAT YOU'VE
21 BEEN ON, PRIOR TO THIS CRUISE, WERE ALL WITH
22 CARNIVAL?
23 A.  YES.
24 Q.  OKAY.  SO, WHAT WAS IT ABOUT THE
25 STAFFING ON THIS PARTICULAR CRUISE THAT YOU

**Page 48**

1 FOUND TO -- OR THAT MADE YOU THINK THAT IT
2 WAS UNDERSTAFFED?
3 A.  UM, IT -- YOU NEVER COULD FIND
4 SOMEBODY; IT TOOK THIRTY, FORTY-FIVE MINUTES
5 FOR PEOPLE TO GET THEIR -- GET TO WHERE THEY
6 NEEDED TO GET TO WHEN YOU CALLED FOR 'EM.
7 Q.  AND HAD THAT BEEN DIFFERENT ON
8 THE OTHER CRUISES YOU WENT ON?
9 A.  YES.
10      MR. KERNS:
11      OBJECTION; FORM.
12      WITNESS:
13      YES.
14 Q.  (BY MR. EIKELAND).  WHAT ABOUT
15 IN TERMS OF CHILDREN ON THE CRUISE; HAD YOU
16 EVER CRUISED ON -- IN APRIL -- ON ANY OF THE
17 OTHER CRUISES; OR DURING SPRING BREAK ON ANY
18 OF THE OTHER CRUISES?
19 A.  YES.
20 Q.  AND WHAT WAS DIFFERENT ABOUT
21 THIS CRUISE, COMPARED TO THE OTHER CRUISES?
22 A.  UM, THIS CRUISE HAD A LOT OF
23 CHILDREN, UM, RANGING FROM SIX TO SIXTEEN,
24 SEVENTEEN, EVEN COLLEGE STUDENTS ON IT, THAT
25 WERE ACTING WILD, AND CRAZY.

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 49

1 Q. AND -- OKAY. SO WHERE WERE --
2 THE WHERE WOULD THE KIDS BE RUNNING; YOU
3 KNOW, WHERE DID YOU SEE KIDS RUNNING?
4 A. UM, ALL OVER THE PLACE; UM, IN
5 THE ATRIUM; UM, THEY WOULD PLAY IN THE, UM,
6 THE BIG MUSIC LOUNGE IN THE FRONT OF THE
7 SHIP; THEY'D PLAY UP AND DOWN THE STEPS,
8 RUNNING BACK AND FORTH; UM, THEY WERE RUNNING
9 THROUGH THE DINING ROOM AREAS; THEY WERE IN
10 THE SERENITY AREA, WHICH CHILDREN AREN'T
11 SUPPOSED TO BE IN; UM, THEY WERE RUNNING IN
12 AND OUT OF THE CASINO; ALL UP AND DOWN THE
13 HALLS; THEY WERE EVERYWHERE.
14 Q. OKAY. AND DO YOU KNOW ANYTHING
15 ABOUT -- I MEAN -- STRIKE THAT. DID YOU SEE
16 KIDS AROUND THE POOL AREA?
17 A. EXCUSE ME.
18 Q. DID YOU GO TO THE POOL?
19 A. YEAH.
20 Q. OKAY. WERE THERE KIDS AROUND
21 THE POOL?
22 A. YES.
23 Q. OKAY. SO DID YOU SEE KIDS
24 RUNNING FROM THE POOL, AND GO OTHER PLACES?
25 A. YES.

Page 50

1 MR. KERNS:
2 OBJECTION; FORM.
3 Q. (BY MR. EIKELAND). IN OTHER
4 WORDS, WHEN YOU SAW THE KIDS WERE THEY,
5 SOMETIMES, IN SWIM TRUNKS?
6 A. YES.
7 Q. OKAY. WERE THEY WET?
8 A. YES.
9 MR. KERNS:
10 OBJECTION; FORM.
11 Q. (BY MR. EIKELAND). OKAY. ON
12 ANY, DID YOU, AT ANY POINT IN TIME PRIOR TO
13 MS. SHIRLEY FALLING, SEE CHILDREN IN THE
14 CASINO?
15 A. YES.
16 Q. OKAY. DID YOU, AT ANY POINT IN
17 TIME BEFORE MS. SHIRLEY FELL, OBSERVE
18 CHILDREN IN SWIM TRUNKS IN THE CASINO?
19 A. YES.
20 Q. OKAY. WHERE ELSE DID YOU SEE
21 KIDS IN SWIM TRUNKS ON THAT PARTICULAR DAY?
22 A. UM --
23 MR. KERNS:
24 OBJECTION; FORM.
25 WITNESS:

Page 51

1 IN AND OUT OF THE DINING ROOM;
2 IN THE, UM, ATRIUM AREA; IN THE, UM, PHOTO
3 BOOTH AREA; PHOTO CENTER AREA; UM, THEY HAD
4 'EM ON THE SERENITY DECK; IN THE HOT TUBS,
5 ALL ALONGSIDE THE CASINO.
6 Q. (BY MR. EIKELAND). ON THAT
7 PARTICULAR DAY OF THE CRUISE, DID YOU OBSERVE
8 WATER ANYWHERE ELSE ON THE SHIP?
9 A. YES.
10 Q. WHERE; WHERE WOULD THAT BE?
11 A. UH, IN THE DINING ROOM AREA.
12 Q. SO, BASED ON WHAT YOU OBSERVED
13 DURING THE CRUISE, AND ON THAT PARTICULAR DAY
14 IN APRIL 19, 2014, DO YOU HAVE AN OPINION AS
15 TO WHERE THE WATER WAS COMING FROM THAT WAS
16 ON THE WALKWAY --
17 MR. KERNS:
18 OBJECTION; FORM; I'M SORRY.
19 Q. (BY MS. EIKELAND) -- WHEN
20 SHIRLEY FELL.
21 MR. KERNS:
22 I'LL LET YOU FINISH.
23 OBJECTION; FORM.
24 WITNESS:
25 UM, IT WAS, MOST LIKELY, FROM

Page 52

1 THE CHILDREN RUNNING ALL OVER THE PLACE.
2 Q. (BY MR. EIKELAND). I'M SORRY; I
3 HAVE TO ASK YOU OVER AGAIN. WHERE HAD YOU
4 SEEN WATER ON THAT PARTICULAR DAY?
5 A. UM, IN THE DINING ROOM AREA.
6 Q. OKAY. WAS THAT ON THE LIDO
7 DECK?
8 A. UM, NO; IT'S ON DECK 4; 4, AND
9 3.
10 Q. DID THERE SEEM TO BE MORE KIDS
11 ON THIS CRUISE THAN ON OTHER CRUISES?
12 A. YES.
13 Q. WHY DO YOU THINK THAT WAS?
14 A. IT WAS SPRING BREAK; BUT WE HAD
15 TRAVELLED SPRING BREAK BEFORE; UM, I DON'T
16 KNOW; PROBABLY 'CAUSE IT WAS ONE OF THE
17 CHEAPEST CRUISES.
18 Q. AND THERE WERE A LOT OF FAMILIES
19 ON THE CRUISE?
20 A. YEAH.
21 Q. OKAY. SO, GOING BACK TO THE
22 PHOTOS; THE PHOTO MARKED PLAINTIFF'S EXHIBIT
23 4. DOES THAT ACCURATELY DEPICT THE CASINO
24 JACKPOT (SIC) AT THE TIME OF MS. SHIRLEY'S
25 FALL?

Page 53

1  A.   YES.
2  Q.   OKAY.  AND DOES IT, PLAINTIFF'S
3  EXHIBIT 4, ACCURATELY DEPICT THE LIGHTING IN
4  THE CASINO AT THE TIME OF MS. SHIRLEY'S FALL?
5  A.   YES.
6       MR. KERNS:
7       OBJECTION; FORM.
8  Q.   (BY MR. EIKELAND).  GOING BACK
9  TO WHEN YOU SAID YOU WERE SEATED AT THE BAR,
10 SMOKING.  DID YOU -- I THINK YOU SAID -- I
11 SHOULD ASK YOU OVER AGAIN.  HOW MUCH -- HOW
12 LONG WERE YOU THERE FOR?
13 A.   AT THE BAR?
14 Q.   UH-HUH.
15 A.   A GOOD THIRTY TO FORTY-FIVE
16 MINUTES.
17 Q.   OKAY.  AND HOW DID YOU COME TO
18 FIGURE IT WAS THIRTY TO FORTY-FIVE MINUTES?
19 A.   UM, IT NORMALLY TAKES ME TEN
20 MINUTES TO SMOKE A CIGARETTE; AND I HAD
21 SMOKED ABOUT FOUR OF 'EM.
22 Q.   DID YOU HAVE ANY ALCOHOLIC
23 BEVERAGES WHILE YOU WERE SEATED THERE?
24 A.   THAT DAY, NO.
25 Q.   WHEN YOU LEFT, YOU SAID YOU WERE

Page 54

1  GOING TO GET READY FOR THE DINNER?
2  A.   YES.
3  Q.   OKAY.  DID YOU HAVE, LIKE, A SET
4  TIME WHERE YOU HAD TO BE FOR DINNER?
5  A.   YES.
6  Q.   DID YOU HAVE THE EARLIER, OR THE
7  LATER, DINNER SEATING?
8  A.   EARLIER.
9  Q.   OKAY.  AND WHAT TIME WOULD THAT
10 BE?
11 A.   UM, 6:30.
12 Q.   ALL RIGHT.
13 A.   6:00; 6:30.
14 Q.   OKAY.  I THINK I ASKED YOU; BUT
15 JUST TO BE ON THE SAFE SIDE.  WHEN YOU
16 OBSERVED THE LIQUID, OR THE WATER, ON THE
17 FLOOR, WHEN YOU CROUCHED DOWN AFTER SHIRLEY
18 HAD FALLEN, DID YOU OBSERVE ANYTHING IN THE
19 WATER?
20 A.   NO.
21     MR. KERNS:
22     OBJECTION; FORM.
23 Q.   (BY MR. EIKELAND).  DID YOU --
24 AT ANY POINT IN TIME, WERE YOU AT -- STRIKE
25 THAT.  WERE YOU, AT ANY POINT IN TIME AFTER

Page 55

1  THE INCIDENT, CONTACTED BY ANYBODY FROM
2  CARNIVAL ON BOARD THE SHIP TO -- TO TALK
3  ABOUT WHAT HA HAPPENED?
4  A.   DURING THE TIME OF THE CRUISE --
5  Q.   UH-HUH.
6  A.   -- OR AFTER?
7  Q.   AT THE CRUISE.
8  A.   NO.
9  Q.   OKAY.  SO YOU WERE NEVER
10 CONTACTED BY A SECURITY OFFICER TO GIVE A
11 STATEMENT?
12 A.   NO.
13 Q.   OKAY.  DID YOU -- DID YOU SEE
14 ANY SECURITY OFFICER THERE AFTER MS. SHIRLEY
15 HAD FALLEN?
16 A.   YES.
17 Q.   DID HE SPEAK TO YOU?
18 A.   NO.
19 Q.   DID HE ASK FOR YOUR NAME?
20 A.   NO.
21 Q.   DID ANYBODY FROM MEDICAL ASK FOR
22 YOUR NAME?
23 A.   (WITNESS SHAKING HEAD
24 NEGATIVELY).  NOPE.
25 Q.   DID ANYBODY FROM THE MEDICAL WHO

Page 56

1  CAME TO THE SCENE OF THE -- WHERE SHIRLEY HAD
2  FALLEN, ASK FOR YOUR NAME?
3  A.   NO.
4  Q.   WHEN YOU -- WHAT WERE YOU DOING
5  AS YOU OBSERVED MS. SHIRLEY FALLING?
6  A.   UM, WALKING TO MY ROOM.
7  Q.   OKAY.  WERE YOU IN A HURRY?
8  A.   NO.
9  Q.   DID YOU HAVE ANY TYPE OF
10 OBSTRUCTIONS IN YOUR VIEW OF SHIRLEY AS SHE
11 WAS FALLING?
12 A.   NO.
13 Q.   DID YOUR HUSBAND SEE HER FALL?
14 A.   NO.
15 Q.   WAS HE STILL AT THE BAR?
16 A.   YES.
17 Q.   DID THERE COME A POINT IN TIME
18 WHERE YOU REPORTED WHAT YOU HAD SEEN?
19 A.   UM, NOT DURING THE CRUISE.
20 Q.   WHAT ABOUT AFTER?
21 A.   YES.
22 Q.   OKAY.  CAN YOU TELL ME ABOUT
23 THAT?
24 A.   UM, THE DAY I GOT OFF THE SHIP,
25 I HAD CALLED, UM, CARNIVAL'S CUSTOMER SERVICE

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

---

Page 57

1   LINE, TO INFORM THEM OF THE HORRIBLE TIME
2   THAT I HAD; AND, UM, DURING THAT
3   CONVERSATION, I HAD TOLD 'EM ABOUT THE, UM --
4   I HAD TOLD 'EM THAT I WATCHED A LADY FALL
5   BECAUSE OF THE FACT THAT THERE WAS WATER ON
6   THE FLOOR; AND THEY SAID THAT THEY HAD NOT
7   RECEIVED THE REPORTS BACK YET FROM THAT SHIP,
8   BECAUSE IT WAS STILL AT -- WE HAD DOCKED JUST
9   THAT MORNING; AND THAT I COULD GIVE 'EM A
10  CALL BACK THE NEXT MORNING.
11  Q.  DID YOU DO THAT?
12  A.  YES.
13  Q.  AND WHAT HAPPENED DURING THAT
14  CONVERSATION?
15  A.  UM, I GAVE 'EM THE WHOLE STORY;
16  AND THEY INFORMED ME THAT, UM, THEY COULD
17  OFFER ME A BOTTLE OF CHAMPAGNE FOR MY
18  INCONVENIENCE.
19  Q.  HA, HA, HA!  DID YOU ACCEPT IT?
20  A.  (WITNESS SHAKING HEAD
21  NEGATIVELY).  I'M SORRY; NO; I INFORMED THEM
22  THAT I DID NOT WANT ANYTHING; IT WASN'T ABOUT
23  THAT; IT WAS ABOUT THE FACT THAT I ENJOYED
24  CRUISING WITH CARNIVAL; AND FOR ME TO HAVE
25  SUCH A BAD EXPERIENCE WITH THEM, IT WAS

---

Page 58

1   RIDICULOUS; AND JUST THAT THEY SHOULD BE ABLE
2   TO GET SOMETHING A LITTLE BIT BETTER THAN
3   WHAT THIS SHIP WAS.
4   Q.  ALL RIGHT.  WHAT WAS THE PURPOSE
5   OF YOUR CALL?
6   A.  JUST TO TELL 'EM WHAT WAS GOING
7   ON.
8   Q.  ALL RIGHT.  DID YOU EXPECT AN
9   APOLOGY?
10  A.  EXCUSE ME?
11  Q.  DID YOU EXPECT AN APOLOGY?
12  A.  YES.
13  Q.  DURING THAT SECOND CONVERSATION,
14  DID YOU, ALSO, DURING THAT SECOND TELEPHONE
15  CONVERSATION WITH THE CUSTOMER REP AT
16  CARNIVAL, TELL THEM ABOUT THE INCIDENT
17  INVOLVING MS. SHIRLEY?
18  A.  YES.
19      MR. KERNS:
20      OBJECTION; FORM.
21  Q.  (BY MS. EIKELAND).  DO YOU
22  REMEMBER WHAT YOU TOLD THEM DURING THAT
23  SECOND CONVERSATION?
24  A.  UM, THE SAME THING I HAD TOLD
25  THE LADY ON THE FIRST DAY, WHEN I GOT OFF THE

---

Page 59

1   SHIP; THAT, UM, THERE WAS SEVERAL ISSUES THAT
2   I HAD WITH THIS CRUISE; UM, ONE OF THEM BEING
3   THAT I HAD TO WATCH A LADY FALL, UM, BECAUSE
4   THERE WAS WATER ON THE FLOOR; AND THEY WERE
5   SUCH SHORT-STAFFED THAT THEY COULDN'T GET IT
6   CLEANED UP.
7   Q.  SO, GOING BACK TO THE TIME WHERE
8   YOU'RE WALKING BACK TO YOUR ROOM AFTER BEING
9   AT THE BAR, AND YOU SEE SHIRLEY COME WALKING
10  IN, BASED ON WHAT YOU SAW, DO YOU FEEL LIKE
11  MS. RILEY DID ANYTHING WRONG?
12      MR. KERNS:
13      OBJECTION TO FORM.
14      WITNESS:
15  UM, NO.
16  Q.  (BY MR. EIKELAND).  ALL RIGHT.
17  LET ME ASK IT DIFFERENTLY.  BASED ON WHAT YOU
18  OBSERVED WHEN YOU SAW MS. SHIRLEY WALKING, DO
19  YOU FEEL LIKE MS. RILEY DID ANYTHING UNSAFE,
20  OR UNREASONABLE, WALKING IN THERE?
21      MR. KERNS:
22      OBJECTION; FORM.
23      WITNESS:
24  NO.
25  Q.  (BY MR. EIKELAND).  HOW BUSY WAS

---

Page 60

1   IT IN THE CASINO DURING THE THIRTY MINUTES
2   WHERE YOU WERE SEATED AT THE BAR SMOKING?
3   A.  UM, IT WASN'T THAT BUSY; IT
4   WASN'T A CROWD OF PEOPLE, LIKE THE CAPTAIN'S
5   DINNER NIGHT.
6   Q.  DO YOU HAVE ANY IDEA OF, YOU
7   KNOW, HOW MANY PEOPLE WALKED IN DURING THAT
8   HALF HOUR TO FORTY-FIVE MINUTES YOU WERE
9   SEATED THERE?
10  A.  HMM, NO; I MEAN, THERE WAS A FEW
11  PEOPLE THAT GOT UP AND LEFT; AND MORE PEOPLE
12  CAME IN; BUT I DON'T -- I WASN'T COUNTING THE
13  PEOPLE THAT WAS COMING IN.
14  Q.  HA, HA, HA!  ALL RIGHT.
15  UNDERSTOOD.  HA, HA!  IS IT FASTER TO GO
16  THROUGH THE CASINO TO GET TO YOUR CABINS ON
17  THAT SHIP?
18  A.  UM, DEPENDING ON WHERE YOU'RE
19  AT, YEAH.
20  Q.  OKAY.
21      MS. EIKELAND:
22      CAN WE TAKE A SHORT BREAK?
23      MR. KERNS:
24      YES.
25      MS. EIKELAND:

---

Page 61

1    GO OFF THE RECORD.
2    MR. KERNS:
3    I'D, ACTUALLY, LOVE TO; MY PEN
4  EXPLODED; I NEED TO WASH MY HANDS.
5    VIDEOGRAPHER:
6    OFF THE RECORD AT 12:04.
7    (WHEREUPON, THERE WAS A RECESS).
8    VIDEOGRAPHER:
9    THIS MARKS THE BEGINNING OF
10 VIDEO TAPE NUMBER 2; WE'RE GOING BACK ON THE
11   RECORD AT 12:14.
12 Q.  (BY MS. EIKELAND).  OKAY.  I
13  JUST WANT TO GO BACK OVER SOMETHING, TO MAKE
14  SURE I GOT IT RIGHT.  I UNDERSTAND IT WAS
15  YOUR TESTIMONY THAT YOU SAW WATER ON THE
16  FLOOR AS YOU WALKED IN THAT DAY; RIGHT?
17 A.  YES.
18 Q.  PRIOR TO YOU SITTING DOWN AT THE
19  BAR?
20 A.  YES.
21 Q.  OKAY.  AND THAT YOUR TESTIMONY
22  IS IT WAS THIRTY TO FORTY-FIVE MINUTES PRIOR
23  TO SHIRLEY FALLING?
24 A.  YES.
25 Q.  SO THE WATER THAT YOU OBSERVED

Page 62

1  ON THE WALKWAY WHEN YOU WALKED IN, THIRTY TO
2  FORTY-FIVE MINUTES PRIOR, IS IT THE SAME
3  PUDDLE OF WATER THAT YOU SAW THAT SHIRLEY
4  FELL IN?
5    MR. KERNS:
6    OBJECTION; FORM.
7    WITNESS:
8    YES.
9 Q.  (BY MR. EIKELAND).  OKAY.  SO,
10  I'M GONNA' JUST ASK IT ONE DIFFERENT WAY,
11  BECAUSE THERE WAS AN OBJECTION.  THE WATER
12  THAT YOU OBSERVED STRIKE THAT?  THE PUDDLE OF
13  WATER THAT YOU OBSERVED WHEN YOU CROUCHED
14  DOWN NEXT TO SHIRLEY.  HAD YOU HAD A CHANCE
15  TO OBSERVE THAT WATER PRIOR TO MS. SHIRLEY
16  FALLING?
17    MR. KERNS:
18    OBJECTION; FORM.
19    WITNESS:
20    BESIDES JUST SEEING IT, NO.
21 Q.  (BY MR. EIKELAND).  I DIDN'T --
22  I'M SORRY; I DON'T THINK YOU UNDERSTOOD THE
23  QUESTION.  HA, HA, HA!
24 A.  NO.
25 Q.  THE WATER THAT MS. SHIRLEY --

Page 63

1  STRIKE THAT?  THE WATER THAT YOU OBSERVED, OR
2  THE PUDDLE OF WATER THAT WERE THERE WHEN
3  SHIRLEY FELL, AND THAT SHIRLEY FELL IN.
4 A.  OKAY.
5 Q.  HAD YOU HAD A CHANCE TO OBSERVE
6  THAT PUDDLE OF WATER BEFORE SHE FELL; AND IF
7  SO, WHAT TIME DID YOU OBSERVE IT?
8    MR. KERNS:
9    OBJECTION; FORM.
10    WITNESS:
11    YES; UM, WHEN I WALKED IN TO GO
12  TO SIT AT THE BAR.
13 Q.  (BY MS. EIKELAND).  OKAY.  ALL
14  RIGHT.  BETWEEN THE TIME YOU WALKED IN TO GO
15  TO THE BAR, THIRTY TO FORTY-FIVE MINUTES
16  PRIOR TO MS. SHIRLEY FALLING, WHAT HAD
17  CHANGED, IF ANYTHING, ABOUT THE PUDDLE OF
18  WATER BEFORE SHIRLEY FELL?
19 A.  UM, IT HAD GOTTEN LARGER; AND IT
20  STARTED TO SPREAD IN TO TOWARDS THE CARPET
21  AREA.
22    MS. EIKELAND:
23    OKAY.  ALL RIGHT.  I THINK -- I
24  THINK I'M GOOD FOR NOW; MASON KERNS IS,
25  PROBABLY, GOING TO HAVE SOME FOLLOW-UP

Page 64

1  QUESTIONS FOR YOU.
2    MR. KERNS:
3    YES.
4    EXAMINATION BY MR. KERNS:
5 Q.  MS. GAUTREAUX, HOW ARE YOU
6  DOING?
7 A.  GOOD.  AND YOURSELF?
8 Q.  VERY WELL; THANK YOU.
9 A.  OKAY.
10 Q.  NOW, MS. EIKELAND WENT OVER
11  SOME, I GUESS I WOULD CALL THEM GROUND RULES,
12  PRIOR TO YOU ANSWERING QUESTIONS -- YOU
13  ANSWERING HER QUESTIONS; AND IT'S PRETTY MUCH
14  THE SAME WITH ME; ONE THING I WANT TO ASK IS,
15  PLEASE MAKE SURE THAT YOU UNDERSTAND EXACTLY
16  WHAT I'M ASKING BEFORE YOU ANSWER A QUESTION.
17  OKAY?
18 A.  OKAY.
19 Q.  BECAUSE SOMETIMES I MIGHT ASK A
20  QUESTION THAT IS POOR; OR THAT IS VAGUE; OR
21  CONFUSING; AND I'M NOT DOING IT ON PURPOSE;
22  SO IF YOU DON'T UNDERSTAND ME, PLEASE JUST
23  ASK FOR CLARIFICATION.  OKAY?
24 A.  OKAY.
25 Q.  BECAUSE IF YOU ANSWER IT, I'M

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 65

1   GOING TO ASSUME THAT YOU -- THAT YOU
2   UNDERSTOOD IT.  ALL RIGHT?
3   A.  ALL RIGHT.
4      MS. EIKELAND:
5      I'M GONNA' OBJECT TO THAT
6   ASSUMPTION; SHE'S NOT HERE TO CONDONE YOUR
7   ASSUMPTIONS; SHE'S HERE TO ANSWER QUESTIONS.
8   Q.  (BY MR. KERNS).  AND YOU
9   INDICATED YOU HAVE GIVEN DEPOSITIONS BEFORE;
10  CORRECT?
11  A.  YES.
12  Q.  AND THOSE WERE IN CRIMINAL
13  MATTERS, HERE IN LOUISIANA?
14  A.  YES.
15  Q.  DO THEY INVOLVE BATTERIES, OR
16  OTHER CRIMES, IN A JAIL SETTING?
17  A.  UM, NOT THOSE SPECIFIC CRIMES;
18  BUT MOST OF THE TIME, YES.
19  Q.  WERE ANY OF THEM, BY CHANCE,
20  INMATES ACTING, LIKE, INAPPROPRIATELY
21  SEXUALLY?
22  A.  YES.
23  Q.  HOW MANY TIMES HAVE YOU BEEN
24  DEPOSED, WOULD YOU SAY?
25  A.  UM, EVERY TIME I WRITE UP A BLUE

Page 66

1   PAPER, WHICH IS A WRITE-UP, THEY USE THAT AS
2   A DEPOSITION.
3   Q.  HAS THE LAWYER FOR THE DEFENDANT
4   IN THOSE CASES EVER ASKED YOU QUESTIONS?
5   A.  NO.
6   Q.  HAVE YOU EVER HAD TO RAISE YOUR
7   RIGHT HAND, OTHER THAN TODAY, AND SWEAR TO
8   TELL THE TRUTH (INDICATING) --
9   A.  NO.
10  Q.  -- AND THEN PROCEED TO TESTIFY?
11  SO, WHEN YOU TALKED ABOUT GIVING PRIOR
12  DEPOSITIONS, YOU MEAN JUST FILLING OUT --
13  A.  PAPERWORK --
14  Q.  -- PAPERWORK?
15  A.  -- THAT IS USED AS MY STATEMENT.
16  Q.  AND YOU INDICATED THAT YOU'VE,
17  ALSO, NEVER TESTIFIED IN A COURTROOM;
18  CORRECT?
19  A.  NO.
20  Q.  HOW ABOUT IN, NOT A CRIMINAL
21  PROCEEDING; BUT ANY OTHER TYPE OF PROCEEDING;
22  LIKE, A DIVORCE PRECEDING --
23  A.  NOPE.
24  Q.  -- OR CHILD CUSTODY; OR ANYTHING
25  LIKE THAT?

Page 67

1   A.  NOPE.
2   Q.  BUT YOU INDICATED THAT'S
3   SOMETHING YOU -- I THINK YOU SAID YOU'D LIKE
4   TO GET IN A COURTROOM?
5   A.  I'D LIKE TO GET INTO THE
6   COURTROOM; YES.
7   Q.  IN WHAT -- IN WHAT WAY --
8      MS. EIKELAND:
9      I'M GONNA' POSE AN OBJECTION,
10  SORRY, RETROSPECTIVELY.
11     MR. KERNS:
12     UNDERSTOOD.
13  Q.  (BY MR. KERNS).  IN WHAT WAY
14  WOULD YOU LIKE TO GET IN THE COURTROOM?
15  A.  UM, I WOULD, REALLY, LOVE TO
16  BECOME A CRIMINAL ATTORNEY, ONCE I COULD
17  FINISH SCHOOL; BUT I DON'T KNOW IF I'M GONNA'
18  MAKE IT THAT FAR.
19  Q.  WOULD YOU LIKE TO BE A
20  PROSECUTOR; OR A DEFENSE ATTORNEY; OR BOTH?
21  A.  UM, I'D LIKE TO START OUT AS A
22  PROSECUTOR; AND, EVENTUALLY, I'D GO TO BE A
23  DEFENSE ATTORNEY.
24  Q.  OKAY.
25  A.  IT'S HARDER TO DEFEND INSTEAD OF

Page 68

1   PROSECUTE.
2   Q.  AND YOU CAN ASK ME; I WAS A
3   PUBLIC DEFENDER FOR ABOUT THREE AND A HALF
4   YEARS.  SO I CAN ANTICIPATE WHAT TYPE OF BLUE
5   FORMS YOU HAD TO WRITE OUT; RIGHT?
6   A.  UH-HUH.
7   Q.  BECAUSE INMATES HAVE A LOT OF
8   TIME ON THEIR HANDS; RIGHT?
9   A.  YES.
10  Q.  NOW, I SEE YOU'RE WEARING YOUR
11  UNIFORM TODAY.  DO YOU HAVE TO WORK TODAY?
12  A.  YES.
13  Q.  WHAT TIME DO YOU HAVE TO WORK?
14  A.  UM, I GO IN FOR 10:00 TONIGHT;
15  BUT I'M WORKING OVERTIME AT 2:00.
16  Q.  AT 2:00.  OKAY.  DID YOU
17  INDICATE TO MS. EIKELAND THAT YOU HAD TO WORK
18  TODAY?
19  A.  YES.
20  Q.  OKAY.  DID YOU LET HER KNOW THAT
21  YOU WERE GONNA' WEAR YOUR UNIFORM?
22  A.  NO.
23  Q.  DID SHE ASK YOU IF YOU WERE
24  WEARING YOUR UNIFORM?
25     MS. EIKELAND:

Associated Reporters, Inc.
(504) 529-3355

Page 69

1  OBJECTION; FORM.
2  WITNESS:
3  NO.
4  Q.  (BY MR. KERNS).  HOW MANY
5  CONVERSATIONS HAVE YOU HAD WITH -- WITH
6  COUNSEL FOR PLAINTIFF?
7  A.  UM, A COUPLE.
8  Q.  OKAY.  AND HAVE YOU RECEIVED ANY
9  WRITTEN CORRESPONDENCE FROM EITHER COUNSEL;
10  OR THE HICKEY LAW FIRM; OR ANYBODY ON BEHALF
11  OF MS. RILEY?
12  A.  SAY THAT AGAIN?  EXCUSE ME.
13  Q.  HAVE YOU RECEIVED ANY WRITTEN
14  CORRESPONDENCE --
15  A.  (WITNESS SHAKING HEAD
16  NEGATIVELY).
17  Q.  -- FROM THE PEOPLE I JUST
18  MENTIONED?
19  A.  UM, JUST A SUBPOENA.
20  Q.  YOU HAVEN'T RECEIVED AN E-MAIL,
21  OR ANYTHING OF THAT NATURE, FROM MS.
22  EIKELAND; OR ANYONE FROM HER FIRM?
23  A.  UM, NO, MA'AM -- NO, SIR; SORRY.
24  Q.  HOW ABOUT A LETTER?
25  A.  UH, NO, SIR; AND IF I DID, I

Page 70

1  HAVEN'T OPENED IT.
2  Q.  HA, HA!  HOW ABOUT A LETTER FROM
3  MYSELF; OR ANYONE ASSOCIATED WITH MY CLIENT,
4  CARNIVAL?
5  A.  UH, NO, SIR.
6  Q.  ALL RIGHT.  HAS ANYONE PROMISED
7  YOU ANYTHING, OR ATTEMPTED TO BRIBE YOU, OR
8  INFLUENCE YOUR TESTIMONY, IN ANY WAY?
9  A.  NO, SIR.
10  Q.  I BELIEVE MS. EIKELAND ASKED IF
11  YOU WERE A VIFP; THAT'S A PROGRAM TO REWARD,
12  LIKE, LOYAL CARNIVAL CUSTOMERS.  IS THAT AN
13  ACCURATE WAY TO PUT IT?
14  A.  YES.
15  MS. EIKELAND:
16  OBJECTION; FORM.
17  Q.  (BY MR. KERNS).  YOU INDICATED,
18  I THINK YOU SAID: "ON THAT CRUISE, NO".
19  WHAT DID YOU MEAN BY THAT?
20  A.  UM, ON THAT CRUISE, I WAS NOT A
21  VIFP, OR A VIP; UM, BUT ON THE LAST CRUISE
22  THAT I'VE JUST BEEN ON ON THE CARNIVAL
23  VICTORY, WITH MY HUSBAND, FOR OUR HONEYMOON,
24  WE WERE VIP.
25  BUT THAT WAS BECAUSE MY MOTHER-

Page 71

1  IN-LAW, WHO PURCHASED THE CRUISE FOR US AS A
2  WEDDING GIFT, UM, SHE PURCHASED IT FOR US TO
3  BE VIPS, SO WE COULD GET ON AND OFF THE SHIP
4  EARLY FOR -- SO WE DON'T MISS OUR FLIGHT FROM
5  MIAMI.
6  Q.  UNDERSTOOD.  AND HOW MANY MORE
7  CRUISES WOULD YOU HAVE TO GO ON TO BE A VIFPE
8  (SIC), OR VIP?
9  A.  UM, I HAVE TO GO ON ONE MORE
10  CRUISE; WELL, I NEED ONE MORE DAY ON A CRUISE
11  IN ORDER TO HAVE THE GOLD CARD; UM, ONCE THAT
12  HAPPENS, THEN, UM, I DON'T KNOW EXACTLY HOW
13  MANY IT IS FROM THE GOLD TO THE DIAMOND, AND
14  PLATINUM, VIP 1.
15  Q.  OKAY.
16  A.  I'M NOT QUITE SURE ON THAT ONE.
17  MR. KERNS:
18  COULD I LOOK AT PLAINTIFF
19  EXHIBITS?
20  MADAME REPORTER:
21  (HANDING EXHIBITS.)
22  Q.  (BY MR. KERNS).  NOW, MS.
23  GAUTREAUX, I'M GONNA' SHOW YOU PLAINTIFF'S
24  EXHIBIT 3, AND PLAINTIFF'S EXHIBIT 4.  YOU
25  SEE BOTH OF THOSE IN FRONT OF YOU; CORRECT?

Page 72

1  A.  YES.
2  Q.  DO YOU KNOW WHAT TIME THE PHOTOS
3  -- I'M SORRY; I SHOULD ASK THIS.  ARE THESE
4  -- DO THESE (INDICATING) APPEAR TO BE
5  PHOTOGRAPHS OF THE CARNIVAL DREAM JACKPOT
6  CASINO?
7  A.  YES.
8  Q.  DO YOU KNOW WHAT TIME THESE WERE
9  TAKEN; WHAT TIME OF DAY THESE (INDICATING)
10  PHOTOGRAPHS WERE TAKEN?
11  A.  I DON'T KNOW WHAT TIME THEY WERE
12  TAKEN; BUT I CAN MAKE THE ASSUMPTION.
13  Q.  ALL RIGHT.  AND HOW CAN YOU MAKE
14  THAT ASSUMPTION?
15  A.  UM, BECAUSE CARNIVAL -- ONE BIG
16  THING WITH CARNIVAL IS, AT NIGHT THEY LOWER
17  THE LIGHTING; THEY DIM THE LIGHTS; AND DURING
18  THE DAY, THEY HAVE IT NICE, BRIGHT, AND
19  SHINY; SO I'M PRETTY SURE THAT THE BLUE, UM
20  -- THE BLUER SCENERY IS FROM A DAYTIME PHOTO;
21  AND THE -- THIS (INDICATING) SCENERY IS FROM
22  A NIGHTTIME; AFTERNOON.
23  Q.  I'M SORRY.  SO YOU THINK EXHIBIT
24  3 IS FROM NIGHTTIME?
25  A.  NO; UM, EXHIBIT 3 IS FROM

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 73

1   DAYTIME.
2   Q.   AND THIS INCIDENT HAPPENED
3   DURING THE DAYTIME; CORRECT?
4   A.   UH.
5       MS. EIKELAND:
6       FORM.
7       WITNESS:
8       UM, AFTERNOON TIME.
9   Q.   (BY MR. KERNS).  WHEN YOU JUST
10  SAID "DAYTIME", WHAT DID YOU MEAN?
11  A.   DAYTIME; MEANING, UM, 9:00 A.M.
12      IN THE MORNING TO, MAYBE, ABOUT 4:00, 5:00 IN
13  THE AFTERNOON.
14  Q.   DO YOU KNOW, WHEN THE PHOTOGRAPH
15  THAT IS EXHIBIT 4 WAS TAKEN, WHETHER THERE
16  WAS ANY NATURAL LIGHT COMING IN FROM THE
17  OUTSIDE OF THE SHIP?
18  A.   UM, CAN YOU CLEAR THAT UP?  I'M
19  SORRY.
20  Q.   I GUESS WHAT I'M ASKING IS, DO
21  YOU KNOW WHAT TIME THE PHOTOGRAPH THAT'S
22  DEPICTED IN EXHIBIT 4 WAS TAKEN?
23  A.   NO; I CAN HAVE THE ASSUMPTION.
24  Q.   OKAY.  AND OTHER THAN WHAT YOU
25  JUST TESTIFIED ABOUT CONCERNING THE LIGHTS

Page 74

1   BEING ON AT CERTAIN TIMES, IS THERE ANYTHING
2   ELSE THAT WENT INTO YOUR ASSUMPTION?
3   A.   UM, THAT'S IT.
4   Q.   I GUESS WHAT I'M GETTING AT IS,
5   WHAT ARE ALL OF THE WAYS -- WHAT ARE ALL OF
6   THE CHARACTERISTICS ABOUT THE DIFFERENCES
7   BETWEEN THE PHOTOS THAT MAKES YOU THINK THAT
8   EXHIBIT 4 IS CLOSER TO THE WAY THE TILE
9   LOOKED AT THE TIME OF THE INCIDENT THAN
10  EXHIBIT 3?
11  A.   BECAUSE, LIKE I SAID JUST A
12  MINUTE AGO, UM, ON THE CARNIVAL SHIPS, THEY
13  GET DARKER -- THEY DIM THE LIGHTS AS THE
14  NIGHT GOES -- AS IT GETS INTO THE NIGHTTIME;
15  AND THEY MAKE IT BRIGHT, AND SUNNY, DURING
16  THE DAY; AND I KNOW THIS HAPPENED RIGHT
17  BEFORE MY DINNER TIME -- THIS INCIDENT WITH
18  MS. SHIRLEY RILEY FALLING, SO; AND I REMEMBER
19  THE, UM, FLOOR LOOKING MORE OF A COPPER
20  COLOR.
21  Q.   AND WHICH ONE -- EXHIBIT 3, OR
22  EXHIBIT 4 -- WOULD YOU DESCRIBE AS MORE OF A
23  COPPER COLOR, WITH RESPECT TO THE TILES?
24  A.   EXHIBIT 4.
25      MR. KERNS:

Page 75

1       NOW, I'M GOING TO SHOW YOU WHAT
2   I WOULD LIKE TO MARK, PRELIMINARILY, AS
3   DEFENSE EXHIBIT 1.
4       MS. EIKELAND:
5       I THINK THAT'S THE SAME AS
6   MY -- MY 2.
7       MR. KERNS:
8       IT'S CLOSE; I THINK THIS
9   (INDICATING) IS A LITTLE BIGGER.  SO I'M
10  SHOWING YOU WHAT'S BEEN MARKED --
11      MS. EIKELAND:
12      CAN I SEE IT?
13      MR. KERNS:
14      I'M SORRY.  AS DEFENSE EXHIBIT
15  NUMBER 1.
16      MS. EIKELAND:
17      DO YOU HAVE NUMBER 2 AVAILABLE?
18      MR. KERNS:
19      (HANDING).
20      MS. EIKELAND:
21      (HANDING).
22      MR. KERNS:
23      (HANDING).
24      (WHEREUPON, THE INSTRUMENT REFERRED
25  TO WAS MARKED DALISE GAUTREAUX DEPOSITION

Page 76

1   DEFENSE EXHIBIT NUMBER 1 AND IS ATTACHED TO
2   THE TRANSCRIPT).
3   Q.   (BY MR. KERNS).  NOW, TAKING A
4   LOOK AT WHAT I'VE MARKED AS DEFENSE EXHIBIT
5   1.  DO YOU KNOW WHAT THAT (INDICATING)
6   DEPICTS?
7   A.   I MEAN, THE PROMENADE LEVEL
8   FLOORING LAYOUT.
9   Q.   AND, BASED UPON YOUR EXPERIENCE
10  ON THE CARNIVAL DREAM, IS THAT A FAIR, AND
11  ACCURATE, REPRESENTATION OF THE GENERAL
12  LAYOUT OF THAT DECK OF THE SHIP?
13  A.   YES.
14  Q.   AND, WITH REGARD TO THE JACKPOT
15  CASINO ITSELF --
16  A.   UH-HUH.
17  Q.   -- DOES THAT DIAGRAM FAIRLY, AND
18  ACCURATELY, REPRESENT WHERE THE JACKPOT
19  CASINO IS RELATIVE TO THE OTHER AMENITIES, OR
20  PORTIONS, OF THAT DECK OF THE SHIP?
21      MS. EIKELAND:
22      OBJECTION TO FORM.
23      WITNESS:
24      UM, I'M NOT UNDERSTANDING.
25  Q.   (BY MR. KERNS).  I MEAN, FOR

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 77

1  EXAMPLE, IS THE JACKPOT CASINO COMPLETELY OUT
2  OF PLACE THERE; I MEAN, IS IT REALLY AT THE
3  FRONT OF THE SHIP; BUT THAT DIAGRAM SHOWS IT
4  AT -- TOWARD THE MIDDLE OF THE SHIP?
5  A.  IT'S -- IT'S ABOUT WHERE IT'S
6  SUPPOSED -- WHERE IT IS NORMALLY.
7  Q.  AND WITHIN THE JACKPOT CASINO,
8  THERE ARE SOME MARKINGS WITHIN IT.  CAN I
9  TAKE A LOOK AT THAT (INDICATING) COPY?
10 A.  (HANDING).
11 Q.  SORRY.  FOR EXAMPLE, WHEN I ASK
12 WHERE THE ENTRANCE FROM THE ATRIUM IS, DO YOU
13 KNOW ABOUT WHERE, ON THE DIAGRAM, THAT I'M
14 SPEAKING?
15 A.  YES.
16 Q.  AND THEN, AFTER ONE WOULD WALK
17 IN FROM THE ATRIUM, LOOKING AT THE DIAGRAM,
18 WHAT ELSE IS DEPICTED IN THE JACKPOT CASINO?
19 A.  UH, THE BAR; UM, I'M GUESSING
20 THOSE (INDICATING) ARE SUPPOSED TO BE SLOT
21 MACHINES; UM, THE TABLES.
22 Q.  WHEN YOU SAY "THOSE ARE SUPPOSED
23 TO BE SLOT MACHINES", WHAT, SPECIFICALLY, ARE
24 YOU REFERRING TO?
25 A.  UM, THE -- ALL THIS (INDICATING)

Page 78

1  LITTLE SIDE PART PIECE.
2  Q.  OKAY.  AND YOU INDICATED TO THE
3  LEFT OF THE TILE WALKWAY?
4  A.  UH-HUH; I MEAN, THE RIGHT SIDE,
5  TOO, THEY HAVE 'EM.
6  Q.  THE RIGHT SIDE, TOO.  WOULD YOU
7  BE ABLE TO, YOU KNOW, USING AS A GUIDE
8  PLAINTIFF'S EXHIBIT 3, AND PLAINTIFF'S
9  EXHIBIT 4, AND THIS (INDICATING) DIAGRAM,
10 WOULD YOU BE ABLE TO DETERMINE WHERE, ON THIS
11 (INDICATING) DIAGRAM, THE FALL OCCURRED?
12 A.  YES.
13 Q.  WOULD YOU TAKE YOUR PEN, AND
14 CIRCLE THAT; OR MAKE AN "X", AND CIRCLE IT,
15 WHERE YOU BELIEVE THAT THE FALL OCCURRED?
16     MS. EIKELAND:
17     I'M GONNA' OBJECT TO THAT, JUST
18 BECAUSE IT'S SO TINY; AND THAT CYLINDER IS
19 NOT THERE; AND, JUST TO SCALE, IT'S JUST
20 INAPPROPRIATE FOR MAKING AN ACCURATE MARKING.
21 Q.  (BY MR. KERNS).  GO AHEAD.
22 A.  (WITNESS MARKING ON DIAGRAM).
23     MR. KERNS:
24     NOW I AM GOING TO SHOW YOU WHAT
25 I WILL MARK AS -- AND I'M SORRY.

Page 79

1  Q.  (BY MR. KERNS).  CAN YOU -- CAN
2  YOU DRAW A LINE FROM THE "X"; AND JUST PUT
3  YOUR INITIALS SOMEWHERE OFF THE DIAGRAM, SO
4  WE KNOW THAT THAT WAS, ACTUALLY, YOU THAT
5  MADE THAT MARK?
6     MS. EIKELAND:
7     I'M, ACTUALLY, GONNA' PLACE ON
8  THE RECORD AN OBJECTION TO USING THIS
9  (INDICATING) EXHIBIT FOR PURPOSES OF
10 IDENTIFYING WHERE IT HAPPENED, BECAUSE THERE
11 IS NO FOUNDATION LAID FOR THE PROPORTIONS
12 BEING ACCURATE; AND ACCURATE -- AND AS TO HOW
13 IT WAS AT THE TIME OF THE INCIDENT.
14     MR. KERNS:
15     I'M NOW SHOWING YOU WHAT I'VE
16 MARKED AS DEFENSE EXHIBIT 2.
17     (WHEREUPON, THE INSTRUMENT REFERRED
18 TO WAS MARKED DALISE GAUTREAUX DEPOSITION
19 DEFENSE EXHIBIT NUMBER 2 AND IS ATTACHED TO
20 THE TRANSCRIPT).
21 Q.  (BY MR. KERNS).  WHAT IS THAT
22 THAT I'M SHOWING YOU; DO YOU RECOGNIZE THAT?
23 A.  YES.
24 Q.  WHAT IS IT?
25 A.  THAT'S THE FLOOR TO THE CASINO.

Page 80

1  Q.  AND DO YOU SEE SLOT MACHINES
2  DEPICTED THERE?
3  A.  YES.
4  Q.  NOW, JUDGING BY THE -- WELL,
5  JUST BASED UPON YOUR EXPERIENCE, AND YOUR
6  KNOWLEDGE OF THAT DECK OF THE SHIP, DO THOSE
7  (INDICATING) SLOT MACHINES APPEAR, TO YOU, TO
8  BE THE SLOT MACHINES ON THE RIGHT SIDE OF THE
9  WALKWAY AS YOU'RE WALKING FROM THE ATRIUM; OR
10 ON THE LEFT SIDE?
11 A.  THAT'S (INDICATING) THE ONES ON
12 THE RIGHT SIDE, WHEN YOU WALK INTO THE
13 CASINO.
14 Q.  OKAY.  AND DO YOU ALSO SEE A
15 PILLAR DEPICTED?
16 A.  YES.
17 Q.  IS THAT PILLAR THAT'S DEPICTED
18 THERE (INDICATING) THE ONE THAT'S CLOSEST TO
19 THE "X" THAT YOU MARKED AS BEING THE SPOT OF
20 THE INCIDENT ON PLAINTIFF'S EXHIBIT 3?
21 A.  YES.
22 Q.  OKAY.  SO, IF YOU WOULDN'T MIND,
23 CAN YOU, ON DEFENSE EXHIBIT 2, MARK WITH AN
24 "X", AND CIRCLE IT, WHERE YOU BELIEVE MS.
25 RILEY'S FEET WERE WHEN SHE FELL BEFORE SHE

Page 81

1   FELL?  RIGHT BEFORE SHE FELL.
2   A.   RIGHT BEFORE SHE FELL?
3   Q.   YEAH.
4   A.   OKAY; (WITNESS MARKING ON
5   PHOTO).
6   Q.   ALL RIGHT.  AND CAN YOU JUST PUT
7   YOUR INITIALS NEAR THERE, SO WE'LL KNOW THAT
8   IT'S YOU THAT MADE THAT MARK?
9   A.   (WITNESS PUTTING CIRCLE ON
10  PHOTO).
11  Q.   THANK YOU VERY MUCH.  NOW, FROM
12  -- ON PLAINTIFF'S EXHIBIT -- I'M SORRY.  ON
13  DEFENSE EXHIBIT 2, ON THE OTHER SIDE OF THE
14  PILLAR THAT WE JUST SPOKE ABOUT, WHAT IS
15  DEPICTED THERE (INDICATING)?
16  A.   ON THE OTHER SIDE OF THE PILLAR?
17  Q.   YES.
18  A.   UM, GOING WHICH WAY; GOING BACK
19  TOWARDS THE SLOT MACHINES; OR GOING TOWARDS
20  THE FRONT?
21  Q.   I'M SORRY; THAT'S A VERY GOOD
22  QUESTION.  GOING -- LOOKING TOWARD THE TOP
23  (INDICATING) OF THE PICTURE, AND THE CARPET
24  AREA.
25  A.   IN THE CARPETED AREA, YOU GOT

Page 82

1   THE SLOT MACHINES; AND YOU HAVE A MIRROR.
2   Q.   ALL RIGHT.  AND IF SOMEONE WAS
3   SEATED -- WELL, DO YOU SEE A COUPLE -- IT
4   APPEARS TO BE LADIES IN THIS DEFENSE EXHIBIT
5   2 -- SEATED AT THE SLOT MACHINES NEAR THE
6   PILLAR THAT WE SPOKE ABOUT?
7   A.   UH-HUH.
8   Q.   APPROXIMATELY HOW FAR ARE THEY
9   FROM WHERE MS. RILEY FELL?
10     MS. EIKELAND:
11     OBJECTION; FORM.
12     WITNESS:
13     THE LADIES?
14  Q.   (BY MR. KERNS).  YES; THE LADIES
15  THAT ARE DEPICTED IN THAT (INDICATING)
16  PHOTOGRAPH.
17     MS. EIKELAND:
18     OBJECTION; FORM.
19     WITNESS:
20     I MEAN, PROBABLY, ABOUT FOUR
21  FEET; FOUR, FIVE FEET.
22  Q.   (BY MR. KERNS).  ASSUMING --
23  WELL, I'LL ASK YOU THIS.  DO YOU SEE ANY
24  OTHER PLACES TO SIT NEAR WHERE THOSE LADIES
25  ARE SITTING?

Page 83

1   A.   YES.
2   Q.   AND CAN YOU MAKE -- CAN YOU
3   CIRCLE THOSE AREAS, AS WELL?
4   A.   (WITNESS CIRCLING AREAS ON
5   PHOTO).
6   Q.   ALL RIGHT.  AND WHAT YOU JUST
7   CIRCLED ARE STOOLS; CORRECT?
8   A.   YES.
9   Q.   ALL RIGHT.  AND CAN YOU MARK
10  INSIDE -- INSIDE, OR OUTSIDE, OF THE CIRCLES;
11  WHICHEVER YOU'D LIKE -- CAN YOU MARK THEM AS
12  "1"; OR ONE OF THEM AS "1"; AND ONE OF THEM
13  AS "2", SO WE KNOW WHICH ONES WE'RE REFERRING
14  TO?
15  A.   (WITNESS MARKING ON PHOTO).
16  Q.   OKAY.  SO --
17     MS. EIKELAND:
18     DO YOU MIND?
19     MR. KERNS:
20     GO AHEAD.
21  Q.   (BY MR. KERNS).  ALL RIGHT.  SO,
22  YOU'VE ACTUALLY MARKED THREE STOOLS USED FOR
23  SITTING AT THE BANK OF SLOT MACHINES NEAR
24  WHERE THOSE TWO LADIES ARE DEPICTED --
25  A.   UH-HUH.

Page 84

1   Q.   -- PLAYING THE SLOTS; CORRECT?
2   A.   UH-HUH.
3   Q.   IF SOMEONE WERE SEATED AT, YOU
4   KNOW, STOOLS THAT YOU'VE MARKED "1", AND "2",
5   AND OBSERVING MS. RILEY FALL, ASSUMING THAT
6   THE PILLAR WAS NOT IN THEIR VIEW.  OKAY?  SO,
7   ASSUMING THE PILLAR WAS NOT IN THEIR VIEW,
8   WOULD THEY HAVE A GOOD -- A GOOD LOOK AT WHAT
9   HAD OCCURRED?
10  A.   ASSUMING --
11     MS. EIKELAND:
12     OBJECTION; FORM.
13     WITNESS:
14     ASSUMING THAT THE PILLAR WAS
15  NOT IN OUR VIEW, YES; THEY WOULD.
16  Q.   (BY MR. KERNS).  OKAY.
17  A.   ONE FROM THE BACK (INDICATING);
18  TWO FROM THE SIDE (INDICATING); AND THREE
19  FROM IN FRONT (INDICATING), WHICH WAS THE
20  SAME AS WHERE I VIEWED HER.
21  Q.   OKAY.  THANK YOU.  NOW, YOU --
22  WHEN YOU WALKED INTO THE CASINO, YOUR GOAL,
23  OR YOUR OBJECTIVE, WAS TO GO HAVE A
24  CIGARETTE; RIGHT?
25  A.   UH-HUH.

Page 85

1 Q.  OR MULTIPLE CIGARETTES?
2 A.  MULTIPLE CIGARETTES.
3 Q.  YOU WEREN'T, SPECIFICALLY,
4  THINKING ABOUT WATER ON THE FLOOR; RIGHT?
5 A.  NO.
6 Q.  WHEN YOU WALKED IN THERE, YOU
7  WEREN'T, SPECIFICALLY, THINKING ABOUT LOOKING
8  FOR PROBLEMS WITH THE CASINO; RIGHT?
9 A.  NO.
10     MS. EIKELAND:
11     OBJECTION TO FORM.
12 Q.  (BY MR. KERNS).  YOU WEREN'T,
13  SPECIFICALLY, THINKING ABOUT LOOKING FOR
14  PROBLEMS WITH REGARD TO LIQUIDS BEING ON THE
15  FLOOR?
16 A.  NO.
17     MS. EIKELAND:
18     FORM.
19 Q.  (BY MR. KERNS).  YET, IT WAS
20  READILY APPARENT, AND OBSERVABLE, TO YOU,
21  THAT THERE WAS WATER ON THE FLOOR; CORRECT?
22     MS. EIKELAND:
23     OBJECTION; FORM.
24     WITNESS:
25     YES.

Page 86

1 Q.  (BY MR. KERNS).  SO, WITHOUT --
2  WITHOUT TRYING TO FIND WATER ON THE FLOOR,
3  YOU DID, READILY, SEE THE WATER THAT MS.
4  RILEY -- THAT YOU INDICATED MS. RILEY,
5  EVENTUALLY, SLIPPED IN; CORRECT?
6     WITNESS:
7     YES.
8     MS. EIKELAND:
9     OBJECTION; FORM.
10 Q.  (BY MR. KERNS).  YOU DIDN'T HAVE
11  TO GET DOWN ON YOUR HANDS AND KNEES TO LOOK
12  AT IT; RIGHT?
13 A.  NO.
14     MS. EIKELAND:
15     FORM.
16 Q.  (BY MR. KERNS).  YOU DIDN'T USE
17  ANY SORT OF SPECIAL MAGNIFYING GLASS, OR X-
18  RAY GOGGLES OR SOMETHING, TO HAVE TO ENHANCE
19  YOUR VISION IN ORDER TO SEE THAT; CORRECT?
20     MS. EIKELAND:
21     FORM.
22     WITNESS:
23     NO.
24 Q.  (BY MR. KERNS).  NOW, WHEN YOU,
25  EVENTUALLY, SAT DOWN AT THE BAR, YOU SPOKE

Page 87

1  WITH A BARTENDER NAMED KAT; CORRECT?
2 A.  YES.
3 Q.  OR YOU KNEW HER AS KAT, ANYWAYS;
4  RIGHT?
5 A.  YES.
6 Q.  SHE IS FROM GERMANY?
7 A.  RUSSIA.
8 Q.  RUSSIA?  OKAY; I'M SORRY.
9 A.  YEAH.
10 Q.  AND YOU MENTIONED TO HER ABOUT
11  THERE BEING WATER ON THE FLOOR?
12 A.  YES.
13 Q.  YOU DIDN'T -- YOU DIDN'T MENTION
14  IT TO ANY OTHER CARNIVAL EMPLOYEES, THOUGH;
15  CORRECT?
16 A.  NO.
17 Q.  AND CAN YOU DESCRIBE WHAT THIS
18  BARTENDER LOOKS LIKE?
19 A.  UM, SMALL; SLENDER; UM, OLIVE-
20  COLORED SKIN; BLACK HAIR; UM, TO ME, SHE'S A
21  GOOD-LOOKING GIRL.
22 Q.  AND SHE'S, ALSO, A VERY GOOD
23  BARTENDER, YOU WOULD SAY; CORRECT?
24     MS. EIKELAND:
25     FORM.

Page 88

1     WITNESS:
2     YES.
3 Q.  (BY MR. KERNS).  IN FACT, ONE OF
4  THE REASONS, OTHER THAN THAT YOU COULD SMOKE
5  IN THERE, THAT YOU ENJOYED GOING TO THE BAR
6  IS THAT YOU AND YOUR, I GUESS NOW HUSBAND,
7  ENJOYED TALKING TO KAT; IS THAT FAIR TO SAY?
8     MS. EIKELAND:
9     FORM.
10     WITNESS:
11     YES; WE WOULD HAVE BEEN IN
12  THERE, ANYWAY --
13 Q.  (BY MR. KERNS).  HA, HA, HA!
14 A.  -- WHETHER WE LIKED HER, OR NOT;
15  BECAUSE, I MEAN, WE HATED THE BARTENDER THIS
16  PAST CRUISE; BUT WE STILL SAT IN THERE, AND
17  SMOKED; BECAUSE, ONCE AGAIN, IT'S THE ONLY
18  PLACE TO SMOKE.
19 Q.  UNDERSTOOD.
20     MR. KERNS:
21     NOW I'M GOING TO SHOW YOU WHAT I
22  WILL MARK AS DEFENSE EXHIBIT 3.
23     (WHEREUPON, THE INSTRUMENT REFERRED
24  TO WAS MARKED DALISE GAUTREAUX DEPOSITION
25  DEFENSE EXHIBIT NUMBER 3 AND IS ATTACHED TO

Page 89

1    THE TRANSCRIPT).
2      MS. EIKELAND:
3      (HANDING).
4  Q.  (BY MR. KERNS).  ALL RIGHT.
5    ARE YOU LOOKING AT DEFENSE EXHIBIT 3?
6  A.  YES.
7  Q.  AND WHAT DOES THAT (INDICATING)
8    DEPICT?
9  A.  UM, THE BAR AREA; AND THE
10   SEATING ARRANGEMENTS THEY HAVE ALL RIGHT
11   THERE (INDICATING).
12 Q.  THE --
13 A.  AND THIS (INDICATING) IS THE
14   BACK AREA, WHERE THE ELEVATORS ARE.
15 Q.  UNDERSTOOD.  IN THE AREA,
16   SPECIFICALLY, WHERE YOU'RE ALLOWED TO SMOKE
17   ON THE -- IN THE JACKPOT CASINO OF THE
18   CARNIVAL DREAM, IS THAT THE ENTIRE BAR AREA;
19   OR IS THAT A SPECIFIC AREA WITHIN THE BAR?
20 A.  THAT'S A SPECIFIC AREA IN THE
21   BAR.
22 Q.  IS THAT AREA AT ALL DEPICTED IN
23   THAT (INDICATING) PHOTOGRAPH?
24 A.  YES.
25 Q.  OKAY.  WHERE IS IT, ROUGHLY?

Page 90

1  A.  UM, RIGHT BEHIND THE PILLAR
2    (INDICATING); ON THIS (INDICATING) SIDE.
3  Q.  BEHIND THE PILLAR ON -- ON WHICH
4    SIDE?
5  A.  ON THIS (INDICATING) SIDE; WHERE
6    YOU HAVE THE GENTLEMAN IN THE PICTURE.
7  Q.  OKAY.  SO, HOW ABOUT IF YOU'RE
8    SITTING AT THE BAR STOOLS; CAN YOU SMOKE
9    THERE?
10 A.  UM, SOME OF THEM; YES.
11 Q.  OKAY.  WHICH ONES CAN YOU NOT
12   SMOKE ON?
13 A.  ANYTHING ON THE LEFT SIDE OF
14   THAT (INDICATING) PILLAR, IF YOU'RE LOOKING
15   AT THAT (INDICATING) PICTURE THE RIGHT WAY.
16 Q.  OKAY.  SO, HOW ABOUT LOOKING AT
17   THE PICTURE WITH EXHIBIT 3 AT THE BOTTOM --
18   WITH THE STICKER SAYING "EXHIBIT 3" AT THE
19   BOTTOM; AND IF YOU'RE LOOKING AT THAT PHOTO
20   THAT WAY; THE SEATS TO THE RIGHT OF THAT
21   PILLAR, IF YOU'RE SITTING THERE, YOU'RE OKAY
22   SMOKING; CORRECT?
23 A.  YES.
24 Q.  ALL RIGHT.  AND WHERE WERE YOU
25   AND -- WAS IT YOUR FIANCE' AT THE TIME?

Page 91

1  A.  UM --
2      MS. EIKELAND:
3      HA, HA, HA, HA!
4      WITNESS:
5      I'M TRYING TO THINK.  HUH!  UH,
6    WE WERE NOT YET ENGAGED; I'M NOT -- NO; WE
7    WERE ENGAGED; WE WERE; 'CAUSE WE GOT ENGAGED
8    ON DECEMBER -- ON CHRISTMAS DAY, IN 2013.
9  Q.  (BY MR. KERNS).  WHAT'S HIS
10   FIRST NAME?
11 A.  ROY.
12 Q.  ROY.  HOW DO YOU PRONOUNCE YOUR
13   LAST NAME?
14 A.  GAUTREAUX.
15 Q.  ROY GAUTREAUX.  SO I CAN REFER
16   TO HIM AS MR. GAUTREAUX?
17 A.  YES.
18 Q.  WHERE WERE YOU AND HIM SITTING?
19 A.  UM.
20 Q.  DURING THE TIME, YOU KNOW, AFTER
21   YOU WALKED IN, AND SAW THE WATER; BUT BEFORE
22   YOU ENCOUNTERED MS. RILEY, ALLEGEDLY,
23   FALLING?
24     MS. EIKELAND:
25     FORM.

Page 92

1      WITNESS:
2      YOU WANT --
3  Q.  (BY MR. KERNS).  YOU CAN GO
4    AHEAD AND DRAW ON THAT (INDICATING), IF YOU'D
5    LIKE; IF IT MAKES IT EASIER.
6  A.  MY HUSBAND ALWAYS SAT THERE
7    (INDICATING); I ALWAYS SAT HERE (INDICATING);
8    BUT I HAVE A NERVOUSNESS; I DON'T LIKE JUST
9    SITTING IN ONE SPOT FOR SEVERAL MINUTES; I
10   GOT UP SEVERAL TIMES, AND MOVED TO THE COUCH
11   (INDICATING); BACK TO THE STOOL; BECAUSE THEY
12   WOULD TELL ME I COULDN'T SMOKE AT THE COUCH;
13   BUT IT'S, LITERALLY, DIRECTLY ACROSS FROM
14   EACH OTHER; SO EITHER WHICH WAY, THE SMOKE
15   WAS GETTING THERE.
16 Q.  SO YOU COULDN'T, SUPPOSEDLY,
17   SMOKE NEAR THE COUCH?
18 A.  YES.
19 Q.  BUT YOU COULD AT THE STOOL THAT
20   YOU WERE STATIONED AT, FOR MOST OF THE PART?
21 A.  YES.
22 Q.  AND YOU -- I THINK YOU PUT AN
23   "X" WHERE YOUR HUSBAND SAT; AND AN "X" WHERE
24   YOU SAT.  CAN YOU PUT AN "H" BY THE ONE TO
25   INDICATE WHICH ONE WAS THE ONE YOUR HUSBAND

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 93

1   SAT AT?
2   A.   (WITNESS INDICATING ON PHOTO).
3   Q.   OKAY.  "H" FOR HUSBAND.  HE WAS
4   YOUR FIANCE' AT THE TIME, BUT?
5   A.   YEAH.
6   Q.   OKAY.  AND YOU INDICATED YOU
7   WERE THERE FOR THIRTY, OR FORTY, MINUTES,
8   PRIOR TO WALKING BACK TOWARD THE ATRIUM?
9   A.   YES.
10  Q.   ALL RIGHT.  AND WAS KAT WORKING
11  AT THE TIME?
12  A.   UM, I DON'T REMEMBER, I'LL BE
13  HONEST; I THINK SHE WAS.
14  Q.   ALL RIGHT.  AND I BELIEVE YOU
15  INDICATED YOU DIDN'T MENTION TO ANYONE, OTHER
16  THAN KAT, THAT THERE WAS -- THAT THERE WAS
17  WATER ON THE FLOOR?
18  A.   YES.
19  Q.   IS THAT -- I'M SORRY.  IS THAT
20  CORRECT?
21  A.   THAT'S CORRECT.
22  Q.   DID YOUR -- DID ROY WALK IN AT
23  THE SAME TIME AS YOU?
24  A.   NO.
25  Q.   WHEN DID HE WALK INTO THE

Page 94

1   CASINO, IF YOU KNOW?
2   A.   HE WALKED IN, UM, ABOUT MAYBE
3   TEN MINUTES LATER; BUT FROM THE OPPOSITE
4   DIRECTION.
5   Q.   ALL RIGHT.
6   A.   HE WAS WITH MY FATHER, ALSO; WHO
7   WAS IN THE CASINO AT THAT TIME.
8   Q.   WAS HE WITH YOU WHEN YOU MADE
9   MENTION OF THE WATER TO THE BARTENDER?
10  A.   UM, I'M NOT QUITE SURE; HE MAY
11  HAVE BEEN, BUT.
12  Q.   NOW, YOU INDICATED THAT YOU WERE
13  WALKING BACK TOWARD THE ATRIUM WHEN YOU FIRST
14  SAW MS. RILEY AT, OR AROUND, THE TIME OF THE
15  INCIDENT; CORRECT?
16  A.   YES.
17  Q.   AND WHEN YOU DESCRIBED HER FALL,
18  YOU USED THE WORDS: "FEET FIRST; BACK DOWN;
19  ON HER BUTT".  THAT'S A FAIR WAY TO DESCRIBE
20  HOW SHE FELL?
21  A.   YES.
22  Q.   AND BY "FEET FIRST; BACK DOWN
23  (INDICATING); ON HER BUTT", THAT INDICATES
24  THAT SHE FELL -- SHE DIDN'T FALL FORWARD?
25  A.   NO.

Page 95

1   Q.   OKAY.  SO SHE -- BASED ON YOUR
2   CLEAR, UNOBSTRUCTED VIEW, SHE, CLEARLY, FELL
3   BACKWARD?
4   A.   YES.
5   MS. EIKELAND:
6   FORM.
7   Q.   (BY MR. KERNS).  AND YOU
8   INDICATED, ALSO, THAT SHE WAS WEARING
9   SANDALS?
10  A.   YES.
11  Q.   CAN YOU DESCRIBE THESE IN
12  ANYMORE DETAIL?
13  A.   UM, I CAN'T -- I'M NOT QUITE --
14  I DON'T REMEMBER THEM, FOR SURE; I KNOW THEY
15  -- THEY WERE SANDALS; UM, THEY HAD LITTLE
16  BLUE AND GREEN STONES ON 'EM; THAT'S WHAT I
17  CAN REMEMBER.
18  Q.   AND WHEN YOU SAY "THEY WERE
19  SANDALS FOR SURE", WHAT DIFFERENTIATES, FOR
20  YOU, A SANDAL FROM ANOTHER TYPE OF SHOE?
21  A.   UM, SANDALS ARE OPEN-TOED; UM,
22  SHOES, AND TENNIS SHOES, ARE CLOSED-TOE.
23  Q.   ALL RIGHT.  SO THESE WERE OPEN-
24  TOED SHOES?
25  A.   YES.

Page 96

1   Q.   ALL RIGHT.  AND YOU'RE SURE SHE
2   WAS WEARING SANDALS?
3   A.   YES.
4   Q.   AND YOU INDICATED, ALSO, THAT
5   "HER ARM WAS BEHIND HER BACK AS SHE CAME
6   DOWN".  AND BY "SHE", I MEAN MS. RILEY.
7   A.   YES.
8   Q.   HOW DO YOU -- THIS QUESTION MAY
9   DRAW AN OBJECTION, AS I UNDERSTAND YOU'RE NOT
10  A MEDICAL DOCTOR.  BUT TO THE EXTENT YOU ARE
11  ABLE TO ANSWER, YOUR OPINION, HOW DO YOU
12  THINK THAT MS. RILEY HURT HER ELBOW AS WAS
13  REPRESENTED WITH THIS FALL?
14  MS. EIKELAND:
15  OBJECTION; FORM.
16  WITNESS:
17  UM, IN MY OPINION, SHE CAME
18  DOWN ON HER ELBOW; I MEAN, EXACTLY HOW YOU
19  JUST DEMONSTRATED WHEN YOU STOOD UP; YOUR
20  ELBOWS WERE COCKED UP, LIKE I HAD SAID; AND
21  THAT WAS WHERE SHE HAD FALLEN.
22  Q.   (BY MR. KERNS).  OKAY.  SO IT
23  APPEARED, TO YOU, AS IF SHE FELL -- AND
24  CORRECT ME IF I'M MISCHARACTERIZING THIS --
25  BUT WITH HER ARM BEHIND HER BACK

Page 97

1   (INDICATING); AND PINCHED BETWEEN
2   (INDICATING) THE FLOOR AND HER BODY?
3   A.   YES.
4   MS. EIKELAND:
5   FORM.
6   Q.   (BY MR. KERNS).  NOW, AS YOU
7   WERE -- AS YOU AND YOUR, NOW HUSBAND, WERE
8   SITTING AT -- SITTING, OR STANDING, OR
9   WHATNOT, AT THE BAR, SMOKING, AND, YOU KNOW,
10  HAVING A CONVERSATION, HOW MANY PEOPLE WOULD
11  YOU ESTIMATE CAME IN AND OUT OF THE CASINO?
12  A.   UM, I WASN'T COUNTING.
13  Q.   BUT YOU HAD BEEN TO THIS -- THE
14  CASINO -- MULTIPLE TIMES THROUGHOUT THIS
15  CRUISE; CORRECT?
16  A.   UH-HUH.
17  Q.   AND FOR THAT TIME OF DAY, ON
18  PAST DAYS --
19  A.   BESIDES THE CAPTAIN'S DINNER,
20  NOT MANY.
21  Q.   OKAY.
22  A.   THE CAPTAIN'S DINNER, THE PLACE
23  WAS SWARMED WITH PEOPLE.
24  Q.   ALL RIGHT.  SO THIS WAS NOT NEAR
25  THE TIME OF THE CAPTAIN'S DINNER?

Page 98

1   A.   NO.
2   Q.   ALL RIGHT.  BUT THIS IS A VERY,
3   AS I BELIEVE YOU ANSWERED "YES" TO WHEN MS.
4   EIKELAND ASKED, IT'S A PUBLIC, OR IT'S A MAIN
5   THOROUGHFARE; OR A MAIN WALKWAY?
6   A.   YES.
7   Q.   SO THERE IS -- THERE IS SOME
8   PEOPLE COMING IN AND OUT?
9   A.   YEAH.
10  Q.   WOULD YOU ESTIMATE THIRTY, FORTY
11  -- THIRTY OR FORTY MINUTES SEEMS LIKE A LONG
12  TIME; AND THAT THERE'D BE QUITE A FEW PEOPLE;
13  BUT THE QUESTION IS HOW MANY.  I MEAN, WOULD
14  YOU ESTIMATE MORE THAN -- MORE THAN FIFTY?
15  MS. EIKELAND:
16  FORM.
17  WITNESS:
18  I'M NOT QUITE SURE; I MEAN, YOU
19  GOT -- YOU'VE GOT THE PIANO BARS; YOU'VE GOT
20  THE DISCO CLUB; AND YOU'VE GOT THE, UM, THE
21  COMEDY CENTER BACK.
22      IN THE BACK TOWARDS THE AREA,
23  THE COMEDY CLUB WAS CLOSED AT THAT POINT IN
24  TIME; SO WAS THE DISCO; THE DISCO CLUB; NOW,
25  THE PIANO BAR IS OPEN; SO, I MEAN; AND IF YOU

Page 99

1   LOOK AT THIS DAY AND AGE, NOBODY GOES TO A
2   PIANO BAR, SO.
3   Q.   (BY MR. KERNS).  HA, HA!  SO,
4   WOULD YOU GUESS MORE THAN TWENTY-FIVE PEOPLE?
5   MS. EIKELAND:
6   FORM.
7   WITNESS:
8   NO.
9   Q.   (BY MR. KERNS).  HAD ENTERED THE
10  CASINO THROUGH THE ATRIUM ENTRANCE WHILE YOU
11  WERE SITTING THERE?
12  MS. EIKELAND:
13  OBJECTION; FORM; CALLS FOR
14  SPECULATION.
15  WITNESS:
16  UM, I'M REALLY NOT QUITE SURE;
17  'CAUSE, ALSO, ON THIS DAY, WE HAD JUST GOTTEN
18  BACK ON THE SHIP, SO.
19  Q.   (BY MR. KERNS).  AND I AM ASKING
20  YOU TO ESTIMATE, OR GUESS, TO THE BEST OF
21  YOUR ABILITY.
22  A.   TO THE BEST OF MY ABILITY --
23  MS. EIKELAND:
24  FORM.
25  WITNESS:

Page 100

1   OKAY.  TWENTY, I GUESS.
2   Q.   (BY MR. KERNS).  ALL RIGHT.
3   A.   I'M NOT SURE.
4   Q.   DO YOU CONSIDER YOURSELF A
5   PEOPLE WATCHER?
6   A.   HMM, NO.
7   Q.   WHEN YOU WERE AT THE -- SITTING
8   AT THE BAR, WHERE WAS YOUR ATTENTION, YOUR
9   VISION, FOCUSSED ON?
10  A.   MY HUSBAND; UM, THE PERSON --
11  THE BARTENDER THAT I WAS SPEAKING TO; MY
12  DRINK; AND MY CIGARETTE.
13  Q.   OKAY.  WHAT WERE YOU DRINKING AT
14  THAT TIME?
15  A.   A COKE.
16  Q.   COCA-COLA?
17  A.   YES.
18  Q.   ANY RUM IN IT?
19  A.   NO.
20  Q.   ALL RIGHT.  ANY ALCOHOL OF ANY
21  KIND?
22  A.   NO.
23  Q.   HAD YOU DRANK AT ALL ON THAT
24  DAY?
25  A.   UH, NO; NOT YET.

Page 101

1 Q.   ALL RIGHT.  HAD YOUR HUSBAND HAD
2   ANYTHING TO DRINK THAT DAY?
3 A.  UH, NO.
4 Q.   AND WHEN YOU SAY "NOT YET",
5   LATER ON YOU HAD SOME DRINKS?
6 A.  YES; IN THE COMEDY CLUB.
7 Q.   ALL RIGHT.  HOW MANY DID YOU
8   HAVE?
9 A.  UM, ONE IN THE COMEDY CLUB,
10   DURING THE COMEDY THING; AND THEN, ACTUALLY,
11   LATER ON THAT NIGHT; UM, BECAUSE THIS WAS THE
12   DAY BEFORE WE GOT OFF THE SHIP, UM, A LADY
13   HAD WON A $500, UH, DRINK THING; AND SHE
14   WASN'T GONNA' DRINK IT; SO SHE BOUGHT ROUNDS
15   AT THE BAR.
16 Q.  HA, HA, HA!  OKAY.
17 A.  SO, OF COURSE, I'M GONNA' HAVE
18   FREE DRINKS!
19 Q.   OF COURSE.  SO, THIS IS AFTER
20   THE COMEDY?
21 A.  YES.
22 Q.   WHAT TIME WAS THE COMEDY SHOW?
23 A.  UM, THEY HAVE 'EM THAT 9:00;
24       10:00; 11:00; AND 12:00.
25 Q.   AND WHICH ONE DID YOU GO TO?

Page 102

1 A.  UM, 11:00.
2 Q.   OKAY.  DID YOU HAVE ANYTHING TO
3   DRINK BETWEEN THE TIME YOU OBSERVED MS.
4   RILEY'S INCIDENT, AND WHEN YOU WENT TO THE
5   COMEDY CLUB?
6 A.  NO.
7 Q.   AND WHAT KIND OF DRINK DID YOU
8   HAVE AT THE COMEDY CLUB?
9 A.  A MARGARITA.
10 Q.   AND HOW BIG WAS IT?
11 A.  UM, A LITTLE BITTY GLASS, ABOUT
12   THAT (INDICATING) BIG.
13 Q.   OKAY.
14 A.  IT'S GOT A --
15 Q.   I SEE YOU HAVE A CUP IN FRONT OF
16   YOU?
17 A.  YEAH.
18 Q.   WHAT DOES THE CUP SAY?
19 A.  "PJ'S COFFEE".
20 Q.   FROM THE PLACE RIGHT DOWN THE
21   STREET; RIGHT?
22 A.  YES.
23 Q.   WAS THE MARGARITA YOU HAD, WAS
24   IT MORE, OR LESS, LIQUID THAN THAT, IF IT'S
25   FULL?

Page 103

1     MS. EIKELAND:
2     OBJECTION; FORM.
3     WITNESS:
4     IF IT'S FULL, INCLUDING THE TOP
5   (INDICATING), LESS.
6 Q.  (BY MR. KERNS).  OKAY.  HOW
7   ABOUT NOT INCLUDING THE TOP?
8 A.  HMM; ABOUT THE SAME AMOUNT.
9 Q.   ALL RIGHT.  WAS THE MARGARITA --
10   WAS IT A GOOD MARGARITA?
11 A.  NO.
12     MS. EIKELAND:
13     FORM.
14 Q.  (BY MR. KERNS).  HA, HA, HA!  IT
15   WASN'T?
16 A.  NO; THEY DON'T PUT TOO -- THAT
17   MUCH LIQUOR IN IT; BUT, I MEAN, YOU'RE GONNA'
18   CHARGE $8 FOR A MARGARITA, OF COURSE.
19 Q.   YEAH.  SO ARE YOU SAYING IT HAD
20   TOO MUCH, OR TOO LITTLE, LIQUOR IN IT?
21 A.  TOO LITTLE.  HA, HA!
22 Q.   HOW ABOUT THE DRINKS AT THE BAR,
23   HELPING THE LADY CELEBRATE HER --
24 A.  THAT WAS GOOD.
25 Q.   THAT WAS GOOD.  WHAT DID YOU

Page 104

1   HAVE THERE?
2 A.  UM, I HAD TWO MARGARITAS ON HER;
3   AND A COUPLE OF SHOTS OF PATRON TEQUILA.
4 Q.   ALL RIGHT.  I THINK YOU
5   INDICATED YOU'RE NOT A VERY HEAVY DRINKER;
6   RIGHT?
7 A.  NO.
8 Q.   SO, AFTER THE COMEDY CLUB, DID
9   YOU GO RIGHT TO THE BAR?
10 A.  YES.
11 Q.   AND HOW LONG WAS THE COMEDY
12   SHOW; WAS IT AN HOUR?
13 A.  UH, YES.
14 Q.   AND SO AT WHAT POINT DID THE
15   LADY START BUYING FREE DRINKS?
16 A.  HMM, ABOUT -- ABOUT MIDNIGHT.
17 Q.   AND SO --
18 A.  SHE WAS -- SHE WAS THERE BEFORE
19   I WAS AT THE BAR; I WALKED IN -- WALKED UP ON
20   HER YELLING "FREE SHOTS".
21 Q.  HA, HA, HA, HA!
22 A.  SO.
23 Q.   OKAY.  THAT'S ALWAYS -- THAT
24   ALWAYS MAKES FOR AN EXCITING TIME.  WHEN YOU
25       GOT THERE, AND SHE WAS YELLING: "FREE

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 105

1   SHOTS", YOU HAD JUST HAD THE ONE MARGARITA AT
2   THE CLUB EARLIER?
3   A.  YES.
4   Q.   THE COMEDY CLUB.  AND THEN, WITH
5   HER AT THE BAR, YOU HAD TWO MARGARITAS, AND
6   TWO SHOTS OF PATRON?
7   A.   HMM, YES.
8   Q.   AND FROM WHAT TIME TO WHAT TIME
9   WAS THAT, APPROXIMATELY; FROM MIDNIGHT TO
10  WHEN?
11  A.  UM, ABOUT --
12      MS. EIKELAND:
13      FORM.
14      WITNESS:
15      -- 3:00, 4:00 IN THE MORNING;
16  'CAUSE I'M ONE THAT LIKES TO STAY UP TO WATCH
17  US COME IN; ESPECIALLY INTO NEW ORLEANS.
18  Q.   (BY MR. KERNS).  WHEN YOU LEFT
19  THE BAR, YOU KNOW, JUST PRIOR TO SEEING MS.
20  RILEY'S INCIDENT, AND YOU WERE WALKING FROM
21  THE BAR TOWARD THE ATRIUM, WHERE WAS ROY AT
22  AT THAT POINT?
23      WITNESS:
24      I'M SORRY; BUT I HAVE TO STOP;
25      IT'S 1:03; I HAVE -- MY CAR IS OUT FRONT; I

Page 106

1   CAN'T AFFORD A TICKET, SO.
2       MR. KERNS:
3       YEAH.  WE'LL TAKE A BREAK.
4       MS. EIKELAND:
5       DO YOU WANT TO TAKE A BREAK,
6   AND COME BACK?
7       WITNESS:
8       I MEAN, SURE.
9       MR. KERNS:
10      YEAH; LET'S TAKE A BREAK.
11      VIDEOGRAPHER:
12      OFF THE RECORD.
13      (WHEREUPON, THERE WAS A RECESS).
14      VIDEOGRAPHER:
15      WE'RE BACK ON THE RECORD AT
16  1:19.
17      MR. KERNS:
18      DID ANYBODY REMEMBER WHERE WE
19  WERE WHEN WE LEFT OFF?
20      MADAME REPORTER:
21      (AT THIS TIME, THE STENOGRAPHER
22  READ BACK THE PREVIOUS QUESTION).
23      MR. KERNS:
24      YOU YOU ANSWERED THAT QUESTION.
25  WHAT WAS HER ANSWER TO THAT QUESTION?

Page 107

1       MADAME REPORTER:
2       (AT THIS TIME, THE STENOGRAPHER
3   READ BACK THE PREVIOUS QUESTION AGAIN).
4       MR. KERNS:
5       SO, SHE DIDN'T ANSWER THAT
6   QUESTION.
7   Q.   (BY MR. KERNS).  WHERE WAS ROY
8   AT THE TIME WHEN YOU STARTED WALKING TOWARD
9   THE ATRIUM FROM THE BAR?
10  A.   SITTING AT THE BAR.
11  Q.   OKAY.  WHY DID HE NOT GO WITH
12  YOU?
13  A.  UH, HE WANTED TO FINISH HIS
14  CIGARETTE; AND FINISH HIS COKE; HIS COKE
15  ZERO.
16  Q.   AND WHERE, EXACTLY, WERE YOU
17  GOING?
18  A.   BACK TO MY ROOM, TO GET DRESSED
19  FOR DINNER.
20  Q.   AND WHAT WAS THE ARRANGEMENT AS
21  TO HIM; WAS HE GOING TO MEET YOU AT THE NEXT
22  SPOT; OR WAS HE GONNA' GO BACK TO THE ROOM
23  AFTER HE FINISHED?
24  A.   HE WAS GONNA' GO BACK TO THE
25  ROOM AFTER HE FINISHED, SO THAT HE COULD GET

Page 108

1   DRESSED, ALSO, FOR DINNER.
2   Q.   IS IT FAIR TO SAY THAT HE DID
3   NOT OBSERVE THE INCIDENT?
4   A.   NO.
5   Q.   IT'S NOT FAIR TO SAY?
6   A.   HE -- HE DID NOT OBSERVE THE
7   INCIDENT.
8   Q.   OKAY.  HOW ABOUT THE AFTERMATH
9   OF THE INCIDENT; MS. RILEY BEING ON THE
10  FLOOR?
11  A.   NO.
12  Q.   DID HE COME OVER AFTER MS. RILEY
13  FELL AT ALL?
14  A.   NO.
15  Q.   SO AS FAR AS YOU KNOW, HE NEVER
16  SAW MS. RILEY ON THE GROUND?
17  A.   NO.
18  Q.   DID YOU TALK TO HIM ABOUT IT
19  AFTERWARD?
20  A.   UM, I TALKED TO HIM WHEN I RAN
21  TO MAKE A PHONE CALL -- MAKE THE PHONE CALL
22  TO HER ROOM; I TOLD HIM WHAT HAD HAPPENED;
23  AND HE -- HE KNOWS THAT TYPE OF SITUATION; HE
24  WAS, LIKE: "I'M NOT GETTING INVOLVED WITH
25  THAT".

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 109

1  Q.   WHAT DO YOU MEAN BY THAT; "KNOWS
2    THAT TYPE OF SITUATION"?
3  A.   HE KNEW THAT -- HE'S BEEN
4    THROUGH SITUATIONS LIKE THIS, WHERE MOST THE
5    THE TIME, IT ENDS UP WITH ATTORNEYS FIGHTING.
6  Q.   HA, HA, HA!
7  A.   SO, I'M PRETTY SURE THAT'S WHERE
8    HE WAS GOING WITH IT.
9  Q.   BUT YOU HAD TO RUN BACK BY HIM
10   BECAUSE THE PHONE WAS BY THE HALL --
11 A.   BY HIM.
12 Q.   -- WHERE HE WAS SITTING?
13 A.   YEAH.
14 Q.   NOW, THE WATER THAT YOU SAW WHEN
15   YOU CAME IN.  YOU INDICATED THAT COVERED
16   ABOUT TWO TILES?
17 A.   YES.
18 Q.   AND THEN, WHEN YOU LEFT, IT WAS
19   FOUR TILES WIDE; AND TWO, TO THREE, TILES
20   LONG?
21 A.   YES.
22 Q.   WHICH WOULD MAKE IT HOW MANY
23   TILES, IN TOTAL?
24 A.   HMM; ABOUT FIVE CIRCULAR AROUND.
25   MS. EIKELAND:

Page 110

1    FORM; I'M SORRY.
2  Q.   (BY MR. KERNS).  BUT IF THE
3    AREA'S FOUR TILES WIDE, AND TWO TO THREE
4    LONG, WOULDN'T IT BE BETWEEN EIGHT AND TWELVE
5    TILES THAT IT COVERED?  YOU CAN DRAW IT OUT,
6    IF YOU WANT; I'LL GIVE YOU A PIECE OF PAPER,
7    IF IT HELPS YOU VISUALIZE IT.  AND WE'RE NOT
8    GONNA' ATTACH THIS AS AN EXHIBIT, OR
9    ANYTHING; BUT (HANDING PAPER).
10 A.   FOUR TILES WIDE; TWO TO THREE
11   LONG; SO, WITHIN THAT (INDICATING).
12 Q.   OH, OKAY; YEAH; I WAS MISTAKEN.
13   THANK YOU.
14 A.   (HANDING).
15 Q.   SO, IS IT YOUR TESTIMONY THAT IT
16   SEEPED BACK TOWARD THE CARPET?
17 A.   YES.
18 Q.   DO YOU HAVE ANY IDEA WHAT WOULD
19   HAVE CAUSED IT TO DO THAT?
20 A.   UH, WATER RUNS; AND KIDS WERE
21   STILL RUNNING IN AND OUT OF THERE; SO, I
22   MEAN.
23 Q.   YOU ALSO INDICATED YOU DID NOT
24   SEE ANY SKIDMARKS, OR SIGNS, THAT SOMEONE HAD
25   STEPPED IN THE WATER; CORRECT?

Page 111

1  A.   NO.
2  Q.   AND THE WATER WASN'T RUNNING
3    WHEN YOU SAW IT, AS YOU WERE COMING INTO THE
4    CASINO; RIGHT?
5  A.   NO.
6    MS. EIKELAND:
7    FORM.
8  Q.   (BY MR. KERNS).  DO YOU KNOW
9    WHAT UNIFORM, OR COLORS, CARNIVAL PERSONNEL
10   -- I'M SORRY -- CARNIVAL SECURITY OFFICERS
11   WEAR?
12 A.   UH, WHITE, UM, BUSINESS TYPE
13   SHIRT; AND THEY HAVE A BLACK, UH, JACKET OVER
14   IT.
15 Q.   IS THIS JUST IN THE CASINO; OR
16   IS THIS SHIPWIDE?
17 A.   THAT'S THE CASINO; UM, SHIP-
18   WIDE, I'M NOT QUITE SURE; UM, EVERYBODY ELSE
19   JUST WEARS, NORMALLY, KHAKI PANTS, AND A BLUE
20   SHIRT.
21 Q.   DID YOU, EVENTUALLY, SEE SOMEONE
22   WHO YOU BELIEVE TO BE A SECURITY OFFICER WHO
23   WAS INVESTIGATING THIS PARTICULAR INCIDENT?
24 A.   UM, I SEEN --
25   MS. EIKELAND:

Page 112

1    FORM.
2    WITNESS:
3    -- A SECURITY GUARD THAT --
4    WELL, WHAT I THINK TO BE A SECURITY GUARD; HE
5    COULDA' JUST BEEN CASINO PERSONNEL; UM, HE
6    WAS STANDING IN THIS (INDICATING) GENERAL
7    FACILITY AREA OF EXHIBIT 2'S EXHIBIT; UM,
8    STANDING THERE.
9    HE WATCHED -- HE HAD, ACTUALLY,
10   UM, WALKED UP AFTER MS. SHIRLEY RILEY HAD
11   FALLEN; AND HE WAS, ALSO, ACTUALLY, TRYING TO
12   HELP HER; HE CALLED FOR -- HE'S THE ONE THAT
13   CALLED FOR MEDICAL.
14 Q.   (BY MR. KERNS).  DID THIS PERSON
15   LOOK LIKE A CASINO EMPLOYEE; OR A GENERAL
16   SECURITY --
17 A.   CASINO.
18 Q.   BECAUSE HE HAD THE BLACK JACKET?
19 A.   YEAH.
20 Q.   DID -- DO YOU KNOW WHAT HE
21   LOOKED LIKE?
22 A.   UM, HE WAS, UH, DARK SKIN
23   COMPLECTED; UM, LOOKED TO BE ARABIAN, MAYBE.
24 Q.   COULD HE HAVE, POSSIBLY, BEEN
25   INDIAN?

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

---

Page 113

1  MS. EIKELAND:
2  FORM.
3  WITNESS:
4  MAYBE.
5  Q.  (BY MR. KERNS).  DO YOU KNOW --
6  A.  SHORT HAIRCUT; UM, HAD IT SPIKED
7  UP.
8  Q.  DID YOU EVER INTERACT WITH
9  ANYBODY, YOU KNOW, TO BE OF INDIAN DECENT;
10  FROM INDIA --
11  A.  UH-HUH.
12  Q.  -- OR HAVE INDIAN ANCESTRY?
13  A.  YES.
14  Q.  OKAY.  SO, YOU HAVE AN IDEA OF
15  WHAT INDIAN PEOPLE, TYPICALLY, LOOK LIKE?
16  A.  YES.
17  Q.  DID YOU HEAR THIS PERSON SPEAK?
18  A.  NO.
19  Q.  CAN YOU DESCRIBE MS. RILEY'S
20  CLOTHING AFTER SHE FELL?
21  A.  UM, HER BOTTOM WAS WET; HER
22  LOWER BACK WAS WET; AND HER ELBOWS WERE WET;
23  AND ALL THE FRONT (INDICATING) OF HER ARM WAS
24  ALL WET.
25  Q.  WHEN YOU SAY "HER BOTTOM", YOU

---

Page 114

1  MEAN HER BUTT?
2  A.  YES.
3  Q.  WAS -- SO, THE WATER DID NOT
4  EXTEND DOWN THE LEGS OF THE CAPRI PANTS?
5  MS. EIKELAND:
6  OBJECTION; FORM.
7  WITNESS:
8  NOT THAT I -- FROM WHAT I COULD
9  SEE, NO.
10  Q.  (BY MR. KERNS).  I MEAN, YOU
11  WERE IN A POSITION TO SEE IT, IF IT DID
12  EXTEND DOWN THAT FAR; RIGHT?
13  MS. EIKELAND:
14  FORM.
15  WITNESS:
16  NO; I WAS NOT.
17  Q.  (BY MR. KERNS).  I MEAN, SHE
18  WASN'T -- IT WASN'T AS IF YOU COULD SEE THE
19  TOP HALF OF MS. RILEY, BUT NOT THE BOTTOM
20  HALF OF MS. RILEY; RIGHT?
21  MS. EIKELAND:
22  FORM.
23  WITNESS:
24  I COULDN'T SEE THE BOTTOM HALF.
25  Q.  (BY MR. KERNS).  OKAY.  WHY NOT?

---

Page 115

1  A.  BECAUSE OF THE WAY SHE WAS
2  FACING ME; I WAS LOOKING AT HER FACE; AND
3  WHEN I CAME BACK, THAT'S WHEN THEY HAD -- UH,
4  THEY WERE GETTING HER SAT UP.
5  Q.  BUT YOU WERE THERE WHEN SHE WAS
6  PICKED UP OFF THE FLOOR; RIGHT?
7  A.  YES.
8  Q.  AND AT THAT TIME, DID YOU SEE
9  ANY AREA BELOW HER BOTTOM -- ANY AREA OF HER
10  CLOTHING BELOW HER BOTTOM BEING WET?
11  A.  UM, I REALLY WASN'T LOOKING THAT
12  HARD.
13  Q.  SO, THE ANSWER IS NO?
14  A.  NO.
15  MS. EIKELAND:
16  OBJECTION; FORM.
17  Q.  (BY MR. KERNS).  I'M SORRY; I
18  DIDN'T HEAR THE ANSWER.
19  A.  UM, NO.
20  Q.  NO; THE -- I SHOULD HAVE ASKED
21  IT DIFFERENT.  IS THAT CORRECT THAT YOU
22  DIDN'T SEE ANY -- BECAUSE "NO" COULD MEAN A
23  COUPLE DIFFERENT THINGS.  IS IT CORRECT THAT
24  YOU DID NOT EVER SEE AN AREA BELOW HER BOTTOM
25  BE WET WITHOUT HER CLOTHING?

---

Page 116

1  A.  THAT'S CORRECT.
2  MS. EIKELAND:
3  FORM.
4  Q.  (BY MR. KERNS).  NOW, THE WORD
5  YOU USED TO DESCRIBE THIS CRUISE WAS
6  "HORRIBLE"; IS THAT RIGHT?
7  A.  YES.
8  Q.  ALL RIGHT.  AND IT SEEMS, TO ME,
9  YOU'RE NOT -- YOU WERE NOT SHY ABOUT
10  EXPRESSING THIS; IS THAT FAIR TO SAY?
11  A.  THAT'S CORRECT.
12  Q.  WHEN DID YOU -- WHILE ON THE
13  SHIP, WHEN DID YOU FIRST MAKE A COMPLAINT
14  ABOUT YOUR EXPERIENCE?
15  A.  UM, MY FIRST DAY ON THE SHIP.
16  Q.  WHICH WAS APRIL -- WHAT; 14?
17  A.  YES.
18  Q.  AND WHAT WAS YOUR COMPLAINT AT
19  THAT TIME?
20  A.  UM, AT THAT TIME, OF OUR ROOM
21  SMELLING LIKE SEWERAGE.
22  Q.  WAS THAT PROBLEM EVER REMEDIED
23  BY THE TIME YOU LEFT?
24  A.  UM, THAT -- LEFT, AS IN HOW; OFF
25  THE SHIP; OR LEFT THAT DAY?

---

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 117

1  Q.  OFF THE SHIP.
2  A.  OFF THE SHIP?  YES.  ON DAY
3  THREE, OR FOUR.
4  Q.  WAS IT UPSETTING TO YOU THAT IT
5  TOOK THREE, OR FOUR, DAYS TO MAKE YOUR ROOM
6  NOT SMELL LIKE SEWERAGE?
7  A.  YES.
8  Q.  AND WAS THAT -- IS THAT PART OF
9  THE REASON YOU WERE UPSET ABOUT YOUR
10  EXPERIENCE ON BOARD THE SHIP?
11  MS. EIKELAND:
12  OBJECTION; FORM.
13  WITNESS:
14  ONE OF THE REASONS; YES.
15  Q.  (BY MR. KERNS).  HOW DID THEY
16  END UP FIXING THAT PROBLEM; DO YOU KNOW?
17  A.  UH, WELL, AT FIRST I WAS
18  INFORMED THAT IT WAS, UM -- IT WOULD SMELL
19  LIKE THAT FOR A COUPLE OF DAYS; AND THAT'S
20  ONE OF THE BAD THINGS ABOUT BEING ON FLOOR
21  ONE.
22  UM, AFTER COMPLAINING ABOUT IT A
23  SECOND, AND THIRD, TIME, THEY FINALLY BROUGHT
24  IN THE, I GUESS, HUMIDIFIER THING; AND, UM,
25  THEY HAD US EXIT THE ROOM FOR ABOUT SIX HOURS

Page 118

1  FOR THEM TO, UM, PUT THE VENTILATOR THING IN,
2  TO GET THE SMELL OUT; AND THAT'S WHEN IT
3  FINALLY WORKED.
4  Q.  WHEN YOU MADE THE COMPLAINT
5  REGARDING THE SEWERAGE, WHO DID YOU MAKE THE
6  COMPLAINT TO?
7  A.  UM, FRONT DESK, ON LEVEL THREE;
8  I ALSO MADE IT TO MY CABIN STEWARDESS.
9  Q.  DO YOU KNOW THAT PERSON'S NAME?
10  A.  NO; I DON'T REMEMBER HIS NAME.
11  Q.  SO IT WAS A STEWARD, NOT A
12  STEWARDESS; CORRECT?
13  A.  STEW- -- YEAH; STEWARD; HIM.
14  Q.  DO YOU KNOW WHAT HE LOOKED LIKE?
15  A.  UH, HE WAS ALSO A, UH, ARABIAN
16  GUY; WHAT LOOKED TO BE AN ARABIAN.
17  Q.  RIGHT.  COULDN'T -- I THINK WHAT
18  YOU MEAN BY THAT IS, EITHER MIDDLE EASTERN,
19  OR SOUTHEAST ASIAN?
20  A.  THAT'S FINE.
21  MS. EIKELAND:
22  OBJECTION TO FORM.
23  Q.  (BY MR. KERNS).  I JUST -- I
24  DON'T WANT YOU TO SAY "ARABIAN" IF YOU DON'T
25  KNOW, FOR SURE, IT'S ARABIAN.  SO WHERE --

Page 119

1  A.  MIDDLE EASTERN; IN THE USUAL
2  AREA; YEAH.
3  Q.  IT COULD, POTENTIALLY, BE
4  INDIAN?
5  A.  YES; ACTUALLY, I THINK HE WAS
6  INDIAN; 'CAUSE, AT ONE POINT, MY HUSBAND DID
7  TALK TO HIM; AND, UH, HE WAS ASKING US WHERE
8  WE WERE FROM, ON OUR FIRST DAY; AND WE TOLD
9  HIM NEW ORLEANS; AND HE SAID: "OH, I'D LOVE
10  TO LIVE IN NEW ORLEANS", AND ALL THAT; AND
11  HE, ACTUALLY, HE TALKED TO US SEVERAL TIMES;
12  AND HE TOLD US THAT HE WAS FROM INDIA.
13  Q.  OKAY.  WHEN YOU SAY YOUR CAB- --
14  HOW DO YOU KNOW THAT THIS PERSON WAS ASSIGNED
15  TO BE THE STEWARD FOR YOUR CABIN?
16  A.  HE INFORMED US HE WAS; HE CAME
17  OUT, AND INTRODUCED HIMSELF.
18  Q.  AND WHEN WAS THIS WHEN YOU MADE
19  THIS INTRODUCTION?
20  A.  UH, DAY ONE.
21  Q.  DID YOU -- OTHER THAN SPEAKING
22  WITH THE CABIN STEWARD, AND TALKING TO THE
23  FRONT DESK ON LEVEL THREE ABOUT THE SEWERAGE
24  ISSUE, SPECIFICALLY, DID YOU SPEAK WITH ANY
25  OTHER CARNIVAL EMPLOYEE ABOUT THE PROBLEM;

Page 120

1  THIS PROBLEM?
2  A.  UM, NO; JUST THE CABIN STEWARD;
3  AND, UM, LEVEL THREE; THAT WAS IT.
4  Q.  WHAT OTHER PROBLEMS DID YOU
5  HAVE, OR WHAT OTHER COMPLAINTS DID YOU HAVE,
6  ABOUT THE CRUISE?
7  A.  UM, OUR WAIT STAFF WAS PRETTY
8  BAD; UM, WE HAD OVER TWELVE PEOPLE AT A
9  TABLE; AND -- WE HAD TWELVE PEOPLE AT TWO
10  TABLES; AND, UM, THE -- OUR -- OUR SET --
11  TEAM SET-UP GUY FOR THE PEOPLE FOR THE DINING
12  ROOM, UM, HAD NOT ONLY OUR TWO BIG TABLES OF
13  SIX EACH, THEY ALSO HAD FIVE OTHER TABLES;
14  AND, BASICALLY, IT TOOK US FOREVER TO GET
15  FOOD; IT TOOK US FOREVER TO GET DRINKS; IT
16  TOOK FOREVER FOR US TO GET BREAD.
17  Q.  DID YOU LODGE A COMPLAINT ABOUT
18  THAT; I MEAN, DID YOU SPEAK TO SOMEONE IN THE
19  RESTAURANT OR ANYTHING?
20  A.  OH, I MADE IT KNOWN; I'M VERY
21  LOUD-MOUTHED.
22  Q.  HA, HA!
23  A.  I MADE IT KNOWN VERY WELL THAT
24  --
25  Q.  WHEN DID YOU MAKE IT KNOWN?

Page 121

1   A.  UM, DAY ONE THROUGH WHATEVER --
2   HOWEVER LONG THE CRUISE WAS; I DIDN'T,
3   SPECIFICALLY, TALK WITH ANYBODY; I DID NOT GO
4   TALK TO THE MAITRE' D, OR ANYBODY LIKE THAT;
5   BUT I DID MAKE IT KNOWN.
6   Q.  OTHER PROBLEMS THAT YOU HAD, OR
7   COMPLAINTS YOU HAD, ABOUT THE CRUISE?
8   A.  UM, THE KIDS RUNNING AROUND.
9   Q.  WHEN YOU SAY "KIDS", WHAT DO YOU
10  MEAN?
11  MS. EIKELAND:
12      I'M SORRY; I THINK YOU CUT HER
13  OFF, ACTUALLY.
14  Q.  (BY MR. KERNS).  GO AHEAD AND
15  FINISH; I'M SORRY.
16  A.  UM, KIDS RUNNING AROUND; UM,
17  ABOUT HOW THEY WERE ON THE SERENITY DECK,
18  WHEN THEY ARE NOT SUPPOSED TO BE, AT ALL; UM,
19  I ALSO HAD A PROBLEM WITH THE FACT THAT, UM,
20  ONE OF 'EM, THE TEENAGERS, UH, THEY WERE
21  UNDERAGE DRINKING ON THE SHIP.
22      AND, COME TO FIND OUT, ONE OF
23  THE, UM, PERSONNEL AT THE BAR, UM, WAS GIVING
24  IT TO THEM; AND THAT WAS, ACTUALLY, ONE OF
25  THE BIGGEST ISSUES; BECAUSE IT WAS MY COUSIN

Page 122

1   THAT WAS ON THE SHIP WHO HAD BEEN DRINKING.
2   Q.  HOW OLD WAS YOUR COUSIN?
3   A.  AT THE TIME, HE WAS EIGHTEEN.
4   Q.  WHAT BAR WAS GIVING HIM ALCOHOL?
5   A.  UH, I'M NOT QUITE SURE; HE WOULD
6   NEVER INFORM US.
7   Q.  IT WASN'T THE CASINO, THOUGH?
8   A.  NO; I'M PRETTY SURE IT WASN'T;
9   I'M NOT QUITE SURE; I MEAN, HE WAS NEVER SEEN
10  IN THE CASINO; HE WAS ALWAYS ON THE LIDO
11  DECK; AND UP BY THE BASKETBALL GOALS.
12  Q.  WHEN YOU WERE TALKING ABOUT
13  "KIDS RUNNING AROUND", WHAT AGE OF KIDS WERE
14  YOU REFERRING TO?
15  A.  SIX TO EIGHT- -- SEVENTEEN,
16  EIGHTEEN, I MEAN.
17  Q.  AND WHY WAS THIS AN ISSUE FOR
18  YOU?
19  A.  UH, ONE, BECAUSE THEY WERE
20  LEAVING WATER EVERYWHERE; I HAD A PROBLEM
21  WITH, BECAUSE I ACTUALLY ALMOST (WITNESS
22  COUGHING) -- MY HUSBAND ALMOST SLIPPED IN THE
23  DINING ROOM AREA.
24      UM, I ALSO HAD A PROBLEM
25  BECAUSE, ON THE LAST NIGHT OF THE CRUISE,

Page 123

1   AFTER EVERYTHING WAS DONE, WE, UM, WENT AND
2   SAT OUT ON THE, UM, LIDO DECK TO WATCH US
3   COME IN; AND TWO TEENAGE BOYS, UM, ABOUT
4   SEVENTEEN TO EIGHTEEN YEARS OLD, UM, CAME UP
5   BEHIND US; AND THEY KICKED THE PLATE GLASS
6   WINDOW THING THAT KEEPS YOU FROM FALLING
7   OVERBOARD ON THE LIDO DECK; AND THEY
8   SHATTERED IT, RIGHT THERE IN FRONT OF US --
9   WELL, BEHIND US.
10  Q.  OTHER THAN COMPLAINING TO THE
11  LEVEL THREE FRONT DESK PEOPLE, AND THE
12  STEWARD REGARDING THE SEWERAGE ISSUE, DID YOU
13  LODGE ANY OTHER FORMAL COMPLAINTS?  AND BY
14  "FORMAL", I MEAN TO CARNIVAL STAFF.
15  A.  NOT -- NOT UNTIL AFTER I GOT OFF
16  THE SHIP.
17  Q.  APPROXIMATELY, WHAT TIME DID YOU
18  GET OFF THE SHIP?
19  A.  UM, THAT CRUISE, MY -- WE WERE
20  ALL OFF BY, MAYBE, 11:00; BESIDES MY AUNT,
21  AND MY GREAT AUNT; THEY ENDED UP NOT GETTING
22  OFF TILL ALMOST 1:00; WE HAD BEEN SITTING
23  OUTSIDE THE TERMINAL, WAITING ON THEM.
24  Q.  WHAT TIME DID YOU CALL CARNIVAL?
25  A.  HMM; ABOUT, MAYBE, 3:00, 4:00,

Page 124

1   IN THE AFTERNOON, WHEN I GOT HOME.
2       Q.    SO YOU WERE ACT- -- YOU WERE,
3   ACTUALLY, IN YOUR HOME WHEN YOU --
4       A.    YES.
5       Q.    -- MADE THE CALL?  WHAT NUMBER
6   DID YOU CALL?
7       A.    UH, WHATEVER NUMBER'S ONLINE
8   WHEN YOU TYPE IN "CARNIVAL CRUISES" ON, UM,
9   GOOGLE.
10      Q.    HOW LONG FROM WHEN YOU CALLED TO
11  WHEN YOU, ACTUALLY, GOT SOMEONE ON THE PHONE
12  THAT YOU COULD TALK WITH ABOUT THESE ISSUES?
13      A.    NOT LONG; ESPECIALLY WHEN YOU
14  PRESS ZERO EVERY TIME IT STARTS SPEAKING.
15      Q.    HA, HA, HA!  YOU AND I HAVE THE
16  SAME TRICK.  DID THE PERSON YOU SPOKE WITH AT
17  FIRST, THE FIRST TIME YOU CALLED, DID YOU, BY
18  CHANCE, GET THAT PERSON'S NAME?
19      A.    HMM, NO, SIR; SHE -- I KNOW SHE
20  WAS A FEMALE; I DIDN'T -- SHE SAID HER NAME
21  AT THE BEGINNING OF THE, UH, CONVERSATION;
22  BUT THAT WAS TWO YEARS AGO; I DON'T REMEMBER.
23      Q.    DID SHE -- DID -- WHEN YOU
24  CALLED THAT NUMBER -- WELL, I'LL JUST ASK
25  ABOUT THIS INSTANCE, SPECIFICALLY.  DO YOU

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 125

1  REMEMBER WHETHER OR NOT YOUR CALL WAS
2  RECORDED?
3  A.   UH, IT SAYS THAT:  "YOUR CALL
4  MAY BE RECORDED"; UM, BUT I'M NOT QUITE SURE.
5  Q.   OKAY.
6  A.   I KNOW SOME -- SOME PEOPLE
7  RECORD EVERY CALL; SOME PEOPLE DON'T; SO, I
8  MEAN.
9  Q.   ARE YOU TALKING ABOUT, WHEN YOU
10  SAY "SOME PEOPLE", ARE YOU TALKING ABOUT SOME
11  CARNIVAL GUEST SERVICES WORKERS?
12  A.   I'M TALKING ABOUT SOME
13  BUSINESSES.
14  Q.   OKAY.  BUT DO YOU KNOW WHETHER
15  OR NOT CARNIVAL, EITHER RECORDS THE CALLS, OR
16  SAYS THAT THEY'RE RECORDING THE CALLS?
17  A.   I'M NOT QUITE SURE.
18  Q.   DID THE FEMALE WHO YOU SPOKE
19  WITH IDENTIFY HERSELF AS -- BY TITLE; BY HER
20  TITLE WITH THE COMPANY?
21  A.   I'M NOT -- I DON'T REMEMBER; SHE
22  INFORMED US BY HER NAME; AND, UM, SHE SAID
23  SHE'S A -- YEAH; SHE DID INFORM US BY TITLE;
24  SHE SAID SHE WAS CARNIVAL, UH, GUEST
25  SERVICES; HOW COULD SHE HELP ME.

Page 126

1  Q.   AND FOR HOW LONG DID YOU SPEAK
2  WITH HER?
3  A.   UM, ABOUT, MAYBE, TWENTY MINUTES
4  I WAS ON THE PHONE WITH HER.
5  Q.   ONE SECOND.  ALL RIGHT.  SO, YOU
6  SPOKE WITH THIS INITIAL GUEST SERVICES WORKER
7  FOR CARNIVAL FOR ABOUT TWENTY MINUTES, YOU
8  SAID?
9  A.   UH-HUH.
10  Q.   YOUR PURPOSE, AND INTENTION, IN
11  MAKING THAT CALL WAS, ESSENTIALLY, TO TELL
12  THEM EVERYTHING THAT WENT WRONG FOR YOU ON
13  THE CRUISE; IS THAT FAIR TO SAY?
14  A.   UH-HUH.
15      MS. EIKELAND:
16      FORM.
17  Q.   (BY MR. KERNS).  AS WELL AS TO
18  TELL THEM PROBLEMS THAT THEY HAVE THAT THEY
19  NEED TO FIX?
20  A.   YES.
21  Q.   AND YOU DID TELL THEM ALL OF THE
22  PROBLEMS THAT YOU ENCOUNTERED THAT CARNIVAL
23  SHOULD FIX; CORRECT?
24  A.   YES.
25  Q.   THERE WASN'T ANY REASON, THAT

Page 127

1  YOU CAN THINK OF, FOR YOU TO INTENTIONALLY
2  LEAVE ANYTHING OUT; IS THAT FAIR TO SAY?
3      MS. EIKELAND:
4      FORM.
5      WITNESS:
6      NO.
7  Q.   (BY MR. KERNS).  I'M SORRY.  IS
8  THAT YES, IT'S FAIR TO SAY; OR NO, THERE
9  WASN'T ANY REASON FOR YOU TO LEAVE ANYTHING
10  OUT?
11      MS. EIKELAND:
12      FORM.
13      WITNESS:
14      THERE WAS NO -- THERE WASN'T
15  ANY REASON FOR ME TO LEAVE ANYTHING OUT.
16  Q.   (BY MR. KERNS).  SO, FOR
17  EXAMPLE, YOU TOLD THEM ABOUT THE ISSUES WITH
18  THE CABIN --
19  A.   YES.
20  Q.   -- SMELLING?
21  A.   YES.
22  Q.   AND YOU TOLD THE CARNIVAL
23  SERVICES -- GUEST SERVICES REPRESENTATIVE,
24  DURING THAT FIRST PHONE CALL, ABOUT THE
25  ISSUES WITH THE CABIN NOT BEING CLEANED ON A

Page 128

1  COUPLE OF THE DAYS?
2  A.   YES.
3  Q.   YOU TOLD THE REPRESENTATIVE,
4  DURING THAT FIRST PHONE CALL, ABOUT KIDS
5  RUNNING AROUND?
6  A.   YES.
7  Q.   AND YOU TOLD THAT
8  REPRESENTATIVE, DURING THAT FIRST
9  CONVERSATION, ABOUT WATER BEING ON THE
10  FLOORS?
11  A.   YES.
12  Q.   AND, SPECIFICALLY, ABOUT MS.
13  RILEY'S INCIDENT?
14  A.   YES.
15  Q.   ALL RIGHT.  AND DID YOU HAVE ANY
16  OTHER PHONE CALLS -- I'M SORRY.  DID YOU MAKE
17  ANY OTHER PHONE CALLS WITH REGARD TO THE
18  CRUISE THAT WE'RE HERE FOR TODAY?
19  A.   YES.
20  Q.   AND WHEN DID THOSE PHONE CALLS
21  OCCUR?
22  A.   THAT PHONE CALL OCCURRED THE
23  NEXT DAY; BECAUSE THE OUTCOME OF THE FIRST
24  PHONE CALL WAS THAT THEY HAD NOT RECEIVED THE
25  DOCUMENTS OFF OF THE SHIP, BECAUSE IT HAD

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 129

1   JUST PORTED THAT MORNING -- DOCKED THAT
2   MORNING; THAT I SHOULD CALL BACK TOMORROW
3   MORNING; AND I CALLED BACK; TOLD THEM THE
4   EXACT SAME THING ALL OVER AGAIN.
5   Q.  WAS IT THE SAME CUSTOMER SERVICE
6   REPRESENTATIVE?
7   A.  NO.
8   Q.  WAS IT SOMEONE WITH THE SAME
9   TITLE?
10  A.  YES.
11  Q.  MALE, OR FEMALE; DO YOU KNOW?
12  A.  UM, MALE.
13  Q.  DID HE SOUND -- DID HE HAVE ANY
14  SORT OF ACCENT THAT WOULD MAKE IT EASIER FOR
15  YOU TO IDENTIFY WHERE HE MIGHT BE FROM --
16  A.  NO.
17  Q.  -- OR -- HOW ABOUT THE LADY YOU
18  SPOKE WITH THE FIRST TIME --
19  A.  NO.
20  Q.  -- YOU CALLED?
21  A.  THEY DON'T SPEAK VERY GOOD
22  ENGLISH; VERY WELL ENGLISH.
23  Q.  BUT NO TYPE OF, FOR EXAMPLE,
24  BRITISH ACCENT, OR --
25  A.  NOPE.

Page 130

1   Q.  DURING THIS FIRST PHONE
2   CONVERSATION YOU HAD WITH -- AFTER GETTING
3   OFF THE CRUISE WITH THE CARNIVAL GUEST
4   SERVICES REPRESENTATIVE, DID IT -- DID THAT
5   PERSON APPEAR TO YOU -- OR "APPEAR" MIGHT BE
6   THE WRONG WORD.  BUT DO YOU KNOW WHETHER THAT
7   PERSON WAS TAKING NOTES?
8   MS. EIKELAND:
9   FORM.
10  WITNESS:
11  WAIT.  SAY THAT AGAIN?
12  MS. EIKELAND:
13  HA, HA, HA!
14  Q.  (BY MR. KERNS).  YES; THIS FIRST
15  -- THAT WAS A POOR QUESTION; I'LL START THE
16  QUESTION OVER.  THIS FIRST CONVERSATION YOU
17  HAD WITH THE CARNIVAL CUSTOMER SERVICES
18  REPRESENTATIVE AFTER YOU A GOT OFF THE
19  CRUISE, WHEN YOU CALLED?
20  A.  UH-HUH.
21  Q.  DID SHE INDICATE TO YOU, OR DO
22  ANYTHING TO YOU, THAT WOULD LEAD YOU TO
23  BELIEVE THAT SHE WAS TAKING NOTES DURING THE
24  PHONE CALL?
25  A.  HMM, NO.

Page 131

1   MS. EIKELAND:
2   FORM.
3   WITNESS:
4   SHE DIDN'T TOLD ME SHE WAS; SHE
5   DIDN'T -- I COULDN'T HEAR TYPING, SO.
6   Q.  (BY MR. KERNS).  OKAY.  AND HOW
7   ABOUT WITH REGARD TO THE SECOND --
8   A.  SAME THING.
9   Q.  -- CALL?
10  A.  HE DIDN'T INFORM ME HE WAS
11  TAKING NOTES; ALL THEY -- ALL IT SAYS IS
12  THAT: "YOUR CALL MAY BE RECORDED FOR QUALITY
13  CONTROL PURPOSES".
14  MS. EIKELAND:
15  HA, HA!
16  Q.  (BY MR. KERNS).  SO, YOU DO
17  REMEMBER THAT BEING SAID?
18  A.  YES.
19  Q.  AND DID YOU ADD, OR SUBTRACT,
20  ANYTHING FROM YOUR LIST OF COMPLAINTS WHEN
21  YOU CALLED FOR THE SECOND TIME; AND SPOKE
22  WITH THE MALE CUSTOMER SERVICE
23  REPRESENTATIVE?
24  A.  NOPE.
25  Q.  BUT TOLD THEM -- YOU MIGHT NOT

Page 132

1   USE THE EXACT SAME WORDS.  BUT IN TERMS OF
2   THE SUBSTANCE OF YOUR COMPLAINTS, THEY WERE
3   THE SAME?
4   A.  YEP.
5   Q.  AND WHAT WAS THE OUTCOME OF THIS
6   PHONE CALL?
7   A.  "WOULD YOU LIKE A BOTTLE OF
8   CHAMPAGNE ON YOUR NEXT CRUISE?"
9   Q.  THAT WAS SOMEWHAT OFFENSIVE TO
10  YOU, WOULD YOU SAY?
11  A.  YES.
12  Q.  AND WHY WOULD YOU SAY THAT IT
13  WAS OFFENSIVE?
14  A.  BECAUSE I INFORMED THE
15  GENTLEMAN, AND THE YOUNG LADY, THAT I SPOKE
16  WITH, BOTH OF 'EM, THAT I DID NOT WANT
17  ANYTHING FROM CARNIVAL; I ENJOYED CRUISING
18  WITH CARNIVAL; AND I WILL REMAIN CRUISING
19  WITH CARNIVAL; BUT I THINK THESE ARE SOME OF
20  THE THINGS THAT THEY NEEDED TO GET FIXED; AND
21  I TOLD 'EM ALL I WANTED WAS A SIMPLE "I'M
22  SORRY"; AND AN APOLOGY.
23  Q.  AND THEY NEVER GAVE YOU THAT
24  APOLOGY?
25  A.  NO.

Page 133

1  Q.   THEY NEVER EVEN ADMITTED THAT
2   THEY WERE WRONG?
3  A.   NOPE.
4  Q.   WHICH IS, CERTAINLY, SOMETHING
5   THAT'S UPSETTING TO YOU?
6  A.   YES.
7     MS. EIKELAND:
8     OBJECTION; FORM.
9  Q.   (BY MR. KERNS).  IT'S FAIR TO
10  SAY, IT STILL KIND OF MAKES YOU A LITTLE
11  PERTURBED, OR UPSET; THE WAY YOU WERE
12  TREATED?
13     MS. EIKELAND:
14     OBJECTION; FORM.
15     WITNESS:
16     TODAY?  NO; I -- THAT'S A THING
17  OF THE PAST; IF I REALLY -- IF I REALLY
18  DWELLED ON THAT, I WOULDN'T HAVE GONE ON
19  CARNIVAL FOR MY HONEYMOON.
20  Q.   (BY MR. KERNS).  WHEN DID YOU
21  TAKE THE HONEYMOON CRUISE?
22  A.   APRIL -- WE LEFT APRIL 13TH; IT
23  WAS A MONDAY.
24  Q.   HOW WAS THAT EXPERIENCE?
25  A.   THAT EXPERIENCE WAS AMAZING; I

Page 134

1   ENJOYED THAT CRUISE.
2  Q.   WHAT SHIP WAS THAT?
3  A.   THAT WAS THE CARNIVAL VICTORY,
4   OUT OF MIAMI.
5  Q.   DID YOU ENJOY THE SIGHTS IN
6   MIAMI WHILE YOU WERE IN TOWN?
7  A.   NO; WE GOT THERE; WE GOT ON THE
8   SHIP; WE GOT OFF THE SHIP; WENT BACK TO THE
9   AIRPORT.
10     MR. KERNS:
11     I'M GOING TO MARK THIS
12  (INDICATING) AS DEFENSE'S -- WHAT ARE WE ON;
13  NUMBER 4?
14     MADAME REPORTER:
15     YEAH.
16     MR. KERNS:
17     (HANDING).
18     MS. EIKELAND:
19     (HANDING).
20  Q.   (BY MR. KERNS).  BEFORE THAT, I
21  HAVE A FEW MORE QUESTIONS; I WAS PREMATURE.
22  THE -- MOSTLY, 'CAUSE I NEED TO LOOK AT IT TO
23  ASK YOU A QUESTION.
24     THE CARNIVAL EMPLOYEE WHO YOU
25  SPOKE WITH ON THE FIRST PHONE CALL YOU MADE,

Page 135

1   THE DAY AFTER YOU GOT OFF THE SHIP.  DID THAT
2   PERSON, AT LEAST, SEEM TO BE LISTENING TO
3   YOU?
4  A.   THEY BOTH DID.
5  Q.   ALL RIGHT.  DID THEY SEEM TO BE
6   UNINTERESTED IN A CERTAIN ONE OF YOUR
7   COMPLAINTS VERSUS OTHER COMPLAINTS?
8  A.   NO.
9     MS. EIKELAND:
10     FORM.
11  Q.   (BY MR. KERNS).  SO, THEY AT
12  LEAST GAVE OUT THE IMPRESSION THAT THEY WERE
13  INTERESTED IN WHAT YOU HAD TO SAY?
14  A.   YEAH.
15     MR. KERNS:
16     I'M SHOWING YOU WHAT I'VE
17  MARKED AS DEFENSE EXHIBIT 4 (HANDING).
18     (WHEREUPON, THE INSTRUMENT REFERRED
19  TO WAS MARKED DALISE GAUTREAUX DEPOSITION
20  DEFENSE EXHIBIT NUMBER 4 AND IS ATTACHED TO
21  THE TRANSCRIPT).
22  Q.   (BY MR. KERNS).  GO AHEAD AND
23  READ THAT TO YOURSELF; AND I MIGHT ASK YOU
24  SOME QUESTIONS ABOUT IT.
25  A.   OKAY.

Page 136

1  Q.   ALL RIGHT.  SO, WHAT DO YOU
2   BELIEVE THAT (INDICATING) TO BE?  AND I'M
3   SPEAKING ABOUT DEFENSE EXHIBIT 4.
4  A.   NOTES --
5     MS. EIKELAND:
6     OBJECTION; FORM.
7     WITNESS:
8     NOTES TAKEN FROM ONE OF THE
9   CALLS.
10  Q.   (BY MR. KERNS).  OKAY.  CAN YOU
11  READ, OUT LOUD, EVERYTHING THAT THAT DOCUMENT
12  SAYS?
13  A.   "MS. WALGAMOTTE CLAIMS THE
14  BOTTOM FLOOR HAD SEWERAGE ISSUES, THE CABIN
15  HAD IT, AND IT WAS -- AND WAS CONFIRMED THAT
16  IT WAS NOT JUST HER CABIN THAT HAD ISSUES.
17  UM, GUEST CLAIMS CONTINUED THE WEEK -- THE
18  ENTIRE WEEK, REPORTED ONBOARD AND NEVER
19  ASSISTED.  GUEST CLAIMED THE CABIN STEWARD
20  WAS IN THE PRESENT EXCEPT WHEN HE TRIED TO
21  CLEAN THE CABINET -- CABIN AND ALLEGEDLY WAS
22  NOT FRIENDLY.  GUEST CLAIMS ON WEDNESDAY AND
23  THURSDAY THAT WAS NOT CLEANED; ALLEGEDLY, IT
24  WAS BECAUSE OF A SIGN ON THE DOOR, BUT NEVER
25  USED THE SIGN.  GUEST CLAIMS CHARLEY WAS

Page 137

1  AMAZING, BUT THE OTHER GUY WHO WAS ASSISTANT
2  WAS HORRIBLE.  GUEST CLAIMS HE WOULD FORGET
3  THE ORDER, KIDS WERE RUNNING UP AND DOWN THE
4  HALLS.  CALL DROPPED WITHOUT SPEAKING TO
5  GUEST BUT WILL RESEARCH ISSUES".
6  Q.   SO, FROM YOUR UNDERSTANDING,
7  WHAT THAT (INDICATING DEFENSE EXHIBIT 4) IS
8  IS NOTES OF THE CLAIMS THAT YOU MADE WHEN YOU
9  CALLED CARNIVAL; IS THAT FAIR TO SAY?
10  A.   UH-HUH (WITNESS NODDING HEAD
11  AFFIRMATIVELY).
12      MS. EIKELAND:
13      OBJECTION; FORM; SHE'S NOT THE
14  PROPER PERSON FOR AUTHENTICATING, OR
15  IDENTIFYING, THAT DOCUMENT; THIS (INDICATING)
16  IS A CARNIVAL DOCUMENT.
17      MR. KERNS:
18      YOUR OBJECTION'S NOTED.
19  Q.   (BY MR. KERNS).  I BELIEVE YOU
20  SAID -- YOU SHOOK YOUR HEAD "YES"; CORRECT?
21  A.   YES.
22  Q.   SO, ESSENTIALLY, WHAT THAT IS IS
23  -- WELL, I'LL START THE QUESTION OVER.  IS
24  THERE ANYTHING YOU BELIEVE TO BE INACCURATE
25  -- AND BY THAT, I MEAN THEY WROTE STUFF --

Page 138

1  THEY WROTE DOWN SUBSTANTIVE THINGS THAT YOU
2  DIDN'T SAY?  YEAH; AGAIN, I'LL START THE
3  QUESTION OVER, AND TRY TO ASK IT MORE
4  CLEARLY.
5      DID THEY MISSTATE -- AND BY
6  "THEY", I MEAN WHOEVER WROTE THAT INFORMATION
7  THAT'S ON DEFENSE EXHIBIT 4.  DID THEY
8  MISSTATE YOUR COMPLAINTS IN ANY WAY?
9  A.   UM, NO; EVERYTHING SEEMS PRETTY
10  MUCH CLEAR; EXCEPT FOR THE CALL THAT HAD BEEN
11  DROPPED; BUT THE CALL WAS NEVER DROPPED.
12  Q.   OKAY.  WHAT IS THE DATE -- IS
13  THAT (INDICATING) DOCUMENT -- AND I'M
14  REFERRING TO DEFENSE EXHIBIT 4.  IS THAT
15  DATED AT ALL; IS THERE DATES, OR TIME STAMP?
16  A.   YES.
17  Q.   AND WHAT IS THE DATE, AND TIME?
18  A.   UM, APRIL 21ST, 2014; 3:54 P.M.;
19  "COMPLAINT" AT THE BOTTOM.
20  Q.   IS THAT ABOUT THE TIME THAT YOU
21  CALLED, DO YOU THINK, FOR THE FIRST TIME?
22  A.   YES.
23  Q.   SO, IS IT FAIR TO SAY THAT
24  WHAT'S WRITTEN DOWN THERE IS -- THE
25  STATEMENTS THAT ARE WRITTEN DOWN THERE THAT

Page 139

1  ARE ATTRIBUTED TO YOU.  IS IT FAIR TO SAY
2  THAT THOSE ARE AN ACCURATE DESCRIPTION OF
3  WHAT YOU SAID TO THE CARNIVAL EMPLOYEE THE
4  FIRST TIME YOU CALLED, THE DAY AFTER YOU GOT
5  OFF THE CRUISE?
6      MS. EIKELAND:
7      FORM.
8      WITNESS:
9      IT'S NOT INACCURATE; IT'S JUST
10  THAT THEY PUT MORE THINGS IN THAT IT WASN'T
11  -- THAT WASN'T BEING SAID -- THAT WASN'T --
12  DID NOT HAPPEN.
13  Q.   (BY MR. KERNS.  CAN YOU EXPLAIN
14  THAT?
15  A.   UM, THE CALL BEING DROPPED.
16  Q.   OKAY.
17  A.   THE CALL WAS NEVER DROPPED.
18  Q.   OKAY.  IF YOU TAKE AWAY THAT
19  FROM IT, THE TYPE --
20  A.   BESIDES THAT, NO; EVERYTHING
21  ELSE SEEMS TO BE EXACTLY TO THE POINT.
22  Q.   OKAY.
23  A.   THEY ALSO TOOK OUT THE, UM --
24  THAT I INFORMED THEM THAT A LADY DID FALL;
25  BUT THESE (INDICATING) ARE ONLY NOTES; SO

Page 140

1  IT'S NOT THE WHOLE PHONE CONVERSATION.
2  Q.   OKAY.  BUT WITH REGARD TO WHAT,
3  ACTUALLY, IS WRITTEN DOWN THERE (INDICATING),
4  YOU WOULD SAY THAT THE CALL -- THE PART ABOUT
5  THE CALL BEING DROPPED IS INACCURATE;
6  CORRECT?
7  A.   YES.
8  Q.   AND WITH REGARD TO EVERYTHING
9  ELSE WRITTEN DOWN THERE, ON DEFENSE EXHIBIT
10  4, THAT IS A FAIR, AND ACCURATE,
11  REPRESENTATION OF THE STATEMENTS THAT YOU
12  MADE TO THE CARNIVAL REPRESENTATIVE ON THAT
13  DAY?
14      MS. EIKELAND:
15      FORM.
16      WITNESS:
17      YES.
18  Q.   (BY MR. KERNS).  SO, YOU DID
19  MAKE THOSE STATEMENTS?
20      MS. EIKELAND:
21      FORM.
22      WITNESS:
23      YES.
24  Q.   (BY MR. KERNS).  I'M SHOWING YOU
25  --

Page 141

1     MR. KERNS:
2     FIRST, I'LL SHOW OPPOSING
3  COUNSEL (HANDING) WHAT I'VE MARKED FOR
4  IDENTIFICATION AS DEFENSE EXHIBIT 5.
5     (WHEREUPON, THE INSTRUMENT REFERRED
6  TO WAS MARKED DALISE GAUTREAUX DEPOSITION
7  DEFENSE EXHIBIT NUMBER 5 AND IS ATTACHED TO
8  THE TRANSCRIPT).
9  Q.  (BY MR. KERNS).  GO AHEAD, IF
10  YOU COULD; AND JUST READ THAT TO YOURSELF;
11  AND THEN, WHEN YOU'RE DONE READING IT, LET ME
12  KNOW; AND I MAY ASK YOU SOME QUESTIONS ABOUT
13  IT.
14  A.  OKAY.
15  Q.  ALL RIGHT.  WHAT -- WHAT DOES
16  THAT (INDICATING) APPEAR TO BE?
17     MS. EIKELAND:
18     FORM.
19     WITNESS:
20     ANOTHER NOTE FROM A CALL.
21  Q.  (BY MR. KERNS).  AND WHAT IS THE
22  DATE, AND TIME, ON THAT NOTE?
23  A.  APRIL 21ST, 2014, AT 4:11 P.M.
24  Q.  SO ABOUT -- IS THAT ABOUT
25  FIFTEEN MINUTES AFTER THE TIME THAT'S

Page 142

1  INDICATED OF YOUR STATEMENTS ON DEFENSE
2  EXHIBIT 4?
3  A.  YES.
4  Q.  ALL RIGHT.  DO YOU RECALL HAVING
5  THIS (INDICATING) SECOND CONVERSATION?
6  A.  NO.
7  Q.  AND I'M NOT -- FOR INSTANCE, I'M
8  NOT TRYING TO CATCH YOU IN A BIG LIE OR
9  ANYTHING.
10  A.  OH, NO.
11  Q.  BUT WHAT I'M ASKING IS IF COULD
12  YOU BE MISTAKEN; OR COULD YOU NOT REMEMBER
13  THAT THERE WAS A SECOND CALL; IS THAT A
14  POSSIBILITY?
15  A.  THERE'S A POSSIBILITY.
16  Q.  OKAY.
17  A.  IT'S BEEN OVER A YEAR NOW; I
18  MEAN.
19  Q.  YEAH; AGAIN --
20  A.  SO.
21  Q.  AND THAT'S --
22  A.  I MEAN, MAYBE THERE WAS A SECOND
23  CALL; I'M NOT -- I'M NOT GONNA' SAY THERE
24  WAS; I'M NOT GONNA' SAY THERE WASN'T.
25  Q.  UNDERSTOOD.  OKAY.  COULD I SEE

Page 143

1  5?
2  A.  5?
3  Q.  YEAH.
4  A.  (HANDING).
5  Q.  THANK YOU.  IS THERE ANYTHING
6  THAT EXHIBIT -- WITH REGARD TO THE STATEMENTS
7  THAT ARE ATTRIBUTED TO YOU BY WHOEVER WROTE
8  THAT INFORMATION, IS THERE ANYTHING THAT IS
9  -- THAT WASN'T ON THE EXHIBIT 4 THAT IS ON
10  EXHIBIT 5?
11  A.  YES.
12  Q.  OKAY.  AND WHAT IS THAT?
13  A.  UM, THIS (INDICATING) ONE,
14  EXHIBIT 4, IS SAYING THAT, UM, THE ROOM WAS
15  NOT CLEANED FOR TWO DAYS; UH, WEDNESDAY, AND
16  THURSDAY; ON EXHIBIT 5, IT'S SAYING THAT, UM
17  -- UM, STATES THAT THE CABIN WAS NEVER
18  CLEANED DURING THE CRUISE.
19  Q.  DO YOU KNOW WHICH ONE OF THOSE
20  IS, FIRST OF ALL, JUST FACTUALLY ACCURATE?
21     MS. EIKELAND:
22     OBJECT.
23  Q.  (BY MR. KERNS).  THE WAY YOU
24  REMEMBER IT, WAS THE ROOM CLEANED ON ANY DAYS
25  OF THE CRUISE?

Page 144

1  A.  YEAH.
2     MS. EIKELAND:
3     FORM.
4  Q.  (BY MR. KERNS).  AND DO YOU KNOW
5  WHY THE STATEMENTS WOULD BE DIFFERENT?
6     MS. EIKELAND:
7     OBJECTION; FORM; CALLS FOR
8  SPECULATION.
9     WITNESS:
10     SAY IT AGAIN?
11  Q.  (BY MR. KERNS).  DO YOU KNOW WHY
12  THE TWO STATEMENTS WOULD BE DIFFERENT?
13     MS. EIKELAND:
14     OBJECTION; FORM.
15     WITNESS:
16     BECAUSE IF THERE IS A SECOND
17  CALL, I DIDN'T WANT TO HAVE TO REPEAT MYSELF
18  ALL; I MEAN, I WAS ALREADY VERY AGGRAVATED.
19  Q.  (BY MR. KERNS).  UNDERSTOOD.
20  A.  I MEAN, AND THE WAY MY -- THE
21  WAY I AM IS, I REPEAT MYSELF ONCE; THAT'S
22  FINE; I REPEAT MYSELF TWICE, YOU'RE GONNA'
23  GET AN ATTITUDE WITH IT.
24  Q.  UNDERSTOOD.  SO YOU MIGHT HAVE
25     SAID: "WELL, AND MY ROOM -- MY ROOM WAS

Page 145

1    NEVER CLEANED"?
2  A.   MAYBE.
3  Q.   OKAY.
4    MS. EIKELAND:
5    FORM.
6  Q.  (BY MR. KERNS).  SO, YOU MIGHT
7   HAVE EXAGGERATED IT IN THE SECOND CALL?
8    MS. EIKELAND:
9    FORM.
10    WITNESS:
11    MAYBE.
12  Q.  (BY MR. KERNS).  IS THERE ANY
13   ADDITIONS, OTHER THAN -- AND I'M NOT ASKING
14   ABOUT CHANGES THIS TIME -- BUT ADDITIONAL
15   COMPLAINTS IN THE EXHIBIT 5 THAT'S NOT IN
16   EXHIBIT 4?
17  A.  UM, IT SAYS THAT KIDS WERE
18   RUNNING ALL UP AND DOWN THE HALLS, UM, IN 4;
19     AND, IN 5, IT SAYS: "INCONSIDERATE TEENAGERS
20   CRUISING TROUBLE -- CAUSING TROUBLE ALL OVER
21   THE SHIP".
22  Q.  ALL RIGHT.  DO YOU HAVE ANY
23   REASON TO BELIEVE YOU DID NOT MAKE EITHER OF
24   THOSE STATEMENTS YOU JUST MENTIONED??
25  A.  UM, THE FIFTH ONE, I CAN SAY I

Page 146

1   DON'T -- I DON'T CALL ANYBODY WHO'S YOUNGER
2   THAN ME -- I DON'T CALL THEM A "TEENAGER"; I
3   CALL 'EM A "CHILD".
4  Q.  OKAY.
5  A.  SO.
6  Q.  SO THEY WOULD HAVE -- WHOEVER
7   WROTE THAT SUPPLIED THE WORD "TEENAGER" FOR
8   YOU; IT WASN'T YOU THAT SAID THE WORD
9   "TEENAGER"?
10  A.  YEAH.
11  Q.  OTHER THAN THEM PARAPHRASING,
12   AND WRITING IT IN THEIR OWN WORDS --
13  A.  THAT'S REALLY IT.
14  Q.  -- IN TERMS OF THE SUBSTANCE OF
15   THE COMPLAINTS, WHAT YOU WERE, ACTUALLY,
16   COMPLAINING ABOUT, ARE -- IS WHAT IS WRITTEN
17   DOWN ON EXHIBIT 5 ACCURATE?
18    MS. EIKELAND:
19    FORM.
20    WITNESS:
21    YEAH.
22  Q.  (BY MR. KERNS).  SO, THOSE ARE
23   YOUR STATEMENTS; EXCEPT FOR, PERHAPS, THE
24   ADJECTIVES USED TO DESCRIBE CERTAIN THINGS?
25  A.  IT CAN BE.

Page 147

1    MS. EIKELAND:
2    FORM.
3    WITNESS:
4    I MEAN, I DON'T KNOW IF IT IS,
5   OR NOT; I MEAN, LIKE I SAID BEFORE, IT'S BEEN
6   OVER A YEAR.
7  Q.  (BY MR. KERNS).  UNDERSTOOD.
8  A.  I KNOW WHAT I WAS COMPLAINING
9   ABOUT; AND EXHIBIT 4, CLEARLY, SHOWS A LOT
10   MORE THAN WHAT EXHIBIT 5 DOES.
11  Q.  OKAY.  AND CAN YOU READ EXHIBIT
12   -- WHAT EXHIBIT 5 SAYS, FOR THE RECORD?
13  A.  "DALISE WALGAMOTTE CALLING
14   STATES THEY HAD A -- THEY HAD A HORRIFIC
15   SEWERAGE SMELL IN THEIR CABIN FOR -- FROM
16   SEWERAGE.  ADDITIONALLY HAD ISSUES WITH CABIN
17   STEWARD; STATES SHE PRACTICALLY NEVER SAW
18   HIM.  UM, STATES THE CABIN WAS NEVER CLEANED
19   DURING CRUISE (ALLEGEDLY).  DINING STAFF WAS
20   NOT ATTENTIVE.  INCONSIDERATE TEENAGERS
21   CAUSING TROUBLE ALL OVER THE SHIP".
22    MR. KERNS:
23    NOW I'M GONNA' SHOW YOU WHAT
24   I'VE MARKED AS DEFENSE EXHIBIT 6 (HANDING).
25    (WHEREUPON, THE INSTRUMENT REFERRED

Page 148

1   TO WAS MARKED DALISE GAUTREAUX DEPOSITION
2   DEFENSE EXHIBIT NUMBER 6 AND IS ATTACHED TO
3   THE TRANSCRIPT).
4    MS. EIKELAND:
5    (HANDING).
6  Q.  (BY MR. KERNS).  GO AHEAD AND
7   READ THAT TO YOURSELF; AND LET ME KNOW WHEN
8   YOU'RE DONE READING IT, PLEASE.
9  A.  OKAY.
10  Q.  ALL RIGHT.  WHAT DOES THAT
11   (INDICATING) APPEAR TO YOU TO BE?
12  A.  I'M NOT QUITE SURE; IT -- IT
13   LOOKS LIKE AN E-MAIL; BUT THE WORDS IN IT
14   APPEAR TO BE WHAT THEY SAID ON THE VOICE
15   MACHINE EVERY TIME THEY'D CALL, WHEN I
16   WOULDN'T BE IN THE ROOM, WHILE THE ROOM
17   SMELLED.
18  Q.  OKAY.  BUT WHAT DOES IT SAY,
19   GENERALLY?  AND YOU DON'T HAVE TO DESCRIBE IT
20   WORD FOR WORD.  BUT WHAT DOES IT APPEAR TO
21   BE?
22  A.  UM.
23  Q.  AN APOLOGY LETTER; OR HOW WOULD
24   YOU DESCRIBE IT?
25    MS. EIKELAND:

Shirley Riley vs
Carnival Corporation, et al

Danise L. Gautreaux
August 27, 2015

Page 149

1    FORM.
2    WITNESS:
3    I WOULDN'T CALL IT AN "APOLOGY
4    LETTER"; I MEAN -- I MEAN, I DON'T KNOW WHAT
5    YOU -- I DON'T KNOW WHAT YOU WANT TO CALL IT;
6    BASICALLY, SAYING -- IT COULD -- IT COULD BE
7    AN APOLOGY LETTER.
8    I MEAN, I -- LIKE I SAID BEFORE,
9    I REALLY THINK THIS (INDICATING) IS SOMETHING
10   THAT WAS LEFT ON MY VOICE MAIL; BECAUSE IT
11   SAYS: "WE HAVE TRIED ON SEVERAL OCCASIONS TO
12   SPEAK WITH YOU PERSONALLY IN YOUR STATEROOM,
13   BUT HAVE BEEN UNSUCCESSFUL".
14   Q.   (BY MR. KERNS)  COULD THAT
15   HAVE, POSSIBLY, BEEN A LETTER THAT WAS LEFT
16   AT YOUR STATEROOM; DO YOU KNOW?
17   MS. EIKELAND:
18   FORM.
19   WITNESS:
20   IF IT WAS, I NEVER GOT IT.
21   Q.   (BY MR. KERNS)  DO YOU REMEMBER
22   RECEIVING ANY DOCUMENTS, AT ALL, THROUGHOUT
23   YOUR CRUISE IN -- YOU KNOW, THE CRUISE THAT
24   WE'RE HERE TALKING ABOUT TODAY?
25   A.   YEAH.

Page 150

1    Q.   WHAT SORT OF THINGS DID YOU
2    RECEIVE?
3    A.   UM, WE'VE GOT -- WE HAD THE DAY-
4    TO-DAY ITINERARY ON WHAT WAS GOING ON WITH
5    THE SHIP; UM, WE RECEIVED THE PASS CRUISERS
6    TICKETS; THAT WAY -- WELL, I DID; UM, FOR US
7    TO GO TO THE PASS CRUISERS THING; UM, WE
8    RECEIVED OUR EXCURSION TICKETS; UM, WE
9    RECEIVED, UM -- I'M TRYING TO THINK OF WHAT
10   ELSE; WE RECEIVED THE BILL FOR A DRINK OF
11   WATER; THAT'S REALLY IT.
12   Q.   DO YOU KNOW, FOR SURE, THAT YOU
13   DIDN'T RECEIVE A COPY OF WHAT I'VE MARKED AS
14   DEFENSE EXHIBIT 6?
15   A.   I'M SURE.
16   Q.   OR YOU DON'T REMEMBER WHETHER
17   YOU RECEIVED IT?
18   A.   I'M SURE I'VE NEVER RECEIVED
19   THIS (INDICATING).
20   Q.   OKAY.  FAIR ENOUGH.
21   VIDEOGRAPHER:
22   I NEED TO CHANGE MY TAPE.
23   MR. KERNS:
24   THAT'S FINE.
25   VIDEOGRAPHER:

Page 151

1    THIS MARKS THE END OF THE VIDEO
2    TAPE NUMBER 2; WE'RE GOING OFF THE RECORD AT
3    2:05.
4    (WHEREUPON, THERE WAS A RECESS).
5    VIDEOGRAPHER:
6    THIS MARKS THE BEGINNING OF
7    VIDEO TAPE NUMBER 3; WE'RE GOING BACK ON THE
8    RECORD AT 2:19.
9    Q.   (BY MR. KERNS).  MS.
10   GAUTREAUX -- OR, I'M SORRY; I PRONOUNCED THAT
11   WRONG.
12   A.   GAUTREAUX.
13   Q.   GAUTREAUX; I'M SORRY.  MS.
14   GAUTREAUX, DO YOU KNOW WHO WAS ACCOMPANYING
15   MS. RILEY AS SHE WALKED THROUGH THE CASINO
16   THAT DAY?
17   A.   AN OLDER GENTLEMAN; UM, I -- SHE
18   SAID HE WAS HER HUSBAND; BUT I DON'T KNOW IF
19   IT WAS THE HUSBAND; BOYFRIEND; FIANCE'; I
20   DON'T KNOW WHAT THEY TITLE WAS.
21   Q.   UH-HUH.
22   A.   I KNOW SHE'S NOT FROM NEW
23   ORLEANS, SO.
24   Q.   WELL, WHEN MS. RILEY WAS -- I'LL
25   START THE QUESTION OVER.  HOW LONG, IF AT

Page 152

1    ALL, DID YOU SEE MS. RILEY WALKING BEFORE SHE
2    FELL?
3    A.   SHE CAME UP THE -- AROUND THE
4    ATRIUM FROM THE ELEVATORS; AND CAME IN THAT
5    WAY; 'CAUSE I SEEN HER COME FROM THE RIGHT;
6    THE -- IF YOU'RE WALKING INTO THE CASINO, IT
7    WAS FROM THE RIGHT SIDE; IF YOU'RE WALKING
8    OUT, IT'S THE LEFT.
9    MS. EIKELAND:
10   EXCUSE ME.
11   Q.   (BY MR. KERNS).  SO, AT
12   APPROXIMATELY WHAT AREA, IF YOU LOOK AT THE
13   DIAGRAM --
14   MS. EIKELAND:
15   EXCUSE ME.
16   Q.   (BY MR. KERNS).  I'LL SHOW YOU
17   DEFENSE EXHIBIT 1; YOU DON'T HAVE TO DRAW ON
18   IT; BUT IF YOU COULD JUST DESCRIBE WHAT AREA
19   SHE WAS IN WHEN YOU FIRST SAW HER ON THAT
20   DAY?
21   A.   WHEN I FIRST SAW HER?
22   Q.   UH-HUH.
23   A.   IN THIS (INDICATING) GENERAL
24   FACILITY (SIC).
25   Q.   THAT GENERAL VICINITY?

Page 153

1 A.   VICINITY; YEAH; THAT WORD.
2 Q.   AND CAN YOU -- ACTUALLY, I'LL
3   HAVE YOU MARK IT; MARK IT WITH AN -- WITH A
4   -- WITH A "P", FOR PLAINTIFF.
5 A.   (WITNESS MARKING ON DIAGRAM).
6 Q.   AND THEN CIRCLE IT; AND DRAW
7   SOMETHING TO IT WITH YOUR INITIALS, SO WE
8   KNOW THAT YOU MADE THAT MARK.
9 A.   (WITNESS MARKING ON DIAGRAM).
10 Q.   THANK YOU; SORRY.
11   MADAME REPORTER:
12   THAT'S OKAY.
13   MS. EIKELAND:
14   WHAT EXHIBIT IS THAT; 3?
15   MR. KERNS:
16   EXHIBIT 1.
17   MS. EIKELAND:
18   OH.
19 Q.   (BY MR. KERNS).  SO, IT LOOKS,
20   TO ME, LIKE -- AND CORRECT MY IF I'M WRONG --
21   MS. RILEY WAS, ACTUALLY, OUTSIDE OF THE
22   CASINO WHEN YOU FIRST LAID EYES ON HER,
23   BEFORE SHE FELL?
24 A.  UH-HUH.
25 Q.   ALL RIGHT.  AND THE PEOPLE WHO

Page 154

1   WERE AROUND HER -- OR I SHOULD ASK IT THIS
2   WAY.  WAS THERE ANYONE AROUND HER?
3   MS. EIKELAND:
4   FORM.
5   WITNESS:
6   YEAH.
7 Q.   (BY MR. KERNS).  ALL RIGHT.  CAN
8   YOU DESCRIBE WHERE THOSE PEOPLE WERE IN
9   RELATION TO MS. RILEY?
10 A.   UM, HER HUSBAND WAS ON HER RIGHT
11   SIDE OF HER SHOULDER -- RIGHT SIDE; SHE HAD
12   PEOPLE IN FRONT OF HER; BEHIND HER, UM,
13   WALKING.
14 Q.   AND HOW DO YOU KNOW THAT THAT
15   PERSON IS HER HUSBAND; OR COMPANION; OR
16   FRIEND; OR LOVER?
17 A.   BECAUSE SHE, UM, TOLD US THAT --
18   WELL, SHE MADE THE COMMENT THAT: "THAT WAS
19 MY HUSBAND", LATER ON IN THE AFTERNOON, WHEN
20   I SEEN HER AGAIN.
21 Q.   AND WHAT DOES THIS GENTLEMAN
22   LOOK LIKE?
23 A.   HE'S AN OLDER GENTLEMAN; HE HAD
24   A, UH, BEARD THAT HUNG LOW (INDICATING); UM,
25   WHITE HAIR; WHITE BEARD; UM, THAT DAY, HE HAD

Page 155

1   A HAY HAT ON; THAT'S WHY -- THAT'S WHAT,
2   ACTUALLY, CAUGHT MY EYE, WAS HIS HAT; BECAUSE
3   I'M A COUNTRY GIRL; I LOVE THE COUNTRY; AND I
4   WAS ADMIRING HIS HAT.
5 Q.   HA, HA, HA!  I, ACTUALLY, GREW
6   UP ON A FARM MYSELF; SO I CAN ALSO RELATE.
7   WHEN YOU SAY A "HAY HAT", YOU MEAN, LIKE, A
8   STRAW HAT?
9 A.   YEAH.
10 Q.   OKAY.  OR ONE THAT A FARMER
11   WOULD WEAR BALING HAY?
12 A.   UH-HUH.
13 Q.   AND HE HAD A -- WAS HIS BEARD
14   WHITE IN COLOR?
15 A.   YEAH; WHITE; GRAY.
16 Q.   AND YOU INDICATED HE WAS WALKING
17   SIDE BY SIDE WITH MS. RILEY WHEN YOU FIRST
18   SAW MS. RILEY?
19 A.   YES.
20 Q.   AND AS THEY APPROACHED YOU, DID
21   HIS POSITION, RELATIVE TO HER, CHANGE;
22   MEANING, DID HE CONTINUE TO WALK SIDE BY SIDE
23   WITH HER, AS THEY APPROACHED YOU?
24   MS. EIKELAND:
25   FORM.

Page 156

1   WITNESS:
2   NO.
3 Q.   (BY MR. KERNS).  CAN YOU
4   DESCRIBE HOW IT CHANGED, IF AT ALL?
5 A.   HE, ACTUALLY, HAD GOTTEN
6   STOPPED, UM, BY SOMEBODY, TALKING TO 'EM; AND
7   SHE WENT AHEAD OF HIM; AND HE, LIKE, KINDA'
8   CAME AROUND, ONCE HE WAS DONE HIS
9   CONVERSATION; AND WAS ON HER LEFT SIDE AT
10   THAT POINT.
11 Q.   SO AT THE TIME MS. RILEY FELL,
12   HER COMPANION -- HER HUSBAND; HOWEVER YOU
13   WANT TO DESCRIBE IT -- WAS ON HER LEFT SIDE?
14 A.   YES.
15   MS. EIKELAND:
16   FORM.
17 Q.   (BY MR. KERNS).  HE WAS NOT
18   BEHIND HER?
19   MS. EIKELAND:
20   FORM.
21   WITNESS:
22   HE WAS, LIKE, DIAGONAL; HE
23   WASN'T, EXACTLY, ON TOP OF HER LEFT SIDE YET;
24   HE WAS MORE, LIKE, TOWARDS THE BACK
25   (INDICATING) OF HER; TOWARDS THE BACK SIDE.

Page 157

1 Q. (BY MR. KERNS). BUT THERE WAS
2 NOT A LOT OF SPACE SEPARATING THE TWO?
3 MS. EIKELAND:
4 FORM.
5 WITNESS:
6 NO.
7 Q. (BY MR. KERNS). AT MOST, A FOOT
8 OR TWO?
9 MS. EIKELAND:
10 FORM.
11 WITNESS:
12 YES.
13 Q. (BY MR. KERNS). AND IN TERMS OF
14 -- WELL, I'LL ASK IT A DIFFERENT WAY. COULD
15 YOU SEE HIM AS, RIGHT BEFORE MS. RILEY FELL?
16 A. YES.
17 Q. AND SO RIGHT BEFORE MS. RILEY
18 FELL, HE WAS NOT STANDING BEHIND HER?
19 MS. EIKELAND:
20 FORM.
21 WITNESS:
22 HE WAS STANDING DIAGONAL TO
23 HER.
24 Q. (BY MR. KERNS). SO AS YOU WERE
25 FACING --

Page 158

1 A. HE WAS WALKING TO CATCH UP WITH
2 HER.
3 Q. AS YOU WERE FACING MS. RILEY, HE
4 WAS TO HER RIGHT SIDE?
5 MS. EIKELAND:
6 FORM.
7 WITNESS:
8 SAY THAT AGAIN?
9 Q. (BY MR. KERNS). WELL, I BELIEVE
10 YOU INDICATED THAT HE WAS ON MS. RILEY'S
11 LEFT?
12 A. HE WAS ON HER RIGHT WHEN SHE
13 FIRST WALKED IN; AND HE WAS STOPPED; AND HE
14 WAS SPEAKING TO ANOTHER SAILOR; I DON'T KNOW
15 WHO IT WAS; AND HE TURNED, AND CAME UP ON HER
16 LEFT; AND WHEN SHE FELL, HE WAS, LIKE,
17 DIAGONAL TO HER.
18 Q. A FEW FEET BEHIND HER; AND A FEW
19 FEET TO MS. RILEY'S LEFT?
20 A. YES.
21 MS. EIKELAND:
22 FORM.
23 Q. (BY MR. KERNS). SO IT WOULD
24 HAVE BEEN A FEW FEET TO YOUR -- AS YOU'RE
25 FACING MS. RILEY, IT WOULD HAVE BEEN YOUR

Page 159

1 RIGHT --
2 A. YES.
3 MS. EIKELAND:
4 FORM.
5 Q. (BY MR. KERNS) -- THAT HER
6 HUSBAND, OR COMPANION, WAS ON?
7 A. YES.
8 Q. WHEN YOU SAY THIS "OTHER
9 SAILOR", YOU MEAN A CARNIVAL CREW MEMBER?
10 A. YES.
11 MS. EIKELAND:
12 FORM.
13 Q. (BY MR. KERNS). AND DO YOU KNOW
14 THIS BECAUSE --
15 A. NOT CREW MEMBER; UM, JUST A
16 REGULAR SAILOR, LIKE WHAT ME AND MS. -- AND
17 THE RILEYS WERE.
18 Q. ALL RIGHT. OTHERWISE KNOWN AS A
19 "PASSENGER"?
20 A. YEAH.
21 Q. ALL RIGHT. NOW, WHERE WERE THE
22 OTHER MEMBERS OF THE GROUP RIGHT WHEN MS.
23 RILEY FELL; THE OTHER MEMBERS OF WHAT YOU
24 BELIEVE TO BE MS. RILEY'S GROUP OF
25 COMPANIONS, OR PEOPLE?

Page 160

1 A. THERE WAS ONLY -- IT WAS ONLY
2 HER, AND HER, UH, SIGNIFICANT OTHER.
3 Q. SO, BASED UPON WHAT YOU COULD
4 TELL, THERE WASN'T ANYONE WITH MS. RILEY?
5 A. (WITNESS SHAKING HEAD
6 NEGATIVELY).
7 Q. AND HER SIGNIFICANT OTHER THAT
8 WAS PART OF THEIR SOCIAL GROUP --
9 A. NO.
10 Q. -- OR WAS WALKING, OR
11 ACCOMPANYING THEM?
12 A. NO.
13 Q. ALL RIGHT. AND HOW DID YOU COME
14 TO THAT CONCLUSION?
15 A. UH, BECAUSE THEY -- ONCE THE
16 PEOPLE IN FRONT OF HER PASSED ME, THEY JUST
17 KEPT WALKING; AND THE PEOPLE THAT WERE
18 WALKING BY ME KEPT GOING; I GUESS, ONCE THEY
19 GOT IN FRONT OF ME, THE ONLY ONES THAT HAD
20 STOPPED WERE ME; UM, A GENTLEMAN THAT WAS
21 SITTING AT THE SLOT MACHINE; AND ANOTHER
22 YOUNG LADY HAD RAN UP TO HER.
23 Q. ALL RIGHT. SO, THE REASON YOU
24 BELIEVE THAT NONE OF THE PEOPLE -- NONE OF
25 THE OTHER PEOPLE, OTHER THAN HER COMPANION,

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 161

1   OR SIGNIFICANT OTHER -- WERE PART OF HER
2   GROUP IS BECAUSE WHEN SHE FELL, THEY DIDN'T
3   STOP?
4   A.   YES.  IF IT WAS YOUR LOVED ONE,
5   WOULDN'T YOU STOP?
6        MS. EIKELAND:
7        HA, HA, HA!
8   Q.   (BY MR. KERNS).  I DON'T THINK
9   I'M ALLOWED TO ANSWER QUESTIONS.
10       MS. EIKELAND:
11       HA, HA, HA!
12       WITNESS:
13       SORRY.  I DIDN'T -- WHOEVER'S
14   WATCHING THIS VIDEO, WOULDN'T YOU STOP?
15  Q.   (BY MR. KERNS).  YEAH; THE GOOD
16  NEWS IS, I DON'T HAVE A LOVED ONE; SO YOU
17  DIDN'T PUT ME ON THE SPOT; SO I DON'T HAVE A
18  GIRLFRIEND, OR A COMPANION; SO I'M NOT GONNA'
19  GET IN TROUBLE, EITHER WAY; OTHERWISE, I'D
20  PROBABLY JUST ANSWER THE QUESTION; BUT, NO.
21       WITH REGARD TO THIS GENTLEMAN,
22  THE COMPANION.  WHEN MS. RILEY FELL, DID YOU
23  HEAR HIM SAY ANYTHING?
24  A.   NO.
25  Q.   AND WHEN YOU SAY THAT THE ONLY

Page 162

1   PEOPLE WHO STOPPED TO SORT OF HELP OUT WERE
2   MS. -- WERE MR. -- I'M SORRY -- MS. RILEY'S
3   COMPANION; AND A GENTLEMAN WHO WAS SITTING A
4   THE THE SLOT MACHINES; AND ANOTHER PERSON?
5   A.   YES.
6        MS. EIKELAND:
7        OBJECTION; FORM; I THINK THAT'S
8   MISCHARACTERIZING THE TESTIMONY.
9   Q.   (BY MR. KERNS).  DID I
10  MISCHARACTERIZE IT?
11  A.   I DON'T KNOW.
12  Q.   HA, HA!  CAN YOU DESCRIBE THAT,
13  JUST SO WE'RE ABUNDANTLY CLEAR; WHO ALL
14  STAYED AROUND TO --
15  A.   IT WAS MS. RILEY'S COMPANION;
16  UM, THE GENTLEMAN THAT WAS AT THE SLOT
17  MACHINE, HE IDENTIFIED HIMSELF AS A DOCTOR; I
18  MEAN, MYSELF; THERE WAS ANOTHER YOUNG
19  BRUNETTE GIRL THAT -- LADY -- THAT CAME
20  RUNNING UP.
21       I DON'T -- I MEAN, I'D SAY SHE
22  WAS YOUNG; SHE LOOKED YOUNGER THAN I AM; BUT
23  SHE COULD HAVE BEEN OLDER; UM, SHE DIDN'T --
24  SHE DIDN'T IDENTIFY HERSELF, AT ALL; AND
25  THERE WAS ONE OTHER, UM, GENTLEMAN THAT

Page 163

1   STOPPED; BUT I DIDN'T, REALLY -- I WASN'T --
2   HE WAS BEHIND ME; SO I DIDN'T EVEN SEE HIM.
3   Q.   THE GENTLEMAN WHO IDENTIFIED
4   HIMSELF AS A DOCTOR.  WHAT SLOT MACHINE, OR
5   BANK OF SLOT MACHINES, WAS HE SITTING AT?
6   A.   AT THE FRONT SLOT MACHINES THAT
7   YOU HAVE A PICTURE.
8   Q.   OKAY.  SO --
9   A.   EXHIBIT 4.
10  Q.   OKAY.  SO, THE BANK OF SLOT
11  MACHINES THAT IS SITTING BEHIND THE PILLAR IN
12  WHAT WE'VE MARKED AS DEFENSE EXHIBIT 4.  IT
13  WAS AT THAT BANK OF SLOT MACHINES THAT THE
14  PERSON WHO IDENTIFIED HIMSELF AS A DOCTOR WAS
15  SITTING, PRIOR TO THE INCIDENT?
16  A.   YES.
17  Q.   DO YOU KNOW WHETHER OR NOT HE,
18  ACTUALLY, SAW THE FALL?
19  A.   I'M NOT QUITE SURE.
20  Q.   YOU COULDN'T TELL, FROM YOUR
21  VANTAGE POINT, WHETHER HE WAS FACING --
22  A.   I WASN'T LOOKING AT HIM.
23  Q.   FAIR ENOUGH.
24  A.   I WAS LOOKING AT THAT.
25  Q.   OKAY.  FAIR ENOUGH.  DO YOU KNOW

Page 164

1   -- WELL, I'LL START THE QUESTION OVER.  DO
2   YOU REMEMBER THIS GENTLEMAN, WHO IDENTIFIED
3   HIMSELF AS A DOCTOR, MAKING ANY STATEMENTS?
4   A.   UM, HE SAID THAT HE THOUGHT IT
5   WAS -- HER ARM WAS BROKEN; AND THAT, UM, SHE
6   NEEDED TO NOT MOVE IT UNTIL MEDICAL GOT
7   THERE.
8   Q.   CAN YOU DESCRIBE THIS GENTLEMAN
9   AT ALL?
10  A.   UM, HE WAS AN OLDER GENTLEMAN;
11  HE -- UM, GRAY HAIR -- NOT GRAY; SORRY; BROWN
12  HAIR; UM, HE LOOKED TO BE IN HIS, MAYBE, MID
13  THIRTIES, FORTIES.  THANK YOU (FOR
14  COCA-COLA).
15  Q.   MS. GAUTREAUX, GOOD NEWS!  YOU
16  NOW HAVE YOUR REFRESHMENT.  DO YOU KNOW WHAT
17  HE WAS WEARING?
18  A.   UM, I WASN'T -- I DIDN'T -- I
19  DON'T REMEMBER; I'LL BE HONEST.
20  Q.   HE WASN'T WEARING A HAY HAT?
21  A.   NO.
22  Q.   OKAY.  AND DO YOU KNOW IF HE HAD
23  A -- PANTS ON; OR SHORTS?
24  A.   HE HAD A PAIR -- HE HAD A PAIR
25  OF CARGO SHORTS.

Page 165

1    MS. EIKELAND:
2    HA, HA, HA!
3    MR. KERNS:
4    WHAT?
5    MS. EIKELAND:
6    NO; I WAS HOPING HE HAD PANTS
7  ON!
8    MR. KERNS:
9    YEAH.
10  Q.  (BY MR. KERNS).  WHAT I MEANT
11   WAS, LONG PANTS, OR SHORT PANTS?
12  A.  HE HAD A PAIR OF CARGO KHAKI
13   PANTS.
14    MS. EIKELAND:
15    HA, HA, HA!
16    MR. KERNS:
17    HA, HA, HA!
18    MS. EIKELAND:
19    SORRY.
20    MR. KERNS:
21    THAT'S ALL RIGHT.
22  Q.  (BY MR. KERNS).  AND DO YOU KNOW
23   IF -- KNOWING WHAT HE HAD ON; YOU KNOW,
24   CARGO, OR KHAKI, PANTS -- DOES THAT BRING
25   BACK WHAT HE MIGHT HAVE BEEN WEARING IN TERMS

Page 166

1   OF A SHIRT; A POLO SHIRT; OR LONG-SLEEVED
2   SHIRT; OR ANYTHING?
3  A.  I'M REALLY -- I REALLY CAN'T
4   REMEMBER; I KNOW HE HAD THE CARGO PANTS ON;
5   AND HE HAD A PAIR OF, UH, FLIP-FLOPS ON THAT,
6   UM -- WHEN I SAY "FLIP-FLOPS", FOR MEN; I
7   MEAN, LIKE, THEY WERE -- THEY HAD THE CRISS-
8   CROSS (INDICATING); AND THEY HAD THE VELCRO
9   AROUND THE ANKLE, SO.
10  Q.  UNDERSTOOD.  AND THEN THIS --
11   THE BRUNETTE WHO CAME RUNNING UP.  WHEN DID
12   SHE COME RUNNING UP?
13  A.  SHE WAS -- SHE CAME RUNNING UP
14   RIGHT AFTER I STOPPED, SO.
15  Q.  AND WHEN YOU SAY "RIGHT AFTER",
16   ARE WE TALKING A MATTER OF --
17  A.  A MATTER OF SECONDS; SHE WAS
18   RIGHT BEHIND ME.
19  Q.  CAN YOU DESCRIBE HER ANYMORE IN
20   TERMS OF HER LOOKS; HER CLOTHING?
21  A.  I -- SHE WAS BEHIND ME; THE SAME
22   THING WITH THE OTHER GENTLEMAN; I REALLY --
23   THE ONLY REASON WHY I REMEMBER A LITTLE BIT
24   ABOUT THE DOCTOR IS BECAUSE OF HIM TALKING;
25   SAYING HE WAS A DOCTOR.

Page 167

1  Q.  DO YOU REMEMBER THE BRUNETTE
2   MAKING ANY STATEMENTS?
3  A.  NO; SHE JUST ASKED HOW -- IF SHE
4   WAS ALL RIGHT.
5  Q.  AT THAT BANK OF SLOT MACHINES
6   FROM WHICH THE DOCTOR EMERGED TO COME HELP,
7   DO YOU -- DID YOU NOTICE ANY OTHER PERSONS
8   SITTING THERE?
9  A.  UM, THEY HAD A COUPLE OF PEOPLE
10   SITTING THERE; UM, THEY HAD A COUPLE OF
11   PEOPLE SITTING THERE AFTER SHE FELL; I DON'T
12   KNOW IF THEY, MAYBE, WALKED UP AND SAT THERE;
13   I DON'T KNOW IF THEY WERE SITTING THERE TO
14   BEGIN WITH; I MEAN, I WASN'T REALLY LOOKING
15   ON THAT SIDE.
16  Q.  BUT THEY WERE WATCHING WHAT WAS
17   GOING ON?
18    MS. EIKELAND:
19    OBJECTION TO FORM.
20    WITNESS:
21    YEAH.
22  Q.  (BY MR. KERNS).  WERE THEY AN
23   OLDER WOMAN; AND A GUY ABOUT MY AGE?  MEANING
24   ABOUT THIRTY.
25    MS. EIKELAND:

Page 168

1    FORM.
2    WITNESS:
3    I DON'T KNOW; I -- I REALLY
4   WASN'T PAYING ATTENTION THERE.
5  Q.  (BY MR. KERNS).  DO YOU KNOW IF
6   IT WAS A MALE, AND A FEMALE?
7  A.  I DON'T KNOW.
8    MS. EIKELAND:
9    FORM.
10  Q.  (BY MR. KERNS).  HOW ABOUT ANY
11   OF THE OTHER CASINO -- I'M SORRY -- ANY OF
12   THE OTHER SLOT MACHINE BANKS; WERE THERE --
13   THAT WERE AROUND THIS TILE WALKWAY.  WAS
14   THERE ANYBODY ELSE SITTING THERE, WATCHING;
15   DO YOU KNOW?
16  A.  THERE WERE PEOPLE SITTING THERE;
17   THERE WAS -- I MEAN, THEY WERE PLAYING THE
18   SLOT MACHINES; AND WHEN SHE FELL, I MEAN,
19   PEOPLE SEEN HER; BUT NOBODY CAME UP TO TRY TO
20   HELP, BESIDES HIM -- BESIDES THE DOCTOR.
21  Q.  THE FIRST CARNIVAL EMPLOYEE TO
22   ARRIVE, OR WHO YOU BELIEVE TO BE A CARNIVAL
23   EMPLOYEE.  HOW LONG AFTER THE FALL DID THAT
24   OCCUR?
25  A.  THE FIRST CARNIVAL EMPLOYEE THAT

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

---

Page 169

1   ARRIVED, UM, ARRIVED WITHIN SECONDS, BECAUSE
2   HE WAS RIGHT THERE; BUT AS FAR AS MEDICAL
3   COME, IT WAS A GOOD TWENTY MINUTES.
4   Q.   WHEN YOU -- AND THE FIRST ONE IS
5   THE PERSON YOU BELIEVE TO BE A CASINO
6   PERSONNEL --
7   A.   YES.
8   Q.   -- WHO WAS WEARING A BLACK
9   JACKET?
10  A.   YES.
11  Q.   AND WHERE DID HE EMERGE FROM?
12  A.   HE EMERGED FROM BEHIND THE, UH,
13  BANKS.
14  Q.   AND SO TOWARDS IF YOU'RE WALKING
15  DOWN THE TILE WALKWAY OF THE CASINO, COMING
16  FROM THE ATRIUM, HE EMERGED FROM THE BANKS
17  THAT ARE ON THE RIGHT?
18  A.   UM, IF YOU'RE WALKING INTO THE
19  -- EXCUSE ME; IF YOU'RE WALKING INTO THE
20  CASINO FROM THE ATRIUM, HE EMERGED FROM THE
21  OTHER BANKS, ON THE RIGHT; UH, LIKE, RIGHT
22  BEHIND THE -- LIKE, RIGHT IN FRONT OF THE
23  MIRROR; HE WAS STANDING.
24  Q.   WHAT'S THE FIRST THING YOU DID
25  WHEN -- AFTER MS. RILEY FELL?

---

Page 170

1   A.   I RAN TO HER; ASKED IF SHE WAS
2   ALL RIGHT; IF SHE NEEDED ANYTHING.
3   Q.   AND WHAT DID SHE SAY TO YOU?
4   A.   UH, SHE NEEDED ME TO CALL HER
5   BROTHER IN THEIR ROOM; SHE GAVE ME THEIR ROOM
6   NUMBER; I DON'T REMEMBER WHAT THE ROOM NUMBER
7   WAS.
8   Q.   HOW LONG AFTER SHE FELL DID SHE
9   GIVE YOU THAT NUMBER?
10  A.   WITHIN SECONDS.
11  Q.   AND DID YOU HESITATE, AT ALL,
12  BEFORE YOU WENT TO THE PHONE, AND MADE THAT
13  CALL?
14  A.   NO.
15  Q.   HOW LONG WERE YOU OVER AT THE
16  PHONE NEAR THE BAR AREA?
17  A.   UM, ABOUT FIVE MINUTES; 'CAUSE I
18  CALLED THREE TIMES; NOBODY ANSWERED; I KEPT
19  GETTING THE MESSAGE; AND THEN, ON THE FOURTH
20  RING -- ON THE FOURTH TIME CALLING, SHE
21  PICKED -- A LITTLE GIRL, OR LITTLE BOY,
22  PICKED UP; SQUEAKY VOICE; SO I'M ASSUMING IT
23  WAS A NIECE; BUT IT COULD BE A -- COULDA'
24  BEEN A NEPHEW.
25  Q.   AND SO YOU DON'T KNOW WHAT

---

Page 171

1   HAPPENED BACK AT SCENE OF THE INCIDENT --
2   A.   NO.
3   Q.   -- DURING THE FIVE MINUTES YOU
4   WERE ON THE PHONE?
5   A.   NO.
6   MS. EIKELAND:
7   FORM.
8   Q.   (BY MR. KERNS).  AND HOW MANY --
9   HOW MANY TIMES DID IT TAKE FOR SOMEONE TO
10  PICK UP?
11  A.   FOUR.
12  Q.   AND WHEN THE PERSON WHO,
13  FINALLY, ANSWERED PICKED UP, HOW LONG WAS
14  YOUR DISCUSSION WITH THAT PERSON?
15  A.   UH, ABOUT A MINUTE, IF THAT; I
16  INFORMED THEM THAT MS., UH -- THAT A YOUNG --
17  THAT A OLDER LADY, UM, HAD FALLEN; AND THAT,
18  UM, SHE WAS LOOKING FOR HER BROTHER; AND I
19  ASKED IF HER DAD WAS THERE; AND SHE SAID, UM
20  -- I SAID: "IS YOUR MOM, OR DAD, THERE?";
21  AND SHE SAID: "NO; BUT I'LL GET 'EM".
22  Q.   WHEN DID YOU --
23  A.   'CAUSE I DIDN'T EVEN KNOW WHAT
24  THE OLDER LADY'S NAME WAS -- MS. RILEY'S NAME
25  WAS -- AT THAT POINT IN TIME.

---

Page 172

1   Q.   AFTER YOU MADE THAT PHONE CALL,
2   WHAT DID YOU DO?
3   A.   I WENT BACK OVER THERE TO SEE IF
4   SHE WAS ALL RIGHT; AND IF SHE NEEDED ANYTHING
5   ELSE.
6   Q.   AT THAT TIME, HAD -- WELL, I'LL
7   START THE QUESTION OVER.  BEFORE YOU LEFT TO
8   GO TO THE PHONE, HAD ANY CARNIVAL EMPLOYEE
9   OTHER THAN THE GENTLEMAN WITH THE BLACK
10  JACKET ARRIVED AT THE SCENE?
11  A.   NO.
12  Q.   BY THE TIME YOU GOT BACK, WERE
13  THERE ANY PERSONS THERE WHO YOU BELIEVED TO
14  BE CARNIVAL PERSONNEL?
15  A.   NO.
16  Q.   WAS THERE ANYONE THERE WHO YOU
17  PERCEIVED TO BE A FAMILY MEMBER, OR
18  ACQUAINTANCE --
19  A.   NO.
20  Q.   -- OF --
21  A.   SORRY.
22  Q.   NO; THAT'S OKAY.  WHAT I WAS
23  GONNA' SAY WAS: OF MS. RILEY?
24  A.   NO; JUST THE COMPANION WAS STILL
25  THERE.

---

Shirley Riley vs
Carnival Corporation, et al

Danise L. Gautreaux
August 27, 2015

Page 173

1  Q.  WHEN DID THE NEXT CARNIVAL
2  EMPLOYEE SHOW UP?
3  A.  ABOUT, MAYBE, FIFTEEN MINUTES
4  LATER.
5  Q.  WHAT WAS THAT PERSON WEARING; DO
6  YOU KNOW?
7  A.  UH, THEY WERE MEDICAL STAFF;
8  THEY HAD A WHITE, UM -- A WHITE JACKET OVER,
9  UM, SCRUBS.
10  MADAME REPORTER:
11  GOD BLESS!
12  WITNESS:
13  BLESS YOU.
14  Q.  (BY MR. KERNS).  WHEN YOU SAY
15  "THEY", IT WAS MULTIPLE PEOPLE?
16  A.  UH, THERE WAS AN OLDER
17  GENTLEMAN; AND THERE WAS A FEMALE THAT, SHE
18  LOOKED TO BE A NURSE; LIKE, A NURSE'S AID;
19  AND, UM, SHE CAME, ALSO, WITH HIM; SHE WAS
20  THE ONE CARRYING THE BAG.
21  Q.  CAN YOU DESCRIBE, IN ANYMORE
22  DETAIL, WHAT THE DOCTOR LOOKED LIKE; OR WHAT
23  THE PERSON YOU BELIEVE TO BE THE DOCTOR?
24  A.  UM, HE HAD BLUE SCRUBS ON; AND
25  HE, ALSO, HAD -- WELL, I GUESS SCRUBS.  WHAT

Page 174

1  DO NURSES WEAR; THE -- IS THAT A SCRUB?
2  Q.  I DON'T THINK I CAN -- I CAN
3  ANSWER, BUT.  YOU KNEW -- YOU KNEW WHAT SHE
4  WAS WEARING TO BE SOMETHING THAT NURSES WEAR?
5  A.  YEAH; IT LOOKED LIKE A SCRUB
6  OUTFIT; AND HE HAD A WHITE JACKET ON, ALSO.
7  Q.  OKAY.  DO YOU KNOW WHAT RACE, OR
8  NATIONALITY, THE DOCTOR WAS?
9  A.  HE WAS A WHITE GENTLEMAN.
10  Q.  AND HOW ABOUT THE NURSE?
11  A.  THE NURSE WAS A -- UH, THE
12  NURSE; A BLACK LADY.
13  Q.  WHEN THEY ARRIVED, WHAT DID THEY
14  DO, IF ANYTHING, TO TRY TO HELP MS. RILEY?
15  A.  UM, MS. RILEY WAS ALREADY
16  SITTING UP BY THE TIME THEY ARRIVED; THEY
17  HELPED HER GET UP; TO STAND TO HER FEET; AND
18  SHE WAS COMPLAINING OF HER ARM AT THAT TIME.
19  AND THAT'S WHEN THEY CALLED TO
20  GET A WHEELCHAIR BROUGHT DOWN; AND ANOTHER
21  GENTLEMAN, YOUNGER GUY, ARRIVED FROM MEDICAL
22  -- FROM, UM, CARNIVAL; HE WAS, ACTUALLY, IN
23  ALL BLUE; SO I KNOW HE WASN'T WITH THE
24  MEDICAL STAFF; HE WAS WITH CARNIVAL.
25  Q.  WHEN YOU SAY "ALL BLUE", YOU

Page 175

1  MEAN HIS SHIRT?
2  A.  YES; BLUE SHIRT; KHAKI PANTS.
3  Q.  OKAY.
4  A.  WELL, BLUE SHIRT -- BLUE SHIRT;
5  THEM BLUE, UM, LIKE, WINDBREAKER PANTS; I
6  THINK HE WAS ONE OF THE GUYS THAT WAS ON THE
7  ENTERTAINMENT THING; THE ENTERTAINMENT GROUP.
8  Q.  DID YOU, AT ANY TIME -- I'LL
9  START THE QUESTION OVER.  HOW DID THE -- FROM
10  WHAT YOU COULD SEE, WERE THE DOCTOR, AND THE
11  NURSE, COURTEOUS TO MS. RILEY?
12  A.  YES.
13  MS. EIKELAND:
14  FORM.
15  Q.  (BY MR. KERNS).  DID THEY SEEM
16  TO BE GENUINELY ATTEMPTING TO HELP HER?
17  MS. EIKELAND:
18  FORM.
19  WITNESS:
20  YES.
21  Q.  (BY MR. KERNS).  DID ANYBODY
22  ELSE, OTHER THAN THE GENTLEMAN WHO IDENTIFIED
23  HIMSELF AS THE DOCTOR PREVIOUSLY, THE DOCTOR
24  WHO CAME LATER, AND THE NURSE WHO CAME LATER,
25  DID ANYBODY ELSE ATTEMPT TO RENDER AID

Page 176

1  PHYSICALLY?
2  A.  UM, JUST THE DOCTOR; AND THE
3  NURSE THAT HAD COME LATER; AND THE DOCTOR;
4  AND THAT'S IT; I MEAN, MYSELF, AND THE TWO
5  OTHER PEOPLE; BUT THAT WAS, REALLY, IT.
6  Q.  BY THE TIME YOU HAD CAME BACK
7  FROM THE PHONE, WAS THE WATER THAT YOU
8  INDICATED THAT YOU ALLEGED WAS ON THE FLOOR,
9  HAD THAT BEEN CLEANED UP; OR WAS THAT STILL
10  THERE?
11  A.  THAT WAS STILL THERE.
12  Q.  HOW LONG WAS IT BETWEEN WHEN YOU
13  CAME BACK FROM THE PHONE UNTIL MS. RILEY WAS
14  WHEELED AWAY?
15  A.  UM, ABOUT, MAYBE -- ABOUT,
16  MAYBE, TWENTY MINUTES; I MEAN, BY THE TIME I
17  CAME BACK, IT TOOK MEDICAL STAFF TWENTY
18  MINUTE -- UH, FIFTEEN MINUTES TO GET THERE
19  AFTER I CAME BACK FROM THE PHONE; AND THEN, I
20  MEAN, THEY WERE STANDING THERE, AROUND WITH
21  HER, TRYING TO HELP HER AS MUCH AS POSSIBLE,
22  FOR ANOTHER FIVE; AND THAT'S WHEN THEY TOOK
23  HER OFF, BUT.
24  Q.  DURING THIS FIFTEEN-MINUTE
25  PERIOD THAT YOU DESCRIBED WHEN YOU WERE

Page 177

1  WAITING, AND MS. RILEY WAS WAITING FOR
2  MEDICAL, DID ANYONE FROM CARNIVAL ATTEMPT TO
3  -- OR ANYONE ELSE -- ATTEMPT TO CLEAN UP WHAT
4  YOU ALLEGE TO BE WATER ON THE FLOOR?
5     MS. EIKELAND:
6     FORM.
7     WITNESS:
8     NO.
9  Q.  (BY MR. KERNS).  HOW LONG AFTER
10  MS. RILEY WAS WHEELED AWAY DID YOU REMAIN IN
11  THE AREA OF THE INCIDENT?
12  A.  UM, ABOUT, MAYBE -- ABOUT,
13  MAYBE, FIVE, TEN MINUTES; NOT LONG.
14  Q.  AND BY "AREA", I MEANT WHERE YOU
15  COULD SEE THE SCENE OF THE INCIDENT.  IS THAT
16  WHAT YOU PERCEIVED THAT I MEANT BY THAT?
17  A.  YEAH.
18  Q.  AND AFTER --
19  A.  I WAS -- I WENT BACK TO THE BAR
20  BY MY HUSBAND, AND I SMOKED ANOTHER
21  CIGARETTE, AND HAD ANOTHER COKE.
22  Q.  WELL -- OKAY.  AND SO AFTER SHE
23  WAS WHEELED AWAY, YOU STAYED AROUND FOR
24  ANOTHER, APPROXIMATELY, FIVE MINUTES --
25  A.  FIVE, TEN MINUTES; YEAH.

Page 178

1  Q.  -- BEFORE YOU WENT BACK TO THE
2  BAR?
3  A.  YEAH -- NO; LIKE, I WALKED BACK
4  TO THE BAR; AND I WAS SITTING AT THE BAR; BUT
5  I KEPT GETTING UP TO SEE IF THEY CLEANED IT
6  UP YET, 'CAUSE I DIDN'T WANT NOBODY ELSE TO
7  SLIP.
8  Q.  AND HOW LONG WERE YOU AT THE BAR
9  BEFORE YOU, EVENTUALLY, LEFT THE CASINO?
10  A.  ABOUT FIVE TO TEN MINUTES.
11  Q.  DURING THAT FIVE TO TEN MINUTES,
12  DID ANYBODY CLEAN UP THE, WHAT YOU ALLEGE TO
13  BE WATER, ON THE FLOOR?
14  A.  NO.
15  Q.  DID ANYBODY YOU KNOW OF ASK ANY
16  CARNIVAL PERSONNEL TO CLEAN UP WHAT YOU
17  ALLEGE TO BE THE WATER ON THE FLOOR?
18  A.  MRS. -- THE, UM, GENTLEMAN THAT
19  MS. RILEY WAS -- THE COMPANION; UM, AS THEY
20  WERE WALKING AWAY, HE YELLED THAT SOMEBODY
21  NEEDED TO CLEAN THAT -- CLEAN THE WATER UP;
22  BUT AS FAR AS ANYBODY GOING TO GET SOMEBODY,
23  I DON'T THINK SO.
24  Q.  AND --
25  A.  AS I WAS WALKING OUT, THAT'S

Page 179

1  WHEN THEY WERE COMING IN TO CLEAN IT UP.
2  Q.  AND WHEN YOU SAY "THEY", CAN YOU
3  DESCRIBE WHO "THEY" IS?
4  A.  UH, JANITORIAL STAFF.
5  Q.  AND HOW DO YOU KNOW THEY WERE
6  JANITORIAL STAFF?
7  A.  UM, THEY HAD THE BIG BUCKET
8  TRUCK THING-A-MA-BOBBER THAT THEY WERE
9  WHEELING.
10  Q.  WAS IT, LIKE, A WHEELED BOX THAT
11  YOU WOULD PUT, LIKE, A MOP?
12  A.  YEAH.
13  Q.  AND HOW MANY PEOPLE WERE --
14  A.  JUST ONE.
15  Q.  DO YOU KNOW WHAT THAT GENTLEMAN
16  LOOKED LIKE?
17  A.  NO.
18  Q.  AND I -- THAT WAS, PERHAPS,
19  SEXIST OF ME; I ASSUMED THAT HE WAS A
20  GENTLEMAN.  WAS IT A MALE, OR A FEMALE?
21  A.  IT WAS A MALE; BUT I DON'T KNOW
22  WHAT HE LOOKED LIKE; WE WERE PASSING EACH
23  OTHER.
24  Q.  AND DO YOU EVEN KNOW WHAT
25  NATIONALITY HE WAS; OR RACE?

Page 180

1  A.  UM, I REALLY DON'T REMEMBER.
2  Q.  I'M JUST -- I'M TRYING TO FIGURE
3  OUT HOW I COULD IDENTIFY THAT PERSON.  DO YOU
4  HAVE, LIKE, AGE; OR ANYTHING THAT WOULD HELP?
5  A.  HE WAS A YOUNG, YOUNG GUY; HE
6  LOOKED TO BE, MAYBE, EIGHTEEN; LIKE, HE JUST
7  TURNED EIGHTEEN.
8  Q.  WHAT UNIFORM WAS HE WEARING, IF
9  ANY?
10  A.  UM, HE WAS WEARING BLACK PANTS
11  WITH, UH, A BLUE SHIRT.
12  Q.  WERE THEY BLACK LIKE THE
13  WINDBREAKER TYPE PANTS; OR --
14  A.  NO; THEY WERE, LIKE, BLACK
15  PANTS, I MEAN.
16  Q.  SLACKS?
17  A.  KIND OF.
18  Q.  DID YOU EVER -- OTHER THAN THE
19  CARNIVAL PERSONNEL YOU'VE NAMED -- NAMED AT
20  THE SCENE; NAMELY, THE GENTLEMAN WITH THE MOP
21  BUCKET; THE DOCTOR; AND THE NURSE; DO YOU
22  RECALL ANY OTHER CARNIVAL PERSONNEL BEING AT
23  THE SCENE OF THE INCIDENT?
24  A.  NO.
25  Q.  DO YOU HAVE ANY IDEA WHAT --

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

Page 181

1 I'LL START THE QUESTION OVER.  IS IT FAIR TO
2 SAY YOU DON'T KNOW WHAT THE SOURCE OF THE
3 ALLEGED WATER IS?
4    MS. EIKELAND:
5    OBJECTION TO FORM.
6    WITNESS:
7    YES; ONE CAN ONLY ASSUME IT WAS
8 FROM THE KIDS; BUT, I MEAN, SOMEBODY COULDA'
9 BEEN WALKING WITH A WATER BOTTLE, AND DROPPED
10 THE WATER BOTTLE, YOU KNOW.
11 Q.  (BY MR. KERNS).  WELL, IN THE --
12 YOU WEREN'T IN THE CASINO --
13 A.  WHEN THE WATER HAPPENED; NO.
14    MR. KERNS:
15    I'M GONNA' REVIEW MY NOTES REAL
16 QUICK; I DON'T THINK I'M GONNA' HAVE A LOT
17 MORE.  CAN YOU BEAR WITH ME FOR TWO MINUTES?
18    WITNESS:
19    SURE.
20    MR. KERNS:
21    THANK YOU.
22    MS. EIKELAND:
23    ARE YOU WARM ENOUGH; ARE YOU
24 TOO WARM?
25    WITNESS:

Page 182

1    I'M GOOD; I'M GOOD.
2    VIDEOGRAPHER:
3    DO YA'LL WANT TO GO OFF THE
4 RECORD?
5    MR. KERNS:
6    YEAH.  COULD WE?  I'M SORRY.
7    VIDEOGRAPHER:
8    OFF THE RECORD AT 2:47.
9    (WHEREUPON, THERE WAS A RECESS).
10    VIDEOGRAPHER:
11    WE'RE BACK ON THE RECORD AT
12    2:48.
13 Q.  (BY MR. KERNS).  MS. GAUTREAUX,
14 DID YOU, ACTUALLY, OBSERVE THE GENTLEMAN WITH
15 THE MOP, AND THE BUCKET, CLEAN UP -- I SHOULD
16 ASK THE QUESTION OVER, 'CAUSE I DON'T KNOW IF
17 WE'VE, ACTUALLY, ESTABLISHED THAT THERE WAS A
18 MOP.
19    DID THE PERSON WHO HAD THE
20 BUCKET THAT LOOKED LIKE IT WAS A MOPPING-TYPE
21 BUCKET, WAS THERE, ACTUALLY, A MOP THERE?
22 A.  NO.
23 Q.  SO YOU DIDN'T, ACTUALLY, SEE
24 ANYONE WITH A MOP?
25 A.  NO; HE HAD A MOP WITH HIM ON THE

Page 183

1 BUCKET -- ON THE CART.
2 Q.  I'M SORRY.  OKAY.
3 A.  YEAH.
4 Q.  ALL RIGHT.  I JUST WANTED TO
5 ESTABLISH THAT THERE WAS A MOP --
6 A.  YEAH.
7 Q.  -- BEFORE I ASKED THIS QUESTION.
8 DID YOU OBSERVE HIM CLEANING UP WHAT YOU
9 ALLEGE TO BE WATER; OR, RATHER, HAD YOU
10 ALREADY LEFT WHEN HE DID SO?
11 A.  I DID NOT OBSERVE HIM CLEANING
12 UP WATER; I WALK -- KEPT WALKING.
13 Q.  AS YOU WERE WALKING OUT OF THE
14 CASINO, THE GENTLEMAN WITH THE MOP, AND THE
15 BUCKET, WAS WALKING INTO THE CASINO?
16 A.  (WITNESS NODDING HEAD
17 AFFIRMATIVELY).
18 Q.  WE DISCUSSED, EARLIER, TWO
19 CALLS; OR AT LEAST ONE CALL, FOR SURE; AND,
20 POSSIBLY, ANOTHER THAT YOU MADE ON THE DAY
21 AFTER YOU GOT OFF THE SHIP.  BUT I BELIEVE
22 YOU INDICATED YOU MADE A FOLLOW-UP CALL THE
23 DAY AFTER THE DAY AFTER YOU GOT OFF THE SHIP;
24 CORRECT?
25 A.  UH-HUH.

Page 184

1 Q.  DO YOU KNOW WHO YOU -- AND THIS
2 WAS THE MALE THAT YOU SPOKE WITH; THE MALE
3 CUSTOMER SERVICE REPRESENTATIVE?
4 A.  THIS WAS A MALE; BUT I, UM --
5    YEAH; THIS WAS A MALE.
6 Q.  AND THEN YOU INDICATED YOU TOLD
7 HIM SAME THING AS YOU TOLD THE --
8 A.  UH-HUH.
9 Q.  -- FEMALE LADY BEFORE.  AND YOU
10 INDICATED IT WOULD HAVE BEEN NICE TO AT LEAST
11 GET AN APOLOGY; RIGHT?
12 A.  YES.
13 Q.  BUT, TO THIS DAY, YOU HAVEN'T
14 BEEN APOLOGIZED TO FOR WHAT HAPPENED TO YOU
15 ABOARD THE CRUISE?
16 A.  NO.
17 Q.  AFTER YOU SPOKE WITH THE MALE
18 CUSTOMER SERVICE REPRESENTATIVE THE DAY AFTER
19 THE DAY AFTER YOU GOT OFF THE CRUISE, DID YOU
20 SPEAK WITH ANY OTHER CARNIVAL PERSONNEL
21 REGARDING WHAT HAPPENED ON BOARD THE DREAM?
22 A.  NO.
23    MS. EIKELAND:
24    FORM.
25 Q.  (BY MR. KERNS).  DID YOU WRITE

Page 185

1   ANY E-MAILS TO ANY CARNIVAL PERSONNEL --
2 A.  NO.
3 Q.  -- OR WHOM YOU BELIEVE TO BE
4  CARNIVAL PERSONNEL, REGARDING YOUR EXPERIENCE
5  ON BOARD THE DREAM?
6 A.  NO.
7 Q.  AND WHEN I SAY "YOUR EXPERIENCE
8  ON BOARD THE DREAM", YOU'VE ONLY BEEN ON THE
9  DREAM ONE TIME; RIGHT?
10 A.  YES.
11 Q.  DID YOU -- HAVE YOU EVER BEEN TO
12  A WEB SITE THAT EVALUATES, OR REVIEWS, OR
13  CRITICIZES, THE CRUISING EXPERIENCE?
14 A.  YES.
15 Q.  OKAY.  AND WHAT WEB SITES HAVE
16  YOU BEEN TO?
17 A.  UM, MOSTLY, THE FACEBOOK; WEB
18  SITES THAT GO THROUGH FACEBOOK.
19 Q.  DID YOU MAKE ANY POSTS WITH
20  REGARD TO YOUR EXPERIENCE ON BOARD THE
21  CARNIVAL DREAM ON ANY FACEBOOK SITE, OR OTHER
22  SOCIAL MEDIA?
23 A.  I MAY HAVE; I DON'T REMEMBER; IF
24  I DID, IT WAS NOT A POST THAT WAS DIRECTED
25  EXACTLY TO -- LIKE, EXACTLY ON THAT SITE; IT

Page 186

1  WAS SOMETHING THAT I HAD TAGGED; LIKE, I HAD
2  HASH TAGGED CARNIVAL INVOLVED IN IT; LIKE,
3  CARNIVAL DREAM.
4 Q.  UH-HUH.
5 A.  AND WHEN YOU HASH TAG STUFF, IT
6  DOESN'T -- IT WASN'T, NECESSARILY, FOR THAT
7  WEB SITE, MAYBE; I MEAN, I DON'T KNOW WHAT
8  WEB SITE YOU COULD BE TALKING ABOUT.
9 Q.  YEAH; I'M JUST WONDERING IF
10  THERE'S ANY -- YOU KNOW, BECAUSE A LOT OF
11  TIMES, WHEN PEOPLE HAVE AN ISSUE, YOU KNOW,
12  THEY'LL POST ABOUT IT ON FACEBOOK, OR A SITE.
13 A.  OH, I DO.
14 Q.  OKAY.
15 A.  AND I'M PRETTY SURE I PROBABLY
16  DID; BECAUSE MY ANGER GETS THE BEST OF ME.
17 Q.  UNDERSTOOD.  WOULD IT HAVE BEEN
18  ON YOUR FACEBOOK WALL?
19 A.  IT WOULD HAVE BEEN ON MY
20  FACEBOOK WALL.
21 Q.  HOW ABOUT ANYONE ELSE'S FACEBOOK
22  WALL; MIGHT YOU HAVE SENT SOMEONE ELSE A
23  MESSAGE; OR POSTED ON THEIR WALL?
24 A.  MAYBE, MY HUSBAND; I MIGHT HAVE
25  TAGGED HIM IN IT.

Page 187

1 Q.  ANYBODY ELSE YOU COULD HAVE
2  TAGGED?
3 A.  NO.
4 Q.  HOW ABOUT OTHER FACEBOOK FORUMS,
5  SUCH AS --
6  VIDEOGRAPHER:
7  OFF THE RECORD.
8  (WHEREUPON, THERE WAS A DISCUSSION
9  OUT OF THE HEARING OF THE REPORTER).
10  VIDEOGRAPHER:
11  WE'RE BACK ON THE RECORD.
12 Q.  (BY MR. KERNS).  ALL RIGHT.  MS.
13  GAUTREAUX, WE WERE TALKING ABOUT FACEBOOK.
14   AND MY NEXT QUESTION WAS GONNA' BE:
15  HAVE YOU POSTED ON A SITE THAT'S NOT YOUR
16  WALL?  AND BY "SITE", I MEAN, LIKE, ANOTHER
17  FACEBOOK PAGE, SUCH AS A PAGE ABOUT THE
18  CRUISE SHIP; OR ABOUT CARNIVAL; OR ABOUT
19  ANYTHING ELSE?
20 A.  NO.
21 Q.  MIGHT YOU HAVE POSTED ANYWHERE
22  ELSE ON THE INTERNET ABOUT YOUR EXPERIENCE ON
23  THE CARNIVAL DREAM?
24 A.  NO.
25 Q.  SO THERE'S NO WAY YOU POSTED ON

Page 188

1  ANY SORT OF MESSAGE BOARD; OR WEB SITE; OR --
2 A.  NO.
3 Q.  -- NEWS ARTICLE; OR ANYTHING?
4 A.  NO.
5 Q.  SO YOU'RE SAYING THAT ANY -- ANY
6  POST THAT'S OUT THERE ON THE INTERNET FROM
7  YOU -- ASSUMING THERE IS ONE; AND I'M NOT
8  SAYING THAT YOU HAVE TO SAY, RIGHT NOW, THAT
9  THERE ISN'T -- BUT IF YOU DID POST ABOUT YOUR
10  EXPERIENCE ON BOARD THE CARNIVAL DREAM, IT
11  WOULD BE ON FACEBOOK, AND NO OTHER FORUM?
12 A.  YES.
13 Q.  AND YOU'RE SURE OF THAT?
14 A.  YES; I'M PRETTY SURE; I MEAN,
15  I'M NOT ONE TO GO BASH PEOPLE; NOW, IF I
16  BASH, IT'S ON FACEBOOK; WHICH THAT -- THAT'S
17  ANOTHER STORY.
18 Q.  ALL RIGHT.  AND I KNOW, MS.
19  GAUTREAUX, THAT I ASKED YOU A LOT OF
20  QUESTIONS TODAY.  DID YOU UNDERSTAND THE
21  QUESTIONS THAT I ASKED YOU?
22 A.  YES.
23  MS. EIKELAND:
24  OBJECTION TO FORM.
25 Q.  (BY MR. KERNS).  DO YOU FEEL

Page 189

1    CONFIDENT THAT THE ANSWERS YOU GAVE WERE
2    TRUTHFUL, AND ACCURATE?
3  A.  YES.
4       MS. EIKELAND:
5       OBJECTION TO FORM.
6  Q.  (BY MR. KERNS).  ANY -- IS THERE
7    ANY REASON, AT ALL, THAT YOU BELIEVE YOUR
8    ANSWERS MIGHT NOT HAVE BEEN TRUTHFUL, OR
9    ACCURATE?
10  A.  NOPE.
11  Q.  IF CALLED TO TESTIFY AT TRIAL IN
12    THIS CASE, AND YOU WERE AT -- AND IF ASKED
13    THE SAME QUESTIONS, IS THERE ANY REASON YOU
14    COULD THINK OF THAT YOU'D GIVE A DIFFERENT
15    ANSWER AT THAT TIME?
16  A.  NO.
17  Q.  AND DID YOU TAKE YOUR OATH TO
18    TELL THE TRUTH TODAY SERIOUSLY?
19  A.  YES.
20  Q.  WAS THERE ANYTHING -- IS THERE
21    ANYTHING THAT I -- WHEN I ASKED YOU A
22    QUESTION, AND YOU ANSWERED, THAT I CUT YOU
23    OFF, AND YOU DIDN'T GET TO FINISH, THAT YOU'D
24    LIKE TO NOW?
25  A.  NO.

Page 190

1       MS. EIKELAND:
2       FORM.
3  Q.  (BY MR. KERNS).  IS THERE
4    ANYTHING YOU BELIEVE IS TERRIBLY IMPORTANT
5    FOR THE RESOLUTION OF THIS CASE THAT YOU
6    DIDN'T GET TO SAY THAT YOU WOULD LIKE TO AT
7    THIS TIME?
8  A.  UM, THE OUTLINE, IN THE
9    BEGINNING; THE OUTLINE OF THE CASINO THAT I
10    WAS TELLING YOU ABOUT IS, ACTUALLY, THE
11    CARNIVAL VICTORY; AND IF YOU PULL IT UP,
12    IT'LL -- YOU'LL SEE THE OUTLINE OF THEIR
13    CASINO IS THE EXACT SAME.
14       MS. EIKELAND:
15       THE LAYOUT, YOU MEAN?
16       WITNESS:
17       THE LAYOUT; THE LAYOUT THAT I
18    DESCRIBED IS NOT OF THE CARNIVAL DREAM; IT IS
19    OF THE CARNIVAL VICTORY.
20  Q.  (BY MR. KERNS).  HOW DID YOU
21    DESCRIBE THE LAYOUT?
22  A.  THE LAYOUT -- THE LAYOUT I
23    DESCRIBED IS, WHEN YOU WALK IN, YOU HAVE ALL
24    THE SLOT MACHINES ON THIS (INDICATING) SIDE.
25       MS. EIKELAND:

Page 191

1       OH.
2  Q.  (BY MR. KERNS).  OKAY.
3       MS. EIKELAND:
4       RIGHT.
5       WITNESS:
6       AND THEN YOU HAVE THE SOFAS ON
7    THIS -- YOU HAVE A LITTLE AREA FOR, UM, IF
8    YOU WANT TO BE A CRUISE, UM, LIKE ONE OF THE
9    BIG VIP GUESTS; AND THEN YOU HAVE, UM, SOFAS,
10    AND CHAIRS; AND THEN YOU HAVE THE TABLE; AND
11    THE BAR.
12  Q.  (BY MR. KERNS).  OKAY.  I
13    UNDERSTAND.  THEY --
14  A.  SO, JUST LETTING YA'LL KNOW, I
15    CAN -- I KNOW, FOR SURE, THAT THAT WOULD BE
16    THE ONLY THING; BUT I WAS THINKING OF THE
17    VICTORY, 'CAUSE -- AND IF YOU LOOK AT THE
18    LAYOUT OF THE VICTORY, IT'LL SHOW YOU THAT
19    THAT'S WHAT I WAS TALKING ABOUT; THAT'S WHAT
20    I WAS THINKING OF.
21  Q.  THANK YOU FOR CLARIFYING THAT; I
22    APPRECIATE THAT.  ANYTHING ELSE THAT YOU CAN
23    THINK OF THAT YOU NEED TO CLARIFY?
24  A.  THAT'S IT.
25       MR. KERNS:

Page 192

1       ALL RIGHT.  SUBJECT TO
2    POTENTIAL RE-CROSS-EXAMINATION, I WILL TURN
3    YOU OVER TO MY ADVERSARY HERE (INDICATING MS.
4    EIKELAND), WHO WILL PROBABLY HAVE QUESTIONS
5    FOR YOU.
6       MS. EIKELAND:
7       I DO HAVE SOME; JUST SOME
8    FOLLOW-UPS TO MR. KERNS'S QUESTIONS.
9       EXAMINATION BY MS. EIKELAND:
10  Q.  YOU TESTIFIED, IF I REMEMBER
11    CORRECTLY -- AND CORRECT ME IF I'M WRONG --
12    THAT YOU WEREN'T PLAYING ON THE SLOT MACHINES
13    IN THE JACKPOT CASINO; IS THAT ACCURATE?
14  A.  THAT'S CORRECT.
15  Q.  SO, WITH REGARD TO THE SLOT
16    MACHINES DEPICTED IN DEFENSE EXHIBIT NUMBER
17    2, YOU NEVER PLAYED ON THESE (INDICATING)
18    SLOT MACHINES; RIGHT?
19  A.  NO.
20  Q.  AND SO YOU NEVER SAT DOWN IN
21    THOSE (INDICATING) SEATS, FACING THE SLOT
22    MACHINE, PLAYING ON THE SLOT MACHINE; RIGHT?
23  A.  I NEVER SAT DOWN PLAYING; I'LL
24    SAY THAT I'VE SAT DOWN, PROBABLY, TO SMOKE A
25    CIGARETTE; BECAUSE, ONCE AGAIN, THAT'S THE

Page 193

1 ONLY PLACE TO SMOKE; AND, LIKE, JUST PASSING;
2 'CAUSE RIGHT ON THE OUTSIDE OF THE CASINO IS
3 WHERE THE PICTURES ARE BEING PUT UP; SO I'D
4 RUN IN THERE, AND SMOKE; AND THEN GO LOOK AT
5 THE PICTURES.
6 Q.  BUT WHERE YOU MARKED "1" AND "2"
7 ON THIS (INDICATING) DEFENSE EXHIBIT NUMBER
8 2, YOU'RE NOT ALLOWED TO SMOKE THERE
9 (INDICATING); ARE YOU?
10 A.  YOU'RE NOT; BUT I DO.
11 Q.  ALL RIGHT.
12 A.  SORRY.
13 Q.  OKAY.  BUT -- OKAY.
14     MR. KERNS:
15       I WON'T TELL ANYONE.
16 Q.  (BY MR. EIKELAND).  I'M TRYING
17 TO UNDERSTAND.  WERE YOU, AT IN ANY POINT IN
18 TIME --
19 A.  SITTING THERE PLAYING?  NO.
20 Q.  OKAY.  WERE YOU, AT ANY POINT IN
21 TIME DURING APRIL 19TH, 2014, OR THAT CRUISE,
22 WERE YOU SEATED ON SEAT NUMBER "1", OR SEAT
23 NUMBER "2" HERE (INDICATING)?
24 A.  NO.
25 Q.  OKAY.  SO, WHEN MR. KERNS,

Page 194

1 CARNIVAL'S LAWYER, ASKED YOU WHAT YOU COULD
2 SEE WHEN YOU WERE SEATED AT SEAT MARKED
3 NUMBER "1", AND "2", IN DEFENSE EXHIBIT
4 NUMBER 2, YOU WOULDN'T KNOW, FROM EXPERIENCE,
5 WHAT, ACTUALLY, VANTAGE POINT YOU HAVE;
6 RIGHT?
7 A.  NO.
8     MR. KERNS:
9       OBJECTION; FORM.
10 Q.  (BY MR. EIKELAND).  AND,
11 SIMILARLY, YOU DO NOT KNOW, FROM EXPERIENCE,
12 WHETHER -- STRIKE THAT.  YOU DON'T KNOW, FROM
13 PERSONAL EXPERIENCE, WHETHER YOU -- ANYBODY
14 SITTING AT SEAT NUMBER "1" OR NUMBER "2", AT
15 THE TIME THAT SHIRLEY FELL, WHAT THEY COULD,
16 ACTUALLY, SEE?
17 A.  SEE?
18 Q.  RIGHT?
19 A.  NOPE.
20     MR. KERNS:
21       OBJECTION; FORM; LEADING.
22 Q.  (BY MR. EIKELAND).  LET ME ASK
23 YOU THIS WAY.  BASED ON YOUR OWN EXPERIENCE,
24 DO YOU HAVE ANY INFORMATION AS TO WHAT YOU
25 CAN SEE IF YOU'RE SEATED IN EITHER SEAT

Page 195

1 NUMBER "1" OR SEAT NUMBER "2" DEPICTED IN
2 PLAINTIFF'S EXHIBIT 2 (SIC)?
3 A.  NO.
4 Q.  YOU MENTIONED, IN YOUR
5 TESTIMONY, A LADY CALLED "KAT"; RIGHT?
6 A.  YES.
7 Q.  DO YOU REMEMBER THAT SHE WAS ONE
8 OF THE SERVERS AT THE BAR?
9 A.  UH-HUH.
10 Q.  HOW -- HOW -- HOW DO YOU KNOW
11 HER NAME?
12 A.  UM, SHE TOLD US; AND IT'S NOT
13 KAT; IT'S KAT -- KAT -- KATIL- -- KATALINA;
14 KATILIANA; SOMETHING LIKE THAT; WE CALLED HER
15 KAT FOR SHORT; THAT WAS, ACTUALLY, A NICKNAME
16 WE GAVE HER.
17 Q.  OKAY.  AND, UM, WHEN DID YOU
18 HAVE THAT CONVERSATION WITH KAT, WHEN YOU
19 TOLD HER ABOUT WATER BEING ON THE FLOOR?
20 A.  UM, WHEN -- RIGHT AFTER I WALKED
21 IN.
22 Q.  WAS THAT BEFORE THE ACCIDENT?
23 A.  YES.
24 Q.  OKAY.  HOW LONG BEFORE THE
25 ACCIDENT WAS THAT?

Page 196

1 A.  HMM; ABOUT THIRTY MINUTES
2 BEFORE.
3 Q.  OKAY.  AND HAVE YOU HAD A CHANCE
4 TO SPEAK WITH CARNIVAL'S LAWYER ABOUT YOUR
5 CONVERSATION WITH KAT?
6 A.  YES.
7 Q.  OKAY.  AND WHEN DID YOU SPEAK
8 WITH HIM ABOUT THIS CONVERSATION BETWEEN YOU
9 AND KAT, ABOUT WATER ON THE FLOOR?
10 A.  UM, WHEN HE CALLED ME ON THE
11 PHONE, I CALLED HIM BACK.
12 Q.  WHAT DID KAT RESPOND TO YOU WHEN
13 YOU TOLD HER ABOUT THE WATER ON THE FLOOR?
14 A.  UM, I DON'T THINK SHE RESPONDED
15 TO ME; I THINK SHE -- IF I REMEMBER RIGHT,
16 SHE WAS IN THE PROCESS OF SERVING ANOTHER
17 DRINK TO SOMEBODY; SO SHE WASN'T, REALLY -- I
18 MEAN, SHE MAY HAVE NOT EVEN HEARD ME.
19 Q.  IS IT -- AT THE TIME, DID YOU
20 BELIEVE THAT SHE HEARD YOU?
21 A.  AT THE TIME, I THOUGHT SHE HEARD
22 ME.
23     MR. KERNS:
24       OBJECT TO FORM.
25 Q.  (BY MR. EIKELAND).  DID YOUR

Page 197

1  HUSBAND HEAR YOU TELL KAT ABOUT THE WATER ON
2  THE FLOOR?
3  A.  UM, I DON'T REMEMBER IF HE HAD
4  ARRIVED JUST YET.
5  Q.  OKAY.  DID KAT DO ANYTHING IN
6  RESPONSE TO YOU TELLING HER THERE WAS WATER
7  ON THE FLOOR?
8  A.  HE DID HEAR ME; HE HEARD ME, UM
9  -- HE DID HEAR ME TELL KAT; BECAUSE MY FATHER
10  WAS WITH HIM; 'CAUSE MY FATHER STARTED, UM,
11  SAYING ABOUT -- ABOUT SOME OF HIS ISSUES THAT
12  HE HAD WITH CARNIVAL; NOT ONLY WITH THE WATER
13  BEING ALL OVER THE PLACE; BUT HE HAD SOME,
14  UH, ISSUES, ALSO, WITH CARNIVAL; THAT SHIP.
15  Q.  OKAY.
16  A.  SO.
17  Q.  DID YOU TELLING KAT ABOUT THE
18  WATER ON THE FLOOR PROMPT HER TO DO ANYTHING?
19  A.  LIKE I SAID, I REALLY DON'T
20  THINK -- I MEAN, I DON'T KNOW IF SHE HEARD
21  ME, OR NOT; I DON'T -- I DON'T KNOW IF SHE
22  DID ANYTHING.
23  Q.  OKAY.  DID YOU SEE HER, YOU
24  KNOW, PICK UP THE PHONE; OR CALL SOMEBODY --
25  A.  NO.

Page 198

1  Q.  -- TO CLEAN IT UP?
2  A.  NO; SHE SERVED THE PERSON -- THE
3  CUSTOMER -- THAT WAS SITTING, UM, TWO SEATS
4  DOWN FROM ME; SHE SERVED THEM; AND THEN SHE
5  JUST KEPT WORKING.
6  Q.  OKAY.  NOW, YOU WERE ASKED SOME
7  QUESTIONS ABOUT -- BY MR. KERNS, AS TO
8  WHETHER THE WATER WAS READILY OBSERVABLE.  DO
9  YOU REMEMBER THAT?
10  A.  YES.
11  Q.  OKAY.  SO I UNDERSTAND, FROM
12  YOUR TESTIMONY, THAT IT WAS READILY
13  OBSERVABLE TO YOU?
14  A.  YES.
15  Q.  IS THAT YOUR POSITION?
16  A.  (WITNESS NODDING HEAD
17  AFFIRMATIVELY).
18  Q.  BUT YOU'RE NOT MAKING A JUDGMENT
19  THAT, GENERALLY, IT WAS OBVIOUS ON THIS KIND
20  OF TILE; ARE YOU?
21  MR. KERNS:
22  OBJECTION TO FORM.
23  WITNESS:
24  I'M NOT UNDERSTANDING.
25  Q.  (BY MR. EIKELAND).  OKAY.  SO IF

Page 199

1  YOU LOOK AT -- OKAY.  IF YOU LOOK AT
2  PLAINTIFF'S EXHIBIT 4, WE TALKED ABOUT HOW
3  YOU COULD SEE THE REFLECTION ON THE FLOOR;
4  RIGHT?
5  A.  UH-HUH.
6  Q.  DO YOU AGREE WITH ME, ON THIS
7  (INDICATING) TYPE OF SHINY FLOOR, WITH THE
8  LIGHT REFLECTION, AND THAT THE LIGHTING
9  CONDITIONS, AS DEPICTED IN PLAINTIFF'S
10  EXHIBIT 4, IT WOULD NOT BE READILY NOTICEABLE
11  TO EVERYBODY WALKING ON THAT WALKWAY?
12  A.  IT WOULDN'T.
13  MR. KERNS:
14  OBJECTION; FORM.
15  Q.  (BY MR. EIKELAND).  YOU CAN
16  ANSWER.
17  A.  UM, IT WOULDN'T BE NOTICEABLE ON
18  THAT TYPE OF FLOOR; UM, THE ONLY REASON WHY I
19  NOTICED IT IS BECAUSE I WALK WITH MY HEAD
20  LOOKING AT THE FLOOR; UNLESS, UNFORTUNATE --
21  UNLESS I SEE SOMETHING THAT CATCHES MY EYE,
22  LIKE THE HAY HAT, SO.
23  Q.  SO YOU TEND TO WALK WITH YOUR
24  HEAD DOWN?
25  A.  YES.

Page 200

1  MR. KERNS:
2  OBJECTION; FORM.
3  Q.  (BY MR. EIKELAND).  HOW DO YOU
4  TEND TO WALK?
5  A.  I -- I WATCH MY FEET IN FRONT OF
6  ME; IT'S JUST A HABIT I HAVE; I HAVE BAD
7  POSTURE.
8  Q.  OKAY.  SO, BASED ON YOUR
9  OBSERVATIONS THAT DAY, AS YOU WALK IN, AND
10  THE LIGHT CONDITIONS, AND THE TYPE OF
11  FLOORING IT WAS, DO YOU HAVE AN OPINION AS TO
12  WHETHER IT WAS READILY NOTICEABLE -- THE
13  WATER WAS READILY NOTICEABLE -- ON THE
14  WALKWAY THAT WE SEE DEPICTED IN PLAINTIFF'S
15  EXHIBIT 4?
16  MR. KERNS:
17  OBJECTION; FORM.
18  WITNESS:
19  IT WASN'T NOTICEABLE.
20  MR. KERNS:
21  YOU GOT MY FORM OBJECTION;
22  DIDN'T YOU?
23  MADAME REPORTER:
24  (NODDING HEAD AFFIRMATIVELY).
25  MR. KERNS:

Page 201

1    OKAY.  THANKS.
2  Q.  (BY MR. EIKELAND).  ALL RIGHT.
3   WHEN MS. RILEY FELL, DID SHE -- DID IT ALL
4   HAPPEN VERY QUICKLY?
5  A.  YES.
6    MR. KERNS:
7      OBJECTION; FORM.
8  Q.  (BY MR. EIKELAND).  OKAY.  CAN
9   YOU TELL ME HOW FAST, OR SLOW, SHE WAS
10  FALLING?  I'M REPHRASING, SINCE THERE WAS AN
11  OBJECTION.
12 A.  SHE FELL FAST; THERE WAS --
13  THERE WAS NO WAY ANYBODY COULD HAVE HELPED
14  HER, LIKE, ONCE SHE FELL; UNLESS YOU'RE
15  SUPERMAN.
16 Q.  HA, HA, HA!  DO YOU REMEMBER HOW
17  HER BODY WAS POSITIONED ON THE FLOOR AFTER
18  SHE HAD FALLEN?
19 A.  YES.
20 Q.  HOW WAS IT; COULD YOU DESCRIBE
21  IT TO ME?
22 A.  UM, SHE WAS LAYING FLAT ON HER
23  BACK, WITH HER ELBOW COCKED (INDICATING);
24  TRYING TO HOLD HERSELF UP.
25 Q.  ARE YOU ABSOLUTELY SURE THAT SHE

Page 202

1   WAS ON HER BACK AS SHE CAME DOWN?
2  A.  YES.
3  Q.  OKAY.  WAS SHE -- IS THERE ANY
4   WAY IT COULD HAVE BEEN THAT SHE FELL FORWARD,
5   BUT LANDED ON HER BACK?
6    MR. KERNS:
7      OBJECTION; FORM.
8      WITNESS:
9      NO; SHE -- WHEN SHE SLIPPED,
10  SHE SLIPPED BACKWARDS; THAT'S -- I MEAN.
11 Q.  (BY MR. EIKELAND).  YOU'RE
12  ABSOLUTELY POSITIVE?
13 A.  I'M POSITIVE.
14 Q.  SO, I'M JUST TRYING TO
15  UNDERSTAND.  AND SO WERE YOU -- DID YOU
16  TESTIFY THAT SHE HAD HER ARM BEHIND HER BACK?
17 A.  YES.
18 Q.  OKAY.  SO, IS IT YOUR TESTIMONY
19  THAT, AS SHE FELL, SHE LANDED ON HER ARM?
20 A.  YES.
21 Q.  OKAY.  ON HER RIGHT ARM?
22 A.  YES.
23 Q.  OKAY.  DID SHE FALL MORE TO ONE
24  SIDE THAN THE OTHER?
25 A.  YES.

Page 203

1  Q.  MEANING --
2    MR. KERNS:
3      OBJECTION; FORM.
4  Q.  (BY MR. EIKELAND).  AND WHICH
5   SIDE DID SHE --
6  A.  HER RIGHT.
7  Q.  SHE FELL ON HER RIGHT?
8  A.  (WITNESS NODDING HEAD
9   AFFIRMATIVELY).
10 Q.  DID IT APPEAR THAT SHE HIT HER
11  HEAD AT ALL?
12 A.  I'M NOT QUITE SURE.
13    MR. KERNS:
14      OBJECTION; FORM.
15      WITNESS:
16      I DIDN'T SEE HER HIT HER HEAD;
17  BUT, I MEAN.
18 Q.  (BY MR. EIKELAND).  OKAY.  AS
19  SHE WAS LAYING THERE ON THE FLOOR, DID
20  ANYBODY MOVE HER BEFORE SHE WAS SAT UP?
21 A.  HMM, NO; THE DOCTOR, UM, WAS
22  MOVING HER ARM, TO TRY TO SEE IF IT WAS
23  BROKEN; BUT THAT WAS IT.
24 Q.  AND IS IT CORRECT THAT YOUR
25  TESTIMONY WAS THAT, AT SOME POINT, SOMEBODY

Page 204

1   ASSISTED HER IN SITTING UP IN A SEATED
2   POSITION?
3  A.  HER COMPANION.
4    MR. KERNS:
5      OBJECTION; FORM.
6  Q.  (BY MR. EIKELAND).  OKAY.  IF
7   YOU -- IT'S MY UNDERSTANDING, FROM YOUR
8   TESTIMONY, THAT YOU WERE -- WERE YOU FACING
9   SHIRLEY AS SHE FELL?
10 A.  YES.
11    MR. KERNS:
12      OBJECTION; FORM.
13 Q.  (BY MR. EIKELAND).  HOW WERE YOU
14  POSITIONED, COMPARED TO SHIRLEY, AS YOU
15  OBSERVED HER FALL?  I HAVE TO ASK YOU, AGAIN;
16  BECAUSE THERE WAS AN OBJECTION.
17 A.  UM, I WAS --
18    MR. KERNS:
19      I'M GONNA' OBJECT TO THIS
20  QUESTION, AS WELL AS THE LAST LEADING
21  QUESTION, MAY INFLUENCE THE WITNESS'S ANSWER
22  AS TO THIS ONE.
23 Q.  (BY MR. EIKELAND).  HOW WERE YOU
24  POSITIONED AS YOU OBSERVED SHIRLEY FALL?
25    WITNESS:

Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

---

Page 205

1     UM --
2     MR. KERNS:
3     SAME OBJECTION.
4     WITNESS:
5     (WITNESS STARING AT MR. KERNS).
6     UM, I WAS IN FRONT OF HER, BUT DIAGONAL TO
7     HER; SO I WAS ABLE TO SEE HOW SHE FELL
8     FORWARD; HOW SHE FELL BACKWARD.
9     Q.  (BY MR. EIKELAND).  YOU WERE
10    ASKED A NUMBER OF QUESTIONS ABOUT DRINKING; I
11    JUST WANT TO MAKE SURE I GOT -- UNDERSTOOD
12    YOUR TESTIMONY CORRECTLY.  AS YOU WERE
13    SITTING AT THE BAR THAT DAY, PRIOR TO SEEING
14    SHIRLEY FALL --
15    A.  UH-HUH.
16    Q.  -- HAD YOU HAD ANY --
17    A.  NO.
18    Q.  -- ALCOHOLIC BEVERAGES?
19    A.  NO.
20    Q.  YOU WERE ALSO ASKED IF YOU COULD
21    SEE HER -- WHETHER ANY OF HER CLOTHING, FROM
22    HER WAIST DOWN, WERE WET.  DO YOU REMEMBER
23    THAT?
24    A.  YES.
25    Q.  OKAY.  AND THAT WAS NOT

---

Page 206

1     SOMETHING THAT YOU NOTICED; IS THAT WHAT YOU
2     TESTIFIED?
3     A.  IT WASN'T SOMETHING I COULD
4     NOTICE; BUT I COULD TELL THAT HER BOTTOM WAS
5     WET; AND, UM, HER BACK SIDE.
6     Q.  YOU WERE ALSO ASKED A NUMBER OF
7     QUESTIONS ABOUT COMPLAINTS THAT YOU'VE MADE.
8     IS IT FAIR TO SAY THAT YOU COMPLAINED TO
9     CARNIVAL TO MAKE THINGS BETTER?
10    A.  YES.
11    MR. KERNS:
12    OBJECTION; FORM; LEADING.
13    Q.  (BY MR. EIKELAND).  OKAY.  WHY
14    DID YOU COMPLAIN?
15    MR. KERNS:
16    OBJECTION.  GIVEN THAT YOU'VE
17    GIVEN HER THE ANSWER NOW, THROUGH YOUR
18    LEADING QUESTION, I'M WORRIED THAT THIS
19    WITNESS'S ANSWER, NOW, WILL BE INFLUENCED BY
20    YOUR LEADING QUESTION.
21    MS. EIKELAND:
22    FORM?
23    MR. KERNS:
24    I'M OBJECTING TO FORM.
25    MS. EIKELAND:

---

Page 207

1     FOR THE RECORD, THESE ARE AREAS
2     OF QUESTIONS THAT YOU ASKED ON YOUR CROSS-
3     EXAMINATION; SO THIS IS OUTSIDE OF MY DIRECT
4     EXAMINATION; SO I CAN, ACTUALLY, CROSS THE
5     WITNESS ON THIS.
6     MR. KERNS:
7     I MEAN --
8     Q.  (BY MS. EIKELAND).  WHY DID YOU
9     MAKE COMPLAINTS?
10    A.  UM, TO HAVE CARNIVAL FIX THE --
11    FIX THE THINGS THAT WERE WRONG ON THE SHIP,
12    SO THAT THAT WAY, THEY COULD BETTER THEIR
13    COMPANY.
14    Q.  YOU HAVE BEEN ON MANY CRUISES;
15    RIGHT?
16    A.  YES.
17    Q.  OKAY.  HAVE YOU CRUISED WITH ANY
18    OTHER CRUISE LINE THAN CARNIVAL?
19    A.  NO.
20    Q.  HAVE YOU BEEN ON CARNIVAL
21    CRUISES AFTER THIS --
22    A.  YES.
23    Q.  -- CRUISE ON THE DREAM?  AND
24    HAVE YOU BEEN ON CRUISES WITH CARNIVAL BEFORE
25    THIS CRUISE ON THE DREAM?

---

Page 208

1     A.  YES.
2     Q.  AND ARE YOU PLANNING ON GOING ON
3     ANY CRUISES IN THE FUTURE WITH CARNIVAL?
4     A.  UM, YES.
5     Q.  YOU WERE ALSO ASKED A NUMBER OF
6     QUESTIONS ABOUT SOME NOTES.  DO YOU REMEMBER
7     THAT?
8     A.  YES.
9     Q.  DEFENSE EXHIBIT 4, AND 5.  YOU
10    CAN ONLY TESTIFY TO WHAT YOU REMEMBER TELLING
11    CARNIVAL; ISN'T THAT CORRECT?
12    A.  YES.
13    Q.  IT'S NOT --
14    MR. KERNS:
15    OBJECTION; FORM.
16    Q.  (BY MR. EIKELAND).  IT'S NOT
17    WITHIN YOUR CONTROL WHAT THE CARNIVAL
18    EMPLOYEE WRITES DOWN; TRUE?
19    A.  YES.
20    MR. KERNS:
21    OBJECTION; FORM.
22    Q.  (BY MR. EIKELAND).  LOOKING AT
23    EXHIBIT NUMBER -- DEFENSE EXHIBIT NUMBER 4,
24    AND 5 -- AND LET ME DO 4 FIRST; NUMBER 4;
25    DEFENSE EXHIBIT NUMBER 4.  IS THE

---

Page 209

1  CONVERSATION THAT YOU HAD WITH THE CUSTOMER
2  REP TAKEN DOWN WORD FOR WORD --
3  A.  NO.
4     MR. KERNS:
5     OBJECTION, FORM.
6  Q.  (BY MR. EIKELAND) -- IN EXHIBIT
7  4?
8  A.  NO.
9  Q.  WHAT ABOUT EXHIBIT 5; IS YOUR
10  CONVERSATION WITH THE CUSTOMER REPRESENTATIVE
11  IN EXHIBIT 5, DEFENSE EXHIBIT 5, TAKEN DOWN
12  WORD BY WORD?
13     MR. KERNS:
14     OBJECTION; FORM.
15     WITNESS:
16     NO.
17  Q.  (BY MR. EIKELAND).  DO YOU SEE
18  ANY NOTES IN -- DO YOU SEE ANYTHING, IN
19  DEFENSE EXHIBIT 4, REFLECTING ANYTHING THAT
20  THE CUSTOMER REP COMMUNICATED TO YOU?
21  A.  NO.
22  Q.  DO YOU SEE ANYTHING, IN DEFENSE
23  EXHIBIT 5, REFLECTING ANYTHING THAT THE
24  CARNIVAL CUSTOMER REPRESENTATIVE COMMUNICATED
25  TO YOU?

Page 210

1  A.  NO.
2  Q.  DO YOU SEE ANYTHING, IN DEFENSE
3  EXHIBIT NUMBER 4, REFLECTING THAT YOU TOLD
4  THE CUSTOMER REP ABOUT WATER ON THE FLOOR;
5  AND MS. RILEY FALLING?
6  A.  NO.
7  Q.  DO YOU SEE ANYTHING, IN DEFENSE
8  EXHIBIT NUMBER 5, ANYTHING ABOUT YOUR
9  COMMUNICATION ABOUT WATER ON THE FLOOR, AND
10  MS. RILEY FALLING?
11  A.  NO.
12  Q.  YOU ALSO TESTIFIED ABOUT THE
13  POSITIONING OF MS. RILEY'S COMPANION AS THEY
14  WERE WALKING INTO THE CASINO.  DO YOU
15  REMEMBER THAT?
16  A.  YES.
17  Q.  OKAY.  SO, BASED ON WHAT YOU
18  EXPLAINED TO MR. KERNS HERE, WAS -- RIGHT
19  BEFORE MS. SHIRLEY FELL, WAS HER COMPANION IN
20  FRONT OF HER; NEXT TO HER; OR BEHIND HER?
21  A.  BEHIND HER.
22  Q.  THE DOCTOR THAT -- THE
23  "PASSENGER DOCTOR" (IN FINGER QUOTES) THAT
24  CAME OVER TO ASSIST MS. RILEY.  DO YOU, BY
25  ANY CHANCE, KNOW HIS NAME?

Page 211

1  A.  NO.
2  Q.  AFTER THE INCIDENT WHERE MS.
3  RILEY SLIPPED, AND FELL, DID YOU PAY
4  ATTENTION TO WHO WAS SITTING AT THE SLOT
5  MACHINES AT THAT TIME?
6     MR. KERNS:
7     OBJECTION; FORM.
8     WITNESS:
9     NO.
10  Q.  (BY MS. EIKELAND).  AND WHAT WAS
11  YOUR FOCUS AFTER SHE HAD FALLEN?
12  A.  ON MS. RILEY.
13  Q.  NOW, WITH REGARD TO THE WATER
14  YOU OBSERVED WHEN YOU CROUCHED DOWN RIGHT
15  AFTER SHIRLEY FELL, WAS THERE ANYTHING
16  DIFFERENT ABOUT THE AMOUNT OF WATER; OR HAD
17  ANYTHING HAPPENED TO THE WATER BETWEEN THE
18  TIME YOU LEFT MS. SHIRLEY, AND YOU MADE THE
19  CALL; AND THE TIME YOU CAME BACK?
20     MR. KERNS:
21     OBJECTION; FORM.
22     WITNESS:
23     YOU GOT TO BE A LITTLE BIT MORE
24  CLEARER.
25  Q.  (BY MR. EIKELAND).  OKAY.  SO,

Page 212

1  MS. SHIRLEY FALLS; YOU CROUCH DOWN.
2  A.  OKAY.
3  Q.  AND THERE IS WATER ON THE FLOOR;
4  RIGHT?
5  A.  YES.
6  Q.  OKAY.  SO YOU GO AND MAKE THE
7  CALL; AND YOU COME BACK?
8  A.  UH-HUH.
9  Q.  HAD ANYTHING CHANGED AT THE
10  SCENE?
11  A.  NO; THEY WERE, UM -- THEY WERE
12  STARTING TO TRY TO HELP HER SIT UP.
13  Q.  WAS THERE ANY CHANGE IN THE --
14  IN TERMS OF THE WATER ON THE FLOOR?
15  A.  HMM, NO.
16  Q.  OKAY.
17  A.  IT SPREAD A LITTLE BIT FURTHER.
18  Q.  YOU WERE ASKED A NUMBER OF
19  QUESTIONS ABOUT POSTINGS ON FACEBOOK.  YOU
20  REMEMBER THAT?
21  A.  YES.
22  Q.  OKAY.  DO YOU POST -- DO YOU,
23  GENERALLY, POST YOUR EXPERIENCE ABOUT YOUR
24  CRUISES ON FACEBOOK, AFTER YOU'VE BEEN ON A
25  CRUISE?

Page 213

1 A.   YES.
2 Q.   DID YOU POST AFTER YOU WENT ON
3 YOUR HONEYMOON?
4 A.   YES.
5 Q.   DO YOU POST POSITIVE THINGS
6 ABOUT CARNIVAL?
7 A.   YES.
8 Q.   HAVE YOU POSTED THAT YOU HAD A
9 GOOD TIME?
10 A.   YES.
11 Q.   IS IT A WAY WHERE YOU SHARE YOUR
12 THOUGHTS ABOUT YOUR CRUISING EXPERIENCE?
13 A.   YES.
14    MR. KERNS:
15    OBJECTION; FORM.
16 Q.   (BY MR. EIKELAND).  WHEN YOU
17 THINK ABOUT WHAT YOU POSTED ON FACEBOOK, IS
18 -- ABOUT CARNIVAL TRIPS, AND CRUISES,
19 OVERALL, WOULD IT BE MORE POSITIVE, OR MORE
20 NEGATIVE?
21 A.   MORE POSITIVE.
22    MR. KERNS:
23    OBJECTION; FORM.
24    MS. EIKELAND:
25    OKAY.  I THINK I'M DONE.  CAN

Page 214

1    WE JUST HAVE ONE SMALL BREAK, PLEASE?
2    VIDEOGRAPHER:
3    OFF THE RECORD AT 3:22.
4    (WHEREUPON, THERE WAS A RECESS.)
5    VIDEOGRAPHER:
6    WE'RE BACK ON THE RECORD AT
7    3:25.
8 Q.   (BY MS. EIKELAND).  OKAY.  I'M
9 JUST GONNA' GO BACK TO THE MECHANICS OF
10 SHIRLEY'S FALL.  IS THERE A POSSIBILITY THAT
11 YOU DON'T REMEMBER EXACTLY HOW -- HOW SHE
12 FELL; THE MECHANICS OF HER FALL?
13    MR. KERNS:
14    OBJECTION; FORM; THE WITNESS
15 HAS BEEN ASKED THIS MULTIPLE TIMES.
16    MADAME REPORTER:
17    EXCUSE ME?
18    MR. KERNS:
19    THE WITNESS HAS BEEN ASKED THIS
20 MULTIPLE TIMES.
21 Q.   (BY MR. EIKELAND).  DO YOU THINK
22 THAT'S A POSSIBILITY?
23 A.   NO.
24 Q.   OKAY.  IF I TELL YOU THAT MS.
25 RILEY SAYS SHE FELL FORWARD, AND SHE HURT HER

Page 215

1    KNEES, DOES THAT CHANGE YOUR OPINION?
2    MR. KERNS:
3    OBJECTION; FORM.
4    WITNESS:
5    NO.
6 Q.   (BY MR. EIKELAND).  OKAY.  IS
7 THERE A POSSIBILITY THAT, MAYBE, IT HAPPENED
8 SO FAST YOU DIDN'T SEE, EXACTLY, THE
9 MECHANICS OF THE FALL?
10    MR. KERNS:
11    SAME OBJECTION.
12    WITNESS:
13    NO.
14 Q.   (BY MR. EIKELAND).  OKAY.
15 A.   I -- I REMEMBER THE FALL.
16    MS. EIKELAND:
17    ALL RIGHT.  I HAVE -- LET ME
18 SEE; I THINK THAT'S IT.
19    MR. KERNS:
20    I DO NEED TO CLARIFY ONE THING;
21 AND, PERHAPS, MS. EIKELAND, YOU'LL HAVE
22 QUESTIONS ABOUT THIS AFTER I ASK 'EM, BUT.
23    MS. EIKELAND:
24    OKAY.
25    MR. KERNS:

Page 216

1    COULD I SEE THE PLAINTIFF'S
2 EXHIBITS PHOTOS?
3    MADAME REPORTER:
4    (HANDING).
5    MR. KERNS:
6    THESE (INDICATING) ARE DEFENSE;
7 NO; THAT'S (INDICATING) MINE.
8    EXAMINATION BY MR. KERNS:
9 Q.   MS. GAUTREAUX, I'M HANDING YOU
10 WHAT'S BEEN MARKED AS PLAINTIFF'S EXHIBIT 3
11 (HANDING); WHAT'S BEEN MARKED AS PLAINTIFF'S
12 EXHIBIT 2; AND WHAT'S BEEN MARKED AS --
13    MR. KERNS:
14    THIS (INDICATING) IS THIS
15 PLAINTIFF?
16    MADAME REPORTER:
17    NO; THAT'S (INDICATING) DEFENSE
18 -- NO; THAT'S (INDICATING) PLAINTIFF.
19 Q.   (BY MR. KERNS).  OKAY.  AS
20 PLAINTIFF'S EXHIBIT 4.  NOW, WITH REGARD TO
21 PLAINTIFF'S (SIC; SHOULD BE DEFENSE) EXHIBIT
22 2, AND 4, WOULD YOU AGREE THAT THEY'RE A
23 PHOTOGRAPH OF THE EXACT SAME AREA?
24 A.   YES.
25    MS. EIKELAND:

Case 1:15-cv-20807-JEM   Document 44-1   Entered on FLSD Docket 11/02/2015   Page 57 of 77
Shirley Riley vs
Carnival Corporation, et al
Dalise L. Gautreaux
August 27, 2015

Page 217

1    OBJECTION; FORM.
2  Q.  (BY MR. KERNS).  WOULD YOU ALSO
3  AGREE THAT, EVEN THOUGH THEY ARE A PHOTOGRAPH
4  OF THE EXACT SAME AREA, THE COLOR OF THE TILE
5  IS DIFFERENT IN THE TWO PHOTOGRAPHS?
6  A.  YES.
7  Q.  DO YOU KNOW WHEN THE PHOTOGRAPH
8  DEPICTED IN PLAINTIFF'S EXHIBIT 2 WAS TAKEN?
9     MS. EIKELAND:
10    OBJECTION; FORM.
11    WITNESS:
12    NO.
13    MS. EIKELAND:
14    ASKED, AND ANSWERED.
15 Q.  (BY MR. KERNS).  DO YOU KNOW THE
16 LIGHTING CONDITIONS IN THE CASINO AT THE TIME
17 THAT PHOTOGRAPH WAS TAKEN?
18    MS. EIKELAND:
19    OBJECTION; FORM; ASKED, AND
20 ANSWERED.
21    WITNESS:
22    NO.
23 Q.  (BY MR. KERNS).  DO YOU KNOW
24 WHAT TYPE OF CAMERA WAS USED TO TAKE THAT
25 (INDICATING) PHOTOGRAPH?

Page 218

1  A.  NO.
2     MS. EIKELAND:
3     FORM.
4  Q.  (BY MR. KERNS).  DO YOU KNOW --
5  I'LL START THAT QUESTION OVER.  WHAT DO YOU
6  BELIEVE COULD ACCOUNT FOR THE DIFFERENCE IN
7  THE COLOR OF THE TILE THAT YOU'VE INDICATED
8  THERE IS AMONG THE TWO PHOTOGRAPHS?
9     MS. EIKELAND:
10    OBJECTION; FORM; ASKED, AND
11 ANSWERED.
12    WITNESS:
13    THE LIGHTING.
14 Q.  (BY MR. KERNS).  AND DO YOU
15 KNOW, OR REMEMBER, THE EXACT LIGHTING
16 CONDITIONS AT THE TIME OF MS. RILEY'S FALL?
17 A.  NO.
18 Q.  SO CAN YOU SAY, WITH ANY
19 CERTAINTY AT ALL, WHICH -- WHETHER IT'S
20 EXHIBIT 3, OR EXHIBIT -- I'M SORRY; WHETHER
21 IT'S -- I'LL START THE QUESTION OVER L.  CAN
22 YOU SAY, WITH ANY CERTAINTY AT ALL, AS
23 BETWEEN PLAINTIFF'S (SIC) EXHIBIT 2, AND
24 PLAINTIFF'S EXHIBIT 4, WHICH ONE'S A MORE
25 ACCURATE DEPICTION OF THE COLOR OF THE TILE

Page 219

1  AT THE TIME OF MS. RILEY'S FALL?
2     MS. EIKELAND:
3     FORM.
4     WITNESS:
5     NO.
6  Q.  (BY MR. KERNS).  AND HOW ABOUT
7  PLAINTIFF'S EXHIBIT 3; DOES THAT -- DOES THE
8  COLOR OF THAT (INDICATING) TILE APPEAR
9  DIFFERENT THAN THAT DEPICTED IN PLAINTIFF'S
10 EXHIBIT 4?
11 A.  YES.
12 Q.  AND DO YOU KNOW WHAT THE
13 LIGHTING CONDITIONS WERE IN PLAINTIFF'S
14 EXHIBIT 4, WHEN THAT PHOTOGRAPH WAS TAKEN?
15    MS. EIKELAND:
16    FORM.
17    WITNESS:
18    YES.
19 Q.  (BY MR. KERNS).  I'M SORRY.
20 A.  OH, 4?  NO.
21 Q.  ALL RIGHT.  3.  YOU CAN -- YOU
22 CAN SEE THE LIGHTS; CORRECT?
23 A.  YES.
24 Q.  BUT DO YOU KNOW WHETHER OR NOT
25 IT WAS NIGHTTIME, OR DAYTIME, DURING --

Page 220

1  A.  NO.
2  Q.  -- WHEN PHOTOGRAPH 3 WAS TAKEN?
3  A.  NO.
4  Q.  SO CAN YOU SAY THAT ANY OF THESE
5  (INDICATING) THREE PHOTOGRAPHS -- PLAINTIFF'S
6  (SIC) 2, 3, OR 4, FAIRLY, AND ACCURATELY,
7  DEPICT THE COLOR OF THE TILE; AND ITS
8  APPEARANCE AT THE TIME OF MS. RILEY'S FALL?
9     MS. EIKELAND:
10    OBJECTION; FORM.
11    WITNESS:
12    SAY THAT AGAIN?
13 Q.  (BY MR. KERNS).  CAN YOU SAY --
14 I'LL START THE QUESTION OVER.  GIVEN THAT YOU
15 DO NOT KNOW WHEN THESE (INDICATING)
16 PHOTOGRAPHS WERE TAKEN, AND THE LIGHTING
17 CONDITIONS, CAN YOU SAY, WITH ANY SORT OF
18 CERTAINTY, WHICH ONE MOST ACCURATELY DEPICTS
19 THE COLOR, AND CONDITION, OF THE TILE AT THE
20 TIME OF MS. RILEY'S FALL?
21    MS. EIKELAND:
22    FORM.
23    WITNESS:
24    NO.
25    MR. KERNS:

Page 221

1    I DON'T HAVE ANY OTHER
2  QUESTIONS.
3    MS. EIKELAND:
4    OKAY.  I HAVE A FOLLOW-UP TO
5  THAT.
6    EXAMINATION BY MS. EIKELAND:
7  Q.  FORGET THE PHOTOS FOR A SECOND.
8  HOW DO YOU RECALL THE COLOR OF THE TILE FROM
9  THE TIME THAT YOU WERE IN THE CASINO, AND YOU
10  SAW MS. RILEY FALL?
11  A.  DARKER COLOR.
12  Q.  OKAY.  AND WHAT KIND OF SHADE
13  WOULD YOU DESCRIBE IT AS?
14  A.  MORE OF A COPPER.
15  Q.  OKAY.  SO, IF YOU LOOK AT
16  PLAINTIFF'S (SIC; SHOULD BE DEFENSE) EXHIBIT
17  2 AND 4, WHICH OF THOSE PHOTOGRAPHS MOST
18  ACCURATELY RESEMBLE THE COLOR, AS YOU RECALL
19  IT, AT THE TIME OF THE INCIDENT?
20  A.  4.
21    MS. EIKELAND:
22    OKAY.  THANK YOU; I HAVE
23  NOTHING FURTHER.
24    VIDEOGRAPHER:
25    THIS CONCLUDES THE VIDEO TAPE

Page 222

1  DEPOSITION --
2    MS. EIKELAND:
3    HANG ON ONE SECOND.  YOU HAVE
4  THE RIGHT TO READ THE TRANSCRIPT; AND READ IT
5  FOR ACCURACY; AND THERE IS A JUROR PAGE AT
6  THE END, WHERE YOU CAN MAKE YOUR COMMENTS, IF
7  YOU FIND ANY OF THE -- ANYTHING IS TAKEN DOWN
8  INCORRECTLY.  WOULD YOU LIKE TO DO THAT?
9    WITNESS:
10    NO.
11    MS. EIKELAND:
12    OKAY.  YOU WAIVE THAT RIGHT?
13    WITNESS:
14    YES.
15    MS. EIKELAND:
16    OKAY.  ALLRIGHTEE.  THANK YOU;
17  AND THANK YOU SO MUCH FOR COMING; YOU'VE BEEN
18  VERY PATIENT.
19    MR. KERNS:
20    THANK YOU VERY MUCH.
21    MS. EIKELAND:
22    THANK YOU VERY, VERY MUCH.
23    VIDEOGRAPHER:
24    THIS CONCLUDES THE VIDEO TAPE
25  DEPOSITION; WE'RE GOING OFF THE RECORD AT

Page 223

1    3:32.
2
3
4
5
6  (WHEREUPON, THE DEPOSITION WAS CONCLUDED.)

Page 224

1
2    REPORTER'S CERTIFICATE
3
4    THIS CERTIFICATION IS VALID ONLY FOR
5  A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
6  SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
7  PAGE.
8
9    I, KATHY A. MARTINY, CERTIFIED COURT
  REPORTER, STATE OF LOUISIANA, AS THE OFFICER
  BEFORE WHOM THIS TESTIMONY WAS TAKEN, DO
10  HEREBY CERTIFY THAT DALISE L. GAUTREAUX,
  AFTER HAVING BEEN DULY SWORN BY ME UPON
11  AUTHORITY OF R.S. 37:2554, DID TESTIFY AS
  HEREINBEFORE SET FORTH IN THE FOREGOING 224
12  PAGES; THAT THIS TESTIMONY WAS REPORTED BY ME
  IN THE ELECTRONIC REPORTING METHOD, WAS
13  PREPARED AND TRANSCRIBED BY ME OR UNDER MY
  PERSONAL DIRECTION AND SUPERVISION, AND IS A
14  TRUE AND CORRECT TRANSCRIPT TO THE BEST OF MY
  ABILITY AND UNDERSTANDING; THAT THE
15  TRANSCRIPT HAS BEEN PREPARED IN COMPLIANCE
  WITH TRANSCRIPT FORMAT GUIDELINES REQUIRED BY
16  STATUTE OR BY RULES OF THE BOARD, THAT I HAVE
  ACTED IN COMPLIANCE WITH THE PROHIBITION ON
17  CONTRACTUAL RELATIONSHIPS, AS DEFINED BY
  LOUISIANA CODE OF CIVIL PROCEDURE ARTICLE
18  1434 AND IN RULES AND ADVISORY OPINIONS OF
  THE BOARD; THAT I AM NOT RELATED TO COUNSEL
19  OR TO THE PARTIES HEREIN, NOR AM I OTHERWISE
  INTERESTED IN THE OUTCOME OF THIS MATTER.
20
21
22
23    _____
24    KATHY A. MARTINY, CSR
  STATE OF LOUISIANA
25

**$**

**$500 (1)**
101:13
**$8 (1)**
103:18

**1**

**1 (17)**
8:13,17;71:14;
75:3,15;76:1,5;
83:12,12;84:4;
152:17;153:16;
193:6,22;194:3,14;
195:1
**1:00 (1)**
123:22
**1:03 (1)**
105:25
**1:19 (1)**
106:16
**10:00 (2)**
68:14;101:24
**10:55 (1)**
6:18
**11/20/91 (1)**
8:4
**11:00 (3)**
101:24;102:1;
123:20
**1111 (1)**
14:8
**12:00 (1)**
101:24
**12:04 (1)**
61:6
**12:14 (1)**
61:11
**13TH (1)**
133:22
**14 (1)**
116:16
**19 (2)**
13:18;51:14
**19TH (1)**
26:4;27:21;193:21

**2**

**2 (28)**
19:17,20;61:10;
75:6,17;79:16,19;
80:23;81:13;82:5;
83:13;84:4;151:2;
192:17;193:6,8,23;
194:3,4,14;195:1,2;
216:12,22;217:8;
218:23;220:6;221:17
**2:00 (2)**
68:15,16
**2:05 (1)**
151:3
**2:19 (1)**
151:8
**2:47 (1)**
182:8
**2:48 (1)**
182:12
**201 (1)**
6:8
**2013 (1)**
91:8
**2014 (12)**
12:19;13:18;
15:15;16:14;24:24;
26:4;27:21;47:5;
51:14;138:18;
141:23;193:21
**20TH (2)**
14:1,5
**21ST (3)**
14:5;138:18;
141:23
**22ND (1)**
9:9
**2'S (1)**
112:7

**3**

**3 (33)**
22:17,22;23:3;
24:2;25:18;26:2;
27:1;29:16;31:2,14;
46:1,15;52:9;71:24;
72:24,25;74:10,21;
78:8;80:20;88:22,25;
89:5;90:17,18;151:7;
153:14;216:10;
218:20;219:7,21;
220:2,6
**3:00 (2)**
105:15;123:25
**3:22 (1)**
214:3
**3:25 (1)**
214:7
**3:32 (1)**
223:1
**3:54 (1)**
138:18

**4**

**4 (54)**
45:14,17;46:3,14,
16,18,24;52:8,8,23;
53:3;71:24;73:15,22;
74:8,22,24;78:9;
134:13;135:17,20;
136:3;137:7;138:7,
14;140:10;142:2;
143:9,14;145:16,18;
147:9;163:9,12;
199:2,10;200:15;
208:9,23,24,24,25;
209:7,19;210:3;
216:20,22;218:24;
219:10,14,20;220:6;
221:17,20
**4:00 (3)**
73:12;105:15;
123:25
**4:11 (1)**
141:23
**4315 (1)**
6:9

**5**

**5 (18)**
141:4,7;143:1,2,
10,16;145:15,19;
146:17;147:10,12;
208:9,24;209:9,11,
11,23;210:8
**5:00 (4)**
28:4;46:10,17;
73:12
**5:30 (1)**
28:4
**5:30-ISH (1)**
28:3

**6**

**6 (3)**
147:24;148:2;
150:14
**6:00 (1)**
54:13
**6:30 (2)**
54:11,13

**9**

**9:00 (2)**
73:11;101:23

**A**

**ABILITY (2)**
99:21,22
**ABLE (7)**
11:16;25:3;58:1;
78:7,10;96:11;205:7
**ABOARD (1)**
184:15
**ABOVE-MENTIONED (1)**
6:3
**ABSOLUTELY (2)**
201:25;202:12
**ABUNDANTLY (1)**
162:13
**AC (1)**
11:8
**ACCENT (2)**
129:14,24
**ACCEPT (1)**
57:19
**ACCIDENT (2)**
195:22,25
**ACCOMMODATE (1)**
11:5
**ACCOMPANYING (2)**
151:14;160:11
**ACCOUNT (1)**
218:6
**ACCURACY (1)**
222:5
**ACCURATE (15)**
27:3;32:25;70:13;
76:11;78:20;79:12,
12;139:2;140:10;
143:20;146:17;
189:2,9;192:13;
218:25
**ACCURATELY (7)**
26:3;52:23;53:3;
76:18;220:6,18;
221:18
**ACQUAINTANCE (1)**
172:18
**ACROSS (1)**
92:13
**ACTING (2)**
48:25;65:20
**ACTUALLY (33)**
9:14;25:4;26:12;
61:3;79:4,7;83:22;
101:10;112:9,11;
119:5,11;121:13,24;
122:21;140:3;
146:15;153:2,21;
155:2,5;156:5;
163:18;174:22;
182:14,17,21,23;
190:10;194:5,16;
195:15;207:4
**ADD (1)**
131:19
**ADDITIONAL (1)**
145:14
**ADDITIONALLY (1)**
147:16
**ADDITIONS (1)**
145:13
**ADJECTIVES (1)**
146:24
**ADMIRING (1)**
155:4
**ADMITTED (1)**
133:1
**ADVERSARY (1)**
192:3
**AFFIRMATIVELY (8)**
12:14;13:20;
22:19;137:11;
183:17;198:17;
200:24;203:9
**AFFORD (1)**
106:1
**AFTERMATH (1)**
108:8
**AFTERNOON (7)**
28:3;46:10,17;
72:22;73:8,13;
154:19
**AFTERWARD (1)**
108:19
**AGAIN (20)**
12:10;15:7;32:8;
36:7;42:21;52:3;
53:11;69:12;88:17;
107:3;129:4;130:11;
138:2;142:19;
144:10;154:20;
158:8;192:25;
204:15;220:12
**AGAINST (1)**
33:10
**AGE (4)**
99:1;122:13;
167:23;180:4
**AGGRAVATED (1)**
144:18
**AGO (1)**
74:12
**AGREE (3)**
199:6;216:22;
217:3
**AHEAD (10)**
11:14;33:18;
78:21;83:20;92:4;
121:14;135:22;
141:9;148:6;156:7
**AID (3)**
40:6;173:18;
175:25
**AIRPORT (1)**
134:9
**ALCOHOL (3)**
18:9;100:20;122:4
**ALCOHOLIC (2)**
53:22;205:18
**ALLEGE (4)**
177:4;178:12,17;
183:9
**ALLEGED (2)**
176:8;181:3
**ALLEGEDLY (4)**
91:22;136:21,23;
147:19
**ALLOWED (4)**
17:14;89:16;
161:9;193:8
**ALLRIGHTEE (1)**
222:16
**ALMOST (3)**
122:21,22;123:22
**ALONGSIDE (1)**
51:5
**ALTHOUGH (1)**

10:7
**ALWAYS (5)**
92:6,7;104:23,24;
122:10
**AMAZING (2)**
133:25;137:1
**AMENITIES (1)**
76:19
**AMONG (1)**
218:8
**AMOUNT (2)**
103:8;211:16
**ANCESTRY (1)**
113:12
**ANGER (1)**
186:16
**ANKLE (1)**
166:9
**ANSWERED (9)**
37:15;98:3;
106:24;170:18;
171:13;189:22;
217:14,20;218:11
**ANTICIPATE (1)**
68:4
**ANYMORE (3)**
95:12;166:19;
173:21
**ANYWAYS (1)**
87:3
**APOLOGIZED (1)**
184:14
**APOLOGY (8)**
58:9,11;132:22,24;
148:23;149:3,7;
184:11
**APPARENT (1)**
85:20
**APPEAR (11)**
43:25;72:4;80:7;
130:5,5;141:16;
148:11,14,20;
203:10;219:8
**APPEARANCE (1)**
220:8
**APPEARED (2)**
44:5;96:23
**APPEARS (2)**
31:15;82:4
**APPRECIATE (2)**
10:5;191:22
**APPROACHED (2)**
155:20,23
**APPROXIMATE (1)**
30:4
**APPROXIMATELY (11)**
8:24;20:7;28:1;
40:15;41:16,21;82:8;
105:9;123:17;
152:12;177:24
**APRIL (17)**
12:19;13:18;14:1;
15:15;16:14;24:24;

26:4;27:21;47:5;
48:16;51:14;116:16;
133:22,23;138:18;
141:23;193:21
**ARABIAN (5)**
112:23;118:15,16,
24,25
**AREA (47)**
21:11;25:10;
26:16,17;27:7,9;
30:2;31:23;34:22;
35:3;36:12;37:11;
39:18;43:20;44:6;
49:10,16;51:2,3,3,
11;52:5;63:21;81:24,
25;89:9,14,15,18,19,
20,22;98:22;112:7;
115:9,9,24;119:2;
122:23;152:12,18;
170:16;177:11,14;
191:7;216:23;217:4
**AREAS (6)**
17:19;21:15;49:9;
83:3,4;207:1
**AREA'S (1)**
110:3
**ARM (15)**
28:7;34:23,25;
35:13,13,14;96:5,25;
113:23;164:5;
174:18;202:16,19,
21;203:22
**ARMPIT (1)**
39:17
**AROUND (18)**
25:24;49:16,20;
94:14;109:24;121:8,
16;122:13;128:5;
152:3;154:1,2;156:8;
162:14;166:9;
168:13;176:20;
177:23
**ARRANGEMENT (1)**
107:20
**ARRANGEMENTS (1)**
89:10
**ARRIVE (2)**
40:23;168:22
**ARRIVED (9)**
40:11,13;169:1,1;
172:10;174:13,16,
21;197:4
**ARRIVING (1)**
40:22
**ARTICLE (1)**
188:3
**ASIAN (1)**
118:19
**ASSIGNED (1)**
119:14
**ASSIST (1)**
210:24
**ASSISTANCE (4)**

38:11,20,20;40:1
**ASSISTANT (1)**
137:1
**ASSISTED (2)**
136:19;204:1
**ASSOCIATED (2)**
6:8;70:3
**ASSOCIATE'S (1)**
10:1
**ASSUME (2)**
65:1;181:7
**ASSUMED (1)**
179:19
**ASSUMING (7)**
82:22;84:5,7,10,
14;170:22;188:7
**ASSUMPTION (5)**
65:6;72:12,14;
73:23;74:2
**ASSUMPTIONS (1)**
65:7
**ATRIUM (21)**
21:23;22:2,3,5;
23:7;27:1;28:16;
42:19;49:5;51:2;
77:12,17;80:9;93:8;
94:13;99:10;105:21;
107:9;152:4;169:16,
20
**ATTACH (1)**
110:8
**ATTACHED (10)**
8:17;19:20;22:22;
45:17;76:1;79:19;
88:25;135:20;141:7;
148:2
**ATTEMPT (3)**
175:25;177:2,3
**ATTEMPTED (1)**
70:7
**ATTEMPTING (1)**
175:16
**ATTENTION (3)**
100:8;168:4;211:4
**ATTENTIVE (1)**
147:20
**ATTITUDE (1)**
144:23
**ATTORNEY (3)**
67:16,20,23
**ATTORNEYS (1)**
109:5
**ATTRIBUTED (2)**
139:1;143:7
**AUNT (3)**
14:12;123:20,21
**AUTHENTICATING (1)**
137:14
**AVAILABLE (1)**
75:17
**AVENUE (1)**
6:9
**AWAY (7)**

30:5;32:13;
139:18;176:14;
177:10,23;178:20

## B

**BACK (78)**
10:24;20:21;
21:10;25:9;26:13;
28:7;30:14;33:10;
34:3,22;35:3,4,15,
18;37:8,21;49:8;
52:21;53:8;57:7,10;
59:7,8;61:10,13;
81:18;84:17;89:14;
92:11;93:8;94:13,18,
22;96:5,25;98:21,22;
99:18;106:6,15,22;
107:3,18,22,24;
109:9;110:16;
113:22;115:3;129:2,
3;134:8;151:7;
156:24,25;165:25;
171:1;172:3,12;
176:6,13,17,19;
177:19;178:1,3;
182:11;187:11;
196:11;201:23;
202:1,5,16;206:5;
211:19;212:7;214:6,
9
**BACKWARD (2)**
95:3;205:8
**BACKWARDS (1)**
202:10
**BAD (5)**
32:6;57:25;
117:20;120:8;200:6
**BAG (4)**
40:6,6,7;173:20
**BALING (1)**
155:11
**BAND (1)**
21:11
**BANK (5)**
83:23;163:5,10,13;
167:5
**BANKS (4)**
168:12;169:13,16,
21
**BAR (61)**
17:12,12;18:6;
21:10;22:7,11;23:2;
25:24;26:7;28:18,24;
29:6,10;36:12;37:8,
10;42:13,24;44:8,13,
17;53:9,13;56:15;
59:9;60:2;61:19;
63:12,15;77:19;
86:25;88:5;89:9,18,
19,21;90:8;97:9;
98:25;99:2;100:8;
101:15;103:22;

104:9,19;105:5,19,
21;107:9,10;121:23;
122:4;170:16;
177:19;178:2,4,4,8;
191:11;195:8;205:13
**BARS (1)**
98:19
**BARTENDER (6)**
87:1,18,23;88:15;
94:9;100:11
**BASED (11)**
47:4;51:12;59:10,
17;76:9;80:5;95:1;
160:3;194:23;200:8;
210:17
**BASH (2)**
188:15,16
**BASICALLY (4)**
9:13;19:3;120:14;
149:6
**BASKETBALL (1)**
122:11
**BATHROOM (1)**
37:11
**BATTERIES (1)**
65:15
**BEAR (1)**
181:17
**BEARD (3)**
154:24,25;155:13
**BECOME (1)**
67:16
**BEGIN (1)**
167:14
**BEGINNING (4)**
18:23;61:9;151:6;
190:9
**BEHALF (1)**
69:10
**BEHIND (25)**
21:7,8;35:2,4,10;
37:10;90:1,3;96:5,
25;123:5,9;154:12;
156:18;157:18;
158:18;163:2,11;
166:18,21;169:12,
22;202:16;210:20,21
**BELOW (3)**
115:9,10,24
**BENT (1)**
39:16
**BESIDES (7)**
17:6;62:20;97:19;
123:20;139:20;
168:20,20
**BEST (3)**
99:20,22;186:16
**BETTER (3)**
58:2;206:9;207:12
**BEVERAGES (4)**
18:7,12;53:23;
205:18
**BIG (12)**

Case 1:15-cv-20807-JEM   Document 44-1   Entered on FLSD Docket 11/02/2015   Page 61 of 77
Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

14:15;19:5;41:16;
43:14;49:6;72:15;
102:10,12;120:12;
142:8;179:7;191:9
**BIGGER (1)**
75:9
**BIGGEST (1)**
121:25
**BILL (1)**
150:10
**BIRTH (1)**
8:2
**BIT (6)**
9:20;30:15;58:2;
166:23;211:23;
212:17
**BITTY (1)**
102:11
**BJORG (1)**
7:2
**BLACK (9)**
87:20;111:13;
112:18;169:8;172:9;
174:12;180:10,12,14
**BLESS (1)**
173:13
**BLESS! (1)**
173:11
**BLUE (13)**
65:25;68:4;72:19;
95:16;111:19;
173:24;174:23,25;
175:2,4,4,5;180:11
**BLUER (1)**
72:20
**BOARD (8)**
55:2;117:10;
184:21;185:5,8,20;
188:1,10
**BODY (4)**
35:25;39:16;97:2;
201:17
**BOOKING (1)**
9:12
**BOOTH (1)**
51:3
**BOSSIER (1)**
6:16
**BOTH (6)**
9:1,17;67:20;
71:25;132:16;135:4
**BOTTLE (4)**
57:17;132:7;
181:9,10
**BOTTOM (13)**
19:6;90:17,19;
113:21,25;114:19,
24;115:9,10,24;
136:14;138:19;206:4
**BOUGHT (1)**
101:14
**BOURGEOISES (1)**
14:13

**BOX (1)**
179:10
**BOY (1)**
170:21
**BOYFRIEND (1)**
151:19
**BOYS (1)**
123:3
**BREAD (1)**
120:16
**BREAK (12)**
11:4,6;38:17;47:6;
48:17;52:14,15;
60:22;106:3,5,10;
214:1
**BRIBE (1)**
70:7
**BRIGHT (2)**
72:18;74:15
**BRING (3)**
40:4,8;165:24
**BRITISH (1)**
129:24
**BROKEN (2)**
164:5;203:23
**BROTHER (3)**
37:5;170:5;171:18
**BROTHER'S (1)**
37:12
**BROUGHT (2)**
117:23;174:20
**BROWN (1)**
164:11
**BRUNETTE (3)**
162:19;166:11;
167:1
**BUBBLES (1)**
18:17
**BUCKET (7)**
179:7;180:21;
182:15,20,21;183:1,
15
**BURN (1)**
17:7
**BUSINESS (1)**
111:12
**BUSINESSES (1)**
125:13
**BUSY (2)**
59:25;60:3
**BUTT (4)**
34:3;94:19,23;
114:1
**BUYING (1)**
104:15

**C**

**CAB- (1)**
119:14
**CABIN (15)**
14:6;118:8;
119:15,22;120:2;

127:18,25;136:14,
16,19,21;143:17;
147:15,16,18
**CABINET (1)**
136:21
**CABINS (1)**
60:16
**CALL (49)**
37:5,11;38:11;
57:10;58:5;64:11;
108:21,21;123:24;
125:1,3,7;126:11;
127:24;128:4,22,24;
129:2;130:24;131:9,
12;132:6;134:25;
137:4;138:10,11;
139:15,17;140:4,5;
141:20;142:13,23;
144:17;145:7;146:1,
2,3;148:15;149:3,5;
170:4,13;172:1;
183:19,22;197:24;
211:19;212:7
**CALLED (18)**
48:6;56:25;
112:12,13;129:3,20;
130:19;131:21;
137:9;138:21;139:4;
170:18;174:19;
189:11;195:5,14;
196:10,11
**CALLING (2)**
147:13;170:20
**CALLS (9)**
99:13;125:15,16;
128:16,17,20;136:9;
144:7;183:19
**CAME (32)**
35:4,5;40:1,2,17;
56:1;60:12;96:5,17;
97:11;109:15;115:3;
119:16;123:4;152:3,
4;156:8;158:15;
162:19;166:11,13;
168:19;173:19;
175:24,24;176:6,13,
17,19;202:1;210:24;
211:19
**CAMERA (3)**
29:17,19;217:24
**CAN (88)**
8:22;9:20;10:15,
23;11:6;12:2;16:24;
17:4,10;18:15;20:25;
22:7;27:25;30:3,4;
31:4;32:24;33:3,19;
34:1;36:25;39:14;
43:9;45:13;47:11;
56:22;60:22;68:2,4;
72:12,13;73:18,23;
75:12;77:8;79:1,1;
80:23;81:6;83:2,2,9,
11;87:17;90:8,11;

91:15;92:3,24;95:11,
17;110:5;113:19;
127:1;136:10;
139:13;145:25;
146:25;147:11;
153:2;154:7;155:6;
156:3;162:12;164:8;
166:19;173:21;
174:2,2;179:2;181:7,
17;191:15,22;
194:25;199:15;
201:8;207:4;208:10;
213:25;218:18,21;
219:21,22;220:4,13,
17;222:6
**CAPRI (1)**
114:4
**CAPTAIN'S (4)**
60:4;97:19,22,25
**CAR (1)**
105:25
**CARD (1)**
71:11
**CARGO (4)**
164:25;165:12,24;
166:4
**CARNIVAL (91)**
6:11,24;12:20;
14:19,23;15:4,10,16,
20,23;19:16;21:3;
24:23;27:15;45:22,
22;47:22;55:2;
57:24;58:16;70:4,12,
22;72:5,15,16;74:12;
76:10;87:14;89:18;
111:9,10;119:25;
123:14,24;125:11,
15,24;126:7,22;
127:22;130:3,17;
132:17,18,19;
133:19;134:3,24;
137:9,16;139:3;
140:12;159:9;
168:21,22,25;172:8,
14;173:1;174:22,24;
177:2;178:16;
180:19,22;184:20;
185:1,4,21;186:2,3;
187:18,23;188:10;
190:11,18,19;
197:12,14;206:9;
207:10,18,20,24;
208:3,11,17;209:24;
213:6,18
**CARNIVAL'S (4)**
12:6;56:25;194:1;
196:4
**CARPET (9)**
23:21;26:24;27:2,
9;41:19;44:6;63:20;
81:23;110:16
**CARPETED (2)**
27:7;81:25

**CARRYING (1)**
173:20
**CART (1)**
183:1
**CASE (4)**
6:11;7:4;189:12;
190:5
**CASES (1)**
66:4
**CASINO (86)**
16:4,15,18,19,22;
17:9,14,19;18:6;
19:3;20:4,8,12,19;
21:2,2;22:7;23:7,11;
25:4,7,12;26:3,12,
20;27:14;28:16;
30:20;36:14;38:15,
16;42:18,24;45:3,23;
46:8;49:12;50:14,18;
51:5;52:23;53:4;
60:1,16;72:6;76:15,
19;77:1,7,18;79:25;
80:13;84:22;85:8;
89:17;94:1,7;97:11,
14;99:10;111:4,15,
17;112:5,15,17;
122:7,10;151:15;
152:6;153:22;
168:11;169:5,15,20;
178:9;181:12;
183:14,15;190:9,13;
192:13;193:2;
210:14;217:16;221:9
**CASINOS (1)**
21:5
**CATCH (2)**
142:8;158:1
**CATCHES (1)**
199:21
**CAUGHT (1)**
155:2
**CAUSE (15)**
29:11;52:16;91:7;
99:17;105:16;119:6;
134:22;152:5;
170:17;171:23;
178:6;182:16;
191:17;193:2;197:10
**CAUSED (1)**
110:19
**CAUSING (2)**
145:20;147:21
**CELEBRATE (1)**
103:23
**CENTER (2)**
51:3;98:21
**CERTAIN (3)**
74:1;135:6;146:24
**CERTAINLY (1)**
133:4
**CERTAINTY (3)**
218:19,22;220:18
**CERTIFIED (1)**

6:3
**CHAIRS (1)**
191:10
**CHAMPAGNE (2)**
57:17;132:8
**CHANCE (10)**
13:5,10;24:22;
34:24;41:9;62:14;
63:5;65:19;196:3;
210:25
**CHANGE (4)**
150:22;155:21;
212:13;215:1
**CHANGED (4)**
44:5;63:17;156:4;
212:9
**CHANGES (1)**
145:14
**CHARACTERISTICS (1)**
74:6
**CHARGE (1)**
103:18
**CHARLES (1)**
6:9
**CHARLEY (1)**
136:25
**CHEAPEST (1)**
52:17
**CHILD (2)**
66:24;146:3
**CHILDREN (6)**
48:15,23;49:10;
50:13,18;52:1
**CHRISTMAS (1)**
91:8
**CIGARETTE (6)**
53:20;84:24;
100:12;107:14;
177:21;192:25
**CIGARETTES (2)**
85:1,2
**CIRCLE (7)**
32:24;78:14,14;
80:24;81:9;83:3;
153:6
**CIRCLED (1)**
83:7
**CIRCLES (1)**
83:10
**CIRCLING (1)**
83:4
**CIRCULAR (1)**
109:24
**CIVIL (2)**
10:10,12
**CLAIMED (1)**
136:19
**CLAIMS (6)**
136:13,17,22,25;
137:2,8
**CLARIFICATION (1)**
64:23
**CLARIFY (2)**

191:23;215:20
**CLARIFYING (1)**
191:21
**CLAW (1)**
19:3
**CLEAN (11)**
23:24;44:13;
136:21;177:3;
178:12,16,21,21;
179:1;182:15;198:1
**CLEANED (10)**
59:6;127:25;
136:23;143:15,18,
24;145:1;147:18;
176:9;178:5
**CLEANING (2)**
183:8,11
**CLEAR (4)**
73:18;95:2;
138:10;162:13
**CLEARER (1)**
211:24
**CLEARLY (3)**
95:2;138:4;147:9
**CLIENT (1)**
70:3
**CLOSE (2)**
29:20;75:8
**CLOSED (1)**
98:23
**CLOSED-TOE (1)**
95:22
**CLOSER (1)**
74:8
**CLOSEST (1)**
80:18
**CLOTHING (5)**
113:20;115:10,25;
166:20;205:21
**CLUB (10)**
98:20,23,24;101:6,
9;102:5,8;104:8;
105:2,4
**COCA-COLA (2)**
100:16;164:14
**COCK (1)**
35:19
**COCKED (2)**
35:19,22;96:20;
201:23
**COFFEE (1)**
102:19
**COKE (4)**
100:15;107:14,14;
177:21
**COLLEGE (2)**
9:25;48:24
**COLOR (18)**
24:2;46:3,13,13,
23,25;74:20,23;
155:14;217:4;218:7,
25;219:8;220:7,19;
221:8,11,18

**COLORED (1)**
87:20
**COLORS (1)**
111:9
**COMEDY (12)**
98:21,23;101:6,9,
10,20,22;102:5,8;
104:8,11;105:4
**COMFORTABLE (1)**
11:10
**COMING (13)**
10:6;21:22,23,25;
33:14;51:15;60:13;
73:16;98:8;111:3;
169:15;179:1;222:17
**COMMENT (1)**
154:18
**COMMENTS (1)**
222:6
**COMMON (3)**
26:16;27:14,17
**COMMUNICATE (1)**
41:5
**COMMUNICATED (2)**
209:20,24
**COMMUNICATION (1)**
210:9
**COMMUNITY (1)**
9:24
**COMPANION (13)**
154:15;156:12;
159:6;160:25;
161:18,22;162:3,15;
172:24;178:19;
204:3;210:13,19
**COMPANIONS (1)**
159:25
**COMPANY (2)**
125:20;207:13
**COMPARED (6)**
20:18;32:9;33:7;
47:15;48:21;204:14
**COMPLAIN (1)**
206:14
**COMPLAINED (1)**
206:8
**COMPLAINING (6)**
34:21;117:22;
123:10;146:16;
147:8;174:18
**COMPLAINT (6)**
116:13,18;118:4,6;
120:17;138:19
**COMPLAINTS (12)**
120:5;121:7;
123:13;131:20;
132:2;135:7,7;138:8;
145:15;146:15;
206:7;207:9
**COMPLECTED (1)**
112:23
**COMPLETED (1)**
11:18

**COMPLETELY (1)**
77:1
**CONCERNING (1)**
73:25
**CONCLUDED (1)**
223:6
**CONCLUDES (2)**
221:25;222:24
**CONCLUSION (1)**
160:14
**CONDITION (1)**
220:19
**CONDITIONS (6)**
199:9;200:10;
217:16;218:16;
219:13;220:17
**CONDONE (1)**
65:6
**CONES (2)**
44:10,22
**CONFIDENT (1)**
189:1
**CONFIRMED (1)**
136:15
**CONFUSING (1)**
64:21
**CONQUEST (2)**
15:6,7
**CONSIDER (2)**
19:2;100:4
**CONTACTED (2)**
55:1,10
**CONTINUE (1)**
155:22
**CONTINUED (1)**
136:17
**CONTROL (2)**
131:13;208:17
**CONVERSATION (17)**
57:3,14;58:13,15,
23;97:10;128:9;
130:2,16;140:1;
142:5;156:9;195:18;
196:5,8;209:1,10
**CONVERSATIONS (1)**
69:5
**COPPER (4)**
46:25;74:19,23;
221:14
**COPY (2)**
77:9;150:13
**CORPORATION (2)**
6:11,25
**CORRECTIONS (1)**
9:5
**CORRECTLY (2)**
192:11;205:12
**CORRESPONDENCE (2)**
69:9,14
**COSTA (2)**
13:3,4
**COUCH (3)**
92:10,12,17

**COUGHING (1)**
122:22
**COULDA' (3)**
112:5;170:23;
181:8
**COUNSEL (5)**
6:19;11:23;69:6,9;
141:3
**COUNTING (1)**
60:12;97:12
**COUNTRY (2)**
155:3,3
**COUPLE (9)**
17:16;69:7;82:3;
104:3;115:23;
117:19;128:1;167:9,
10
**COURSE (3)**
101:17,19;103:18
**COURT (6)**
6:3,13,15;7:6;
10:15;11:15
**COURTEOUS (1)**
175:11
**COURTROOM (4)**
66:17;67:4,6,14
**COUSIN (2)**
121:25;122:2
**COVERED (2)**
109:15;110:5
**COZUMEL (1)**
13:4
**CRAZY (1)**
48:25
**CREATE (1)**
10:17
**CREW (2)**
159:9,15
**CRIMES (2)**
65:16,17
**CRIMINAL (5)**
9:1;10:1;65:12;
66:20;67:16
**CRIMINALS (1)**
9:15
**CRISS- (1)**
166:7
**CRITICIZES (1)**
185:13
**CROSS (2)**
166:8;207:4
**CROSS- (1)**
207:2
**CROUCH (4)**
41:5;43:24;44:22;
212:1
**CROUCHED (4)**
41:7;54:17;62:13;
211:14
**CROWD (1)**
60:4
**CRUISE (67)**
12:19,23;13:1,6,

10,14,23;14:19;15:4,
9,25;16:13;18:4,19;
24:24;47:5,9,15,21,
25;48:15,21,22;51:7,
13;52:11,19;55:4,7;
56:19;59:2;70:18,20,
21;71:1,10,10;88:16;
97:15;116:5;120:6;
121:2,7;122:25;
123:19;126:13;
128:18;130:3,19;
132:8;133:21;134:1;
139:5;143:18,25;
147:19;149:23,23;
184:15,19;187:18;
191:8;193:21;
207:18,23,25;212:25

**CRUISED (3)**
15:19;48:16;
207:17

**CRUISERS (2)**
150:5,7

**CRUISES (19)**
14:19,25;15:3,5;
47:16,20;48:8,17,18,
21;52:11,17;71:7;
207:14,21,24;208:3;
212:24;213:18

**CRUISING (6)**
57:24;132:17,18;
145:20;185:13;
213:12

**CUP (2)**
102:15,18

**CURRENTLY (2)**
6:12;9:24

**CUSTODY (1)**
66:24

**CUSTOMER (13)**
56:25;58:15;
129:5;130:17;
131:22;184:3,18;
198:3;209:1,10,20,
24;210:4

**CUSTOMERS (1)**
70:12

**CUT (2)**
121:12;189:22

**CYLINDER (9)**
30:25;31:5,9,10,
19,24;32:10,14;
78:18

**D**

**DAD (4)**
37:17,18;171:19,
20

**DALISE (14)**
6:1,7;7:18;8:16;
19:19;22:21;45:16;
75:25;79:18;88:24;
135:19;141:6;
147:13;148:1

**DARK (1)**
112:22

**DARKER (2)**
74:13;221:11

**DATE (4)**
8:2;138:12,17;
141:22

**DATED (1)**
138:15

**DATES (1)**
138:15

**DAY (49)**
10:18;13:10,13,22,
22;17:23,25;28:1;
36:15;50:21;51:7,13;
52:4;53:24;56:24;
58:25;61:16;71:10;
72:9,18;74:16;91:8;
97:17;99:1,17;
100:24;101:2,12;
116:15,25;117:2;
119:8,20;121:1;
128:23;135:1;139:4;
140:13;151:16;
152:20;154:25;
183:20,23,23;
184:13,18,19;200:9;
205:13

**DAY- (1)**
150:3

**DAYS (7)**
12:22;97:18;
117:5,19;128:1;
143:15,24

**DAYTIME (6)**
72:20;73:1,3,10,
11;219:25

**DEALT (1)**
9:15

**DECEMBER (1)**
91:8

**DECENT (1)**
113:9

**DECISION (1)**
11:2

**DECK (15)**
16:3,7;17:6;19:16;
20:7;51:4;52:7,8;
76:12,20;80:6;
121:17;122:11;
123:2,7

**DEFEND (1)**
67:25

**DEFENDANT (2)**
6:24;66:3

**DEFENDER (1)**
68:3

**DEFENSE (44)**
67:20,23;75:3,14;
76:1,4;79:16,19;
80:23;81:13;82:4;
88:22,25;89:5;

135:17,20;136:3;
137:7;138:7,14;
140:9;141:4,7;142:1;
147:24;148:2;
150:14;152:17;
163:12;192:16;
193:7;194:3;208:9,
23,25;209:11,19,22;
210:2,7;216:6,17,21;
221:16

**DEFENSE'S (1)**
134:12

**DEGREE (1)**
10:2

**DELGADO (1)**
9:24

**DEMONSTRATED (1)**
96:19

**DEPARTMENT (1)**
38:3

**DEPENDING (1)**
60:18

**DEPICT (5)**
26:3;52:23;53:3;
89:8;220:7

**DEPICTED (17)**
26:8;27:1;73:22;
77:18;80:2,15,17;
81:15;82:15;83:24;
89:22;192:16;195:1;
199:9;200:14;217:8;
219:9

**DEPICTION (1)**
218:25

**DEPICTS (2)**
76:6;220:18

**DEPOSED (1)**
65:24

**DEPOSITION (19)**
6:7;8:16,20;10:10,
25;11:11;19:19;
22:21;45:16;66:2;
75:25;79:18;88:24;
135:19;141:6;148:1;
222:1;225;223:6

**DEPOSITIONS (2)**
65:9;66:12

**DESCRIBE (29)**
20:25;23:10,23;
34:1;36:13;42:9;
46:23;47:9;74:22;
87:17;94:19;95:11;
113:19;116:5;
146:24;148:19,24;
152:18;154:8;156:4,
13;162:12;164:8;
166:19;173:21;
179:3;190:21;
201:20;221:13

**DESCRIBED (5)**
24:5;94:17;
176:25;190:18,23

**DESCRIBING (1)**

24:1

**DESCRIPTION (1)**
139:2

**DESIGNATED (1)**
17:19

**DESK (3)**
118:7;119:23;
123:11

**DETAIL (2)**
95:12;173:22

**DETAILS (1)**
33:20

**DETERMINE (1)**
78:10

**DIAGONAL (5)**
30:2;156:22;
157:22;158:17;205:6

**DIAGRAM (12)**
20:10;76:17;77:3,
13,17;78:9,11,22;
79:3;152:13;153:5,9

**DIAMOND (1)**
71:13

**DIFFERENCE (2)**
46:3;218:6

**DIFFERENCES (1)**
74:6

**DIFFERENT (15)**
45:20;46:7;47:15;
48:7,20;62:10;
115:21,23;144:5,12;
157:14;189:14;
211:16;217:5;219:9

**DIFFERENTIATES (1)**
95:19

**DIFFERENTLY (3)**
11:23;22:6;59:17

**DIFFICULT (1)**
26:14

**DIM (2)**
72:17;74:13

**DINING (8)**
25:9;49:9;51:1,11;
52:5;120:11;122:23;
147:19

**DINNER (10)**
54:1,4,7;60:5;
74:17;97:19,22,25;
107:19;108:1

**DIRECT (4)**
11:24;12:5,9;
207:3

**DIRECTED (1)**
185:24

**DIRECTION (1)**
94:4

**DIRECTLY (1)**
92:13

**DIRT (1)**
42:6

**DISCO (3)**
98:20,24,24

**DISCUSSED (1)**

183:18

**DISCUSSION (2)**
171:14;187:8

**DISEMBARKED (1)**
14:1

**DISTRICT (2)**
6:13,13

**DIVISION (1)**
6:14

**DIVORCE (1)**
66:22

**DOCKED (2)**
57:8;129:1

**DOCTOR (22)**
39:12;96:10;
162:17;163:4,14;
164:3;166:24,25;
167:6;168:20;
173:22,23;174:8;
175:10,23,23;176:2,
3;180:21;203:21;
210:22,23

**DOCUMENT (4)**
136:11;137:15,16;
138:13

**DOCUMENTS (2)**
128:25;149:22

**DOLLAR (3)**
19:8,9,10

**DONE (7)**
12:5,8;123:1;
141:11;148:8;156:8;
213:25

**DOOR (1)**
136:24

**DOTIS (1)**
14:14

**DOUBT (1)**
10:25

**DOWN (53)**
10:16;11:16;
29:14;30:16;34:3;
35:5,5;37:18;39:2,4,
16;41:5,7;42:24;
43:24;44:22;49:7,12;
54:17;61:18;62:14;
86:11,25;94:18,22;
96:6,18;102:20;
114:4,12;137:3;
138:1,24,25;140:3,9;
145:18;146:17;
169:15;174:20;
192:20,23,24;198:4;
199:24;202:1;
205:22;208:18;
209:2,11;211:14;
212:1;222:7

**DRANK (1)**
100:23

**DRAW (6)**
79:2;92:4;96:9;
110:5;152:17;153:6

**DREAM (27)**

12:20;14:20,24;
15:5,10,17,20,23;
16:1;19:16;21:3;
27:15;45:22;72:5;
76:10;89:18;184:21;
185:5,8,9,21;186:3;
187:23;188:10;
190:18;207:23,25
**DRESSED (2)**
107:18;108:1
**DRINK (12)**
11:8;18:9,11,15;
100:12;101:2,13,14;
102:3,7;150:10;
196:17
**DRINKER (1)**
104:5
**DRINKING (4)**
100:13;121:21;
122:1;205:10
**DRINKS (4)**
101:5;103:22;
104:15;120:15
**DRINKS! (1)**
101:18
**DROPPED (7)**
137:4;138:11,11;
139:15,17;140:5;
181:9
**DUFFLE (1)**
40:7
**DULY (1)**
6:2
**DURING (38)**
11:24;12:10;
16:13;18:19;21:12,
13;24:23;38:23;
44:8;47:5;48:17;
51:13;55:4;56:19;
57:2,13;58:13,14,22;
60:1,7;72:17;73:3;
74:15;91:20;101:10;
127:24;128:4,8;
130:1,23;143:18;
147:19;171:3;
176:24;178:11;
193:21;219:25
**DWELLED (1)**
133:18

## E

**EARLIER (4)**
54:6,8;105:2;
183:18
**EARLY (1)**
71:4
**EASIER (2)**
92:5;129:14
**EASTERN (2)**
118:18;119:1
**EASY (1)**
17:7

**EDUCATION (2)**
9:20,21
**EIGHT (1)**
110:4
**EIGHT- (1)**
122:15
**EIGHTEEN (5)**
122:3,16;123:4;
180:6,7
**EIKELAND (221)**
7:1,2,15;8:11,19;
19:14,22;20:2,16;
22:15,24;24:19;
28:23;29:4;30:3,13;
32:4,7;33:19;34:9,
17;35:11;38:9;44:7;
45:11,19;46:22;
48:14;50:3,11;51:6,
19;52:2;53:8;54:23;
58:21;59:16,25;
60:21,25;61:12;62:9,
21;63:13,22;64:10;
65:4;67:8;68:17,25;
69:22;70:10,15;73:5;
75:4,11,16,20;76:21;
78:16;79:6;82:10,17;
83:17;84:11;85:10,
17,22;86:8,14,20;
87:24;88:8;89:2;
91:2,24;95:5;96:14;
97:4;98:4,15;99:5,
12,23;103:1,12;
105:12;106:4;
109:25;111:6,25;
113:1;114:5,13,21;
115:15;116:2;
117:11;118:21;
121:11;126:15;
127:3,11;130:8,12;
131:1,14;133:7,13;
134:18;135:9;136:5;
137:12;139:6;
140:14,20;141:17;
143:21;144:2,6,13;
145:4,8;146:18;
147:1;148:4,25;
149:17;152:9,14;
153:13,17;154:3;
155:24;156:15,19;
157:3,9,19;158:5,21;
159:3,11;161:6,10;
162:6;165:1,5,14,18;
167:18,25;168:8;
171:6;175:13,17;
177:5;181:4,22;
184:23;188:23;
189:4;190:1,14,25;
191:3;192:4,6,9;
193:16;194:10,22;
196:25;198:25;
199:15;200:3;201:2,
8;202:11;203:4,18;
204:6,13,23;205:9;

206:13,21,25;207:8;
208:16,22;209:6,17;
211:10,25;213:16,
24;214:8,21;215:6,
14,16,21,23;216:25;
217:9,13,18;218:2,9;
219:2,15;220:9,21;
221:3,6,21;222:2,11,
15,21
**EITHER (7)**
69:9;92:14;
118:18;125:15;
145:23;161:19;
194:25
**ELATION (1)**
15:7
**ELBOW (7)**
34:22;35:19,23;
39:18;96:12,18;
201:23
**ELBOWS (2)**
96:20;113:22
**ELEVATORS (6)**
20:11,17;25:15;
29:13;89:14;152:4
**ELSE (21)**
24:12;37:25;
50:20;51:8;74:2;
77:18;111:18;
139:21;140:9;
150:10;168:14;
172:5;175:22,25;
177:3;178:6;186:22;
187:1,19,22;191:22
**ELSE'S (1)**
186:21
**EM (18)**
48:6;51:4;53:21;
57:3,4,9,15;58:6;
78:5;95:16;101:23;
121:20;132:16,21;
146:3;156:6;171:21;
215:22
**E-MAIL (2)**
69:20;148:13
**E-MAILS (1)**
185:1
**EMERGE (1)**
169:11
**EMERGED (4)**
167:6;169:12,16,
20
**EMPLOYEE (10)**
112:15;119:25;
134:24;139:3;
168:21,23,25;172:8;
173:2;208:18
**EMPLOYEES (1)**
87:14
**ENCOUNTERED (2)**
91:22;126:22
**END (5)**
10:18,24;117:16;

151:1;222:6
**ENDED (2)**
13:14;123:21
**ENDLESS (1)**
18:17
**ENDS (1)**
109:5
**ENGAGED (3)**
91:6,7,7
**ENGLISH (2)**
129:22,22
**ENHANCE (1)**
86:18
**ENJOY (1)**
134:5
**ENJOYED (5)**
57:23;88:5,7;
132:17;134:1
**ENOUGH (4)**
150:20;163:23,25;
181:23
**ENROLLED (1)**
9:24
**ENTERED (1)**
99:9
**ENTERTAINMENT (3)**
21:13;175:7,7
**ENTIRE (3)**
26:20;89:18;
136:18
**ENTRANCE (4)**
21:21;42:19;
77:12;99:10
**ERRORS (1)**
10:22
**ESPECIALLY (1)**
105:17
**ESSENTIALLY (2)**
126:11;137:22
**ESTABLISH (1)**
183:5
**ESTABLISHED (1)**
182:17
**ESTIMATE (5)**
30:4;97:11;98:10,
14;99:20
**EVALUATES (1)**
185:12
**EVEN (7)**
48:24;133:1;
163:2;171:23;
179:24;196:18;217:3
**EVENTUALLY (5)**
67:22;86:5,25;
111:21;178:9
**EVERYBODY (4)**
9:13;28:7;111:18;
199:11
**EVERYWHERE (3)**
47:19;49:13;
122:20
**EXACT (6)**
129:4;132:1;

190:13;216:23;
217:4;218:15
**EXACTLY (13)**
33:21;34:10,19;
64:15;71:12;96:18;
107:16;139:21;
156:23;185:25,25;
214:11;215:8
**EXAGGERATED (1)**
145:7
**EXAMINATION (10)**
7:15;11:24;12:6,9;
64:4;192:9;207:3,4;
216:8;221:6
**EXAMINED (1)**
6:4
**EXAMPLE (4)**
77:1,11;127:17;
129:23
**EXCEPT (3)**
136:20;138:10;
146:23
**EXCITING (1)**
104:24
**EXCURSION (1)**
150:8
**EXCUSE (9)**
27:16;36:21;
49:17;58:10;69:12;
152:10,15;169:19;
214:17
**EXHIBIT (120)**
8:13,17;19:17,20;
22:17,22;23:3;24:2;
25:18;26:2;27:1;
29:16;31:2,14;45:13,
17;46:1,2,3,14,14,18,
24;52:22;53:3;71:24,
24;72:23,25;73:15,
22;74:8,10,21,22,24;
75:3,14;76:1,4;78:8,
9;79:9,16,19;80:20,
23;81:12,13;82:4;
88:22,25;89:5;90:17,
18;110:8;112:7,7;
135:17,20;136:3;
137:7;138:7,14;
140:9;141:4,7;142:2;
143:6,9,10,14,16;
145:15,16;146:17;
147:9,10,11,12,24;
148:2;150:14;
152:17;153:14,16;
163:9,12;192:16;
193:7;194:3;195:2;
199:2,10;200:15;
208:9,23,23,25;
209:6,9,11,11,19,23;
210:3,8;216:10,12,
20,21;217:8;218:20,
20,23,24;219:7,10,
14;221:16
**EXHIBITS (3)**

71:19,21;216:2
**EXIT (1)**
117:25
**EXPECT (2)**
58:8,11
**EXPERIENCE (19)**
57:25;76:9;80:5;
116:14;117:10;
133:24,25;185:4,7,
13,20;187:22;
188:10;194:4,11,13,
23;212:23;213:12
**EXPLAIN (3)**
39:14;47:11;
139:13
**EXPLAINED (1)**
210:18
**EXPLODED (1)**
61:4
**EXPRESSING (1)**
116:10
**EXTEND (2)**
114:4,12
**EXTENT (1)**
96:10
**EYE (2)**
155:2;199:21
**EYES (1)**
153:22

**F**

**FACE (2)**
17:11;115:2
**FACEBOOK (15)**
185:17,18,21;
186:12,18,20,21;
187:4,13,17;188:11,
16;212:19,24;213:17
**FACILITY (3)**
9:16;112:7;152:24
**FACING (10)**
30:9;33:9,11;
115:2;157:25;158:3,
25;163:21;192:21;
204:8
**FACT (4)**
57:5,23;88:3;
121:19
**FACTUALLY (1)**
143:20
**FAIR (20)**
17:18;76:10;88:7;
94:19;108:2,5;
116:10;126:13;
127:2,8;133:9;137:9;
138:23;139:1;
140:10;150:20;
163:23,25;181:1;
206:8
**FAIRLY (2)**
76:17;220:6
**FALL (39)**

30:6;33:23;34:2,6,
10,15;36:5,9,18;
40:20;42:17,25;
52:25;53:4;56:13;
57:4;59:3;78:11,15;
84:5;94:17,24;96:13;
139:24;163:18;
168:23;202:23;
204:15,24;205:14;
214:10,12;215:9,15;
218:16;219:1;220:8,
20;221:10
**FALLEN (12)**
40:24;41:1;43:21;
44:21;54:18;55:15;
56:2;96:21;112:11;
171:17;201:18;
211:11
**FALLING (19)**
28:6;29:22;30:24;
32:9;33:13,22;34:25;
50:13;56:5,11;61:23;
62:16;63:16;74:18;
91:23;123:6;201:10;
210:5,10
**FALLS (3)**
42:19;43:23;212:1
**FAMILIAR (3)**
15:24;22:25;24:20
**FAMILIES (1)**
52:18
**FAMILY (3)**
14:12,13;172:17
**FAR (10)**
30:5,22,23;32:13;
67:18;82:8;108:15;
114:12;169:2;178:22
**FARM (1)**
155:6
**FARMER (1)**
155:10
**FAST (3)**
201:9,12;215:8
**FASTER (1)**
60:15
**FATHER (4)**
14:12;94:6;197:9,
10
**FEEL (4)**
11:21;59:10,19;
188:25
**FEET (15)**
30:7;34:3,4;39:21,
24;80:25;82:21,21;
94:18,22;158:18,19,
24;174:17;200:5
**FELL (51)**
31:24;32:20;
36:15;40:16;42:12;
50:17;51:20;62:4;
63:3,3,6,18;80:25;
81:1,1,2;82:9;94:20,
24;95:2;96:23;

108:13;113:20;
152:2;153:23;
156:11;157:15,18;
158:16;159:23;
161:2,22;167:11;
168:18;169:25;
170:8;194:15;201:3,
12,14;202:4,19;
203:7;204:9;205:7,8;
210:19;211:3,15;
214:12,25
**FEMALE (7)**
9:17;125:18;
129:11;168:6;
173:17;179:20;184:9
**FEW (6)**
60:10;98:12;
134:21;158:18,18,24
**FIANCE' (4)**
29:11;90:25;93:4;
151:19
**FIFTEEN (6)**
38:21,23;39:3;
141:25;173:3;176:18
**FIFTEEN-MINUTE (1)**
176:24
**FIFTH (2)**
16:5;145:25
**FIFTY (1)**
98:14
**FIGHTING (1)**
109:5
**FIGURE (2)**
53:18;180:2
**FILLING (1)**
66:12
**FINALLY (3)**
117:23;118:3;
171:13
**FIND (4)**
48:3;86:2;121:22;
222:7
**FINE (3)**
118:20;144:22;
150:24
**FINGER (1)**
210:23
**FINISH (9)**
11:14;12:2,11;
51:22;67:17;107:13,
14;121:15;189:23
**FINISHED (3)**
12:4;107:23,25
**FIRM (4)**
6:23;7:3;69:10,22
**FIRST (47)**
6:2;8:23;9:25;
14:8;21:4,16;27:25;
29:14;30:17,18,25;
34:3;35:24;36:1;
40:6;58:25;91:10;
94:13,18,22;116:13,
15;117:17;119:8;

127:24;128:4,8,23;
129:18;130:1,14,16;
134:25;138:21;
139:4;141:2;143:20;
152:19,21;153:22;
155:17;158:13;
168:21,25;169:4,24;
208:24
**FIVE (11)**
82:21;109:24;
120:13;170:17;
171:3;176:22;
177:13,24,25;
178:10,11
**FIX (4)**
126:19,23;207:10,
11
**FIXED (1)**
132:20
**FIXING (1)**
117:16
**FLAT (1)**
201:22
**FLIGHT (1)**
71:4
**FLIP-FLOPS (2)**
166:5,6
**FLOOR (46)**
14:8;25:25;29:14;
35:24;36:1;39:4;
41:2,10,15;54:17;
57:6;59:4;61:16;
74:19;79:25;85:4,15,
21;86:2;87:11;
93:17;97:2;108:10;
115:6;117:20;
136:14;176:8;177:4;
178:13,17;195:19;
196:9,13;197:2,7,18;
199:3,7,18,20;
201:17;203:19;
210:4,9;212:3,14
**FLOORING (4)**
23:11;26:22;76:8;
200:11
**FLOORS (1)**
128:10
**FLORIDA (1)**
6:13
**FOCUS (1)**
211:11
**FOCUSSED (1)**
100:9
**FOLLOWS (1)**
6:4
**FOLLOW-UP (3)**
63:25;183:22;
221:4
**FOLLOW-UPS (1)**
192:8
**FOOD (1)**
120:15
**FOOT (1)**

157:7
**FOOTING (1)**
36:5
**FOOTPRINTS (1)**
42:6
**FOREVER (3)**
120:14,15,16
**FORGET (2)**
137:2;221:7
**FORM (148)**
20:15;24:18;
28:22;29:3,25;30:12;
32:1;33:18;34:8,13;
35:8;38:6;44:3;
46:21;48:11;50:2,10,
24;51:18,23;53:7;
54:22;58:20;59:13,
22;62:6,18;63:9;
69:1;70:16;73:6;
76:22;82:11,18;
84:12;85:11,18,23;
86:9,15,21;87:25;
88:9;91:25;95:6;
96:15;97:5;98:16;
99:6,13,24;103:2,13;
105:13;110:1;111:7;
112:1;113:2;114:6,
14,22;115:16;116:3;
117:12;118:22;
126:16;127:4,12;
130:9;131:2;133:8,
14;135:10;136:6;
137:13;139:7;
140:15,21;141:18;
144:3,7,14;145:5,9;
146:19;147:2;149:1,
18;154:4;155:25;
156:16,20;157:4,10,
20;158:6,22;159:4,
12;162:7;167:19;
168:1,9;171:7;
175:14,18;177:6;
181:5;184:24;
188:24;189:5;190:2;
194:9,21;196:24;
198:22;199:14;
200:2,17,21;201:7;
202:7;203:3,14;
204:5,12;206:12,22,
24;208:15,21;209:5,
14;211:7,21;213:15,
23;214:14;215:3;
217:1,10,19;218:3,
10;219:3,16;220:10,
22
**FORMAL (2)**
123:13,14
**FORMS (1)**
68:5
**FORTH (1)**
49:8
**FORTIES (1)**
164:13

**FORTY (5)**
42:14,15;93:7;
98:10,11
**FORTY-FIVE (11)**
43:2,5,11;45:4;
48:4;53:15,18;60:8;
61:22;62:2;63:15
**FORUM (1)**
188:11
**FORUMS (1)**
187:4
**FORWARD (4)**
94:24;202:4;
205:8;214:25
**FOUND (1)**
48:1
**FOUNDATION (1)**
79:11
**FOUR (13)**
14:23;30:7;41:23,
24;53:21;82:20,21;
109:19;110:3,10;
117:3,5;171:11
**FOURTH (2)**
170:19,20
**FREE (5)**
11:21;101:18;
104:15,20,25
**FREEZING (1)**
11:9
**FRIEND (1)**
154:16
**FRIENDLY (1)**
136:22
**FRIENDS (2)**
14:13,13
**FRONT (29)**
20:9,20,23;21:25;
25:10;28:15;29:13;
30:2;35:5;49:6;
71:25;77:3;81:20;
84:19;102:15;
105:25;113:23;
118:7;119:23;123:8,
11;154:12;160:16,
19;163:6;169:22;
200:5;205:6;210:20
**FULL (3)**
7:17;102:25;103:4
**FULLY (1)**
39:24
**FURTHER (2)**
212:17;221:23
**FUTURE (1)**
208:3

**G**

**GAMING (1)**
27:11
**GAUTREAUX (27)**
6:1,7;7:18;8:16;
19:19;22:21;45:16;

64:5;71:23;75:25;
79:18;88:24;91:14,
15,16;135:19;141:6;
148:1;151:10,12,13,
14;164:15;182:13;
187:13;188:19;216:9
**G-A-U-T-R-E-A-U-X (1)**
7:21
**GAVE (6)**
57:15;132:23;
135:12;170:5;189:1;
195:16
**GENERAL (5)**
76:11;112:6,15;
152:23,25
**GENERALLY (4)**
11:1;148:19;
198:19;212:23
**GENTLEMAN (26)**
90:6;132:15;
151:17;154:21,23;
160:20;161:21;
162:3,16,25;163:3;
164:2,8,10;166:22;
172:9;173:17;174:9,
21;175:22;178:18;
179:15,20;180:20;
182:14;183:14
**GENUINELY (1)**
175:16
**GERMANY (1)**
87:6
**GETS (2)**
74:14;186:16
**GIFT (1)**
71:2
**GIRL (4)**
87:21;155:3;
162:19;170:21
**GIRLFRIEND (1)**
161:18
**GIVEN (6)**
10:10,20;65:9;
206:16,17;220:14
**GIVING (3)**
66:11;121:23;
122:4
**GLASS (3)**
86:17;102:11;
123:5
**GLASSY (1)**
23:12
**GOAL (1)**
84:22
**GOALS (1)**
122:11
**GOD (2)**
7:12;173:11
**GOES (2)**
74:14;99:1
**GOGGLES (1)**
86:18
**GOLD (2)**

71:11,13
**GONNA' (44)**
8:12;10:14,17,20;
11:11,16;13:16;
15:22;19:15,17;
22:16;26:12,13;32:5;
33:20;45:8,9,12;
46:6;62:10;65:5;
67:9,17;68:21;71:23;
78:17;79:7;101:14,
17;103:17;107:22,
24;110:8;142:23,24;
144:22;147:23;
161:18;172:23;
181:15,16;187:14;
204:19;214:9
**GOOD (20)**
7:16;20:1;36:6;
53:15;63:24;64:7;
81:21;84:8,8;87:22;
103:10,24,25;
129:21;161:15;
164:15;169:3;182:1,
1;213:9
**GOOD-LOOKING (1)**
87:21
**GRAB (1)**
19:1
**GRANITE (1)**
23:20
**GRAY (3)**
155:15;164:11,11
**GREAT (1)**
123:21
**GREEN (1)**
95:16
**GREW (1)**
155:5
**GROUND (5)**
35:1,12,14;64:11;
108:16
**GROUP (6)**
14:16;159:22,24;
160:8;161:2;175:7
**GUARD (3)**
38:14;112:3,4
**GUESS (10)**
64:11;73:20;74:4;
88:6;99:4,20;100:1;
117:24;160:18;
173:25
**GUESSING (1)**
77:19
**GUEST (11)**
125:11,24;126:6;
127:23;130:3;
136:17,19,22,25;
137:2,5
**GUESTS (1)**
191:9
**GUIDE (1)**
78:7
**GUY (6)**

118:16;120:11;
137:1;167:23;
174:21;180:5
**GUYS (1)**
175:6

**H**

**HA (54)**
8:7;7;17:1,1,1;
35:20,20,20;42:22,
22;55:3;57:19,19;
60:14,14,15;62:23,
23;70:2;88:13,13;
91:3,3,3;99:3;
101:16,16;103:14,
14,21;104:21,21,21;
109:6,6;120:22;
130:13,13;131:15;
155:5,5;161:7,7,11,
11;162:12;165:2,2,
15,15,17,17;201:16,
16
**HA! (27)**
8:7;17:1;42:22;
57:19;60:14,15;
62:23;70:2;88:13;
91:3;99:3;101:16;
103:14,21;104:21;
109:6;120:22;
130:13;131:15;
155:5;161:7,11;
162:12;165:2,15,17;
201:16
**HABIT (1)**
200:6
**HAIR (4)**
87:20;154:25;
164:11,12
**HAIRCUT (1)**
113:6
**HALF (5)**
60:8;68:3;114:19,
20,24
**HALL (2)**
30:16;109:10
**HALLS (3)**
49:13;137:4;
145:18
**HALLWAY (1)**
45:5
**HAND (3)**
7:9;39:16;66:7
**HANDING (19)**
20:3;71:21;75:19,
21,23;77:10;89:3;
110:9,14;134:17,19;
135:17;141:3;143:4;
147:24;148:5;216:4,
9,11
**HANDS (4)**
19:5;61:4;68:8;
86:11

**HANG (1)**
222:3
**HAPPEN (2)**
139:12;201:4
**HAPPENED (16)**
13:17;37:6,19;
45:3;55:3;57:13;
73:2;74:16;79:10;
108:22;171:1;
181:13;184:14,21;
211:17;215:7
**HAPPENS (1)**
71:12
**HARD (1)**
115:12
**HARDER (1)**
67:25
**HASH (2)**
186:2,5
**HAT (7)**
155:1,2,4,7,8;
164:20;199:22
**HATED (1)**
88:15
**HAY (5)**
155:1,7,11;164:20;
199:22
**HE/SHE (1)**
37:17
**HEAD (17)**
12:13;13:19;
22:19;55:23;57:20;
69:15;137:10,20;
160:5;183:16;
198:16;199:19,24;
200:24;203:8,11,16
**HEADING (1)**
28:14
**HEAR (7)**
113:17;115:18;
131:5;161:23;197:1,
8,9
**HEARD (6)**
34:18;196:18,20,
21;197:8,20
**HEARING (1)**
187:9
**HEAVY (1)**
104:5
**HELD (1)**
6:7
**HELLO (1)**
6:22
**HELP (15)**
7:12;28:8,9;33:24;
36:19;112:12;
125:25;162:1;167:6;
168:20;174:14;
175:16;176:21;
180:4;212:12
**HELPED (5)**
39:6,13,19;174:17;
201:13

**HELPING (1)**
103:23
**HELPS (1)**
110:7
**HERSELF (3)**
125:19;162:24;
201:24
**HESITATE (1)**
170:11
**HICKEY (2)**
7:3;69:10
**HIGH (1)**
9:22
**HIMSELF (6)**
119:17;162:17;
163:4,14;164:3;
175:23
**HIT (4)**
35:24;36:1;
203:10,16
**HMM (11)**
60:10;100:6;
103:8;104:16;105:7;
109:24;123:25;
130:25;196:1;
203:21;212:15
**HOLD (1)**
201:24
**HONDURAS (2)**
13:4,9
**HONEST (2)**
93:13;164:19
**HONEYMOON (4)**
70:23;133:19,21;
213:3
**HOPING (1)**
165:6
**HORRIBLE (4)**
47:10;57:1;116:6;
137:2
**HORRIFIC (1)**
147:14
**HOT (2)**
25:8;51:4
**HOUR (2)**
60:8;104:12
**HOURS (1)**
117:25
**HUH! (1)**
91:5
**HUMIDIFIER (1)**
117:24
**HUNDRED (1)**
16:25
**HUNG (1)**
154:24
**HURRY (1)**
56:7
**HURT (4)**
33:25;37:4;96:12;
214:25
**HURTING (2)**
33:25;34:19

**HUSBAND (24)**
14:11,14;56:13;
70:23;88:6;92:6,23,
25;93:3;97:7;
100:10;101:1;119:6;
122:22;151:18,19;
154:10,15,19;
156:12;159:6;
177:20;186:24;197:1
HUSBAND/BOYFRIEND/FIANCE' (1)
28:10

**I**

**IDEA (4)**
60:6;110:18;
113:14;180:25
**IDENTIFICATION (1)**
141:4
**IDENTIFIED (5)**
162:17;163:3,14;
164:2;175:22
**IDENTIFY (5)**
6:19;125:19;
129:15;162:24;180:3
**IDENTIFYING (2)**
79:10;137:15
**IMPORTANT (1)**
190:4
**IMPRESSION (1)**
135:12
**IN! (1)**
19:10
**INACCURATE (3)**
137:24;139:9;
140:5
**INAPPROPRIATE (1)**
78:20
**INAPPROPRIATELY (1)**
65:20
**INCIDENT (31)**
13:17,21;15:9;
16:21;27:23;28:2;
33:3;45:8;46:9;55:1;
58:16;73:2;74:9,17;
79:13;80:20;94:15;
102:4;105:20;108:3,
7,9;111:23;128:13;
163:15;171:1;
177:11,15;180:23;
211:2;221:19
**INCLUDING (2)**
103:4,7
**INCONSIDERATE (2)**
145:19;147:20
**INCONVENIENCE (1)**
57:18
**INCORRECTLY (1)**
222:8
**INDIA (2)**
113:10;119:12
**INDIAN (6)**
112:25;113:9,12,

15;119:4,6
**INDICATE (3)**
68:17;92:25;
130:21
**INDICATED (23)**
6:17;65:9;66:16;
67:2;70:17;78:2;
86:4;93:6,15;94:12;
95:8;96:4;104:5;
109:15;110:23;
142:1;155:16;
158:10;176:8;
183:22;184:6,10;
218:7
**INDICATES (1)**
94:23
**INDICATING (106)**
19:4;24;20:10;
22:5,17;23:5;24:20;
26:1,9,15;27:2;
30:14;31:6,9,10,16,
18,19,23;32:23;33:1,
5;35:6,19,23;39:17,
18;45:21;66:8;72:4,
9,21;75:9;76:5;77:9,
20,25;78:9,11;79:9;
80:7,11,18;81:15,23;
82:15;84:17,18,19;
89:7,11,13,23;90:2,2,
5,14,15;92:4,7,7,11;
93:2;94:23;97:1,2;
102:12;103:5;
110:11;112:6;
113:23;134:12;
136:2;137:7,15;
138:13;139:25;
140:3;141:16;142:5;
143:13;148:11;
149:9;150:19;
152:23;154:24;
156:25;166:8;
190:24;192:3,17,21;
193:7,9,23;199:7;
201:23;216:6,7,14,
17,18;217:25;219:8;
220:5,15
**INFLUENCE (2)**
70:8;204:21
**INFLUENCED (1)**
206:19
**INFORM (4)**
57:1;122:6;
125:23;131:10
**INFORMATION (3)**
138:6;143:8;
194:24
**INFORMED (9)**
37:15;57:16,21;
117:18;119:16;
125:22;132:14;
139:24;171:16
**INITIAL (1)**
126:6

**INITIALS (3)**
79:3;81:7;153:7
**IN-LAW (1)**
71:1
**INMATES (3)**
9:17;65:20;68:7
**INSIDE (2)**
83:10,10
**INSTANCE (1)**
142:7
**INSTEAD (1)**
67:25
**INSTRUMENT (10)**
8:15;19:18;22:20;
45:15;75:24;79:17;
88:23;135:18;141:5;
147:25
**INTAKE (1)**
9:12
**INTENTION (1)**
126:10
**INTENTIONALLY (1)**
127:1
**INTERACT (1)**
113:8
**INTERESTED (1)**
135:13
**INTERNET (2)**
187:22;188:6
**INTO (21)**
10:17;23:6;30:20;
36:14;41:19;42:18,
23;45:2;67:5;74:2,
14;80:12;84:22;
93:25;105:17;111:3;
152:6;169:18,19;
183:15;210:14
**INTRODUCED (1)**
119:17
**INTRODUCTION (1)**
119:19
**INVESTIGATING (1)**
111:23
**INVOLVE (1)**
65:15
**INVOLVED (2)**
108:24;186:2
**INVOLVING (4)**
13:17;16:21;
27:23;58:17
**ISSUE (4)**
119:24;122:17;
123:12;186:11
**ISSUES (10)**
59:1;121:25;
127:17,25;136:14,
16;137:5;147:16;
197:11,14
**ITINERARY (1)**
150:4

**J**

**JACKET (6)**
111:13;112:18;
169:9;172:10;173:8;
174:6
**JACKPOT (19)**
16:19;20:4,8,18;
23:7,11;25:23;27:13;
42:18;45:23;52:24;
72:5;76:14,18;77:1,
7,18;89:17;192:13
**JAIL (1)**
65:16
**JANITORIAL (2)**
179:4,6
**JEFFERSON (1)**
9:6
**JOB (1)**
9:11
**JUDGING (1)**
80:4
**JUDGMENT (1)**
198:18
**JUROR (1)**
222:5
**JUSTICE (1)**
10:1
**JUVENILE (1)**
37:15

**K**

**KAT (18)**
87:1,3;88:7;93:10,
16;195:5,13,13,13,
15,18;196:5,9,12;
197:1,5,9,17
**KATALINA (1)**
195:13
**KATHY (1)**
6:16
**KATIL- (1)**
195:13
**KATILIANA (1)**
195:14
**KEEP (1)**
45:13
**KEEPS (1)**
123:6
**KEPT (6)**
160:17,18;170:18;
178:5;183:12;198:5
**KERNS (239)**
6:21,22;19:25;
20:14;22:18;24:17;
28:21;29:2,24;30:11;
31:25;33:16;34:7,12;
35:7;38:5;44:2;
46:20;48:10;50:1,9,
23;51:17,21;53:6;
54:21;58:19;59:12,
21;60:23;61:2;62:5,
17;63:8,24;64:2,4;
65:8;67:11,13;69:4;

Case 1:15-cv-20807-JEM   Document 44-1   Entered on FLSD Docket 11/02/2015   Page 68 of 77
Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

70:17;71:17,22;73:9;
74:25;75:7,13,18,22;
76:3,25;78:21,23;
79:1,14,21;82:14,22;
83:19,21;84:16;
85:12,19;86:1,10,16,
24;88:3,13,20;89:4;
91:9;92:3;95:7;
96:22;97:6;99:3,9,
19;100:2;103:6,14;
105:18;106:2,9,17,
23;107:4,7;110:2;
111:8;112:14;113:5;
114:10,17,25;
115:17;116:4;
117:15;118:23;
121:14;126:17;
127:7,16;130:14;
131:6,16;133:9,20;
134:10,16,20;
135:11,15,22;
136:10;137:17,19;
139:13;140:18,24;
141:1,9,21;143:23;
144:4,11,19;145:6,
12;146:22;147:7,22;
148:6;149:14,21;
150:23;151:9;
152:11,16;153:15,
19;154:7;156:3,17;
157:1,7,13,24;158:9,
23;159:5,13;161:8,
15;162:9;165:3,8,10,
16,20,22;167:22;
168:5,10;171:8;
173:14;175:15,21;
177:9;181:11,14,20;
182:5,13;184:25;
187:12;188:25;
189:6;190:3,20;
191:2,12,25;193:14,
25;194:8,20;196:23;
198:7,21;199:13;
200:1,16,20,25;
201:6;202:6;203:2,
13;204:4,11,18;
205:2,5;206:11,15,
23;207:6;208:14,20;
209:4,13;210:18;
211:6,20;213:14,22;
214:13,18;215:2,10,
19,25;216:5,8,13,19;
217:2,15,23;218:4,
14;219:6,19;220:13,
25;222:19

**KERNS'S (1)**
    192:8
**KHAKI (4)**
    111:19;165:12,24;
    175:2
**KICKED (1)**
    123:5
**KIDS (19)**

47:18;49:2,3,16,
20,23;50:4,21;52:10;
110:20;121:8,9,16;
122:13,13;128:4;
137:3;145:17;181:8
**KIND (12)**
    9:16;23:16;24:8;
    25:21;26:22;35:16;
    100:21;102:7;
    133:10;180:17;
    198:19;221:12
**KINDA' (1)**
    156:7
**KINDS (1)**
    47:17
**KNEES (2)**
    86:11;215:1
**KNEW (4)**
    87:3;109:3;174:3,
    3
**KNOWING (1)**
    165:23
**KNOWLEDGE (1)**
    80:6
**KNOWN (5)**
    120:20,23,25;
    121:5;159:18
**KNOWS (2)**
    108:23;109:1

# L

**LADIES (5)**
    82:4,13,14,24;
    83:24
**LADY (15)**
    57:4;58:25;59:3;
    101:12;103:23;
    104:15;129:17;
    132:15;139:24;
    160:22;162:19;
    171:17;174:12;
    184:9;195:5
**LADY'S (1)**
    171:24
**LAID (2)**
    79:11;153:22
**LANDED (2)**
    202:5,19
**LARGER (1)**
    63:19
**LAST (6)**
    7:19;13:22;70:21;
    91:13;122:25;204:20
**LATER (11)**
    40:10,24;54:7;
    94:3;101:5,11;
    154:19;173:4;
    175:24,24;176:3
**LAW (3)**
    6:23;7:3;69:10
**LAWYER (5)**
    11:2;12:6;66:3;

194:1;196:4
**LAYING (5)**
    35:18;39:2,3;
    201:22;203:19
**LAYOUT (14)**
    15:24;19:15;21:1;
    22:5;26:3;76:8,12;
    190:15,17,17,21,22,
    22;191:18
**LEAD (1)**
    130:22
**LEADING (5)**
    194:21;204:20;
    206:12,18,20
**LEAST (4)**
    135:2,12;183:19;
    184:10
**LEAVE (3)**
    127:2,9,15
**LEAVING (1)**
    122:20
**LEFT (29)**
    21:15;27:6;28:24;
    39:15;53:25;60:11;
    78:3;80:10;90:13;
    105:18;106:19;
    109:18;116:23,24,
    25;133:22;149:10,
    15;152:8;156:9,13,
    23;158:11,16,19;
    172:7;178:9;183:10;
    211:18
**LEFT-HAND (1)**
    21:18
**LEGS (1)**
    114:4
**LESS (2)**
    102:24;103:5
**LETTER (6)**
    69:24;70:2;
    148:23;149:4,7,15
**LETTING (1)**
    191:14
**LEVEL (5)**
    76:7;118:7;
    119:23;120:3;123:11
**LIDO (5)**
    17:6;52:6;122:10;
    123:2,7
**LIE (1)**
    142:8
**LIGHT (4)**
    26:11;73:16;
    199:8;200:10
**LIGHTING (8)**
    53:3;72:17;199:8;
    217:16;218:13,15;
    219:13;220:16
**LIGHTS (7)**
    24:14;25:18,21;
    72:17;73:25;74:13;
    219:22
**LIKED (1)**

88:14
**LIKELY (1)**
    51:25
**LIKES (1)**
    105:16
**LINE (3)**
    57:1;79:2;207:18
**LIQUID (2)**
    54:16;102:24
**LIQUIDS (1)**
    85:14
**LIQUOR (2)**
    103:17,20
**LIST (1)**
    131:20
**LISTENING (1)**
    135:2
**LITERALLY (1)**
    92:13
**LITTLE (18)**
    9:20;21:15;30:15;
    32:18;58:2;75:9;
    78:1;95:15;102:11;
    103:20,21;133:10;
    166:23;170:21,21;
    191:7;211:23;212:17
**LIVE (1)**
    119:10
**LIVING (1)**
    9:4
**LOCATED (6)**
    20:4,8,17;27:11;
    33:3;43:19
**LOCATION (1)**
    26:7
**LODGE (2)**
    120:17;123:13
**LONG (30)**
    9:7;36:8,10;38:19;
    39:3;40:16,19;41:25;
    42:1,13;43:14;53:12;
    98:11;104:11;
    109:20;110:4,11;
    121:2;126:1;151:25;
    165:11;168:23;
    170:8,15;171:13;
    176:12;177:9,13;
    178:8;195:24
**LONGER (1)**
    28:18
**LONG-SLEEVED (1)**
    166:1
**LOOK (26)**
    19:23;20:3;21:2;
    22:4,25;29:15;31:13;
    41:20;45:10,25;
    71:18;76:4;77:9;
    84:8;86:11;99:1;
    112:15;113:15;
    134:22;152:12;
    154:22;191:17;
    193:4;199:1,1;
    221:15

**LOOKED (15)**
    36:11;74:9;
    112:21,23;118:14,
    16;162:22;164:12;
    173:18,22;174:5;
    179:16,22;180:6;
    182:20
**LOOKING (22)**
    23:12,25;24:1;
    30:13;31:1;74:19;
    77:17;81:22;85:7,13;
    89:5;90:14,16,19;
    115:2,11;163:22,24;
    167:14;171:18;
    199:20;208:22
**LOOKS (5)**
    23:20;87:18;
    148:13;153:19;
    166:20
**LOSE (1)**
    36:4
**LOT (9)**
    42:11;48:22;
    52:18;68:7;147:9;
    157:2;181:16;
    186:10;188:19
**LOUD (1)**
    136:11
**LOUD-MOUTHED (1)**
    120:21
**LOUISE (1)**
    7:18
**LOUISIANA (3)**
    6:10;13:3;65:13
**LOUNGE (1)**
    49:6
**LOVE (4)**
    61:3;67:15;119:9;
    155:3
**LOVED (2)**
    161:4,16
**LOVER (1)**
    154:16
**LOW (1)**
    154:24
**LOWER (3)**
    34:21;72:16;
    113:22
**LOYAL (1)**
    70:12

# M

**MA'AM (8)**
    8:3;10:3;13:12,15,
    24;14:3;35:2;69:23
**MACHINE (10)**
    19:1,2,3;148:15;
    160:21;162:17;
    163:4;168:12;
    192:22,22
**MACHINES (32)**
    17:17;18:19,25;

Case 1:15-cv-20807-JEM   Document 44-1   Entered on FLSD Docket 11/02/2015   Page 69 of 77
Shirley Riley vs
Carnival Corporation, et al
Dalise L. Gautreaux
August 27, 2015

21:6,7,9,17;22:11;
25:24;26:7;27:10;
77:21,23;80:1,7,8;
81:19;82:1,5;83:23;
162:4;163:5,6,11,13;
167:5;168:18;
190:24;192:12,16,
18;211:5
**MADAME (11)**
7:8;71:20;106:20;
107:1;134:14;
153:11;173:10;
200:23;214:16;
216:3,16
**MAGNIFYING (1)**
86:17
**MAIL (1)**
149:10
**MAIN (2)**
98:4,5
**MAITRE' (1)**
121:4
**MAKES (5)**
8:5;74:7;92:5;
104:24;133:10
**MAKING (8)**
8:13;11:8;32:18;
78:20;126:11;164:3;
167:2;198:18
**MALE (12)**
9:17;129:11,12;
131:22;168:6;
179:20,21;184:2,2,4,
5,17
**MANY (24)**
8:23;12:22;14:22,
25;15:12;16:21;
18:21;40:2;41:21,25;
60:7;65:23;69:4;
71:6,13;97:10,20;
98:13;101:7;109:22;
171:8,9;179:13;
207:14
**MARBLE (5)**
24:5,9,9,10,11
**MARGARITA (6)**
102:9,23;103:9,10,
18;105:1
**MARGARITAS (2)**
104:2;105:5
**MARK (18)**
8:12,14;19:17;
22:16;33:4;45:12;
75:2;78:25;79:5;
80:23;81:8;83:9,11;
88:22;134:11;153:3,
3,8
**MARKED (32)**
8:16;19:19;22:21;
23:3;25:17;26:2;
45:16;46:1,2;52:22;
75:10,25;76:4;79:16,
18;80:19;83:22;

84:4;88:24;135:17,
19;141:3,6;147:24;
148:1;150:13;
163:12;193:6;194:2;
216:10,11,12
**MARKING (7)**
32:21;78:20,22;
81:4;83:15;153:5,9
**MARKINGS (1)**
77:8
**MARKS (3)**
61:9;151:1,6
**MARRIED (1)**
10:3
**MARTINY (1)**
6:16
**MASELARA (1)**
6:23
**MASON (2)**
6:22;63:24
**MATERIAL (1)**
23:17
**MATTE (1)**
24:10
**MATTER (4)**
6:10;10:12;
166:16,17
**MATTERS (1)**
65:13
**MAY (9)**
11:23;94:10;96:8;
125:4;131:12;
141:12;185:23;
196:18;204:21
**MAYA (2)**
13:3,4
**MAYBE (31)**
18:22;30:7;36:6;
38:17,21;39:5;40:18,
23;42:1;43:16;
73:12;94:2;112:23;
113:4;123:20,25;
126:3;142:22;145:2,
11;164:12;167:12;
173:3;176:15,16;
177:12,13;180:6;
186:7,24;215:7
**MEAN (68)**
27:20;30:19;
47:12;49:15;60:10;
66:12;70:19;73:10;
76:7,25;77:2;78:4;
82:20;88:15;96:6,18;
98:13,18,25;103:17;
106:8;109:1;110:22;
114:1,10,17;115:22;
118:18;120:18;
121:10;122:9,16;
123:14;125:8;
137:25;138:6;
142:18,22;144:18,
20;147:4,5;149:4,4,
8;155:7;159:9;

162:18,21;166:7;
167:14;168:17,18;
175:1;176:4,16,20;
180:15;181:8;186:7;
187:16;188:14;
190:15;196:18;
197:20;202:10;
203:17;207:7
**MEANING (4)**
73:11;155:22;
167:23;203:1
**MEANS (1)**
40:9
**MEANT (3)**
165:10;177:14,16
**MECHANICS (4)**
34:2;214:9,12;
215:9
**MEDIA (1)**
185:22
**MEDICAL (17)**
38:3,11,11,19;
40:1,22;55:21,25;
96:10;112:13;164:6;
169:2;173:7;174:21,
24;176:17;177:2
**MEET (1)**
107:21
**MEMBER (4)**
18:3;159:9,15;
172:17
**MEMBERS (2)**
159:22,23
**MEN (1)**
166:6
**MENTION (3)**
87:13;93:15;94:9
**MENTIONED (4)**
69:18;87:10;
145:24;195:4
**MESSAGE (3)**
170:19;186:23;
188:1
**MIAMI (5)**
6:14,23;71:5;
134:4,6
**MID (2)**
28:3;164:12
**MIDDLE (6)**
20:24;23:9,14;
77:4;118:18;119:1
**MIDNIGHT (2)**
104:16;105:9
**MIGHT (13)**
64:19;129:15;
130:5;131:25;
135:23;144:24;
145:6;165:25;
186:22,24;187:14,
21;189:8
**MIKE (1)**
6:16
**MIND (3)**

32:17;80:22;83:18
**MINE (1)**
216:7
**MINUTE (3)**
74:12;171:15;
176:18
**MINUTES (40)**
38:22,24;39:5;
40:19,23;42:14,15;
43:3,5,11;45:4;48:4;
53:16,18,20;60:1,8;
61:22;62:2;63:15;
92:9;93:7;94:3;
98:11;126:3,7;
141:25;169:3;
170:17;171:3;173:3;
176:16,18;177:13,
24,25;178:10,11;
181:17;196:1
**MIRROR (2)**
82:1;169:23
**MISCHARACTERIZE (1)**
162:10
**MISCHARACTERIZING (2)**
96:24;162:8
**MISS (1)**
71:4
**MISSTATE (2)**
138:5,8
**MISTAKEN (2)**
110:12;142:12
**MISTAKES (1)**
10:22
**MOM (1)**
171:20
**MONDAY (1)**
133:23
**MONEY (3)**
19:1,4,5
**MONITOR (1)**
6:18
**MOP (9)**
179:11;180:20;
182:15,18,21,24,25;
183:5,14
**MOPPING-TYPE (1)**
182:20
**MORE (34)**
16:24;21:9;32:25;
33:20;35:2,15;44:6;
46:13,18,25;52:10;
60:11;71:6,9,10;
74:19,22;98:14,14;
99:4;102:24;134:21;
138:3;139:10;
147:10;156:24;
181:17;202:23;
211:23;213:19,19,
21;218:24;221:14
**MORNING (8)**
7:16;57:9,10;
73:12;105:15;129:1,
2,3

**MOST (7)**
51:25;65:18;
92:20;109:4;157:7;
220:18;221:17
**MOSTLY (2)**
134:22;185:17
**MOTHER (1)**
14:11
**MOTHER- (1)**
70:25
**MOVE (2)**
164:6;203:20
**MOVED (1)**
92:10
**MOVING (1)**
203:22
**MRS (1)**
178:18
**MUCH (14)**
36:3;42:9,20;43:1;
53:11;64:13;81:11;
103:17,20;138:10;
176:21;222:17,20,22
**MULTICOLOR (1)**
24:3
**MULTIPLE (6)**
85:1,2;97:14;
173:15;214:15,20
**MUSIC (1)**
49:6
**MYSELF (7)**
70:3;144:17,21,22;
155:6;162:18;176:4

**N**

**NAME (20)**
6:16,22;7:2,17,20;
16:6,8,17;55:19,22;
56:2;91:10,13;118:9,
10;125:22;171:24,
24;195:11;210:25
**NAMED (3)**
87:1;180:19,19
**NAMELY (1)**
180:20
**NAMES (1)**
7:23
**NATIONALITY (2)**
174:8;179:25
**NATURAL (1)**
73:16
**NATURE (1)**
69:21
**NEAR (7)**
81:7;82:5,24;
83:23;92:17;97:24;
170:16
**NECESSARILY (1)**
186:6
**NEED (11)**
11:6,8,9;33:17;
61:4;71:10;126:19;

134:22;150:22;
191:23;215:20
**NEEDED (9)**
28:9;37:4;48:6;
132:20;164:6;170:2,
4;172:4;178:21
**NEGATIVE (1)**
213:20
**NEGATIVELY (4)**
55:24;57:21;
69:16;160:6
**NEPHEW (2)**
37:14;170:24
**NERVOUSNESS (1)**
92:8
**NEW (6)**
6:9;13:2;105:17;
119:9,10;151:22
**NEWS (2)**
161:16;188:3
**NEWS! (1)**
164:15
**NEXT (13)**
11:19;13:22;
31:24;37:6,13;57:10;
62:14;107:21;
128:23;132:8;173:1;
187:14;210:20
**NICE (4)**
34:16;41:18;
72:18;184:10
**NICKNAME (1)**
195:15
**NIECE (2)**
37:14;170:23
**NIGHT (5)**
60:5;72:16;74:14;
101:11;122:25
**NIGHTTIME (4)**
72:22,24;74:14;
219:25
**NOBODY (4)**
99:1;168:19;
170:18;178:6
**NODDING (8)**
12:13;13:19;
22:19;137:10;
183:16;198:16;
200:24;203:8
**NONE (2)**
160:24,24
**NOPE (10)**
12:17;42:7;55:24;
66:23;67:1;129:25;
131:24;133:3;
189:10;194:19
**NORMALLY (3)**
53:19;77:6;111:19
**NOTE (2)**
141:20,22
**NOTED (1)**
137:18
**NOTES (10)**

130:7,23;131:11;
136:4,8;137:8;
139:25;181:15;
208:6;209:18
**NOTICE (2)**
167:7;206:4
**NOTICEABLE (5)**
199:10,17;200:12,
13,19
**NOTICED (2)**
199:19;206:1
**NUMBER (40)**
8:17;19:20;22:22;
37:7;45:17;61:10;
75:15,17;76:1;79:19;
88:25;134:13;
135:20;141:7;148:2;
151:2,7;170:6,6,9;
192:16;193:7,22,23;
194:3,4,14,14;195:1,
1;205:10;206:6;
208:5,23,23,24,25;
210:3,8;212:18
**NURSE (8)**
173:18;174:10,11,
12;175:11,24;176:3;
180:21
**NURSES (2)**
174:1,4
**NURSE'S (1)**
173:18

---

## O

**OATH (1)**
189:17
**OBJECT (9)**
11:24;12:1,1,10;
33:17;65:5;78:17;
143:22;196:24;
204:19
**OBJECTING (1)**
206:24
**OBJECTION (96)**
12:1,2,4,11;20:15;
24:18;28:22;29:3,25;
30:12;32:1;34:8,13;
35:8;38:6;44:3;
46:21;48:11;50:2,10,
24;51:18,23;53:7;
54:22;58:20;59:13,
22;62:6,11,18;63:9;
67:9;69:1;70:16;
76:22;79:8;82:11,18;
84:12;85:11,23;86:9;
96:9,15;99:13;103:2;
114:6;115:16;
117:12;118:22;
133:8,14;136:6;
137:13;144:7,14;
162:7;167:19;181:5;
188:24;189:5;194:9,
21;198:22;199:14;

200:2,17,21;201:7,
11;202:7;203:3,14;
204:5,12,16;205:3;
206:12,16;208:15,
21;209:5,14;211:7,
21;213:15,23;
214:14;215:3,11;
217:1,10,19;218:10;
220:10
**OBJECTION'S (1)**
137:18
**OBJECTIVE (1)**
84:23
**OBSERVABLE (3)**
85:20;198:8,13
**OBSERVATIONS (3)**
28:13;41:13;200:9
**OBSERVE (23)**
28:5;30:24;33:13,
21;34:5;38:2;41:9;
42:3,5;43:6,24;
44:17;50:17;51:7;
54:18;62:15;63:5,7;
108:3,6;182:14;
183:8,11
**OBSERVED (19)**
28:2;29:21;32:8,
19;33:2;43:10;44:9;
51:12;54:16;56:5;
59:18;61:25;62:12,
13;63:1;102:3;
204:15,24;211:14
**OBSERVING (1)**
84:5
**OBSTRUCTIONS (1)**
56:10
**OBVIOUS (1)**
198:19
**OBVIOUSLY (1)**
46:7
**OCCASIONS (3)**
15:17;25:1;149:11
**OCCUR (2)**
128:21;168:24
**OCCURRED (4)**
78:11,15;84:9;
128:22
**OFF (36)**
45:5;56:24;58:25;
61:1,6;71:3;79:3;
101:12;106:12,19;
115:6;116:24;117:1,
2;121:13;123:15,18,
20,22;128:25;130:3,
18;134:8;135:1;
139:5;151:2;176:23;
182:3,8;183:21,23;
184:19;187:7;
189:23;214:3;222:25
**OFFENSIVE (2)**
132:9,13
**OFFER (1)**
57:17

OFFICE (1)
9:6
**OFFICER (5)**
9:5,13;55:10,14;
111:22
**OFFICERS (1)**
111:10
**OFFICES (1)**
6:8
**OLD (3)**
8:5;122:2;123:4
**OLDER (8)**
151:17;154:23;
162:23;164:10;
167:23;171:17,24;
173:16
**OLIVE- (1)**
87:19
**ON! (1)**
165:7
**ONBOARD (1)**
136:18
**ONCE (12)**
15:13,20;18:22;
67:16;71:11;88:17;
144:21;156:8;
160:15,18;192:25;
201:14
**ONE (65)**
17:19;18:14;
32:23,25;52:16;59:2;
62:10;64:14;71:9,10,
16;72:15;74:21;
77:16;80:18;83:12,
12;84:17;88:3;92:9,
24,25,25;101:9,25;
105:1,16;112:12;
117:14,20,21;119:6,
20;121:1,20,22,24;
122:19;126:5;135:6;
136:8;143:13,19;
145:25;155:10;
161:4,16;162:25;
169:4;173:20;175:6;
179:14;181:7;
183:19;185:9;188:7,
15;191:8;195:7;
202:23;204:22;
214:1;215:20;
220:18;222:3
**ONES (4)**
80:11;83:13;
90:11;160:19
**ONE'S (5)**
20:20,20,23,23;
218:24
**ONLY (18)**
15:19;17:3,13;
88:17;120:12;
139:25;160:1,1,19;
161:25;166:23;
181:7;185:8;191:16;
193:1;197:12;

199:18;208:10
**OPEN (1)**
98:25
**OPEN- (1)**
95:23
**OPENED (1)**
70:1
**OPEN-TOED (1)**
95:21
**OPINION (5)**
51:14;96:11,17;
200:11;215:1
**OPPOSING (2)**
11:23;141:2
**OPPOSITE (5)**
22:12,13;27:5;
33:8;94:3
**ORDER (5)**
11:25;41:4;71:11;
86:19;137:3
**ORLEANS (6)**
6:9;13:3;105:17;
119:9,10;151:23
**OTHERWISE (3)**
11:15;159:18;
161:19
**OUT (32)**
13:2;23:17;28:16;
49:12;51:1;66:12;
67:21;68:5;77:1;
97:11;98:8;105:25;
110:5,21;118:2;
119:17;121:22;
123:2;127:2,10,15;
134:4;135:12;
136:11;139:23;
152:8;162:1;178:25;
180:3;183:13;187:9;
188:6
**OUTCOME (2)**
128:23;132:5
**OUTFIT (1)**
174:6
**OUTLINE (3)**
190:8,9,12
**OUTSIDE (6)**
73:17;83:10;
123:23;153:21;
193:2;207:3
**OVER (38)**
10:14;11:17;
21:14;40:25;43:24;
44:20;49:4;52:1,3;
53:11;61:13;64:10;
108:12;111:13;
120:8;129:4;130:16;
137:23;138:3;
142:17;145:20;
147:6,21;151:25;
164:1;170:15;172:3,
7;173:8;175:9;
181:1;182:16;192:3;
197:13;210:24;

218:5,21;220:14
**OVERALL (1)**
213:19
**OVERBOARD (1)**
123:7
**OVERTIME (1)**
68:15
**OWN (2)**
146:12;194:23

**P**

**PACKAGES (1)**
18:15
**PAGE (3)**
187:17,17;222:5
**PAIR (5)**
34:16;164:24,24;
165:12;166:5
**PANTS (14)**
111:19;114:4;
164:23;165:6,11,11,
13,24;166:4;175:2,5;
180:10,13,15
**PAPER (3)**
66:1;110:6,9
**PAPERWORK (2)**
66:13,14
**PARAPHRASING (1)**
146:11
**PARISH (1)**
9:6
**PART (10)**
26:16;28:15;36:1;
39:17;78:1;92:20;
117:8;140:4;160:8;
161:1
**PARTICULAR (8)**
18:19;47:9,25;
50:21;51:7,13;52:4;
111:23
**PASS (2)**
150:5,7
**PASSED (3)**
42:20;43:1;160:16
**PASSENGER (4)**
39:6,9;159:19;
210:23
**PASSING (2)**
179:22;193:1
**PAST (3)**
88:16;97:18;
133:17
**PATIENT (1)**
222:18
**PATRON (2)**
104:3;105:6
**PAY (1)**
211:3
**PAYING (1)**
168:4
**PEN (2)**
61:3;78:13

**PENDING (1)**
6:12
**PENNY (1)**
19:7
**PEOPLE (41)**
27:18;40:2;48:5;
60:4,7,11,11,13;
69:17;97:10,23;98:8,
12;99:4;100:5;
113:15;120:8,9,11;
123:11;125:6,7,10;
153:25;154:8,12;
159:25;160:16,17,
24,25;162:1;167:9,
11;168:16,19;
173:15;176:5;
179:13;186:11;
188:15
**PERCEIVED (3)**
46:12;172:17;
177:16
**PERHAPS (3)**
146:23;179:18;
215:21
**PERIOD (1)**
176:25
**PERSON (19)**
100:10;112:14;
113:17;119:14;
130:5,7;135:2;
137:14;154:15;
162:4;163:14;169:5;
171:12,14;173:5,23;
180:3;182:19;198:2
**PERSONAL (1)**
194:13
**PERSONALLY (1)**
149:12
**PERSONNEL (11)**
111:9;112:5;
121:23;169:6;
172:14;178:16;
180:19,22;184:20;
185:1,4
**PERSONS (2)**
167:7;172:13
**PERSON'S (1)**
118:9
**PERTURBED (1)**
133:11
**PHONE (28)**
37:9,11;108:21,21;
109:10;126:4;
127:24;128:4,16,17,
20,22,24;130:1,24;
132:6;134:25;140:1;
170:12,16;171:4;
172:1,8;176:7,13,19;
196:11;197:24
**PHOTO (21)**
22:17;23:3;24:13;
25:19;26:9;31:2,6;
32:21;33:1,5;46:2;

51:2,3;52:22;72:20;
81:5,10;83:5,15;
90:19;93:2
**PHOTOGRAPH (16)**
25:17;26:2;30:14;
45:20,25;73:14,21;
82:16;89:23;216:23;
217:3,7,17,25;
219:14;220:2
**PHOTOGRAPHS (7)**
72:5,10;217:5;
218:8;220:5,16;
221:17
**PHOTOS (6)**
46:5;52:22;72:2;
74:7;216:2;221:7
**PHRASED (1)**
26:14
**PHYSICALLY (1)**
176:1
**PIANO (3)**
98:19,25;99:2
**PICK (2)**
171:10;197:24
**PICKED (5)**
39:19;115:6;
170:21,22;171:13
**PICTURE (6)**
45:9;81:23;90:6,
15,17;163:7
**PICTURES (2)**
193:3,5
**PIECE (2)**
78:1;110:6
**PILE (1)**
41:14
**PILLAR (13)**
80:15,17;81:14,16;
82:6;84:6,7,14;90:1,
3,14,21;163:11
**PINCHED (1)**
97:1
**PJ'S (1)**
102:19
**PLACE (12)**
17:3,9,14;49:4;
52:1;77:2;79:7;
88:18;97:22;102:20;
193:1;197:13
**PLACEMENT (1)**
26:6
**PLACES (2)**
49:24;82:24
**PLAINTIFF (5)**
69:6;71:18;153:4;
216:15,18
**PLAINTIFF'S (48)**
8:13,17;19:17,20;
22:17,22;23:3;24:1;
25:18;26:2;27:1;
29:16;31:2,14;45:13,
17;46:1,1,2,14,14,18,
24;52:22;53:2;71:23,

24;78:8,8;80:20;
81:12;195:2;199:2,9;
200:14;216:1,10,11,
20,21;217:8;218:23,
24;219:7,9,13;220:5;
221:16
**PLANNING (1)**
208:2
**PLATE (1)**
123:5
**PLATINUM (1)**
71:14
**PLAY (3)**
18:18;49:5,7
**PLAYED (1)**
192:17
**PLAYING (6)**
84:1;168:17;
192:12,22,23;193:19
**PLEASE (9)**
6:19;7:6,9,16;
11:13;64:15,22;
148:8;214:1
**PM (2)**
138:18;141:23
**POINT (21)**
28:24;31:4;33:7;
41:8;50:12,16;54:24,
25;56:17;98:23;
104:14;105:22;
119:6;139:21;
156:10;163:21;
171:25;193:17,20;
194:5;203:25
**POINTING (1)**
31:7
**POLISHED (2)**
24:9,11
**POLO (1)**
166:1
**POOL (4)**
49:16,18,21,24
**POOR (2)**
64:20;130:15
**PORTED (1)**
129:1
**PORTIONS (1)**
76:20
**POSE (1)**
67:9
**POSITION (7)**
35:16;39:22,23;
114:11;155:21;
198:15;204:2
**POSITIONED (5)**
30:8;33:6;201:17;
204:14,24
**POSITIONING (1)**
210:13
**POSITIVE (5)**
202:12,13;213:5,
19,21
**POSSIBILITY (5)**

142:14,15;214:10,
22;215:7
**POSSIBLE (1)**
176:21
**POSSIBLY (3)**
112:24;149:15;
183:20
**POST (8)**
185:24;186:12;
188:6,9;212:22,23;
213:2,5
**POSTED (6)**
186:23;187:15,21,
25;213:8,17
**POSTINGS (1)**
212:19
**POSTS (1)**
185:19
**POSTURE (1)**
200:7
**POTENTIAL (1)**
192:2
**POTENTIALLY (1)**
119:3
**PRACTICALLY (1)**
147:17
**PRECEDING (1)**
66:22
**PRELIMINARILY (1)**
75:2
**PRELIMINARY (1)**
8:14
**PREMATURE (1)**
134:21
**PRESENT (1)**
136:20
**PRESERVE (1)**
11:25
**PRETTY (9)**
23:24;64:13;
72:19;109:7;120:7;
122:8;138:9;186:15;
188:14
**PREVIOUS (2)**
106:22;107:3
**PREVIOUSLY (1)**
175:23
**PRIOR (18)**
15:4;16:21;43:5,
11;45:4;47:21;
50:12;61:18,22;62:2,
15;63:16;64:12;
66:11;93:8;105:19;
163:15;205:13
**PROBABLY (14)**
12:7;16:25;32:16;
40:22;41:23;42:1;
43:17;52:16;63:25;
82:20;161:20;
186:15;192:4,24
**PROBLEM (7)**
116:22;117:16;
119:25;120:1;

Case 1:15-cv-20807-JEM   Document 44-1   Entered on FLSD Docket 11/02/2015   Page 72 of 77
Shirley Riley vs
Carnival Corporation, et al

Dalise L. Gautreaux
August 27, 2015

121:19;122:20,24
**PROBLEMS (6)**
  85:8,14;120:4;
  121:6;126:18,22
**PROCEED (2)**
  12:3;66:10
**PROCEEDING (2)**
  66:21,21
**PROCESS (1)**
  196:16
**PROCESSING (1)**
  9:13
**PROGRAM (1)**
  70:11
**PROMENADE (5)**
  16:11,12;19:16;
  20:7;76:7
**PROMISED (1)**
  70:6
**PROMPT (1)**
  197:18
**PRONOUNCE (1)**
  91:12
**PRONOUNCED (1)**
  151:10
**PROPER (1)**
  137:14
**PROPORTIONS (1)**
  79:11
**PROSECUTE (1)**
  68:1
**PROSECUTOR (2)**
  67:20,22
**PUBLIC (3)**
  26:17;68:3;98:4
**PUDDLE (7)**
  41:18;43:12;62:3,
  12;63:2,6,17
**PULL (1)**
  190:11
**PURCHASED (2)**
  71:1,2
**PURPOSE (3)**
  58:4;64:21;126:10
**PURPOSES (2)**
  79:9;131:13
**PURSUANT (1)**
  8:8
**PUT (16)**
  19:7,8,9,10;39:16;
  70:13;79:2;81:6;
  92:22,24;103:16;
  118:1;139:10;
  161:17;179:11;193:3
**PUTTING (2)**
  44:9;81:9

## Q

**QUALITY (1)**
  131:12
**QUICK (1)**
  181:16

**QUICKLY (1)**
  201:4
**QUITE (15)**
  36:2;71:16;94:10;
  95:13;98:12,18;
  99:16;111:18;122:5,
  9;125:4,17;148:12;
  163:19;203:12
**QUOTES (1)**
  210:23

## R

**RACE (2)**
  174:7;179:25
**RAISE (2)**
  7:9;66:6
**RAN (5)**
  36:19;37:8;
  108:20;160:22;170:1
**RANGING (1)**
  48:23
**RATHER (1)**
  183:9
**RAY (1)**
  86:18
**READ (10)**
  10:21;106:22;
  107:3;135:23;
  136:11;141:10;
  147:11;148:7;222:4,
  4
**READILY (7)**
  85:20;86:3;198:8,
  12;199:10;200:12,13
**READING (2)**
  141:11;148:8
**READY (1)**
  54:1
**REAL (1)**
  181:15
**REALLY (19)**
  67:15;77:2;99:16;
  115:11;133:17,17;
  146:13;149:9;
  150:11;163:1;166:3,
  3,22;167:14;168:3;
  176:5;180:1;196:17;
  197:19
**REASON (12)**
  11:5,7;117:9;
  126:25;127:9,15;
  145:23;160:23;
  166:23;189:7,13;
  199:18
**REASONS (2)**
  88:4;117:14
**RECALL (5)**
  34:19;142:4;
  180:22;221:8,18
**RECEIVE (2)**
  150:2,13
**RECEIVED (11)**

57:7;69:8,13,20;
  128:24;150:5,8,9,10,
  17,18
**RECEIVING (1)**
  149:22
**RECESS (5)**
  61:7;106:13;
  151:4;182:9;214:4
**RECOGNIZE (2)**
  45:20;79:22
**RECORD (21)**
  7:17;12:1;61:1,6,
  11;79:8;106:12,15;
  125:7;147:12;151:2,
  8;182:4,8,11;187:7,
  11;207:1;214:3,6;
  222:25
**RECORDED (3)**
  125:2,4;131:12
**RECORDING (1)**
  125:16
**RECORDS (1)**
  125:15
**RE-CROSS-EXAMINATION (1)**
  192:2
**REFER (1)**
  91:15
**REFERRED (10)**
  8:15;19:18;22:20;
  45:15;75:24;79:17;
  88:23;135:18;141:5;
  147:25
**REFERRING (4)**
  77:24;83:13;
  122:14;138:14
**REFLECT (1)**
  25:25
**REFLECTING (3)**
  209:19,23;210:3
**REFLECTION (3)**
  24:13;199:3,8
**REFRESHMENT (1)**
  164:16
**REGARD (12)**
  76:14;85:14;
  128:17;131:7;140:2,
  8;143:6;161:21;
  185:20;192:15;
  211:13;216:20
**REGARDING (4)**
  118:5;123:12;
  184:21;185:4
**REGULAR (2)**
  36:16;159:16
**RELATE (1)**
  155:6
**RELATION (2)**
  20:18;154:9
**RELATIVE (2)**
  76:19;155:21
**REMAIN (4)**
  38:24;41:6;
  132:18;177:10

**REMEDIED (1)**
  116:22
**REMEMBER (46)**
  12:23;13:5,10,13,
  21;14:6;16:3,17;
  21:1;47:2;58:22;
  74:18;93:12;95:14,
  17;106:18;118:10;
  125:1,21;131:17;
  142:12;143:24;
  149:21;150:16;
  164:2,19;166:4,23;
  167:1;170:6;180:1;
  185:23;192:10;
  195:7;196:15;197:3;
  198:9;201:16;
  205:22;208:6,10;
  210:15;212:20;
  214:11;215:15;
  218:15
**RENDER (1)**
  175:25
**REP (4)**
  58:15;209:2,20;
  210:4
**REPEAT (3)**
  144:17,21,22
**REPHRASE (3)**
  11:22;32:5;47:14
**REPHRASING (1)**
  201:10
**REPORTED (2)**
  56:18;136:18
**REPORTER (17)**
  6:3,15;7:6,8;
  10:16;11:15;71:20;
  106:20;107:1;
  134:14;153:11;
  173:10;187:9;
  200:23;214:16;
  216:3,16
**REPORTERS (1)**
  6:8
**REPORTS (1)**
  57:7
**REPRESENT (5)**
  6:20,24;7:3;13:16;
  76:18
**REPRESENTATION (2)**
  76:11;140:11
**REPRESENTATIVE (12)**
  127:23;128:3,8;
  129:6;130:4,18;
  131:23;140:12;
  184:3,18;209:10,24
**REPRESENTED (1)**
  96:13
**RESEARCH (1)**
  137:5
**RESEMBLE (1)**
  221:18
**RESOLUTION (1)**
  190:5

**RESPECT (1)**
  74:23
**RESPOND (2)**
  37:1;196:12
**RESPONDED (1)**
  196:14
**RESPONSE (1)**
  197:6
**RESTAURANT (1)**
  120:19
**RETROSPECTIVELY (1)**
  67:10
**REVIEW (1)**
  181:15
**REVIEWS (1)**
  185:12
**REWARD (1)**
  70:11
**RIDICULOUS (1)**
  58:1
**RIGHT (162)**
  7:9;8:19,25;9:23;
  10:2,20,23;11:1;
  12:15;14:15,16;17:5,
  8;19:13;20:11;21:5,
  7,8;27:2;29:23;30:2;
  31:9;32:11,15;34:23,
  25;35:13,14;37:9,10;
  38:15,16;54:12;58:4,
  8;59:16;60:14;61:14,
  16;63:14,23;65:2,3;
  66:7;68:5,8;70:6;
  72:13;74:16;78:4,6;
  80:8,12;81:1,2,6;
  82:2;83:6,9,21;
  84:24;85:4,8;86:12;
  87:4;89:4,10;90:1,
  15,20,24;93:10,14;
  94:5;95:23;96:1;
  97:24;98:2;100:2,20;
  101:1,7;102:20,21;
  103:9;104:4,6,9;
  111:4;114:12,20;
  115:6;116:6,8;
  118:17;123:8;126:5;
  128:15;135:5;136:1;
  141:15;142:4;
  145:22;148:10;
  152:5,7;153:25;
  154:7,10,11;157:15,
  17;158:4,12;159:1,
  18,21,22;160:13,23;
  165:21;166:14,15,
  18;167:4;169:2,17,
  21,21,22;170:2;
  172:4;183:4;184:11;
  185:9;187:12;188:8,
  18;191:4;192:1,18,
  22;193:2,11;194:6,
  18;195:5,20;196:15;
  199:4;201:2;202:21;
  203:6,7;207:15;
  210:18;211:14;

212:4;215:17;
219:21;222:4,12
**RIGHT-HAND (5)**
17:12;22:10;31:8,
14,21
**RILEY (61)**
6:10;7:4;13:17;
27:23;28:6;32:19;
37:22;40:24;41:1;
43:21,23;59:11,19;
69:11;74:18;82:9;
84:5;86:4,4;91:22;
94:14;96:6,12;108:9,
12,16;112:10;
114:19,20;151:15,
24;152:1;153:21;
154:9;155:17,18;
156:11;157:15,17;
158:3,25;159:23;
160:4;161:22;
169:25;172:23;
174:14,15;175:11;
176:13;177:1,10;
178:19;201:3;210:5,
10,24;211:3,12;
214:25;221:10
**RILEYS (1)**
159:17
**RILEY'S (16)**
80:25;102:4;
105:20;113:19;
128:13;158:10,19;
159:24;162:2,15;
171:24;210:13;
218:16;219:1;220:8,
20
**RING (1)**
170:20
**ROATAN (2)**
13:7,9
**ROLLS (1)**
19:5
**ROOM (30)**
25:10;28:14;29:9;
37:5,7,12;49:9;51:1,
11;52:5;56:6;59:8;
107:18,22,25;
108:22;116:20;
117:5,25;120:12;
122:23;143:14,24;
144:25,25;148:16,
16;170:5,5,6
**ROOMS (1)**
25:12
**ROPED (1)**
45:5
**ROUGHLY (1)**
89:25
**ROUNDS (1)**
101:14
**ROW (1)**
32:16
**ROY (6)**

91:11,12,15;93:22;
105:21;107:7
**RULES (2)**
10:15;64:11
**RUM (1)**
100:18
**RUN (3)**
26:19;109:9;193:4
**RUNNING (20)**
47:18;49:2,3,8,8,
11,24;52:1;110:21;
111:2;121:8,16;
122:13;128:5;137:3;
145:18;162:20;
166:11,12,13
**RUNS (1)**
110:20
**RUSSIA (2)**
87:7,8

---

# S

**SAFE (1)**
54:15
**SAILOR (3)**
158:14;159:9,16
**SAILORS (1)**
33:14
**SAME (22)**
26:8;58:24;62:2;
64:14;75:5;84:20;
93:23;103:8;129:4,5,
8;131:8;132:1,3;
166:21;184:7;
189:13;190:13;
205:3;215:11;
216:23;217:4
**SANDAL (1)**
95:20
**SANDALS (6)**
34:16;95:9,15,19,
21;96:2
**SAT (14)**
86:25;88:16;92:6,
7,23,24;93:1;115:4;
123:2;167:12;
192:20,23,24;203:20
**SAW (19)**
30:6;36:18;42:16;
50:4;59:10,18;61:15;
62:3;91:21;94:14;
108:16;109:14;
111:3;147:17;
152:19,21;155:18;
163:18;221:10
**SAYING (12)**
10:16;11:16;
33:24;90:18;103:19;
143:14,16;149:6;
166:25;188:5,8;
197:11
**SCALE (1)**
78:19

**SCENE (9)**
38:1,4;56:1;171:1;
172:10;177:15;
180:20,23;212:10
**SCENERY (2)**
72:20,21
**SCHOOL (2)**
9:22;67:17
**SCREAM (1)**
33:23
**SCREAMING (1)**
33:24
**SCRUB (2)**
174:1,5
**SCRUBS (3)**
173:9,24,25
**SEAT (6)**
193:22,22;194:2,
14,25;195:1
**SEATED (14)**
29:6;44:13,16;
53:9,23;60:2,9;82:3,
5;84:3;193:22;194:2,
25;204:1
**SEATING (2)**
54:7;89:10
**SEATS (3)**
90:20;192:21;
198:3
**SECOND (14)**
58:13,14,23;
117:23;126:5;131:7,
21;142:5,13,22;
144:16;145:7;221:7;
222:3
**SECONDS (3)**
166:17;169:1;
170:10
**SECURITY (8)**
38:14;55:10,14;
111:10,22;112:3,4,
16
**SEEING (3)**
62:20;105:19;
205:13
**SEEM (4)**
52:10;135:2,5;
175:15
**SEEMED (1)**
46:18
**SEEMS (4)**
98:11;116:8;
138:9;139:21
**SEEPED (2)**
44:6;110:16
**SEEPING (1)**
41:19
**SENT (1)**
186:22
**SEPARATING (1)**
157:2
**SEPTEMBER (1)**
9:9

**SERENITY (3)**
49:10;51:4;121:17
**SERIOUSLY (1)**
189:18
**SERVED (2)**
198:2,4
**SERVERS (1)**
195:8
**SERVICE (5)**
56:25;129:5;
131:22;184:3,18
**SERVICES (7)**
125:11,25;126:6;
127:23,23;130:4,17
**SERVING (1)**
196:16
**SET (2)**
54:3;120:10
**SETTING (1)**
65:16
**SET-UP (1)**
120:11
**SEVENTEEN (3)**
48:24;122:15;
123:4
**SEVERAL (9)**
16:23;17:25;25:1;
33:14;59:1;92:9,10;
119:11;149:11
**SEWERAGE (8)**
116:21;117:6;
118:5;119:23;
123:12;136:14;
147:15,16
**SEXIST (1)**
179:19
**SEXUALLY (1)**
65:21
**SHADE (1)**
221:12
**SHAKING (4)**
55:23;57:20;
69:15;160:5
**SHARE (1)**
213:11
**SHATTERED (1)**
123:8
**SHERIFF'S (1)**
9:6
**SHINY (2)**
72:19;199:7
**SHIP (49)**
15:25;17:20;20:9;
21:22;22:1;26:16;
28:15;29:13;38:3;
49:7;51:8;55:2;
56:24;57:7;58:3;
59:1;60:17;71:3;
73:17;76:12,20;77:3,
4;80:6;99:18;
101:12;116:13,15,
25;117:1,2,10;
121:21;122:1;

123:16,18;128:25;
134:2,8,8;135:1;
145:21;147:21;
150:5;183:21,23;
187:18;197:14;
207:11
**SHIP- (1)**
111:17
**SHIPS (2)**
15:5;74:12
**SHIPWIDE (1)**
111:16
**SHIRLEY (54)**
6:10;7:4;16:22;
27:23;28:6;29:21;
30:5,17,23;32:8,19;
33:7,13;36:18;37:21;
38:24;40:16,24;
42:12,25,25;43:20;
44:21;50:13,17;
51:20;54:17;55:14;
56:1,5,10;58:17;
59:9,18;61:23;62:3,
14,15,25;63:3,3,16,
18;74:18;112:10;
194:15;204:9,14,24;
205:14;210:19;
211:15,18;212:1
**SHIRLEY'S (4)**
38:20;52:24;53:4;
214:10
**SHIRT (10)**
111:13,20;166:1,1,
2;175:1,2,4,4;180:11
**SHOE (1)**
95:20
**SHOES (3)**
95:22,22,24
**SHOOK (1)**
137:20
**SHORT (5)**
47:18;60:22;
113:6;165:11;195:15
**SHORTS (2)**
164:23,25
**SHORT-STAFFED (1)**
59:5
**SHOTS (3)**
104:3,20;105:1,6
**SHOULDER (2)**
34:22;154:11
**SHOW (13)**
19:15;45:9;71:23;
75:1;78:24;88:21;
101:22;104:12;
141:2;147:23;
152:16;173:2;191:18
**SHOWING (5)**
75:10;79:15,22;
135:16;140:24
**SHOWS (2)**
77:3;147:9
**SHY (1)**

Case 1:15-cv-20807-JEM   Document 44-1   Entered on FLSD Docket 11/02/2015   Page 74 of 77
Shirley Riley vs                                                          Dalise L. Gautreaux
Carnival Corporation, et al                                                 August 27, 2015

116:9
SIC (8)
    52:24;71:8;
    152:24;195:2;
    216:21;218:23;
    220:6;221:16
SIDE (56)
    17:12;20:12;
    21:15,18,22,23,24;
    22:10,12,13;23:7;
    25:9;26:23;27:3,5,6;
    31:8,15,21;32:11,15;
    37:9;38:15,16;39:15;
    54:15;78:1,4,6;80:8,
    10,12;81:13,16;
    84:18;90:2,4,5,13;
    152:7;154:11,11;
    155:17,17,22,22;
    156:9,13,23,25;
    158:4;167:15;
    190:24;202:24;
    203:5;206:5
SIGHTS (1)
    134:5
SIGN (2)
    136:24,25
SIGNIFICANT (3)
    160:2,7;161:1
SIGNS (3)
    44:18,25;110:24
SIMILARLY (1)
    194:11
SIMPLE (1)
    132:21
SISTER (1)
    14:12
SIT (4)
    42:24;63:12;
    82:24;212:12
SITE (9)
    185:12,21,25;
    186:7,8,12;187:15,
    16;188:1
SITES (2)
    185:15,18
SITTING (37)
    39:22,23;42:13;
    44:8;61:18;82:25;
    83:23;90:8,21;91:18;
    92:9;97:8,8;99:11;
    100:7;107:10;
    109:12;123:22;
    160:21;162:3;163:5,
    11,15;167:8,10,11,
    13;168:14,16;
    174:16;178:4;
    193:19;194:14;
    198:3;204:1;205:13;
    211:4
SITUATION (3)
    11:13;108:23;
    109:2
SITUATIONS (2)

9:2;109:4
SIX (6)
    12:24;15:2;48:23;
    117:25;120:13;
    122:15
SIXTEEN (1)
    48:23
SIZE (2)
    41:18,21
SKIDMARKS (2)
    42:5;110:24
SKIN (2)
    87:20;112:22
SLACKS (1)
    180:16
SLEEK (1)
    23:24
SLENDER (1)
    87:19
SLIP (4)
    34:6,15;36:18;
    178:7
SLIPPED (6)
    36:12;86:5;
    122:22;202:9,10;
    211:3
SLOT (38)
    17:17;18:18,25;
    19:2;21:6,7,9,17;
    22:10;26:7;27:10;
    77:20,23;80:1,7,8;
    81:19;82:1,5;83:23;
    160:21;162:4,16;
    163:4,5,6,10,13;
    167:5;168:12,18;
    190:24;192:12,15,
    18,21,22;211:4
SLOTS (1)
    84:1
SLOW (1)
    201:9
SMALL (3)
    43:12;87:19;214:1
SMELL (4)
    117:6,18;118:2;
    147:15
SMELLED (1)
    148:17
SMELLING (2)
    116:21;127:20
SMOKE (17)
    17:4,10,15;18:6;
    53:20;88:4,18;89:16;
    90:8,12;92:12,14,17;
    192:24;193:1,4,8
SMOKED (3)
    53:21;88:17;
    177:20
SMOKING (5)
    17:19;53:10;60:2;
    90:22;97:9
SOCIAL (2)
    160:8;185:22

SODA (2)
    18:11,15
SOFA (1)
    21:15
SOFAS (2)
    191:6,9
SOLEMNLY (1)
    7:10
SOMEBODY (9)
    37:5;48:4;156:6;
    178:20,22;181:8;
    196:17;197:24;
    203:25
SOMEONE (8)
    82:2;84:3;110:24;
    111:21;120:18;
    129:8;171:9;186:22
SOMETIMES (2)
    50:5;64:19
SOMEWHAT (2)
    15:24;132:9
SOMEWHERE (1)
    79:3
SORRY (42)
    13:8;32:23;33:17;
    51:18;52:2;57:21;
    62:22;67:10;69:23;
    72:3,23;73:19;75:14;
    77:11;78:25;81:12,
    21;87:8;93:19;
    105:24;110:1;
    111:10;115:17;
    121:12,15;127:7;
    128:16;132:22;
    151:10,13;153:10;
    161:13;162:2;
    164:11;165:19;
    168:11;172:21;
    182:6;183:2;193:12;
    218:20;219:19
SORT (6)
    86:17;129:14;
    150:1;162:1;188:1;
    220:17
SOUND (2)
    14:2;129:13
SOUNDS (1)
    10:9
SOURCE (1)
    181:2
SOUTHEAST (1)
    118:19
SOUTHERN (1)
    6:13
SPACE (1)
    157:2
SPEAK (11)
    11:17;55:17;
    113:17;119:24;
    120:18;126:1;
    129:21;149:12;
    184:20;196:4,7
SPEAKING (6)

77:14;100:11;
    119:21;136:3;137:4;
    158:14
SPECIAL (1)
    86:17
SPECIFIC (5)
    16:24;17:9;65:17;
    89:19,20
SPECIFICALLY (8)
    77:23;85:3,7,13;
    89:16;119:24;121:3;
    128:12
SPECULATION (2)
    99:14;144:8
SPELL (2)
    7:19,25
SPIKED (1)
    113:6
SPOKE (11)
    81:14;82:6;86:25;
    125:18;126:6;
    129:18;131:21;
    132:15;134:25;
    184:2,17
SPOT (4)
    80:19;92:9;
    107:22;161:17
SPREAD (2)
    63:20;212:17
SPRING (4)
    47:6;48:17;52:14,
    15
SQUEAKY (1)
    170:22
ST (1)
    6:8
STAFF (8)
    120:7;123:14;
    147:19;173:7;
    174:24;176:17;
    179:4,6
STAFFED (1)
    47:18
STAFFING (1)
    47:25
STAMP (1)
    138:15
STAND (2)
    21:11;174:17
STANDING (8)
    41:6;97:8;112:6,8;
    157:18,22;169:23;
    176:20
STARING (1)
    205:5
START (15)
    12:16;13:1;67:21;
    104:15;130:15;
    137:23;138:2;
    151:25;164:1;172:7;
    175:9;181:1;218:5,
    21;220:14
STARTED (6)

13:2,6,11;63:20;
    107:8;197:10
STARTING (1)
    29:9;212:12
STARTS (1)
    16:10
STATE (2)
    6:20;7:17
STATEMENT (2)
    55:11;66:15
STATEMENTS (11)
    138:25;140:11,19;
    142:1;143:6;144:5,
    12;145:24;146:23;
    164:3;167:2
STATEROOM (1)
    149:12,16
STATES (5)
    6:12;143:17;
    147:14,17,18
STATIONED (1)
    92:20
STAY (1)
    105:16
STAYED (2)
    162:14;177:23
STENOGRAPHER (2)
    106:21;107:2
STEPPED (1)
    110:25
STEPS (1)
    49:7
STEW- (1)
    118:13
STEWARD (8)
    118:11,13;119:15,
    22;120:2;123:12;
    136:19;147:17
STEWARDESS (2)
    118:8,12
STICKER (1)
    90:18
STILL (9)
    41:2;56:15;57:8;
    88:16;110:21;
    133:10;172:24;
    176:9,11
STONES (1)
    95:16
STOOD (1)
    96:19
STOOL (2)
    92:11,19
STOOLS (5)
    25:24;83:7,22;
    84:4;90:8
STOP (4)
    105:24;161:3,5,14
STOPPED (6)
    156:6;158:13;
    160:20;162:1;163:1;
    166:14
STORY (2)

57:15;188:17
**STRAIGHT (1)**
21:9
**STRAW (1)**
155:8
**STREET (1)**
102:21
**STRIKE (12)**
12:8;26:12;27:20;
38:2,10;45:8;47:4;
49:15;54:24;62:12;
63:1;194:12
**STROLL (1)**
36:16
**STUDENTS (1)**
48:24
**STUFF (2)**
137:25;186:5
**SUBJECT (4)**
15:4,9,9;192:1
**SUBPOENA (3)**
8:8,12;69:19
**SUBPOENAED (1)**
10:8
**SUBSEQUENT (1)**
15:8
**SUBSEQUENTLY (1)**
10:19
**SUBSTANCE (3)**
43:6;132:2;146:14
**SUBSTANTIVE (1)**
138:1
**SUBTRACT (1)**
131:19
**SUITE (1)**
6:9
**SUNNY (1)**
74:15
**SUPERMAN (1)**
201:15
**SUPPLIED (1)**
146:7
**SUPPOSED (5)**
49:11;77:6,20,22;
121:18
**SUPPOSEDLY (1)**
92:16
**SURE (35)**
36:2;61:14;64:15;
71:16;72:19;94:10;
95:14,19;96:1;98:18;
99:16;100:3;106:8;
109:7;111:18;
118:25;122:5,8,9;
125:4,17;148:12;
150:12,15,18;
163:19;181:19;
183:19;186:15;
188:13,14;191:15;
201:25;203:12;
205:11
**SURFACE (1)**
23:10

**SWARMED (1)**
97:23
**SWARMING (1)**
28:8
**SWEAR (3)**
7:7,10;66:7
**SWIM (3)**
50:5,18,21
**SWORN (1)**
6:2

## T

**TABLE (2)**
120:9;191:10
**TABLES (8)**
21:8,8,14;27:11;
77:21;120:10,12,13
**TAG (1)**
186:5
**TAGGED (4)**
186:1,2,25;187:2
**TALK (5)**
55:2;108:18;
119:7;121:3,4
**TALKED (4)**
66:11;108:20;
119:11;199:2
**TALKING (14)**
31:10;88:7;
119:22;122:12;
125:9,10,12;149:24;
156:6;166:16,24;
186:8;187:13;191:19
**TAPE (7)**
6:6;61:10;150:22;
151:2,7;221:25;
222:24
**TEAM (1)**
120:11
**TEENAGE (1)**
123:3
**TEENAGER (3)**
146:2,7,9
**TEENAGERS (3)**
121:20;145:19;
147:20
**TELEPHONE (1)**
58:14
**TELLING (4)**
190:10;197:6,17;
208:10
**TEN (9)**
38:21;39:3,5;
53:19;94:3;177:13,
25;178:10,11
**TEND (2)**
199:23;200:4
**TENNIS (1)**
95:22
**TEQUILA (1)**
104:3
**TERMINAL (1)**

123:23
**TERMS (8)**
9:19;48:15;132:1;
146:14;157:13;
165:25;166:20;
212:14
**TERRIBLY (1)**
190:4
**TESTIFIED (6)**
6:4;66:17;73:25;
192:10;206:2;210:12
**TESTIFY (4)**
66:10;189:11;
202:16;208:10
**TESTIMONY (13)**
7:10;31:22;61:15,
21;70:8;110:15;
162:8;195:5;198:12;
202:18;203:25;
204:8;205:12
**THANKS (3)**
8:7;20:1;201:1
**THERE'D (1)**
98:12
**THING-A-MA-BOBBER (1)**
179:8
**THINKING (5)**
85:4,7,13;191:16,
20
**THIRD (2)**
32:16;117:23
**THIRTIES (1)**
164:13
**THIRTY (17)**
42:14;43:2,5,10;
45:3;48:4;53:15,18;
60:1;61:22;62:1;
63:15;93:7;98:10,11;
167:24;196:1
**THOROUGHFARE (2)**
27:14;98:5
**THOUGH (3)**
87:14;122:7;217:3
**THOUGHT (2)**
164:4;196:21
**THOUGHTS (1)**
213:12
**THREE (8)**
30:7;40:18;42:1;
43:16;68:3;83:22;
84:18;109:19;110:3,
10;117:3,5;118:7;
119:23;120:3;
123:11;170:18;220:5
**THROUGHOUT (2)**
97:14;149:22
**THURSDAY (2)**
136:23;143:16
**TICKET (1)**
106:1
**TICKETS (2)**
150:6,8
**TILE (16)**

41:21;45:9;46:13,
23;74:8;78:3;
168:13;169:15;
198:20;217:4;218:7,
25;219:8;220:7,19;
221:8
**TILED (2)**
38:24;45:21
**TILES (14)**
32:16;41:20,22,24,
25;43:17;74:23;
109:16,19,19,23;
110:3,5,10
**TILL (2)**
123:22
**TIMES (18)**
8:23;9:3;15:12;
16:21;17:25;18:7,21;
46:7;65:23;74:1;
92:10;97:14;119:11;
170:18;171:9;
186:11;214:15,20
**TINY (1)**
78:18
**TITLE (5)**
125:19,20,23;
129:9;151:20
**TODAY (12)**
6:15;10:6,7;66:7;
68:11,11,18;128:18;
133:16;149:24;
188:20;189:18
**TO-DAY (1)**
150:4
**TOED (1)**
95:24
**TOLD (22)**
57:3,4;58:22,24;
108:22;119:8,12;
127:17,22;128:3,7;
129:3;131:4,25;
132:21;154:17;
184:6,7;195:12,19;
196:13;210:3
**TOMORROW (1)**
129:2
**TONIGHT (1)**
68:14
**TOOK (8)**
48:4;117:5;
120:14,15,16;
139:23;176:17,22
**TOP (6)**
25:23;81:22;
103:4,7;114:19;
156:23
**TOTAL (2)**
15:1;109:23
**TOWARD (7)**
77:4;81:22;93:8;
94:13;105:21;107:8;
110:16
**TOWARDS (15)**

20:9;29:12,17,19;
35:15;36:11;37:8;
44:6;63:20;81:19,19;
98:22;156:24,25;
169:14
**TOWN (1)**
134:6
**TRACK (1)**
45:13
**TRANSCRIPT (14)**
8:18;10:18,21,23;
19:21;22:23;45:18;
76:2;79:20;89:1;
135:21;141:8;148:3;
222:4
**TRANSPORTATION (1)**
40:9
**TRAVELLED (1)**
52:15
**TRAVELLING (1)**
14:9
**TREATED (1)**
133:12
**TRIAL (1)**
189:11
**TRIED (3)**
39:24;136:20;
149:11
**TRIP (1)**
34:9
**TRIPS (1)**
213:18
**TRIUMPH (1)**
15:6
**TRIVIA (1)**
21:12
**TROUBLE (4)**
145:20,20;147:21;
161:19
**TRUCK (1)**
179:8
**TRUE (1)**
208:18
**TRUNKS (3)**
50:5,18,21
**TRUTH (5)**
7:11,11,12;66:8;
189:18
**TRUTHFUL (2)**
189:2,8
**TRY (5)**
11:18,22;138:3;
168:19;174:14;
203:22;212:12
**TRYING (11)**
14:14;86:2;91:5;
112:11;142:8;150:9;
176:21;180:2;
193:16;201:24;
202:14
**TUBS (2)**
25:8;51:4
**TURN (2)**

12:9;192:2
**TURNED (2)**
158:15;180:7
**TWELVE (3)**
110:4;120:8,9
**TWENTY (7)**
40:23;100:1;
126:3,7;169:3;
176:16,17
**TWENTY-FIVE (1)**
99:4
**TWENTY-THREE (1)**
8:6
**TWICE (3)**
8:25;18:22;144:22
**TWO (29)**
9:3;40:3,18;42:1;
43:16,17;46:5;83:24;
84:18;104:2;105:5,6;
109:16,19;110:3,10;
120:9,12;123:3;
143:15;144:12;
157:2,8;176:4;
181:17;183:18;
198:3;217:5;218:8
**TYPE (16)**
11:13;40:8;56:9;
66:21;68:4;95:20;
108:23;109:2;
111:12;129:23;
139:19;180:13;
199:7,18;200:10;
217:24
**TYPICALLY (1)**
113:15
**TYPING (1)**
131:5

## U

**UH (47)**
7:24;13:2;20:20;
40:3;51:11;69:25;
70:5;73:4;77:19;
91:5;100:25;101:3,
13;104:13;107:13;
110:20;111:12,13;
112:22;115:3;
117:17;118:15,15;
119:7,20;121:20;
122:5,19;125:3,24;
143:15;154:24;
160:2,15;166:5;
169:12,21;170:4;
171:15,16;173:7,16;
174:11;176:18;
179:4;180:11;197:14
**UM (282)**
8:25,25;9:1,12,14,
23;14:13;16:8;
17:16;21:4,12,13,14,
14;24:3;25:8,23,24;
28:6,7,8;29:12;

30:25;32:15;33:14,
23;35:15,20;36:10,
16,24;37:4,7,14,16,
18,21;38:14,15,21;
39:6;40:6,6,10,21,
22;41:14,18,23;
42:14;43:12,13,16;
47:13,18,19;48:3,22,
23;49:4,4,5,5,8,11;
50:22;51:2,2,3,25;
52:5,8,15;53:19;
54:11;56:6,19,24,25;
57:2,3,15,16;58:24;
59:1,2,3,15;60:3,18;
63:11,19;65:17,25;
67:15,21;68:14;69:7,
19,23;70:20,21;71:2,
9,11,12;72:15,19,25;
73:8,11,18;74:3,12,
19;76:24;77:19,21,
25;81:18;87:19,19,
20;89:9;90:1,10;
91:1,19;93:12;94:2,
10;95:13,15,21,21;
96:17;97:12;98:20;
99:16;100:10;101:9,
11,12,23;102:1,11;
104:2;105:11;
108:20;111:12,17,
18,24;112:5,7,10,22,
23;113:6,21;115:11,
19;116:15,20,24;
117:18,22,24;118:1,
7;120:2,3,7,8,10,12;
121:1,8,16,16,18,19,
23,23;122:24;123:1,
2,3,4,19;125:4,22;
126:3;129:12;
136:17;138:9,18;
139:15,23;143:13,
14,16,17;145:17,18,
25;147:18;148:22;
150:3,5,6,7,8,9;
151:17;154:10,12,
17,24,25;156:6;
159:15;160:20;
162:16,23,25;164:4,
5,10,11,12,18;166:6;
167:9,10;169:1,18;
170:17;171:17,18,
19;173:8,9,19,24;
174:15,22;175:5;
176:2,15;177:12;
178:18,19;179:7;
180:1,10;184:4;
185:17;190:8;191:7,
8,9;195:12,17,20;
196:10,14;197:3,8,
10;198:3;199:17,18;
201:22;203:21;
204:17;205:1,6;
206:5;207:10;208:4;
212:11

**UNCHANGED (1)**
43:25
**UNCOMFORTABLE (1)**
11:7
**UNDERAGE (1)**
121:21
**UNDERSTAFFED (1)**
48:2
**UNDERSTOOD (14)**
60:15;62:22;65:2;
67:12;71:6;88:19;
89:15;142:25;
144:19,24;147:7;
166:10;186:17;
205:11
**UNFORTUNATE (1)**
199:20
**UNIFORM (5)**
68:11,21,24;111:9;
180:8
**UNINTERESTED (1)**
135:6
**UNITED (1)**
6:12
**UNLESS (3)**
199:20,21;201:14
**UNOBSTRUCTED (1)**
95:2
**UNREASONABLE (1)**
59:20
**UNSAFE (1)**
59:19
**UNSUCCESSFUL (1)**
149:13
**UP (71)**
25:23;29:11;
30:15;35:22;39:7,14,
19,19,21,21,24;44:9,
13;49:7,12;59:6;
60:11;65:25;73:18;
92:10;96:19,20;
104:19;105:16;
109:5;112:10;113:7;
115:4,6;117:16;
122:11;123:4,21;
137:3;145:18;152:3;
155:6;158:1,15;
160:22;162:20;
166:11,12,13;
167:12;168:19;
170:22;171:10,13;
173:2;174:16,17;
176:9;177:3;178:5,6,
12,16,21;179:1;
182:15;183:8,12;
190:11;193:3;
197:24;198:1;
201:24;203:20;
204:1;212:12
**UPON (3)**
76:9;80:5;160:3
**UPPER (1)**
39:17

**UPSET (2)**
117:9;133:11
**UPSETTING (2)**
117:4;133:5
**USE (3)**
66:1;86:16;132:1
**USED (7)**
66:15;83:22;
94:18;116:5;136:25;
146:24;217:24
**USING (2)**
78:7;79:8
**USUAL (1)**
119:1

## V

**VAGUE (1)**
64:20
**VANTAGE (2)**
163:21;194:5
**VELCRO (2)**
166:8
**VENTILATOR (1)**
118:1
**VERSUS (2)**
6:11;135:7
**VFIP (1)**
18:3
**VICINITY (2)**
152:25;153:1
**VICTORY (6)**
70:23;134:3;
190:11,19;191:17,18
**VIDEO (8)**
6:6,18;61:10;
151:1,7;161:14;
221:25;222:24
**VIDEOGRAPHER (19)**
6:5,17;7:5;61:5,8;
106:11,14;150:21,
25;151:5;182:2,7,10;
187:6,10;214:2,5;
221:24;222:23
**VIEW (6)**
23:6;56:10;84:6,7,
15;95:2
**VIEWED (1)**
84:20
**VIFP (2)**
70:11,21
**VIFPE (1)**
71:7
**VIP (6)**
18:3;70:21,24;
71:8,14;191:9
**VIPS (1)**
71:3
**VISION (2)**
86:19;100:9
**VISUALIZE (1)**
110:7
**VOICE (3)**

148:14;149:10;
170:22

## W

**WAIST (1)**
205:22
**WAIT (5)**
11:18;36:6;42:21;
120:7;130:11
**WAITING (4)**
38:16;123:23;
177:1,1
**WAIVE (3)**
10:23;11:1;222:12
**WALGAMOTTE (3)**
7:24;136:13;
147:13
**W-A-L-G-A-M-O-T-T-E (1)**
8:1
**WALK (24)**
21:4,9,16,21;22:9;
23:6;24:23;25:4,6;
26:25;27:6,18;42:23;
77:16;80:12;93:22,
25;155:22;183:12;
190:23;199:19,23;
200:4,9
**WALKED (26)**
29:12;36:10;
40:25;42:18;43:4,10,
13,23;45:2;60:7;
61:16;62:1;63:11,14;
84:22;85:6;91:21;
94:2;104:19,19;
112:10;151:15;
158:13;167:12;
178:3;195:20
**WALKING (38)**
22:11;28:15,16;
29:17,17,19;30:16;
36:14;56:6;59:8,9,
18,20;80:9;93:8;
94:13;105:20;107:8;
152:1,6,7;154:13;
155:16;158:1;
160:10,17,18;
169:14,18,19;
178:20,25;181:9;
183:12,13,15;
199:11;210:14
**WALKS (3)**
30:18,20;36:14
**WALKWAY (25)**
23:13,19;24:20,23;
26:15,19,23;27:13,
17;30:16;32:12;
38:25;43:7;45:5,10,
21;51:16;62:1;78:3;
80:9;98:5;168:13;
169:15;199:11;
200:14
**WALL (8)**

31:15,19;37:9;
186:18,20,22,23;
187:16
**WARM (2)**
181:23,24
**WARNING (4)**
44:9,17,22,25
**WASH (1)**
61:4
**WATCH (5)**
9:15;59:3;105:16;
123:2;200:5
**WATCHED (2)**
57:4;112:9
**WATCHER (1)**
100:5
**WATCHING (3)**
161:14;167:16;
168:14
**WATER (69)**
41:14;42:3,9,9;
43:13,18,25;44:14;
51:8,15;52:4;54:16,
19;57:5;59:4;61:15,
25;62:3,11,13,15,25;
63:1,2,6,18;85:4,21;
86:2,3;87:11;91:21;
93:17;94:9;109:14;
110:20,25;111:2;
114:3;122:20;128:9;
150:11;176:7;177:4;
178:13,17,21;181:3,
9,10,13;183:9,12;
195:19;196:9,13;
197:1,6,12,18;198:8;
200:13;210:4,9;
211:13,16,17;212:3,
14
**WAY (31)**
18:2;26:14;29:16;
62:10;67:7,13;70:8,
13;74:8;81:18;90:15,
20;92:14;94:19;
115:1;133:11;138:8;
143:23;144:20,21;
150:6;152:5;154:2;
157:14;161:19;
187:25;194:23;
201:13;202:4;
207:12;213:11
**WAYS (1)**
74:5
**WEAR (5)**
68:21;111:11;
155:11;174:1,4
**WEARING (12)**
68:10,24;95:8;
96:2;164:17,20;
165:25;169:8;173:5;
174:4;180:8,10
**WEARS (1)**
111:19
**WEB (6)**

185:12,15,17;
186:7,8;188:1
**WEDDING (1)**
71:2
**WEDNESDAY (2)**
136:22;143:15
**WEEK (3)**
21:13;136:17,18
**WEREN'T (5)**
85:3,7,12;181:12;
192:12
**WET (9)**
50:7;113:21,22,22,
24;115:10,25;
205:22;206:5
**WHATNOT (1)**
97:9
**WHAT'S (9)**
9:10;75:10;91:9;
138:24;169:24;
216:10,11,12
**WHEELCHAIR (5)**
40:10,13,17,22;
174:20
**WHEELED (4)**
176:14;177:10,23;
179:10
**WHEELING (1)**
179:9
**WHEREUPON (17)**
8:15;19:18;22:20;
45:15;61:7;75:24;
79:17;88:23;106:13;
135:18;141:5;
147:25;151:4;182:9;
187:8;214:4;223:6
**WHICHEVER (1)**
83:11
**WHITE (9)**
111:12;154:25,25;
155:14,15;173:8,8;
174:6,9
**WHOEVER'S (1)**
161:13
**WHOLE (3)**
7:11;57:15;140:1
**WHO'S (2)**
10:16;146:1
**WIDE (8)**
41:22,23,24,25;
109:19;110:3,10;
111:18
**WILD (2)**
47:18;48:25
**WIN (1)**
19:11
**WINDBREAKER (2)**
175:5;180:13
**WINDOW (1)**
123:6
**WITHIN (7)**
77:7,8;89:19;
110:11;169:1;

170:10;208:17
**WITHOUT (4)**
86:1,2;115:25;
137:4
**WITNESS (124)**
7:7,13;12:13;
13:19;30:1;32:2,21;
33:5;34:14;35:9;
38:7;44:4;48:12;
50:25;51:24;55:23;
57:20;59:14,23;62:7,
19;63:10;69:2,15;
73:7;76:23;78:22;
81:4,9;82:12,19;
83:4,15;84:13;85:24;
86:6,22;88:1,10;
91:4;92:1;93:2;
96:16;98:17;99:7,15,
25;103:3;105:14,23;
106:7;112:2;113:3;
114:7,15,23;117:13;
122:21;127:5,13;
130:10;131:3;
133:15;136:7;
137:10;139:8;
140:16,22;141:19;
144:9,15;145:10;
146:20;147:3;149:2,
19;153:5,9;154:5;
156:1,21;157:5,11,
21;158:7;160:5;
161:12;167:20;
168:2;173:12;
175:19;177:7;181:6,
18,25;183:16;
190:16;191:5;
198:16,23;200:18;
202:8;203:8,15;
204:25;205:4,5;
207:5;209:15;211:8,
22;214:14,19;215:4,
12;217:11,21;
218:12;219:4,17;
220:11,23;222:9,13
**WITNESSED (1)**
27:22
**WITNESS'S (2)**
204:21;206:19
**WOMAN (1)**
167:23
**WON (1)**
101:13
**WONDERING (1)**
186:9
**WORD (11)**
116:4;130:6;
146:7,8;148:20,20;
153:1;209:2,2,12,12
**WORDS (7)**
13:25;26:6;50:4;
94:18;132:1;146:12;
148:13
**WORK (6)**

9:1,12;10:7;68:11,
13,17
**WORKED (2)**
9:7;118:3
**WORKER (1)**
126:6
**WORKERS (1)**
125:11
**WORKING (3)**
68:15;93:10;198:5
**WORRIED (1)**
206:18
**WRITE (3)**
65:25;68:5;184:25
**WRITES (1)**
208:18
**WRITE-UP (1)**
66:1
**WRITING (1)**
146:12
**WRITTEN (8)**
10:17;69:9,13;
138:24,25;140:3,9;
146:16
**WRONG (8)**
59:11;126:12;
130:6;133:2;151:11;
153:20;192:11;
207:11
**WROTE (5)**
137:25;138:1,6;
143:7;146:7

**X**

**X- (1)**
86:17

**Y**

**YA'LL (2)**
182:3;191:14
**YEAR (4)**
9:9,25;142:17;
147:6
**YEARS (2)**
68:4;123:4
**YELLED (1)**
178:20
**YELLING (2)**
104:20,25
**YEP (1)**
132:4
**YOUNG (7)**
132:15;160:22;
162:18,22;171:16;
180:5,5
**YOUNGER (3)**
146:1;162:22;
174:21

**Z**

**ZERO (1)**
107:15