EXHIBIT B

**1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

SHIRLEY RILEY,                    )

    Plaintiff,                    )
                                  ) Case No.
    VS.                           ) 1:15-cv-20807
                                  )
CARNIVAL CORPORATION D/B/A        )
CARNIVAL CRUISE LINES, in         )
personam,                         )
                                  )
    Defendant.                    )

VIDEOTAPED DEPOSITION OF SANDRA L. MORTON, produced, sworn and examined on the 7th day of July, 2015, between the hours of eight o'clock in the forenoon and six o'clock in the afternoon of that day, at Midwest Litigation Services, 2511 Broadway Bluffs, Suite 201, Columbia, Missouri, before Patricia A. Stewart, a Certified Court Reporter in the State of Missouri, in a certain cause now pending in the United States District Court for the Southern District of Florida, Miami Division, wherein Shirley Riley is the Plaintiff and Carnival Corporation, d/b/a Carnival Cruise Lines, in personam, is the Defendant.

**2**

INDEX

WITNESSES

For the Defendant:

SANDRA L. MORTON                              page
  Direct Examination by Mr. Kerns         5:9
  Cross-Examination by Ms. Eikeland       37:11
  Redirect Examination by Mr. Kerns       85:20

PLAINTIFF'S EXHIBITS INDEX
                                        marked
Plaintiff's Exhibit No. 4
Color Photograph                        43:11

EXHIBIT INSTRUCTIONS:

    Attach to the original transcript; attach a copy to Ms. Eikeland's transcript and scan to Ms. Eikeland's e-tran.

SIGNATURE INSTRUCTIONS:
    Obtain signature; waive presentment.

**3**

APPEARANCES

FOR THE PLAINTIFF:

  HICKEY LAW FIRM
  1401 Brickell Avenue, Suite 510
  Miami, Florida  33131
  (305) 371-8000
  By:  Mr. Bjorg Eikeland
  beikeland@hickeylawfirm.com

FOR THE DEFENDANT:

  MASA LARA, P.A.
  2601 South Bayshore Drive, Suite 800
  Miami, Florida  33133
  (305) 377-3770
  By:  Mr. Mason Kerns
  mkerns@maselara.com

ALSO PRESENT:
  Patricia A. Stewart, CCR 401
  Rita Yencarelli, Videographer

**4**

    IT IS HEREBY STIPULATED AND AGREED by and between Counsel for the Plaintiff and Counsel for the Defendant that this deposition may be taken by Patricia A. Stewart, a Certified Court Reporter in the State of Missouri, thereafter transcribed into typewriting, with the signature of the witness being expressly reserved,

        SANDRA L. MORTON,

of lawful age, having been produced, sworn and examined on the part of the Defendant, testified as follows:

    VIDEOGRAPHER YENCARELLI:  Good afternoon.  We are now on the video record.  Today is Tuesday, the 7th day of July 2015.  The time is 1:06 p.m.

    We are here at 2511 Broadway in Columbia, Missouri for the purpose of taking the video deposition of Sandra Morton taken by the Defendant in Case No. 1:15-cv-20807, case name Shirley Riley versus Carnival Corporation d/b/a Carnival Cruise Lines, which is filed in the United States District Court for the Southern District of Florida, Miami Division.

    The court reporter is Pat Stewart of US Legal Support.  The videographer is Rita Yencarelli of US Legal Support.

    Would all counsel please state their appearance for the record.

5

1    MR. KERNS:  Yes.  Mason Kerns of Mase Lara,
2  P.A. on behalf of the Carnival Corporation.
3    MS. EIKELAND:  My name is Bjorg Eikeland from
4  Hickey Law Firm representing the Plaintiff, Shirley
5  Riley, in this matter.
6    VIDEOGRAPHER YENCARELLI:  Will the court
7  reporter please swear in the witness.
8    (Witness sworn.)
9    DIRECT EXAMINATION
10  BY MR. KERNS:
11    Q.   Ms. Morton, can you state your name and date
12  of birth for the record, please?
13    A.   Sandra Lee Morton, 7-24-46.
14    Q.   And the other parties have — have announced,
15  so we'll — we'll skip that.
16    Now, Ms. Morton, you're here to give a
17  deposition.  Is this something you've done before?
18    A.   No.  Never.
19    Q.   Have you ever testified in court or anything,
20  in any sort of proceeding or anything like that?
21    A.   No.
22    Q.   Okay.  Essentially what a deposition is is
23  it's our opportunity as lawyers to find out what you
24  know about the case.  And I think we both have spoken
25  with you, or I know I've spoken with you, so I know a

6

1  little bit, but this is just a more thorough sort of
2  information gathering endeavor.  Okay?
3    A.   Uh-huh.
4    Q.   You really only have one main obligation and
5  that is to just testify truthfully.  Okay?
6    A.   Yes.
7    Q.   And alongside that, if I ask a question that
8  is in any way unclear to you, please, rather than guess
9  at what I'm — what I'm asking, because sometimes I
10  might just ask a poor question, please ask me for
11  clarification before answering.  Okay?
12    A.   Okay.
13    Q.   And do you understand that if you don't know
14  the answer to something, it's perfectly okay in a
15  deposition to say I don't know?
16    A.   Yeah.
17    Q.   Are you feeling okay today?
18    A.   Yes.
19    Q.   Okay.  You're not under the influence of any
20  prescription medication that makes you drowsy or may
21  hurt your memory in any way or anything like that?
22    A.   No.  Huh-uh.
23    Q.   Okay.  Any reason you can think of that you
24  would not be able to give complete, accurate testimony
25  at this time?

7

1    A.   No.
2    Q.   All right.  Where were you born?
3    A.   In Junction City, Kansas.
4    Q.   All right.  And what cities have you lived in
5  in the past?
6    A.   Oh.  I lived in Henderson, Nevada for, like,
7  eight years, and I was in Hawthorne, California.  That
8  wasn't for very long.  And my -- most of my life I've
9  lived in Marshall, Missouri.
10    Q.   In Marshall.
11    And Marshall is where you live right now.
12  Correct?
13    A.   Yeah, uh-huh.
14    Q.   And that's how far from here did you say?
15    A.   About 60 miles.
16    Q.   60 miles.
17    And it's to the -- the northwest?
18    A.   Yeah.
19    Q.   Are you married?
20    A.   No.
21    Q.   Were you married previously?
22    A.   Yes.
23    Q.   Is — do you have any children other than
24  John?
25    A.   I have five all total.

8

1    Q.   Oh, okay.
2    And how old are they?
3    A.   The oldest one is a girl.  She's Tabatha.
4  She's 40— she'll be 49 her birthday, which is pretty
5  shortly.  And then I have Theodore.  He's 46.  And then
6  I have Aaron.  He's 42.  And I have a daughter that's --
7  Melissa.  She's 38.
8    Q.   Okay.  So John is the youngest?
9    A.   Yeah.  He's the baby.
10    Q.   All right.  Are you currently employed?
11    A.   No.  I take care of Teddy, the oldest boy, is
12  mentally challenged, and he has Cerebral Palsy and he's
13  autistic.  So I have taken care of him -- his father was
14  killed when he was five, so I've taken care of him by
15  myself for a lot of years.
16    Q.   Do you enjoy going on — on cruises?
17    A.   Yes.
18    Q.   How — how many have you went on in total?
19    A.   I think six.  I've kind of — I lose track
20  after a while.
21    Q.   That's — that's understandable.
22    John was saying you go on about one a year.
23  Is that —
24    A.   We went on about -- yeah, two last year.
25    Q.   Two last year?

2  (Pages 5 to 8)

**9**

1   A.   Once this year, and I've already got my money
2   saved to go on another one in November.
3   Q.   Understood.
4   A.   I stayed home all my life, and I finally got
5   respite care for my boy that's disabled.  So the kids
6   for my birthday or Christmas give me a cruise, so . . .
7   Q.   Nice.
8        And you went on the Carnival Dream actually
9   in February.  Correct?
10  A.   Yeah.
11  Q.   Okay.  And then prior to that, the cruise
12  before that was also on the Carnival Dream, right --
13  A.   Uh-huh.
14  Q.   -- in 2014?
15  A.   Yes.
16  Q.   Was that a -- an enjoyable experience?
17  A.   Oh, yeah.
18  Q.   Have you ever been on a cruise line other
19  than Carnival?
20  A.   No.
21  Q.   Did either me or anyone from Carnival or an
22  agent of Carnival offer you any money or anything else
23  for your testimony in this case?
24  A.   No.
25  Q.   Have you been promised anything for

**10**

1   testifying today?
2   A.   No.
3   Q.   All right.  Do you remember the day of the --
4   the day that Ms. Riley, the Plaintiff in this case, fell
5   in the casino of the Carnival Dream?
6   A.   Yes.
7   Q.   Were you feeling alert and well on that day?
8   A.   Oh, yes.
9   Q.   Were you drinking excessively --
10  A.   No.
11  Q.   -- or doing drugs or anything?
12  A.   No.
13  Q.   Okay.
14       MS. EIKELAND:  Objection, form.
15  BY MR. KERNS:
16  Q.   And do you remember being in the casino when
17  Shirley Riley fell?
18  A.   Yes.
19  Q.   And what were you doing in the minutes
20  leading up to Ms. Riley's fall?
21  A.   We was getting ready to go to an afternoon
22  show, and my niece was with me, and she had to go to the
23  bathroom.  So I didn't, so I told her I would just sit.
24  And as we were going through the casino, she said, I
25  think there's one in here, a bathroom in here.  I said,

**11**

1   well, let me just sit and you go and I'll be here when
2   you get back.
3   Q.   And what was John doing at that time?
4   A.   He was with -- he was with me.  He was just
5   kind of standing.
6   Q.   Were you -- in the -- in the minutes leading
7   up to the -- to Ms. Riley's incident, were you playing
8   slots?
9   A.   I don't think I -- not that time, but I'd
10  been through there so many times, and, of course, I'd
11  put a dollar in when --
12  Q.   Okay.
13  A.   -- I do, you know.  I don't -- I don't
14  believe that I was at that time --
15  Q.   Okay.
16  A.   -- because I was just sitting.  I was
17  spinning in the seat, you know, biding my time waiting
18  for Coetta to get back.
19  Q.   Understood.
20       And from where you were -- the seat that you
21  were sitting in in the minutes leading up to
22  Ms. Riley's fall, which way were you facing, do you
23  know?
24  A.   I was -- I was facing towards the bar.  I was
25  just sitting -- the -- the slots were here in front of

**12**

1   me, and the bar was, like, this way, and I was just kind
2   of sitting there looking at people.
3   Q.   Were you -- were you near the -- were you
4   near a tile walkway where you were sitting?
5   A.   A tile walkway.  What do you mean?  Oh,
6   the -- the casino has carpet, and I was sitting right at
7   the edge of the tile walkway.
8   Q.   All right.  So your -- your chair was on the
9   carpet.  Correct?
10  A.   I believe so, yeah.
11  Q.   How far away were you from the -- from where
12  the carpet meets the tile, do you know?
13  A.   It couldn't have been maybe a foot or two,
14  because I was right by the door.  I mean, the door that
15  you come into the casino.  And I was kind of a -- a
16  green, shiny tile.  I remember the tile.
17  Q.   Understood.
18       Were you facing -- do you know whether or not
19  you were facing the tile walkway or whether you were
20  facing the machines or some other direction, any idea?
21  A.   Well, it's --
22       MS. EIKELAND:  Form.
23       THE WITNESS:  -- the walkway comes in and
24  kind of turns, and then the bar is over here.  So I was
25  kind of facing the bar.  So I -- I had the -- the whole

3 (Pages 9 to 12)

### 13

1  walkway and the carpet. I could see both.
2  BY MR. KERNS:
3      Q.   Okay. Do you remember what you and John
4  were -- were discussing?
5      A.   We weren't. He was behind me, and I don't
6  know what he was doing. I was just watching people.
7      Q.   Okay. We all do that.
8      A.   I'm a people watcher.
9      Q.   You know, your son said the same thing.
10     A.   Yeah.
11     Q.   Okay. And the woman who we now know
12  as -- as Ms. Riley, before she fell did you see her?
13     A.   I seen her -- well, I turned around. The
14  man, or whoever she was with, the man she was with --
15  there was like a party of four or five. There was a
16  little group of people, and they were right in the very
17  front.
18         And what made me look around to look at her
19  is because he was real loud and obnoxious, and he was
20  telling her to hurry -- hurry up or something to that
21  effect. Come on. We're going to be late, you know.
22  And that's what caused me to look -- to look to the side
23  where they was, because they was right beside me.
24         And when I looked over, that's when I heard
25  her -- she had big boat shoes on, and I heard the skid.

### 14

1  I heard like chalk on a chalkboard. And she just went
2  straight facedown. She didn't bend her knees. She
3  didn't bend at the waist. She just went -- it happened
4  just real fast. She just -- it was like she stuck and
5  went down.
6      Q.   Uh-huh.
7      A.   And he was on her -- he had ahold of her on
8  the -- on her left side, and her right arm was at her
9  waist. And when she fell, her right arm was underneath
10  her --
11     Q.   Okay.
12     A.   -- at her waist.
13     Q.   All right. I'll probably walk -- walk
14  through that sort of more step by step.
15         When you first noticed her, you indicated it
16  was because her -- her companion was saying hurry up?
17     A.   Yeah.
18     Q.   Where was --
19         MS. EIKELAND: Objection, form.
20  BY MR. KERNS:
21     Q.   When you first saw Ms. Riley on that day, how
22  far away was the -- her companion who was -- who was
23  making those statements from Ms. Riley?
24     A.   He was just -- she was not very far from him,
25  maybe three foot. He was right next to her on the -- on

### 15

1  the other side.
2      Q.   Was -- who was closer to you, Ms. Riley or
3  the other --
4      A.   She was.
5      Q.   And how far would you estimate she was from
6  you when you first saw her?
7      A.   Oh. She couldn't have been over three feet
8  maybe, four at the most. And just as I looked up at him
9  is when I heard -- she was completely standing, and I
10  heard the screech and she just went facedown. I thought
11  she had hurt her face --
12     Q.   Okay.
13     A.   -- because her face was on the floor.
14     Q.   Did you -- prior to sitting down, you know,
15  in the chair there by the slot machines, were you
16  walking on the -- on the tile?
17     A.   Uh-huh.
18     Q.   Were you walking in the area where Ms. Riley
19  eventually fell?
20     A.   I just had just come through there.
21     Q.   All right. And when you were walking on
22  there, did you see any liquid or any substance of any
23  kind on the tile floor?
24     A.   No.
25     Q.   All right. Do you believe that if you saw --

### 16

1  do you believe that if there was something visible, you
2  would have seen it?
3      A.   Oh, yeah.
4          MS. EIKELAND: Objection, form.
5  BY MR. KERNS:
6      Q.   When -- when opposing counsel objects, she--
7  she'll object occasionally and she'll say objection,
8  form or objection. Just wait for her to make her
9  objection and then -- then you can go ahead and answer
10  the question. Then when she's asking questions, I'll
11  probably do the same. So just wait for the objection
12  and then go.
13     A.   Okay.
14     Q.   So I believe the question was do you believe
15  that if there was water on the tile, would you have seen
16  it?
17         MS. EIKELAND: Objection, form.
18         THE WITNESS: I don't -- I doubt if I would
19  have seen it, because it was -- I was-- I wasn't looking
20  down when I was walking. But I probably would have fell
21  in it.
22  BY MR. KERNS:
23     Q.   Do you remember which -- you indicated that
24  you felt as if Ms. Riley's -- she kind of got stuck.
25  Was that -- was that sort of the word you used?

---

**17**

```
 1    A.   Yeah --
 2    Q.   Okay.
 3    A.   -- because I've done it before.
 4         MS. EIKELAND:  Form.
 5  BY MR. KERNS:
 6    Q.   You can -- can you describe what happens
 7  when -- when that has happened to you?
 8    A.   Well, I don't pick my feet up and my shoe
 9  will just stick.  And, of course, I'm in the house so
10  there is always something I can grab, you know, to keep
11  from falling.  But as you get older, you don't pick your
12  feet up like you did when you was younger.
13    Q.   Before Ms. Riley fell, other than the
14  statement that you indicated you heard the gentleman
15  make, did you hear Ms. Riley, the gentleman or anyone
16  else make any other statements that you remember in the
17  moments leading up to the fall?
18    A.   No.  There was just kind -- kind of some chit
19  chatting going on because it was a group of them, but I
20  didn't pay any attention until he kind of drowned them
21  all out.
22    Q.   Okay.  How long was it, would you estimate,
23  between when you -- your attention was first drawn to
24  the group because you heard him make the statement to
25  when Ms. Riley actually toppled over and fell?
```

**18**

```
 1    A.   Just as soon as he made the statement, I
 2  turned and she was al-- and she was standing up, and
 3  just within seconds she was down.
 4    Q.   Was there anyone closer to Ms. Riley when she
 5  fell than the -- than her companion, the one that was
 6  saying hurry up?
 7    A.   They was pretty close behind her, but him and
 8  her were kind of in the front.
 9    Q.   When you looked over and as you indicated saw
10  Ms. Riley fall, what, if anything, was the gentleman who
11  was with her doing, I mean physically?  Was he -- was he
12  moving in any way?
13    A.   Yes.  And he was hollering immediately, get
14  somebody here.  And, of course, she -- the minute she
15  hit the floor, she started hollering, I broke my arm.
16         And then he started hollering at the stewards
17  or the security guards, whatever, you know, around
18  there, and get somebody here right now, real loud.  He
19  was very obnoxious.  And get somebody over here right
20  now.  Hurry up.  And, you know, he said it several
21  times.
22         But she just kept hollering, I broke my arm.
23  I broke my arm.  But her whole group just kind of
24  flocked around her once she hit the floor.
25    Q.   When you looked over after you heard the
```

**19**

```
 1  gentleman saying hurry up and you saw Ms. Riley, did you
 2  at that time see any substance or any liquid on the
 3  tile?
 4    A.   No.
 5         MS. EIKELAND:  Form.
 6  BY MR. KERNS:
 7    Q.   When -- well, I'll -- I'll start the question
 8  over.
 9         How long did it take for someone who you
10  believed to be a Carnival employee to get to the scene?
11  How -- how long a period was that from the time she
12  fell?
13    A.   It wasn't -- it wasn't very long.  I remember
14  him hollering several times, and they kept telling him
15  that they called someone, that they was on the way with
16  a wheelchair, and then that's when I went over to talk
17  to one of the -- the stewards that was there.
18    Q.   Who -- who made the decision to -- to talk to
19  whom?  Did you volunteer information to the steward?
20  Did the steward ask you questions?  Can you explain how
21  that went?
22    A.   No.  I volunteered, because there was people
23  going over to her giving her their business cards, you
24  know, as if to sue, in case she sued.  And I thought,
25  well, now, you know, I'm going to tell my story, what I
```

**20**

```
 1  seen, and I didn't think anything would come of it to
 2  tell you the truth but . . .
 3    Q.   So -- so there were actually people handing
 4  out business cards?
 5    A.   One was at the bar, which was way at the end,
 6  walked up and gave her a card, and then somebody else
 7  gave her a piece of paper and I don't -- I don't know.
 8  That's when I started talking to the --
 9    Q.   Okay.
10    A.   -- the steward, and I just told him what I'd
11  seen.  And --
12    Q.   What -- what was your -- what was your
13  intention and -- why did you talk to the -- to the
14  steward?
15    A.   Just because I'm an honest person and I felt
16  like it wasn't -- it was her own fault.
17    Q.   Uh-huh.
18    A.   And I just felt like everybody else was, you
19  know -- I mean, he -- and he was very belligerent all
20  this time.  He was hollering, you know, hurry up and get
21  somebody over here and all this.  And I thought -- they
22  just seemed to me to be like the type of people that
23  would sue.
24    Q.   Did -- do you know whether or not anyone in
25  that group, be it Ms. Riley or her companion or any of
```

21

1  the other people who seemed to be with them, were
2  drinking at all?
3      A.   I have no idea.
4          MS. EIKELAND:  Objection, form.
5  BY MR. KERNS:
6      Q.   You wouldn't know either way?
7      A.   Huh-uh.
8      Q.   Between the time when Ms. Riley fell and when
9  she was taken away — away in the wheelchair, did you
10 leave from your chair that you were sitting in?
11     A.   No.  I -- actually I was standing by the
12 steward that I talked to when they took her away in the
13 wheelchair.
14     Q.   And where was the steward relative to —
15     A.   He was just right up from where I was
16 sitting, standing.  He was standing right kind of on the
17 edge of the tile where she was laying.
18     Q.   And when you were standing near the steward,
19 speaking with the steward, how far was -- was she from
20 you where she was laying on the ground?
21     A.   Not very.  About maybe three feet.  Because
22 we was just right -- I had my back to her because I was
23 still talking to him.  And I had made the remark that if
24 there was something in the floor, we needed to check
25 before somebody else fell.

22

1      Q.   Uh-huh.
2          And did you get a chance to look at the
3  floor?
4      A.   Yes.  I went with the steward.  We both went
5  over and looked at the floor, and I'm pretty sure he
6  even felt on the floor, because we was looking sideways
7  to see if we could see anything shining and there was
8  nothing.  There was nothing on the floor.
9      Q.   And —
10     A.   Because we was going to wipe it up if there
11 was in case somebody else would, you know.
12     Q.   Understood.
13         When — when you say you went over and looked
14 to see if there was any— anything on the floor, what —
15 what area did — did that cover when you went —
16     A.   Right across from where I was sitting where I
17 seen her feet when she fell, when she went down.  We
18 covered a pretty good size area.  Probably three or four
19 feet in that -- around the door where she'd come
20 through.
21     Q.   Would — would the area that you looked in
22 for any sort of substance or anything on the floor —
23 well, I'll start the question over.  That was going to
24 be a very poor question.  Okay.
25     Q.   Did — was she in — and by she I mean

23

1  Ms. Riley — in the area when she fell that you looked
2  at afterward?
3      A.   Yes.
4          MS. EIKELAND:  Objection, form.
5  BY MR. KERNS:
6      Q.   And were you able to observe anything on the
7  floor that was abnormal in any way?
8      A.   Yes.  There was beads all over the floor that
9  she broke when she was falling, and we picked those up.
10 There was a lot of people that helped pick those up.
11     Q.   Before she fell were there any beads on the
12 floor?
13     A.   No.  No.  She broke and -- and they just kind
14 of popped everywhere when she hit the floor.
15     Q.   So was Ms. Riley wearing the beads?
16     A.   Yes.
17     Q.   How good is your — your vision, do you know,
18 your —
19     A.   I -- well, I can see fine from a distance.  I
20 have to have reading glasses.
21     Q.   Are you at all nearsighted?
22     A.   That's from a distance.
23     Q.   Right.  Right.
24     A.   No.
25     Q.   You're not?

24

1      A.   No.  Huh-uh.  No.
2      Q.   Do you know, are you 20/20?  Do you know
3  what —
4      A.   I think it's 20/40 the last eye exam I had.
5      Q.   Do you — do you wear any corrective lenses
6  or glasses or anything?
7      A.   Just when I read.
8      Q.   At 20/40 you don't have to wear anything.
9  Right?
10     A.   Huh-uh.
11         MS. EIKELAND:  Objection, form, (inaudible)
12 question.
13         THE COURT REPORTER:  I'm sorry.  Objection,
14 form?
15         MS. EIKELAND:  If that was a question.  I'm
16 not sure if it was.
17 BY MR. KERNS:
18     Q.   Do you have any problem, for example,
19 noticing a substance or liquid on -- on a tile floor?
20     A.   No.
21         MS. EIKELAND:  Form.
22 BY MR. KERNS:
23     Q.   Between when Ms. Riley fell and when she was
24 wheeled away, did you see any Carnival employee
25 manipulate the floor or clean the floor or do anything

25

to the floor?

A.   No.  And I was there the whole time.

MS. EIKELAND: Objection, form.

BY MR. KERNS:

Q.   And after Ms. Riley was wheeled away, how long do you believe you were -- did you stay in the casino or in the casino area?

A.   It was a good -- it was about ten minutes before my niece ever got back from the bathroom, so I was there a good ten minutes.

Q.   During those ten minutes did you see any Carnival employee clean or wipe up or dry or in any other way manipulate the area of the floor on which Ms. Riley could have fallen?

MS. EIKELAND: Objection, form.

THE WITNESS: No.

BY MR. KERNS:

Q.   If -- if a Carnival employee had done something like that, is that something you would have been able to observe from the vantage point that you had?

A.   Oh, yes.

MS. EIKELAND: Objection, form.

BY MR. KERNS:

Q.   Do you know how many Carnival employees were

26

in the area helping out or assisting in some sort of way between the time when she -- when Ms. Riley fell and when she was taken away in the wheelchair?

A.   There was -- I know there was one on the right side, because that's the one I spoke to, and then there was one that came over by her on the opposite side, on the left side, and then I remember seeing a couple come with a wheelchair, so . . .

Q.   When Ms. Riley was on the floor, did you happen to take a look at her clothes?

A.   Well, her feet mainly.  She had on capris and a -- and a blouse, what everybody wears on the ship.

Q.   And can you describe her shoes?

A.   They were -- they were a tennis shoe but they was an older type tennis shoe.  They had the -- the rubber that come up high on the sides and around.  They were white.

Q.   You're saying the rubber area was white?

A.   Uh-huh.

MS. EIKELAND: Objection, form, mischaracterization of the witness's testimony.

BY MR. KERNS:

Q.   Did you -- were you able to tell whether or not Ms. Riley's clothes were wet in any way?

A.   No.

27

Q.   And does that mean, no, they weren't wet or, no, you weren't -- weren't able to tell?

A.   I -- I didn't even look.

Q.   Do you remember any -- any person, be it Ms. Riley, her companion, the group she was with or any Carnival employee, making any specific statements between the time when she fell and when she was taken away in a wheelchair?

A.   All I heard was him hollering to get somebody there, and they kept telling him someone is on the way, and she kept hollering that she broke her arm. That's -- that was all I heard was those two.

Q.   How many Carnival employees did you speak with about the incident, do you know?

A.   I just spoke to one when I was there, and then they came later too and spoke to me, took a deposition or whatever.

Q.   Did you -- did you write out a statement for them?

A.   Well, my niece did because I didn't have my glasses, so I told her and she wrote it, because I left my glasses back in the room.

Q.   All right.  Did -- did not having your glasses in any way affect your ability to see what happened to Ms. Riley?

28

A.   No.  Huh-uh.

MS. EIKELAND: Form.

BY MR. KERNS:

Q.   Do you know where you were when your niece wrote out the statement for you?

A.   Yes.  We was right off of the -- we had -- the middle pool, they was getting ready to show a movie and I was all ready to watch it, and they come and got me and took me into the -- just right inside the door to the foyer.

Q.   Okay.  So what -- what floor were you on at that -- at that time?

A.   Whichever one the pool is in -- on.  I can't remember because I've been on several ships.

Q.   Understood.

But it was --

A.   They're different.

Q.   It was a different floor than -- than the casino?

A.   I think so.

Q.   How did -- how did the Carnival employees know where to find you after -- you know, when they went to get the statement from you?

A.   I have no idea.

Q.   They figured it out.  Huh?

29

1   A.   Yeah.

2   Q.   All right. And other than Ms. Williams who
3 wrote the statement, who else was there when you gave
4 that statement?

5   A.   Just her and I. And I hadn't even thought
6 about -- you know, since it happened I hadn't even
7 thought about it.

8   Q.   Okay. Did -- did you forget anything that
9 you think is important between the time that you saw the
10 incident and when you gave the statement?

11   MS. EIKELAND: Form.

12   THE WITNESS: Well, I -- I had to think a
13 little bit, but I probably didn't give all of the
14 information then because I didn't have time to think.

15 BY MR. KERNS:

16   Q.   Did any Carnival employee or anyone else
17 attempt to influence the substance of your statement in
18 any way?

19   A.   The only thing that I recall is when she fell
20 her right arm was underneath her, and I asked -- I said
21 something about, well, did she break her right arm? And
22 the -- the guy said no. She said it was her left arm,
23 so . . .

24   Of course, I didn't know -- you know, I
25 couldn't tell which one she broke.

30

1   VIDEOGRAPHER YENCARELLI: Excuse me,
2 Ma'am, could you straighten your mike for me,
3 please.

4   Thank you so much.

5 BY MR. KERNS:

6   Q.   Did you feel pressured when you gave the
7 statement to give the statement in any way either
8 favorable for Carnival or against Carnival?

9   A.   No. Huh-uh.

10   Q.   And other -- other than someone saying, you
11 know, you need to write this or ask me to write it a
12 certain way, was there any subtle influence?

13   A.   No.

14   MS. EIKELAND: Form.

15 BY MR. KERNS:

16   Q.   Do you feel that your statement is a true and
17 accurate representation of what occurred?

18   A.   Yes.

19   MS. EIKELAND: Form.

20 BY MR. KERNS:

21   Q.   Do you recall while you were sitting there in
22 the casino anybody walking through on the tile that
23 appeared as if they had been to a pool or a jacuzzi?

24   A.   No.

25   Q.   Do you remember anybody during the period in

31

1 which you were sitting in the casino before Ms. Riley
2 fell, anybody spilling anything on the floor?

3   A.   No.

4   Q.   I'm just going to look through this quick.
5 Please bear with me a moment.

6   I'm looking at your statement which is marked
7 as Defendant's Exhibit 2. Can you take a look at that?
8 That -- this is where you need your reading glasses?

9   A.   Yes.

10   Q.   All right.

11   A.   That's probably -- she -- she kind of put it
12 in her own words but that's basically.

13   Q.   Understanding that you didn't -- didn't write
14 this, and I'm referring to Defendant's -- what was
15 marked as Defendant's Exhibit 2. Is there anything that
16 you said that was translated inaccurately other than
17 maybe the phrasing of certain things?

18   MS. EIKELAND: Form.

19   THE WITNESS: Well, I don't remember saying
20 that she broke her right elbow. I said arm.

21 BY MR. KERNS:

22   Q.   Uh-huh.

23   In terms of the -- the last sentence where it
24 indicates that there was no substance on the floor, is
25 that -- did she, Ms. Williams, error at all in -- in

32

1 writing down what you told her?

2   A.   I don't know what she's got here. Was it
3 wet? What is the word before that? I just -- I just
4 told her there was nothing wet on the floor.

5   Q.   Okay.

6   A.   So I don't know how she put that.

7   Q.   Okay. Have you ever -- have you ever made
8 any statements inconsistent with your statement that
9 there is nothing wet on the floor?

10   A.   No.

11   MS. EIKELAND: Form.

12 BY MR. KERNS:

13   Q.   Having viewed the incident, how do you
14 feel -- well, I'll start the question over.

15   Having viewed the incident, what do you think
16 the cause of Ms. Riley's fall was?

17   MS. EIKELAND: Objection, form. She's here
18 to testify as to her observations as a lay witness, not
19 as an expert in this deposition.

20 BY MR. KERNS:

21   Q.   You can answer.

22   A.   To me he was hurrying her and her feet just
23 stuck on the floor and that's what caused her to go
24 forward.

25   Q.   Is -- is your testimony that her feet

8  (Pages 29 to 32)

---

**33**

```
 1   sticking and her -- and that having caused -- is what
 2   has caused her to go forward --
 3       A.   Yes.
 4       Q.   -- is that based on --
 5       MS. EIKELAND:  Objection, form.
 6       MR. KERNS:  I'll start the question over.
 7   BY MR. KERNS:
 8       Q.   Your last statement about her feet sticking
 9   and her falling forward, are you able to give that
10   testimony because you're an expert?
11       A.   Yes. I've done it several times.
12       Q.   Okay.
13       A.   And when you slip, your feet go out.  You
14   don't fall flat on your face.
15       Q.   I guess what I'm asking is, does the
16   observation that you just gave, does that come from any
17   special training and experience that you had?
18       A.   I very frequently don't pick my feet up or
19   get in a hurry, and my top goes faster than my bottom of
20   my feet and . . .
21       Q.   If you hadn't had that experience yourself,
22   would you have a different conclusion about why
23   Ms. Riley fell?
24       MS. EIKELAND:  Objection, form, calls for
25   speculation.
```

**34**

```
 1       THE WITNESS:  Now I forgot what the question
 2   was.
 3   BY MR. KERNS:
 4       Q.   That's okay.  I'll -- I'll -- it was objected
 5   to. I'll move on.
 6       A.   Okay.
 7       Q.   It was probably a confusing question.
 8       A.   Okay.
 9           Well, I've slipped before and I -- I don't
10   fall. I mean, I'm backwards or sideways or -- you know,
11   it's -- it's not that simple.
12       Q.   Uh-huh.
13           And when you say that it looked as if her
14   feet got stuck, can you describe why you think that is
15   or what -- what goes into your statement that her feet
16   got stuck?  What did you observe?
17       A.   I heard a scr-- kind of a screech like chalk
18   on a chalkboard, and I've heard that same sound when I
19   haven't picked my feet up.
20           And it was like her feet just stayed there.
21   I mean, they -- they -- they didn't come off the floor,
22   and her -- from -- she just went straight.  She didn't
23   bend her knees, bend her waist or nothing.  I mean, it
24   was just a straight fall down.  And I thought maybe she
25   had hurt her face, because her face was right on the
```

**35**

```
 1   floor.
 2       Q.   Is there -- is there any way that you're
 3   mistaken, that there -- that there was water on the
 4   floor and that she slipped on?
 5       A.   No.
 6       Q.   In terms of your niece, Ms. Williams, did she
 7   come back from the bathroom before or after Ms. Riley
 8   was taken away in the wheelchair?
 9       A.   She come back just -- it was a little bit
10   after that for -- I don't -- she didn't see anything or
11   hear anything.
12       Q.   Do you know whether there were other people
13   in that area of the casino at the time Ms. Riley fell
14   that were in a position to -- to see what you saw or
15   something similar?
16       A.   Well, the row of -- of slot machines that I
17   sat down at, the only ones there was -- was my son and
18   me.  We were the only two at that whole, and it was
19   pretty bare.  There wasn't that many -- there
20   was some -- you know, there's a few people here, there.
21   But I know -- I'm sure I was the closest one to her.
22       Q.   How about on the other side of the tile from
23   where you were, the other side of the tile walkway,
24   what --
25       A.   There's --
```

**36**

```
 1       Q.   -- is over there?
 2       A.   There -- there's casinos over there too, and
 3   there was a few people over there.
 4       Q.   Do you know if any of them --
 5       A.   They were playing the slots, so they were
 6   pretty interested --
 7       Q.   Okay.
 8       A.   -- in what they were doing.
 9       Q.   Did you speak with any other bystanders, any
10   nonCarnival employees about what you saw or what --
11       A.   No.
12       Q.   -- what had occurred?
13           All right.  And do you remember talking to me
14   on the phone when I -- when I gave you a call about this
15   case?
16       A.   Uh-huh.  Yes.
17       Q.   Did I try to influence your -- your testimony
18   in any way?
19       A.   No.
20       Q.   Did I -- did I offer to buy you a -- a new
21   Corvette if you testified a certain way?
22       A.   No.  I wouldn't want one if you had have.
23       MR. KERNS:  At this time, subject to redirect
24   examination, I don't have any further questions.  I will
25   let my counterpart start her questioning.
```

9  (Pages 33 to 36)

37

1    MS. EIKELAND: Do you mind if we just take a
2  two-minute bathroom break?
3    MR. KERNS: That's fine with me.
4    MS. EIKELAND: Okay. Thank you.
5    VIDEOGRAPHER YENCARELLI: This is the end of
6  Media 1. We are off the record. The time is 1:54.
7    (A RECESS WAS TAKEN.)
8    VIDEOGRAPHER YENCARELLI: This is the
9  beginning of Media 2. We are on the record. The time
10  is 1:59 p.m.
11          CROSS-EXAMINATION
12  BY MS. EIKELAND:
13    Q.  Good afternoon, Ms. Morton. My name is Bjorg
14  Eikeland, and I represent Shirley Riley in this case.
15  I'm going to ask you some followup questions.
16    A.  Yes.
17    Q.  Okay. On April 19, 2014 which side of the
18  casino did you walk into? And I'm talking prior to the
19  fall incident.
20    A.  We was on the left side.
21    Q.  Did you walk in close to the bar?
22    A.  No.
23    I don't know. I'd have to have something to
24  look at to see.
25    Q.  All right. So from your memory do you

38

1  remember if — let's back up a little bit.
2    There are two entrances to the casino. Do
3  you remember that?
4    A.  Yes.
5    Q.  Okay.
6    A.  The first —
7    Q.  Do you remember — I'm sorry. I didn't hear
8  you.
9    A.  I think — isn't there two on each side or
10  just one side? I don't remember. Because you go in and
11  then you go out the other side.
12    Q.  Right.
13    So you can walk through the casino on the
14  Carnival Dream. Correct?
15    A.  Yes.
16    Q.  Okay. Did you come in from the atrium?
17    A.  Yes.
18    Q.  Okay. Did you come in next to the bar?
19    A.  No. It was the opposite way.
20    Q.  Did you come — okay.
21    Did you come in closer to where the restrooms
22  are?
23    A.  I have no idea where the restrooms were.
24    Q.  Okay. When you sat down to wait for your
25  niece, were you seated close to the restrooms?

39

1    A.  I don't know where the restrooms were. She
2  just was going to go find a restroom.
3    Q.  Your son, John Ezell, he created this — what
4  should I call it, like an illustration of where the two
5  of you were seated at the time of the fall incident. Do
6  you remember that?
7    A.  Yes.
8    Q.  Have you seen it?
9    A.  No.
10    Q.  Okay. So if you'll look at a piece of paper
11  that is in front of you and it's marked Plaintiff's
12  Exhibit 1, if you would take a look at that, please.
13    A.  Okay.
14    Q.  Have you seen this document before?
15    A.  No.
16    Q.  Okay. So your son here is indicating that
17  you are the green circle and that he's the blue circle
18  and you were seated next to each other in the casino.
19  Do you see that —
20    A.  Yes.
21    Q.  — illustrated on Plaintiff's —
22    A.  Yes.
23    Q.  — Exhibit 1?
24    A.  Yeah.
25    Q.  Okay. Does that look right?

40

1    A.  Yes.
2    Q.  Okay. So based on your recollection you were
3  seated next to your son?
4    A.  Yes.
5    Q.  Okay. Now, if you'll look at the piece of
6  paper called Plaintiff's Exhibit 2, this is an
7  enlargement, as you can see, of that same area.
8    A.  Yes.
9    Q.  Do you agree with — do you agree with that?
10    A.  Yes.
11    Q.  And then we have put in numbers on the chairs
12  around the slot machines and marked them one, two, three
13  through ten. Do you see that in the illustration marked
14  Plaintiff's Exhibit 2?
15    A.  Yes.
16    Q.  Okay. Your son testified today that you were
17  sitting in the place marked — or the chair marked No. 1
18  in this illustration marked Plaintiff's Exhibit 2. Does
19  that sound accurate to you?
20    A.  Yes.
21    Q.  Okay. So if you'll look at that illustration
22  marked Plaintiff's Exhibit 2, you were sitting on the
23  end on that chair marked No. 1. Correct?
24    A.  Yes.
25    Q.  Okay. Do you see in this illustration that

**WWW.USLEGALSUPPORT.COM**

---

41

1  right behind you as you're sitting on that chair marked
2  No. 1, there is, like, a box right behind you. Do you
3  see that?
4      A.   Yes.
5      Q.   Like a square.
6          Okay. And then further behind there's an
7  entrance illustrated by the way of an opening. Do you
8  see that?
9      A.   Yes.
10     Q.   Okay. And just to be clear, this is — the
11  seat marked No. 1 on this illustration, Plaintiff's
12  Exhibit 2, is where you were seated at the time of the
13  incident where Shirley Riley fell in the Jackpot Casino
14  in the Carnival Dream. Correct?
15     A.   Yes.
16         MS. EIKELAND: Okay. Now, Madam Court
17  Reporter, can you pull out, or Mr. Kerns, please, the
18  photograph Bates stamped CCL18733-18.
19         MR. KERNS: I'm sorry, Ms. Eikeland. Can you
20  repeat that number?
21         MS. EIKELAND: Yeah. It's a photograph
22  marked Bates stamped 18. So it's 18733-18.
23         MR. KERNS: I don't believe I have Bate
24  stamped numbers on my copies, unless I'm not looking at
25  it correctly.

---

42

1          MS. EIKELAND: Can you — if I hold it up,
2  can you see it? You have produced a Bate stamped and
3  then you produced the better copy which is not Bate
4  stamped.
5          Can you see it? It's — it's the photograph
6  from the casino, and there is — do you see that end
7  chair, the slot machine and there's a lady standing
8  straight up next to Seat No. 1? Do you see that?
9          MR. KERNS: That's a lady? There's a lady
10  sitting —
11         MS. EIKELAND: The lady —
12         MR. KERNS: I'm sorry. Go ahead.
13         MS. EIKELAND: Yeah, there's a lady sitting
14  in the middle of the photo, and then to the right in the
15  photo there's a lady standing.
16         MR. KERNS: And there's a pillar in the
17  middle?
18         MS. EIKELAND: Yes.
19         MR. KERNS: Yes, I have that on — it's
20  not — it's not —
21         MS. EIKELAND: Okay.
22         MR. KERNS: — bate stamped, but I can show
23  that to the witness.
24         MS. EIKELAND: Okay. And then can we have it
25  marked Plaintiff's Exhibit 3, please.

---

43

1          THE COURT REPORTER: Plaintiff's — I'm
2  sorry. Plaintiff's Exhibit what?
3          MS. EIKELAND: Plaintiff's Exhibit 3.
4          THE COURT REPORTER: We have a Plaintiff's
5  Exhibit 3 —
6          MS. EIKELAND: Oh, we do?
7          THE COURT REPORTER: — which is the
8  statement of John Ezell.
9          MS. EIKELAND: Oh, okay. So No. 4 then.
10         I'm sorry about that.
11         (PLAINTIFF'S EXHIBIT NO. 4 WAS MARKED FOR
12  IDENTIFICATION BY THE COURT REPORTER.)
13  BY MS. EIKELAND:
14     Q.   Now, Ms. Riley, does that accurately depict
15  the casino on the Carnival Dream as it was on April 19,
16  2014?
17     A.   Yes.
18     Q.   And if you look to the right in that — to
19  the right in that photo there's a lady standing there.
20  Do you see that?
21     A.   Yes.
22     Q.   Okay. Right next to her there is a seat.
23  That's where you were seated at the time of the subject
24  incident. Correct?
25     A.   Yes.

---

44

1      Q.   Would you do me a favor and just mark an X on
2  that seat to indicate that that is, in fact, where you
3  were seated at the time of the subject incident?
4      A.   (Witness complied.)
5      Q.   Okay. Did you do that?
6      A.   Yes.
7      Q.   Okay. Thank you.
8          Now, at the time of the subject incident you
9  were sitting by the slot machine and you were facing the
10  slot machine. Isn't that correct?
11     A.   Ye— no. I was kind of looking down the —
12  the tile way. I was just looking around.
13     Q.   Okay. Do you remember speaking to the
14  security officer and telling him that while you were
15  playing on the slot machine you noticed Shirley Riley
16  fall?
17         MR. KERNS: Objection, form.
18         THE WITNESS: I wasn't playing the slot
19  machine. I was just sitting there.
20  BY MS. EIKELAND:
21     Q.   Okay. So you do not remember telling the
22  security officer that while you were playing in the
23  casino on one of the slot machines just a few feet away
24  from the accident spot you witnessed Ms. Riley?
25     A.   No.

---

11 (Pages 41 to 44)

45

1    MR. KERNS:  Objection, form.
2    THE WITNESS:  No, I didn't.
3    BY MS. EIKELAND:
4    Q.    Do you remember — you do not remember that?
5    A.    No.
6    Q.    Okay.  You do not — you do not remember
7    telling the security officer that?
8    A.    No.  I didn't tell him that,
9    Q.    Do you remember speaking with me?
10   A.    Yes.
11   Q.    Do you remember telling me that you looked at
12   the slot machine and turned around when you heard the
13   screeching sound?
14   A.    Well, I was looking at a lot of the slot
15   machines, just seeing what was on them, and, yeah, I was
16   sitting there, but I was —
17   Q.    Right.  And you — and you were facing the
18   slot machine, didn't you, and you turned around as you
19   heard the man's voice —
20   MR. KERNS:  Objection —
21   BY MS. EIKELAND:
22   Q.    — correct?
23   MR. KERNS:  Objection, form.
24   THE WITNESS:  I don't remember where I was
25   facing when I heard his voice, but I was — I wasn't

46

1    playing — I wasn't actually looking at the slot
2    machine.  I was just looking at the people around.
3    BY MS. EIKELAND:
4    Q.    Okay.  So today you're testifying that you
5    weren't looking at the slot machine, do you — but when
6    I spoke to you, you had told me that you looked at the
7    slot machine?
8    MR. KERNS:  Objection —
9    THE WITNESS:  Well, I'm sure —
10   MR. KERNS:  Objection, form.
11   Go ahead.
12   THE WITNESS:  I'm sure I did.
13   BY MS. EIKELAND:
14   Q.    Okay.  So is it fair to say that you're not
15   quite sure whether at the time that you heard this sound
16   you were, in fact, looking at the slot machine or if you
17   were looking ahead towards the bar?
18   MR. KERNS:  Objection, form.
19   THE WITNESS:  Because I looked all -- I was
20   just looking all over the room when I was sitting there.
21   BY MS. EIKELAND:
22   Q.    Okay.  Which is the natural thing to do, but
23   is it fair to say that you aren't sure whether you were
24   loo-- looking at the slot machine or were you looking
25   maybe towards the bar at that point where you heard the

47

1    man -- man's voice?
2    MR. KERNS:  Objection, form.
3    BY MS. EIKELAND:
4    Q.    Is that fair to say?
5    A.    Yeah.
6    Q.    Is that a fair statement —
7    A.    Yeah, because I looked all around the room
8    when I was sitting there.
9    Q.    And you could have looked at the slot
10   machine.  Right?
11   A.    Yes.
12   Q.    What kind of chairs were those chairs in
13   front of the slot machines?
14   A.    There was just -- it was just a chair.
15   Q.    All right.  It was not a swivel chair?
16   A.    Yeah.  No.  I thought it was -- it was a
17   swivel chair, but I wasn't paying that much attention.
18   Q.    All right.  Now, prior to you coming sitting
19   here today for your deposition, did you have a chance to
20   speak to your son today?
21   A.    Yes.
22   Q.    Did he tell you about his deposition?
23   A.    He just told me that -- not to go where I was
24   told to go, that that was the wrong place.
25   Q.    Okay.  Did you discuss with him his

48

1    testimony?
2    A.    No.  I just -- he had to give me directions
3    how to get here.
4    Q.    Okay.  And how long did you speak with him
5    for?
6    A.    Just a few minutes because he was back at
7    work.
8    Q.    Okay.  Prior to coming here for deposition
9    today have you had a chance to speak to Mason Kerns, the
10   lawyer for Carnival?
11   A.    Yes.
12   Q.    Okay.  On how many occasions have you spoken?
13   A.    I think just once because he -- u-- usually
14   I'm not home, so he left -- he would leave me a message.
15   Q.    Okay.  Did you speak to him today prior to
16   your deposition?
17   A.    He introduced himself when I came in, or when
18   he came in.
19   Q.    Okay.  How did you get to the -- to the place
20   where you are now sitting for your deposition?
21   A.    I drove.
22   Q.    Did you drive — you drove yourself?
23   A.    Yes.
24   Q.    Have you had any written correspondence with
25   Mason Kerns, the lawyer for Carnival?

12  (Pages 45 to 48)

**49**

1  A.  No.
2  Q.  Have you ever been arrested for a crime?
3  A.  No.
4  Q.  Have you ever been convicted of a crime?
5  A.  No.
6  Q.  Have you ever pled guilty to a crime or a
7  felony?
8  A.  No.
9  Q.  What kind -- do you have prescription
10 glasses?
11 A.  Not -- no.  They're just reading glasses.
12 Q.  Okay.  And they're over-the-counter glasses?
13 A.  Yes.
14 Q.  Okay.  Are you taking any type of medication,
15 ma'am?
16 A.  Yes.
17 Q.  What kind of medication are you currently on?
18 A.  Let's see.  I'm taking vitamins, I'm taking
19 fish oil, I'm taking a high blood pressure pill, and I'm
20 taking a mild heart pill.
21 Q.  Okay.  And what is the name of your blood
22 pressure pill?
23 A.  I have no idea.
24 Q.  Do you have the medication with you by any
25 chance?

**50**

1  A.  No, I don't.
2  Q.  Okay.  And what about the heart medication,
3  do you know the name of your heart medication?
4  A.  No.  I just take the pills.
5  Q.  Okay.  Are you on any other medication other
6  than the heart medication and the blood pressure
7  medication?
8  A.  I take a Zoloft.
9  Q.  And what is that for, ma'am?
10 A.  That's for -- because I take care of a 70-- a
11 70 -- a 46-year-old son, 47-year-old son that is
12 mentally challenged, and I just felt like I needed it.
13 Q.  Understood, ma'am.
14   Is that an antidepressant?
15 A.  Yeah.
16 Q.  And how long have you been on it?
17 A.  For about 15 years, because I had cancer
18 15 years ago.
19 Q.  I'm very sorry to hear that, ma'am.
20   What kind of cancer?
21 A.  Colon cancer.
22 Q.  Are you cancer free today, ma'am?
23 A.  Yes, I am.
24 Q.  I'm glad to hear that.
25   At the time of the cruise where Shirley Riley

**51**

1  fell --
2  THE COURT REPORTER:  I'm -- I'm sorry.
3  BY MS. EIKELAND:
4  Q.  -- (inaudible).
5  THE COURT REPORTER:  I'm sorry.  If you can
6  repeat that, please.
7  BY MS. EIKELAND:
8  Q.  Yes.
9  At the time of the cruise where the fall
10 incident occurred, April 19, 2014, were you on the blood
11 pressure medication, the heart medication and Zoloft?
12 A.  Yes.
13 Q.  Okay.  At the time of this -- I'm going to
14 say the subject incident, and by that I mean the
15 incident involving Ms. Riley.  Okay?
16 A.  Uh-huh.
17 Q.  At the time of the subject incident did you
18 take any sleep medication?
19 A.  No.
20 Q.  Any over-the-counter sleep aid?
21 A.  No.
22 Q.  Okay.  Onboard the ship did you bring a cane?
23 A.  Yes, I did.
24 Q.  Do you have a mobility issue or did you have
25 at the time of the subject cruise?

**52**

1  A.  Yes.  I still have.  I have a knee that needs
2  to be replaced.
3  Q.  Sorry to hear that, ma'am.
4  And is one of the reasons that you brought a
5  cane to prevent yourself from slipping and falling?
6  A.  Yes.  And I've walked -- I walk more on a
7  cruise than I do at home.
8  Q.  Right.
9  And as you can see from this pic-- the photo
10 marked Plaintiff's Exhibit 4, some of the tiles on
11 cruise ships can be pretty shiny and slippery.  Do you
12 agree?
13 A.  Yes.
14 MR. KERNS:  Objection, form.
15 BY MS. EIKELAND:
16 Q.  Okay.  And if they are wet, they're even more
17 slippery.  Correct?
18 MR. KERNS:  Objection, form.
19 THE WITNESS:  I suppose.
20 BY MS. EIKELAND:
21 Q.  And is that your experience from other
22 cruises?
23 A.  Yeah, the floor -- every floor on a ship is
24 different.
25 Q.  Right.  And you've been on the Carnival Dream

**53**

1  several times.  Right?
2      A.   Yes.
3      Q.   And the tile here in the Jackpot Casino as
4  you can see is very shiny.  Are you able to see the
5  lights reflecting in the tile in that photo?
6      MR. KERNS:  Objection, form.
7      THE WITNESS:  Yes.
8  BY MS. EIKELAND:
9      Q.   Okay.  And is it possible for you looking at
10 that photo to determine whether the surface is mat or
11 shiny?
12     Can you look at the photo?  Is it shiny?
13     A.   Yes, it's smooth.  I'd call it smooth.
14     Q.   Right.
15     A.   But I've never had any trouble with my cane
16 in there.  It's just dinner where -- where you eat at is
17 the only place I have trouble.
18     MS. EIKELAND:  Move to strike as
19 nonresponsive.
20     MR. KERNS:  She was completing her answer.
21 BY MS. EIKELAND:
22     Q.   Now, if you look at Plaintiff's Exhibit 4,
23 can you point out to me in this photograph where it was
24 you saw Shirley Riley on the floor after she had fallen?
25     A.   Well, her feet was -- was about right across

**54**

1  from where I was sitting, just -- there was a short area
2  there.  I mean, I could see -- and, of course, her head
3  fell to the front.
4      Q.   So if you wouldn't mind, ma'am, just putting
5  a little cross where you believe her feet were as she
6  was on the floor after she had fallen.
7      A.   Well, I was standing then, so I'm not really
8  positive.
9      Q.   Okay.  So put an F next to it so we
10 understand that's where the feet were.
11     A.   I believe in --
12     Q.   Can you do that for me?
13     A.   -- in this area, yeah.
14     Q.   Okay.  So can you mark it on the photo for
15 me, please?
16     A.   (Witness complied.)
17     Q.   Okay.  And then can you indicate to me as
18 Shirley was laying on the floor where her head would be?
19     A.   It would have to be up here somewhere.
20     Q.   All right.  And can you put an H next to that
21 cross --
22     A.   I don't know what the distance is.
23     Q.   -- so we know.
24     A.   I'm not positive.
25     Q.   Would you put an H next to that mark so we

**55**

1  know that's where the head was?
2      A.   Yes, I did.
3      Q.   Okay.  Thank you.
4      Do you remember testifying that as you -- and
5  correct me if I'm wrong -- that when you heard -- when
6  you heard what you perceived to be Ms. Shirley's
7  companion, when you heard him and you thought he was
8  obnoxious, you turned to see -- to see where the -- the
9  voice was coming from?
10     A.   Yes.
11     Q.   Okay.  So as you are turning your head around
12 to see who in your mind is being obnoxious, you're
13 looking up to see where the voice is coming from.  Isn't
14 that correct?
15     A.   Yes.
16     Q.   Okay.  So at that point you are not looking
17 at Shirley's feet.  Correct?
18     A.   No.
19     Q.   And at the time that you heard this obnoxious
20 voice you did not know whether that was anybody related
21 to or friends or companions of this lady that you later
22 learned to -- that was called Ms. Shirley -- Shirley
23 Riley --
24     MR. KERNS:  Objection --
25 BY MS. EIKELAND:

**56**

1      Q.   -- isn't that true?
2      MR. KERNS:  Objection, form.
3      You -- you can answer.
4  BY MS. EIKELAND:
5      Q.   Is that correct?
6      A.   Repeat that, please.
7      Q.   Okay.  Yeah.  It was kind of clumsy.
8      At the time you heard the noise and you hear
9  this man that you think is obnoxious, you did not know
10 who he was.  Isn't that true?
11     A.   That's true.
12     Q.   And you did not know whether he was
13 Ms. Riley's companion at that time.  Isn't that true?
14     A.   True.
15     Q.   So you're looking up towards him and it's my
16 understanding -- and correct me if I'm wrong -- then you
17 heard the screech.  Correct?
18     A.   Yes, just a second -- just the minute I
19 turned around to look at him I heard the screech and I
20 looked down --
21     Q.   Right.
22     A.   -- because I had heard that screech before.
23     Q.   So at the time you heard the screech you
24 didn't know where the screech is coming from, whose
25 shoes it's coming from.  Is that true?

57

1    A.   That's true.

2    Q.   And isn't it true, ma'am, that you didn't see

3  Shirley lose her footing.  You only saw her fall.  Isn't

4  that true?

5        MR. KERNS:  Objection, form.

6        THE WITNESS:  I heard the screech and she

7  immediately fell.

8  BY MS. EIKELAND:

9    Q.   Right.

10        But isn't it true, ma'am, that you didn't see

11  her lose her footing.  You heard the screech and then

12  you saw her as she was falling.  Isn't that true, ma'am?

13        MR. KERNS:  Objection, form.

14        THE WITNESS:  Yeah, because she didn't lose

15  her footing.  She just stopped and went forward.

16  BY MS. EIKELAND:

17    Q.   We agree you heard the screech.  You saw her

18  fall.  Right?

19    A.   Yes.

20    Q.   You didn't see exactly how it happened.  You

21  just saw the process of her falling.  Isn't that true?

22        MR. KERNS:  Objection, form.

23        THE WITNESS:  I guess -- yes.

24  BY MS. EIKELAND:

25    Q.   Because you weren't looking at her feet.  You

---

58

1  were looking at her coming down.  Right?

2    A.   I -- I was looking at everyone's feet, and

3  then she just toppled over.

4    Q.   Right.

5        And you're looking at everybody's feet but

6  nobody's in particular.  Correct?

7    A.   I just looked when I heard the screech

8  because I had heard that before and it -- from my feet,

9  so I looked down at every-- I just looked down at

10  everybody's feet.

11    Q.   But it happened very fast.  Right?

12    A.   Yes.

13    Q.   It was like a split second --

14    A.   Yes.

15    Q.   -- correct?

16        Have you ever experienced -- so in other

17  words -- I think we agree that you didn't see exactly --

18  you weren't focusing in -- or on Shirley Riley's feet as

19  she was losing her footing.  True?

20        MR. KERNS:  Objection, form.

21        THE WITNESS:  True.  I -- I was not

22  specifically looking at her feet.

23  BY MS. EIKELAND:

24    Q.   Right.

25        Have you ever had the experience where you go

---

59

1  through a wet area or a slick area that's slick and then

2  there's a dry spot and then it's slick again and you

3  slide and then you -- you -- you stumble on the -- on

4  the dry spot?  Have you ever experienced that?

5        MR. KERNS:  Objection, form.

6        THE WITNESS:  No.

7  BY MS. EIKELAND:

8    Q.   No.

9        Have you ever slipped in your own house on

10  water?

11    A.   Yes, because my son spills stuff a lot.

12    Q.   Oh, okay.

13    A.   So I've slipped a lot in my house.  And I

14  have tile floors because I can't have carpet with him.

15    Q.   Right.  Understood.

16        When you get up from your chair and notify

17  the steward about what had happened, was Shirley still

18  on the floor?

19    A.   Yes.

20    Q.   Okay.  Where did you go to within the casino

21  to notify the steward?

22    A.   He was right -- he was up basically by her

23  head, where her head had went down, at the next bunch of

24  slot machines.  He was standing right -- right by the

25  floor between -- by the car-- I don't know if he was on

---

60

1  the carpet or the tile but he was right there.

2    Q.   Okay.  Are you positive that he was a

3  Carnival employee?

4    A.   Oh, yeah.  He had the white uniform and hat

5  and everything on.

6    Q.   Okay.  So as you're walking, you're getting

7  up from your chair and walking towards him, which would

8  be towards the bar in the casino, you have your back

9  turned towards Ms. Riley.  Right?

10    A.   Yes.

11    Q.   Okay.  And then you walk back.  Do you walk

12  back to your seat with the steward or what happened?

13    A.   No.  I stood by him for a while until they

14  took her away.

15    Q.   Okay.  And you were -- while you were

16  standing with him, were you standing approximately where

17  the lady that in Exhibit -- Plaintiff's Exhibit 4 is

18  seated?

19        Do you see that lady with the white sweater?

20    A.   Oh.  It -- it was maybe over a little bit

21  farther.  I don't -- it was in that area.

22    Q.   Okay.  And as you were standing there, your

23  testimony was that you had your back against Ms. Riley

24  at that point --

25    A.   Yes.

61

Q.   – right?

It was not until after she had been taken

away that you actually walk over to the area where you

believe she had fallen to look at the floor.  Is that

correct?

A.   Yes.

Q.   Okay.  So there's a period of time between

when you get up – between the time that you get up from

your seat, walk over to the steward, notify him about

Shirley's fall, stand there speaking with him with your

back against – towards Shirley and up to the time where

you actually go back to the floor to look at it.

Correct?

MR. KERNS:  Objection, form.

THE WITNESS:  I spoke -- when I spoke to

him, when I first spoke to him, my back was to her, but

then I turned around next to him and we was both looking

at -- at her when the wheelchair come -- when they got

there with the wheelchair to put her in it.

BY MS. EIKELAND:

Q.   Okay.  So do you agree with me that for part

of the time between the time you would get up from your

seat to notify him and talk with him until the time you

go back onto the floor, there are – there are portions

of that time period where you do not look at the floor

62

and you have your back against Ms. Riley.  Correct?

A.   For maybe a minute, yeah.  It wasn't very

long because then I turned around --

Q.   Were you look-- I'm sorry.  Go ahead.

A.   I just turned around and was talking to him

next to him, and he was the only -- when they took her

away, he was the only Carnival personnel that was there.

Q.   Okay.  So let's break it down.

So you agree with me that as you get up and

walk towards him, you have your back against Ms. Riley?

A.   Well, she was beside -- I mean, I could see

her from the -- the side.  It wasn't until I go up in

front of him that I turned around and my back was to

her.

Q.   Okay.  So for part of the time you -- you are

not walking backwards keeping an eye on the accident

scene as you're walking --

A.   No --

Q.   -- you walk away from the accident scene.

Right?

A.   Yeah, because she was -- they was waiting.

He was hollering to get somebody there, and she was

hollering she broke her arm.  And I could -- I mean, I

could hear what they was saying, but I knew they wasn't

doing anything.  They was just waiting for the

63

wheelchair to get there.

Q.   And you weren't looking at your watch at that

time, so you don't know if it was exactly one minute

where you had your back against the accident – or the

incident scene or – or whether it was more.  Isn't that

true?

A.   I know it was – it was just a short amount

of time.

Q.   Okay.  So that's how you perceived it but

you – which I respect, but you – you weren't timing

it.  Is that true –

A.   Yeah.

Q.   – is that correct?

A.   Nobody has watches on –

MR. KERNS:  Objection, form.

THE WITNESS:  the ship.

MR. KERNS:  I'm sorry.

BY MS. EIKELAND:

Q.   Did you actually wear a watch?

A.   No.

Q.   Oh, okay.

A.   Nobody has watches on the ship.

Q.   What did you tell the steward?  Did you tell

the steward that it was Shirley's fault?

A.   No.  I just explained to him what I heard and

64

what I seen, just real quick, that -- that she fell on

her -- I -- I said she stuck to the floor and fell

facedown.

And then I turned around, and we was just

sitting there discussing and listening to everything

that was going on.  And then when they took her in the

wheelchair, I told him, I said, if there is something on

the floor, we need to go wipe it up if there is

something on the floor, and he said, yeah.

And we went -- he went with me to the d—

almost right to the door where you come in, and we

looked all in that area and we seen nothing on the floor

except her beads.

Q.   Right.

So -- okay.  So how many people were there

looking --

A.   There was just --

Q.   -- after --

A.   There was just --

Q.   I'm sorry.

A.   Pardon me.

Q.   Let me start over again.

A.   Okay.

Q.   So Shirley is taken away and you walk back on

the walkway to look at the floor.  Is that correct?

16  (Pages 61 to 64)

65

1  A.  Yes.
2  Q.  Okay.  So where did you look?  If you look at
3  that Exhibit 4 where you marked one X for F for feet and
4  one marked for H, where in that area did you look for
5  any substance of any kind?
6  A.  We looked in the whole area plumb up to the
7  door, where you walk -- where you come into the casino.
8  Q.  So what area?  From where you marked H?
9  A.  Well, yeah, the whole length of her -- her
10  body, plumb up to the door.
11  Q.  Okay.  So the whole area H to F in the pic--
12  in the photo?
13  A.  Past -- yeah, past the feet.  Even down
14  farther --
15  Q.  Okay.
16  A.  -- from the feet --
17  Q.  Okay.
18  A.  -- to the head.
19  Q.  How much farther -- how much further down?
20  A.  We actually went plumb to where you walk in
21  the door.
22  Q.  Okay.  And how about across?  Did you walk --
23  did you inspect any --
24  A.  Yeah.  Well, we --
25  Q.  -- the whole walkway across --

66

1  A.  Yeah.
2  Q.  -- the full length?
3  A.  Yes, because we -- and we were also picking
4  up beads when we was doing that.
5  Q.  And how did you inspect it?
6  A.  I just looked, but he kind of got down, and I
7  was looking for a reflection on the floor, because the
8  water leaves -- you know, water leaves a -- a shine or
9  something different, and I didn't see anything.  And he
10  was the only Carnival employee that was there.
11  And then my son came up and he looked on the
12  floor.  And I'm sure the employee even put his hand down
13  on the floor, because we just kind of walked that whole
14  area, and we was picking up beads too as we was doing
15  it.
16  Q.  Okay.  So you -- you looked -- you visually
17  inspected it.  Is that a correct statement?
18  A.  Yes.
19  Q.  Okay.  Were you wearing glasses at the time
20  you inspected it?
21  A.  No.
22  Q.  Okay.  Did you go tile by tile?
23  A.  Well, we just covered the area.
24  Q.  Did you go tile by tile, look at each and
25  every tile?

67

1  A.  I didn't.
2  Q.  All right.  Did you put your hand down to
3  touch and swipe the floor?
4  A.  I didn't.
5  Q.  So you didn't go tile by tile and swipe each
6  and every tile in that area, did you?
7  A.  No.  Huh-uh.  But there was several people,
8  my son for one, that went over and looked too on the
9  floor.
10  Q.  Okay.  I -- I appreciate that, ma'am.  I --
11  right now I'm just interested in you --
12  A.  Yeah.
13  Q.  -- and your observations.
14  All right.  So have you ever seen what this
15  tile looks like --
16  A.  Well, it's dark.
17  Q.  -- when there is water on it?
18  Hello?
19  A.  Pardon me?
20  Q.  I didn't hear.
21  A.  Oh.  I said it's dark.
22  Q.  It's dark?
23  A.  Uh-huh.
24  Q.  Have you ever seen, observed, what this type
25  of tile looks like when it has water on it?

68

1  A.  No, but in -- in the picture there's a lot of
2  lights, and this was in the afternoon and there -- there
3  wasn't that many lights in there reflecting on the floor
4  because it was in the afternoon and there was more
5  daylight in there.
6  Q.  So -- so you looked -- initially looked at
7  the floor or, quote, unquote, checked out the floor and
8  you didn't see any water.  Is that your testimony?
9  A.  Yes.
10  Q.  So if there was a spot of water, you didn't
11  see it.  Is that fair to say?
12  A.  Yes.
13  Q.  You testified that Cheryl -- sorry -- Shirley
14  Riley hollered I broke my arm.  I broke my arm.  Do you
15  remember that testimony?
16  A.  Yes, I do.
17  Q.  What do you mean by holler?
18  A.  Very loud.  She kept a hollering that she
19  broke her arm.  I broke my arm.  Get somebody here.  I
20  broke my arm.
21  Q.  Was she in pain?
22  A.  I presume she was.
23  Q.  Was she panicked?  I'm just trying to -- to
24  understand what kind of -- was it a scream?  Was it a --
25  A.  No.  No.  She wasn't panicked.  The man she

**69**

1  was with was more panicked than she was.
2     Q.   And when you saw her on the floor, you saw
3  her right arm underneath her.  Correct?
4     A.   When she hit the floor, her right arm was at
5  her waist underneath her.
6     Q.   Right.
7          Did she appear to be in agony --
8     A.   No.
9     Q.   -- when -- when -- when she said I broke my
10 arm?
11    A.   No.  She was just hollering I broke my arm.
12 I think I broke my arm.
13    Q.   Do you -- actually sitting here today do you
14 know what kind of injury she sustained in that incident?
15    A.   No.  I have no idea.
16    Q.   Okay.  So she has -- I'm going to represent
17 to you that she has a comminuted fracture of the elbow,
18 which comminuted means that it's broken in three or more
19 pieces.  So her elbow was -- was broken in several
20 pieces.
21         MR. KERNS:  I'm going to move to strike that.
22 The last time --
23         MS. EIKELAND:  Okay.
24 BY MS. EIKELAND:
25    Q.   And I'm telling you because -- I'm telling

**70**

1  you for a reason and then I'm going to come back to it.
2         But -- okay.
3         So she said I broke my arm, I broke my arm,
4  and she was hollering.  Right?
5     A.   Yeah.
6     Q.   Was she still on the floor when she said
7  that?
8     A.   Yes.
9     Q.   Okay.  Did she make any other statements that
10 she kept repeating over and over again?
11    A.   No.
12    Q.   Did she say -- did she keep on saying -- go
13 ahead.
14    A.   Pardon?
15    Q.   Do you remember any other statements that
16 she -- she -- she made or things that she said?
17    A.   No.  He was -- he was hollering for someone
18 to get there to help her.  So I -- I don't remember if
19 she said anything else.
20    Q.   Did she keep saying that she slipped --
21    A.   I don't remember.
22    Q.   Do you remember telling me that when we spoke
23 a couple weeks ago?
24    A.   Yeah.  I -- well, I got it from somewhere.  I
25 read it somewhere, in the letter you sent me I think,

**71**

1  that said she slipped.
2     Q.   Well, the letter was sent to you after -- oh,
3  was just sent to you before we spoke, but you said
4  several times in our conversation that she kept on
5  saying she slipped.  Do you recall that?
6     A.   No.  She didn't say it.  One of the -- the
7  guys that came to take my deposition said that she had
8  slipped.
9     Q.   Oh.  You mean one of the Carnival people?
10    A.   Yeah.
11    Q.   Okay.  So do you -- do you have any
12 recollection of saying to me it happened so fast --
13 quote, it happened so fast.  She kept on saying she
14 slipped on something.  Do you remember that?
15        MR. KERNS:  Form.
16        THE WITNESS:  No, I don't remember saying
17 that.
18 BY MS. EIKELAND:
19    Q.   Okay.  You testified that there was some
20 people that came over to Shirley after she fell.  Do you
21 remember that statement?
22    A.   Yes.
23    Q.   Okay.  How many -- was -- first of all, was
24 Shirley still on the floor when people came over?
25    A.   Well, the -- the group that she was with just

**72**

1  kind of all gathered around her, and she was still on
2  the floor.
3     Q.   Okay.  You specifically mentioned two people
4  that came over, one with a business card and another
5  person with, like, a note.  Do you remember that
6  testimony?
7     A.   Yes.  I don't remember if they give them to
8  her or to him because he was standing right -- he was
9  standing right by her.
10    Q.   Okay.  Did they -- first of all, were these
11 two individuals passengers?
12    A.   Yes.
13    Q.   Okay.  And did they come over when Ms. Riley
14 was still on the floor?
15    A.   I -- I believe she had started to -- to sit
16 up then.
17    Q.   Okay.  And by the way, somebody helped her
18 sit up.  Isn't that correct?
19    A.   That's when my back was to her.  When --
20 when -- when I had turned back around, she -- she was
21 already in a sitting position.
22    Q.   Okay.  Did you observe anybody roll her over
23 on her back prior to her sitting up?
24    A.   No.
25    Q.   Okay.  Did you actually watch them put her in

18  (Pages 69 to 72)

73

```
1    the wheelchair?
2        A.   No.
3        Q.   Okay.
4        A.   There was too many people.
5        Q.   So anyway, back to the people that came over.
6    So the two passengers that came over, you believe that
7    they came over after Shirley was seated in the
8    wheelchair?
9        A.   No.  No.  She was still on the floor.
10       Q.   All right.  And there were two passengers.
11   Right?
12       A.   Yeah.
13       Q.   Okay.  What gender were they, man, woman, two
14   women, two men?
15       A.   The first one was a -- a woman and the second
16   one --
17       Q.   And -- go ahead.
18       A.   I believe the second --
19       Q.   Go ahead, ma'am.
20       A.   I believe the second one was a man.  Now, I
21   didn't actually see him hand anything.  I just presumed
22   that he did because he walked over to them and he didn't
23   know them.
24       Q.   So you didn't actually see him hand anything
25   to Shirley Riley?
```

74

```
1        A.   No, but I seen the -- the first lady that
2    went.  I mean, it was pretty obvious that she --
3        Q.   Okay.
4        A.   -- handed her a card.
5        Q.   And did she hand it --
6        A.   Or to him or -- the -- the guy she was with I
7    believe is who they hand-- they handed it to.
8        Q.   Okay.  So it wasn't just Shirley.  It was
9    to --
10       A.   Well, there was --
11       Q.   -- the companion?
12       A.   Yeah.  Well, there was people standing
13   around, and I seen them hand but I didn't see who
14   reached up and took it.
15       Q.   Okay.  And what did the female passenger hand
16   to the companion?  Was it a piece of paper or a business
17   card?
18       A.   I don't know.  It looked like a business
19   card.
20       Q.   Could it have been a piece of paper?
21       A.   It could have been.
22       Q.   Okay.  Do you know the name of that woman?
23       A.   No.
24       Q.   Did you speak to that woman?
25       A.   No.
```

75

```
1        Q.   Did you ever ask that woman what she gave to
2    Ms. Riley's companion?
3        A.   No.  She just walked on through the bar and
4    that was the end of it.
5        Q.   Okay.  And so you never asked that female
6    passenger why she handed it to Ms. Riley's companion
7    either.  Is that correct?
8        A.   Right.
9        Q.   But you made your own conclusions, isn't that
10   true, as to the reason why she handed Shirley Riley's
11   companion a piece of paper.  True?
12       A.   True.
13       Q.   Did you at any point in time speak to
14   Ms. Riley either -- strike that.
15            Did you at any point in time speak to
16   Ms. Riley prior to the fall incident?
17       A.   No.
18       Q.   Did you speak to Ms. Riley at any point when
19   she was still on the floor?
20       A.   No.
21       Q.   Did you at any point after you saw her fall
22   on the floor laying there facedown go over to her and
23   say are you okay, ma'am?
24       A.   No.  Because there was so many people around
25   there.  I couldn't have got to her.
```

76

```
1        Q.   Okay.  Did you at any point in time go over
2    and ask her while she was still laying on the floor is
3    there anything I can do for you, ma'am?
4        A.   No.
5        Q.   Did you at any point in time while she --
6    strike that.
7            Did you at any point in time after Shirley
8    had fallen go over to her companion or her group to
9    offer -- to be of assistance?
10       A.   No.
11       Q.   Did you at any point in time after the fall
12   incident speak with Shirley Riley about what had
13   happened?
14       A.   No.
15       Q.   So you never asked Ms. Riley why did you fall
16   or how did you fall.  Isn't that true?
17       A.   Yes.
18       Q.   Did you ask her companion after it had
19   happened how did it happen or why did it happen?
20       A.   No, I didn't get a chance because they took
21   her in a wheelchair and they was gone.
22       Q.   Okay.  So this happened on April 19th, 2014
23   and the following day the cruise was over.  Is that
24   true?
25       A.   I don't remember.  I think it went to the
```

19  (Pages 73 to 76)

77

1    15th, yeah.
2        Q.   So after this happened and for the remainder
3    of the cruise you never spoke to either of them.  Is
4    that correct?
5        A.   That's right.
6        Q.   Okay.  About how many people came over to
7    Ms. Riley as she was laying down on the floor after she
8    had fallen?
9        A.   The people that was in her group.  There was
10   I don't know how many, five, six.
11       Q.   Did other passengers in the casino come over
12   to -- to either, you know, see what was going on or --
13   or offer to help?
14       A.   No.  Nobody offered to help.  There was
15   people standing watching.
16       Q.   And about how many people?
17       A.   I have no idea.
18       Q.   With regard to the time between the time that
19   she falls down on the floor and then until the time that
20   she's taken away in the wheelchair, you made a
21   prediction as to how much time transpired between the
22   two events.  Do you remember that?
23       A.   Uh-huh.
24       Q.   And I don't remember right now how much time
25   you -- you said it was, but do you remember how much you

78

1    believed it was or what your -- what your testimony was?
2        A.   I don't remember.  I -- probably about five,
3    six minutes.  Something like that.
4        Q.   All right.  And again, that would be a rough
5    estimate.  Isn't that correct?
6        A.   Yes.
7        Q.   Because you weren't -- you didn't wear a
8    watch.  Right?
9        A.   Right.
10       Q.   And you weren't timing it --
11       A.   No.
12       Q.   -- right?
13            Do you know the name of the steward that you
14   spoke to in the casino after Shirley fell?
15       A.   No.
16       Q.   So I understand from your testimony that
17   you -- you -- hang on one second.  Strike that.
18            I take it from your testimony that you don't
19   like lawsuits.  Is that a fair statement?
20       A.   Well, I don't think anybody does.
21       Q.   I'm asking about your opinion, ma'am.
22            You don't like lawsuits.  Is that correct?
23       A.   It depends on what happened whether I like it
24   or not.
25       Q.   Okay.  But you don't have anything against

79

1    Shirley Riley, do you?
2        A.   No.  I couldn't even tell you what she looked
3    like today.
4        Q.   All right.  Is it your testimony, ma'am, that
5    you told the steward that it was her own fault?
6        A.   Yes, probably, because that's -- that's why I
7    went and talked to him.
8        Q.   Right.
9            And you went to talk to him before you had
10   inspected the floor.  Isn't that correct?
11       A.   Yep.
12       Q.   Okay.  So you told him that it was her own
13   fault before you had even looked at the -- before you --
14   you -- strike that.
15            You went over to the steward and told him
16   that it was her own fault and that happened before you
17   and the steward went over to the area where she fell
18   after she had been taken away.  Isn't that true?
19            MR. KERNS:  Objection, form.
20            THE WITNESS:  Actually I told him I thought
21   it was her own fault from my experiences.
22   BY MS. EIKELAND:
23       Q.   Okay.  But you weren't exactly sure.  Is that
24   what you're saying?
25       A.   That's right.  I just heard the squeak and

80

1    seen the fall and . . .
2        Q.   Right.  And you just wanted to notify him and
3    you would leave it to Carnival to investigate what
4    exactly happened.  Isn't that accurate?
5        A.   Yeah, that's right.
6        Q.   Because you're not trying to pass judgment on
7    Ms. Riley.  Is that correct?
8        A.   That's right.
9        Q.   And sitting here today, ma'am, you're not
10   saying that you are sure that it was her fault.  Is that
11   true?
12       A.   That's true.
13       Q.   And do you agree that that is not for you to
14   determine?
15       A.   Yes.
16       Q.   All you can do as a witness is to testify
17   about what you observed with your eyes and what you
18   heard and what you touched and what you -- what you
19   perceived with your senses.  Is that correct?
20            MR. KERNS:  Object--
21            THE WITNESS:  Yes.
22            MR. KERNS:  Objection, form.
23   BY MS. EIKELAND:
24       Q.   And the same thing goes for causation, isn't
25   that correct, ma'am?

81

1   MR. KERNS: Objection, form.
2   BY MS. EIKELAND:
3       Q.   That you're not here to testify about the
4   causation in this case. You're only here to testify
5   about what you observed and heard and saw that day in
6   the casino on the Carnival Dream. Isn't that true?
7       MR. KERNS: Objection, form.
8       THE WITNESS: Yes.
9   BY MS. EIKELAND:
10      Q.   Are you a VIFP member of Carnival? Are you a
11  member of a club, like a VIFP program?
12      A.   I don't know.
13      Q.   Are you familiar with a VIFP club? It's a --
14  it's a club that you are part of if you're a frequent
15  cruiser.
16      A.   I have a gold card if that's what you mean.
17      Q.   Yeah. Thank you. That's -- that's kind of
18  what I was trying to -- to get to.
19      So okay. You have a gold card, and you have
20  been on -- was it six cruises?
21      A.   I thinks so, yeah.
22      Q.   Okay. And Carnival is the only cruise line
23  that you cruise with. Is that correct?
24      A.   Yes.
25      Q.   Okay. Remember I asked you about Shirley

82

1   Riley's injury from the fall incident?
2       A.   Yes.
3       Q.   Okay. Do you agree that Shirley Riley didn't
4   fake an accident to break her elbow into multiple
5   pieces?
6       MR. KERNS: Objection, form.
7       THE WITNESS: No.
8   BY MS. EIKELAND:
9       Q.   You don't -- you don't suspect her of having
10  faked the accident, do you?
11      MR. KERNS: Objection, form.
12      THE WITNESS: Well, when I first did my
13  deposition, I thought it was her right arm that was
14  hurt, and the steward said no. She said it's her left
15  arm. So that -- that confused me.
16  BY MS. EIKELAND:
17      Q.   Right. But she never told you it was her
18  left arm, did she?
19      A.   No. I figured it was her right arm because
20  that is what was under her. But her elbow was showing.
21  Her elbow wasn't under her. Her arm was under her. Her
22  elbow was out -- out to where -- I could see her elbow.
23      Q.   Right. So it was her right arm that was
24  underneath her body. Isn't that true?
25      A.   Yes.

83

1       Q.   All right. So you suspected the right arm to
2   be the injured arm. Correct?
3       MR. KERNS: Objection, form.
4       THE WITNESS: When she broke her arm, I
5   immediately --
6   BY MS. EIKELAND:
7       Q.   Right.
8       A.   -- thought it was her right arm because it --
9   it was -- it was at her waist underneath -- underneath
10  her at her waist.
11      Q.   Right. And --
12      A.   But I could -- I could see her whole elbow.
13  It was -- it was out from under her body to the side,
14  and that's -- but the other arm, I didn't see where it
15  was at, and that's why when I put on the statement the
16  right arm -- I mean, I started to put the right arm, and
17  one of the -- the guys that come for the deposition said
18  that she said it was her left arm, so I wrote -- I wrote
19  down left arm.
20      Q.   Actually in the statement it says your right
21  elbow.
22      A.   I don't --
23      MR. KERNS: Objection, form.
24  BY MS. EIKELAND:
25      Q.   So I think --

84

1       A.   I said -- yeah. Yeah. Because I thought I
2   wrote down the -- the left arm because that's what he
3   said that she said.
4       MR. KERNS: Ms. Eikeland, will you allow
5   her -- will you allow her to look at her statement?
6       MS. EIKELAND: Yeah, yeah, yeah.
7       MR. KERNS: Do you have it currently? I'm
8   sorry.
9       THE WITNESS: Huh-uh. No. I think you --
10      MR. KERNS: Maybe I have it.
11      THE WITNESS: -- you took it.
12      MR. KERNS: I stole it. Here it is. Here
13  you are.
14      THE WITNESS: I don't -- I don't remember. I
15  think they -- maybe they told us that. I don't know.
16  But her right arm was what I thought she broke, which I
17  didn't know, you know, one way or the other.
18  BY MS. EIKELAND:
19      Q.   Okay. So -- so from what you saw you
20  suspected the right arm to be the injured arm. Right?
21      A.   Yeah. Yes.
22      Q.   All right. And Ms. Riley never told you
23  anything else. Is that correct?
24      A.   That's right.
25      Q.   All right. And what -- did you ever observe

21 (Pages 81 to 84)

85

her holding her arm?

A. She was holding kind of both of them, one with the other. So I didn't -- I didn't have any idea.

Q. Okay. So whoever said -- the person that said it was the left arm, that was one of the Carnival employees, wasn't it?

A. Yeah, he said she said the left arm.

MS. EIKELAND: Okay. All right. So I think that there lies the confusion. I don't know if it does, but . . .

Okay. I -- I think that's it for me. If Mr. Kerns, Carnival's lawyer, has some followup questions, I reserve the right to do a recross. Other than that, I -- I don't think I have any other questions for you --

MR. KERNS: Briefly I --

MS. EIKELAND: -- Ms. Morton.

MR. KERNS: I'm sorry.

Briefly I do have some followup questions.

REDIRECT EXAMINATION

BY MR. KERNS:

Q. Ms. Morton, you indicated you've been on about six cruises. How many different ships did that entail?

A. Just the Triumph and the Dream.

86

Q. And --

A. We go on whoever is going out -- out of New Orleans because it's close. We can drive there.

Q. Understood.

Are the -- are all of the floors on the cruise ship the same kind of floor?

A. No.

Q. Are there -- is tile flooring on a lot of the different decks of the cruise ships?

A. Yes.

Q. Is all of the tile flooring the same?

A. No.

Q. In your experience on the two ships have you -- have you seen many different types of tile floors?

A. Yes.

Q. Now, the photo that is marked as Plaintiff's Exhibit 4 in front of you, that depicts the tile floor of the Jackpot Casino in the Carnival Dream. Correct?

A. Uh-huh. Yes.

Q. The reflectiveness that appears in that photograph, is that how it actually appears when you look at it not through a lens or anything but when you're just looking at it in the casino?

MS. EIKELAND: Objection, form.

87

THE WITNESS: No.

BY MR. KERNS:

Q. And can you -- can you explain why you said no?

A. Well, late at night when all of the lights is shining it looks like this, but this was in the afternoon and there -- there was more sunlight, you know, coming in through the windows, and it wasn't -- there wasn't that many people in there playing the slots. So it was more of a -- you know, just a tile floor. It was a smooth tile floor.

Q. In terms of reflectiveness, how does that tile floor compare to other tile floors that you've seen on different areas of the Carnival Dream and on areas of the Carnival Triumph?

MS. EIKELAND: Objection, form, lack of foundation.

THE WITNESS: I don't remember the Triumph. Those -- those -- those were the first cruises I took. So the last three has been on the Dream --

BY MR. KERNS:

Q. Well --

A. -- so . . .

Q. -- in terms of other -- between that floor of the Jackpot Casino in the Dream and other tile floors on

88

the Dream, are any -- do you notice that some floors that are tiled are more reflective than others? Are they all pretty much the same? Is that more reflective or less reflective than other -- other floors? Do you have any idea?

A. Yeah, the --

MS. EIKELAND: Objection, form.

THE WITNESS: The res-- where the food, the restaurant is at, where they're at, it's a duller but it's a slicker floor, because I have to walk through there without my cane because my cane slides across the floor. But the floor in here is -- it's not slick at all.

BY MR. KERNS:

Q. And aside from cruise ships are -- have you had experience with any other tile floors?

A. At home.

Q. All right. And how about anywhere else other than home and in cruise ships?

A. Just every day, you know.

Q. I guess what I'm getting at is, do you believe that the tile floor on -- on the Jackpot Casino -- I'm sorry -- in the Jackpot Casino of the Carnival Dream is -- in some way would hide a substance like water better than your average tile floor?

22  (Pages 85 to 88)

**89**

1    A.   No.  I --
2         MS. EIKELAND:  Objection, form.
3    BY MR. KERNS:
4    Q.   You can answer.
5    A.   Yeah.  No.  I -- I mean, because when I was
6    looking at the floor, there was nothing on it.  You can
7    tell.
8    Q.   And have you ever had water spilled on your
9    tile floors at home?
10   A.   Yes.  My son spills everything.
11   Q.   And -- and why is that?
12   A.   Because he's -- he's autistic.  He's got
13   Cerebral Palsy.
14   Q.   Do you ever have any trouble seeing liquids
15   on the floors of your tile floors at home?
16   A.   No.
17        MS. EIKELAND:  Form.
18   BY MR. KERNS:
19   Q.   Now, do you think that when you had your back
20   turned to Ms. Riley as she was on the ground, that a
21   Carnival employee or someone else saw some sort of
22   liquid and -- and cleaned it up?
23   A.   No.
24        MS. EIKELAND:  Objection, form.
25   BY MR. KERNS:

**90**

1    Q.   And -- and why do you not believe that?
2    A.   Well, because the one I was talking to was
3    the only one I seen in there, other than there was one
4    where she was at next to her boyfriend.  There was no
5    other ones in there.
6    Q.   Did the one -- did either of the two Carnival
7    employees who were in there have a -- a towel in their
8    hand?
9    A.   No.
10   Q.   Did either of them have a mop?
11   A.   No.
12        MS. EIKELAND:  Objection, form.
13   BY MR. KERNS:
14   Q.   Did either of them have any Bounty paper
15   towels?
16   A.   No.
17   Q.   Did either of them --
18        MS. EIKELAND:  Form.
19   BY MR. KERNS:
20   Q.   -- have anything in their hands that you
21   could see that would be used to clean up liquids?
22   A.   No.
23        MS. EIKELAND:  Objection, form.
24        THE WITNESS:  Because I had mentally thought
25   where are we going to get something if there is water on

**91**

1    the floor.
2    BY MR. KERNS:
3    Q.   Now, did you receive a let-- a letter from
4    counsel for Ms. Riley in this case?
5    A.   Yes.
6    Q.   Okay.  What did that letter state, do you
7    remember?
8    A.   That they wanted to speak to me on the phone.
9    Q.   Did the letter state that -- what -- what did
10   the letter state to the best that you can remember
11   about --
12   A.   Well, it was very short, but I do remember it
13   said that she had --
14        MS. EIKELAND:  Objection, form.
15        THE WITNESS:  -- slipped on the floor.
16   BY MR. KERNS:
17   Q.   Okay.  So the letter told you that she had
18   slipped on the floor?
19   A.   Uh-huh.
20        MS. EIKELAND:  Form.
21   BY MR. KERNS:
22   Q.   But that's -- that's not how you remember it?
23   A.   No.
24        MS. EIKELAND:  Objection, form.
25   BY MR. KERNS:

**92**

1    Q.   Now, Ms. Eikeland asked you whether or not
2    you believed Ms. Riley was, quote, faking her injury.
3         My question for you is, could someone be at
4    fault for their own injury even though they're not
5    faking it?
6    A.   Yes.
7    Q.   And earlier when you -- just to clarify, when
8    you said -- you know, when you gave your deposition to
9    the Carnival employees, did you mean -- what did you
10   mean by that?
11   A.   Well, they came later on that evening and
12   asked me to -- while it was still kind of fresh in my
13   head -- well, I hadn't even thought about it because I
14   didn't think anything would become of it.
15        And that's when my eye-- I was -- didn't have
16   my glasses because I don't wear them but when I read,
17   and they wanted me to make a statement.  And that's --
18   that's when they said her left hand -- her -- her left
19   arm, and -- and I -- I just had thought it was the
20   right, because that was -- that's the one that was under
21   her.
22   Q.   Uh-huh.
23        With regard to the -- to the rest of your
24   statement, is anything else in the statement someone
25   else's words or recollection?

93

1    A.   Yes. I --
2         MS. EIKELAND: Objection, form.
3         THE WITNESS: I don't remember me telling my
4    niece -- how would I know her elbow was crushed. I had
5    no idea. I didn't even think it was her elbow. I
6    thought it was her -- her arm because this -- it was --
7    she fell just like this. The arm was under. The elbow
8    was out -- out to the side, I don't know where that
9    come from.
10   BY MR. KERNS:
11   Q.   Did you -- in order to tell -- in order to
12   explain today what you observed onboard the ship inside
13   the casino, did you need to -- look at a statement?
14   A.   No. I remember what I seen and what -- you
15   know, what I said.
16   Q.   When you -- when I spoke with you a few
17   months ago -- do you remember that?
18   A.   Yeah.
19   Q.   Okay. At that -- at that time did you have
20   any statement in front of you when you spoke to me?
21   A.   No. I was just going off of memory.
22   Q.   And did you remember that you had even given
23   a statement at that time?
24   A.   To who? I mean, on the ship?
25   Q.   Yeah, on the ship.

94

1    A.   Yeah.
2    Q.   Okay. All right. And earlier when you were
3    talking about when you -- when the Carnival employees
4    came and got you and asked you what happened, that's
5    what you were referring to as -- as the deposition.
6    Right?
7    A.   Yeah.
8         MR. KERNS: Okay. All right. I want to
9    thank you for giving myself and Ms. Eikeland your time.
10   Ms. Eikeland may have more questions for you but I --
11   but I do not.
12        MS. EIKELAND: No. I'm actually good. Thank
13   you.
14        And thank you so much for your time. Good
15   luck with everything, Ms. Morton.
16        THE WITNESS: You're welcome.
17        MR. KERNS: All right.
18        THE COURT REPORTER: Signature.
19        MR. KERNS: Yes.
20        Ms. Morton, you have the right to read a copy
21   of the deposition transcript, which is just basically
22   the questions that I asked and Ms. Eikeland asked and
23   your answers written down on a -- in a little booklet.
24   You have a chance to read that for -- to ensure the
25   accuracy of it.

95

1         Would you like us to reserve your right to do
2    that, so that if there is anything wrong, you can make
3    the correction?
4         THE WITNESS: It doesn't matter.
5         MR. KERNS: Okay. If it's -- if it's all the
6    same to you, I'd rather have it be accurate, so I'd --
7    I'd like to reserve that right.
8         THE WITNESS: Okay. That's --
9         MR. KERNS: Unless --
10        THE WITNESS: That's fine.
11        MR. KERNS: Unless counsel for Plaintiff
12   objects.
13        MS. EIKELAND: I'm sorry?
14        MR. KERNS: I -- she indicated that she
15   didn't really care either way whether we reserved her
16   right to read a copy of the deposition transcript. I
17   said, you know, I'd just as soon it be accurate, and
18   unless you objected --
19        MS. EIKELAND: Okay.
20        MR. KERNS: Okay.
21        MS. EIKELAND: No, no, no. I don't -- I
22   don't object.
23        MR. KERNS: I didn't think so.
24        All right. We'll reserve the right to read.
25        THE COURT REPORTER: The same order as the

96

1    last transcript?
2         MR. KERNS: The same order as --
3         MS. EIKELAND: Yeah.
4         MR. KERNS: -- the John Ezell deposition.
5         MS. EIKELAND: Yes.
6         VIDEOGRAPHER YENCARELLI: Okay. That
7    concludes the deposition. We are off the record. The
8    time is 3:16 p.m.
9         WHEREIN, the deposition concluded at
10   3:16 p.m.
11        (OBTAIN SIGNATURE; WAIVE PRESENTMENT.)

97

CERTIFICATE OF REPORTER

I, Patricia A. Stewart, CCR, a Certified
Court Reporter in the State of Missouri, do hereby
certify that the witness whose testimony appears in the
foregoing deposition was duly sworn by me; that the
testimony of said witness was taken by me to the best of
my ability and thereafter reduced to typewriting under
my direction; that I am neither counsel for, related to,
nor employed by any of the parties to the action in
which this deposition was taken, and further that I am
not a relative or employee of any attorney or counsel
employed by the parties thereto, nor financially or
otherwise interested in the outcome of the action.

_____

Patricia A. Stewart
CCR 401

---

98

STATE OF _____)
COUNTY OF _____)
I, SANDRA MORTON, do hereby certify:
    That I have read the foregoing deposition;
    That I have made such changes in form and/or
substance to the within deposition as might be
necessary to render the same true and correct;
    That having made such changes thereon, I
hereby subscribe my name to the deposition.
    I declare under penalty of perjury that the
foregoing is true and correct.
    Executed this _____ day of _____,
2015, at _____.

_____
    Notary Public

My commission expires: _____

_____
        SANDRA MORTON

Signature page to Sandra Morton

PAS/SANDRA MORTON/07-07-2015

Shirley Riley vs. Carnival Corporation, d/b/a Carnival
Cruise Lines, in personam

---

99

WITNESS ERRATA SHEET

Witness Name:  SANDRA MORTON

Case Name:  Shirley Riley vs. Carnival Corporation,
        d/b/a Carnival Cruise Lines, in personam

Date Taken:  07-07-2015

Page #_____ Line #_____
Should read: _____
Reason for change: _____
Page #_____ Line #_____
Should read: _____
Reason for change: _____
Page #_____ Line #_____
Should read: _____
Reason for change: _____
Page #_____ Line #_____
Should read: _____
Reason for change: _____
Page #_____ Line #_____
Should read: _____
Reason for change: _____
Page #_____ Line #_____
Should read: _____
Reason for change: _____
Witness signature: _____

25  (Pages 97 to 99)